## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREATER NEW ORLEANS FAIR HOUSING
ACTION CENTER, *et al.*,

               Plaintiffs,

    v.                                 No. 1:08-cv-1938-HHK

UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT, *et al.*,

               Defendants.

## PLAINTIFFS' MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

       Plaintiffs Greater New Orleans Fair Housing Action Center, *et al.*, respectfully submit this memorandum of law in support of their motion for a temporary restraining order and a preliminary injunction against the Executive Director of the Louisiana Recovery Authority ("LRA"), or the administrator of any successor to the LRA.

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

PROCEDURAL BACKGROUND........................................................................................ 2

FACTUAL BACKGROUND ............................................................................................... 3

      A.     Congress Responded to Hurricanes Katrina and Rita by Funding the
            Largest Emergency Housing Program in American History, and Required
            States Spending the Funds to Follow Federal Non-Discrimination and Fair
            Housing Requirements.......................................................................................... 3

      B.     Louisiana Has Spent Approximately $11 Billion of the Recovery Funds on
            the Road Home Program to Assist Homeowners With Repairing and
            Rebuilding Their Homes, But Applies a HUD-Approved Formula That
            Adversely Impacts African American Homeowners ............................................ 5

      C.     The Road Home Program Grant Formula Has Had a Disparate Impact on
            African American Home Owners ......................................................................... 8

      D.     The LRA Executive Director Admits That the Road Home Grant Formula
            Has Adversely Affected African American Homeowners................................... 15

      E.     More than $500 Million in Road Home Monies Are Needed to Fund the
            Road Home Grants Recalculated Through Use of a Non-Discriminatory
            Formula .............................................................................................................. 16

      F.     LRA Has Announced Plans That, in the Near Future, Would Deprive the
            Plaintiffs of Their Ability to Obtain Equitable Relief in This Action ................. 17

STANDARD OF REVIEW ................................................................................................ 21

SUMMARY OF ARGUMENT .......................................................................................... 23

ARGUMENT ...................................................................................................................... 24

     The Plaintiffs Are Entitled to a Temporary Restraining Order and Preliminary Injunction
     Barring the Executive Director of LRA or a Successor From Obligating and/or Spending
     Any Funds Available for Relief in This Action, or Seeking From HUD the Further
     Obligation and/or Disbursement of Any Such Funds

      A.     The Plaintiffs Have a Substantial Likelihood of Success on the Merits.............. 24

      B.     Absent an Order Freezing the Assets Available to Satisfy the Equitable
            Relief the Plaintiffs Seek in This Action Until the Merits of This Action
            Can be Adjudicated, the Plaintiffs Will Be Irreparably Harmed ....................... 30

      C.     A Preliminary Injunction Will Not Substantially Harm the Defendants or
            Other Interested Parties...................................................................................... 37

      D.     The Public Interest Unequivocally Favors Injunctive Relief.............................. 40

CONCLUSION................................................................................................................... 43

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                                                    PAGE(S)

*2922 Sherman Ave. Tenants Assoc. v. District of Columbia*,
    444 F.3d 673 (D.C. Cir. 2006) ..................................................................................25

*Ambach v. Bell*,
    686 F.2d 974 (D.C. Cir. 1982) ..................................................................................31

*Brown v. Artery Org., Inc.*,
    654 F. Supp. 1106 (D.D.C. 1987) .................................................................40, 41, 42

*Brown v. Artery Org., Inc.*,
    691 F. Supp. 1459 (D.D.C. 1987) ..............................................................................40

*CFTC v. Next Fin. Servs. Unlimited, Inc.*,
    No. 04-80562, 2005 U.S. Dist. LEXIS 38965 (S.D. Fla. June 7, 2005) .................35

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ......................................................................21, 22, 30

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ............................................................................. 22-23

*City of Houston v. HUD*,
    24 F.3d 1421 (D.C. Cir. 1994) ......................................................................31, 32, 37

*Cook v. Billington*,
    No. 82-0400, 1988 WL 35364 (D.D.C. Mar. 31, 1988) ...........................................40

*Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*,
    417 F.3d 898 (8th Cir. 2005) ...................................................................................25

*Deckert v. Independence Shares Corp.*,
    311 U.S. 282 (1940) .................................................................................................33

*Davenport v. Int'l Bhd. of Teamsters*,
    166 F.3d 356 (D.C. Cir. 1999) .................................................................................22

*Ellipso, Inc., v. Mann*,
    480 F.3d 1153 (D.C. Cir. 2007) ......................................................................... 32-34

*Ex Parte Young*,
    209 U.S. 123 (1908) ...................................................................................................3

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*,
    316 F.3d 357 (2d Cir. 2003) ........................................................................25, 26, 29

*FOP Library of Cong. Labor Comm. v. Library of Cong.,
   639 F. Supp. 2d 20 (D.D.C. 2009) ............................................................22, 30, 31

Freeman v. Cavazos,
   756 F. Supp. 1 (D.D.C. 1990) ...............................................................................32

Gamble v. City of Escondido,
   104 F.3d 300 (9th Cir. 1997) ................................................................................25

Gresham v. Windrush Partners, Ltd.,
   730 F.2d 1417 (11th Cir. 1984) ............................................................................30

Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,
   527 U.S. 308 (1999) ..............................................................................................33

Harris County, Tex. v. Gist,
   976 F. Supp. 601 (S.D. Tex. 1996) .......................................................................37

*Huntington Branch, NAACP v. Town of Huntington,
   844 F.2d 926 (2d Cir. 1988).......................................................................... 24-25, 29

Indian Path Med. Ctr. v. Leavitt,
   No. 04-01000 (HHK), 2006 WL 1663453 (D. D.C. June 9, 2006) ......................32

Jasperson v. Fed. Bureau of Prisons,
   460 F. Supp. 2d 76 (D.D.C. 2006) ..................................................................22, 37

Langlois v. Abington Hous. Auth.,
   207 F.3d 43 (1st Cir. 2000) ...................................................................................25

Leitner v. United States,
   679 F. Supp. 2d 37 (D.D.C. 2010) ........................................................................22

Metropolitan Housing Development Corporation v. Village of Arlington Heights,
   558 F.2d 1283 (7th Cir. 1977) ..............................................................................25

Meyer v. Holley,
   537 U.S. 280, 290 (2003)  .....................................................................................40

Monument Realty LLC v. Wash. Metro. Area Transit Auth.,
   540 F. Supp. 2d 66 (D.D.C. 2008) ........................................................................37

Nat'l Fair Housing Alliance v. The Prudential Ins. Co. of Am.,
   208 F. Supp. 2d 46 (D.D.C. 2002) ........................................................................24

Pan Am Flight 73 Liaison Group v. Dave,
   No. 10-0077 JDB, 2010 U.S. Dist. LEXIS 46623 (D.D.C. May 12, 2010)............34

*PCTV Gold, Inc. v. SpeedNet, LLC*,
  508 F.3d 1137 (8th Cir. 2007) ...................................................................37

*Pelfresne v. Village of Williams Bay*,
  865 F.2d 877 (7th Cir. 1989) .....................................................................36

*Pfaff v. HUD*,
  88 F.3d 739 (9th Cir. 1996) .......................................................................25

*\*Population Inst. v. McPherson*,
  797 F.2d 1062 (D.C. Cir. 1986) .......................................................31, 32, 41

*Price v. Pelka*,
  690 F.2d 98 (6th Cir. 1982) ...................................................................40-41

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
  251 F.3d 814 (9th Cir. 2001) .....................................................................31

*South Camden Citizens in Action v. N.J. Dep't of Env. Prot.*,
  145 F. Supp. 2d 446 (D.N.J. 2001) ............................................................41

*Trafficante v. Metro. Life Ins. Co.*,
  409 U.S. 205 (1972) ...................................................................................40

*United Church of the Med. Ctr. v. Med. Ctr. Comm'n*,
  689 F.2d 693 (7th Cir. 1982) .....................................................................36

*\*United States ex rel. Rahman v. Oncology Assocs., P.C.*,
  198 F.3d 489 (4th Cir. 1999) ........................................................33, 34, 35

*United States v. Edward Rose & Sons*,
  246 F. Supp. 2d 744 ...................................................................................41

*United States v. Edward Rose & Sons*,
  384 F.3d 258 (6th Cir. 2004) .....................................................................40

*United States v. First Nat'l City Bank*,
  379 U.S. 378 (1965) ...................................................................................35

*United States v. Puerto Rico*,
  764 F. Supp. 220 (D.P.R. 1991) .................................................................41

*United States v. City of Black Jack*,
  508 F.2d 1179 (8th Cir. 1974) ...................................................................25

*United States v. Yonkers Bd. of Educ.*,
  837 F.2d 1181 (2d Cir. 1987) .....................................................................25

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ................................................................................. 21-22

*Virginian Ry. Co. v. System Fed'n No. 40,*
    300 U.S. 515 (1937) .......................................................................................35

*WMATC v. Holiday Tours,*
    559 F.2d 841 (D.C. Cir. 1977) ......................................................................22

*Winter v. Nat. Res. Def. Council, Inc.,*
    129 S. Ct. 365 (2008)......................................................................................22

STATUTES

42 U.S.C. § 3601..............................................................................................40-41

42 U.S.C. § 3604............................................................................................... 1-2

42 U.S.C. § 3605............................................................................................... 1-2

42 U.S.C. § 3608............................................................................................... 1-2

42 U.S.C. § 5301...................................................................................................4

42 U.S.C. § 5304................................................................................................2, 5

Department of Defense Appropriations Act, 2008, Pub. L. No. 110-116, 121 Stat. 1295,
    1343-44 (Nov. 13, 2007) ............................................................................4, 21

Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and
    Hurricane Recovery, 2006, Pub. L. No. 109-234, 120 Stat. 418, 472-73 (June 15,
    2006) ........................................................................................................... 3-4

Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes
    in the Gulf of Mexico, and Pandemic Influenza Act, 2006, Pub. L. No. 109-148, 119
    Stat. 2680, 2779-81 (Dec. 30, 2005) .......................................................3, 4, 5, 21

La. Rev. Stat. § 42:7(A)(1)(b)............................................................................21

La. Rev. Stat. § 49:220.4(C) ..............................................................................21

La. Rev. Stat. § 49:220.5(G)(4) .........................................................................20

# OTHER AUTHORITIES

24 C.F.R. § 91.5 ................................................................................................................5

24 C.F.R. § 91.500 ..........................................................................................................21

71 Fed. Reg. 63,337 (Oct. 30, 2006)) .........................................................................4, 5

71 Fed. Reg. 7666 (Feb. 13, 2006)) ............................................................................4, 5

72 Fed. Reg. 70,472 (Dec. 11, 2007) (Ex. F)................................................................5

Field Hearing Before the Subcommittee on Housing and Community Opportunity of the
     Committee on Financial Services, *Implementation of the Road Home Program Four
     Years After Hurricane Katrina* (Aug. 20, 2009), Ser. No. 111-70 ................................. passim

11A Wright, Miller and Kane, Federal Practice and Procedure § 2948.1 (1995)………………..30

James Wm. Moore, et al., Moore's Federal Practice § 65.20 (2010)……………………………30

James Wm. Moore, et al., Moore's Federal Practice at § 65.22[3] (2010)………………………40

\*Authorities chiefly relied upon

## <u>INTRODUCTION</u>

In this action, the Plaintiffs—two fair housing organizations, five African American homeowners, and a proposed class of approximately 20,000 African American homeowners—challenge racial discrimination in the design and operation of the Road Home program, an $11 billion recovery program intended to help homeowners affected by Hurricanes Katrina and Rita.

The Plaintiffs allege that the Defendants, Paul Rainwater ("Rainwater"), Executive Director of the Louisiana Recovery Authority ("LRA"), and the U.S. Department of Housing and Urban Development ("HUD"), are in violation of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3604, 3605, and 3608 (the "Fair Housing Act" or "Title VIII"), and the Housing and Community Development Act of 1974, 42 U.S.C. § 5304 (the "HCDA"), by implementing a grant formula that has had a disparate impact on African American homeowners in New Orleans. The formula adversely affects African American homeowners, as it ties the amount of rebuilding grants to pre-storm home values, which were far lower in predominantly African American communities than predominantly White communities, leaving African American families with more frequent and larger gaps between their rebuilding grants and the cost to rebuild their homes.

In this motion, the Plaintiffs seek a temporary restraining order and, if necessary, a preliminary injunction enjoining LRA from depleting the remaining federal Road Home funds that are needed to provide the prospective equitable relief the Plaintiffs seek – the recalculation of grants based on a non-discriminatory formula.  Without temporary and, if necessary, preliminary injunctive relief, the LRA will continue to commit the balance of available funds, making those funds unavailable to rectify the disparate impact that past grant awards have had on African American homeowners.  Accordingly, the Plaintiffs respectfully request that this Court

preserve the status quo until it can adjudicate the merits of this action and award whatever relief is warranted.

## PROCEDURAL BACKGROUND

On November 12, 2008, the Greater New Orleans Fair Housing Action Center, National Fair Housing Alliance, and five African American homeowners from New Orleans ("Plaintiffs"), filed the instant action against the U.S. Department of Housing and Urban Development ("HUD") and the Louisiana Recovery Authority's ("LRA") Executive Director Paul Rainwater, alleging that Defendants developed, implemented, and oversaw the Road Home program in violation of the nondiscrimination and affirmative fair housing provisions of the Fair Housing Act and the HCDA, because the program has an unlawful disparate impact on African American homeowners.  Dkt. No. 1, ¶¶ 74-77.[1]  The Plaintiffs seek declaratory and injunctive relief to end the discriminatory operation of the Road Home program and to direct the Defendants to develop and apply a new, non-discriminatory grant formula.  *Id.* at 17.

On March 6, 2009, HUD moved to dismiss for lack of jurisdiction and for failure to state a claim on which relief can be granted.  Dkt. No. 22.  On May 5, 2009, Rainwater moved to dismiss for lack of jurisdiction, failure to state a claim, and a sovereign immunity defense.  Dkt. No. 28.  Rainwater also moved for a transfer of venue to the Middle District of Louisiana.  *Id.* On June 5, 2009, Plaintiffs opposed the Defendants' motions to dismiss and transfer venue.  Dkt. No. 34.  The same day, HUD responded to Rainwater's motions, arguing that the Plaintiffs have

---

[1] Section 3604(a) makes it unlawful to "make unavailable or deny" housing to any person because of race.  42 U.S.C. § 3604(a).  Section 3605(a) makes it unlawful to discriminate on the basis of race in the availability, terms, or conditions of residential real estate-related transactions.  *Id.* § 3605(a).  And § 3608(e)(5) of Title VIII requires HUD and recipients of federal funds to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further" fair housing.  *Id.* § 3608(e)(5).  Finally, § 5304(b)(2) of the HCDA requires that the use of all CDBG funds be conducted in a manner that "affirmatively further[s] fair housing."  *Id.* § 5304(b)(2).

a right to sue Rainwater under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), Rainwater's sovereign immunity defense is meritless, and the action should not be transferred.  Dkt. No. 33. On July 8, 2009, Rainwater and HUD filed reply briefs in support of their respective motions. Dkt. Nos. 38-40.

On March 3, 2010, the Court denied the Plaintiffs' July 23, 2009 request for an oral hearing on the pending motions.  *See* Minute Order of Judge Henry H. Kennedy, Jr. (Mar. 3, 2010); Dkt. No. 41.  However, on May 24, 2010, the Court scheduled a hearing for June 4, 2010, at 3:00 p.m., and directed the parties to address (1) whether *Ex Parte Young* permits an order precluding a state officer from using funds that have not yet been released in a manner that violates federal law, and (2) how much money is available to the Road Home program but has not yet been disbursed to Louisiana for that use, and how much money Louisiana and/or the LRA have that has not yet been disbursed to Road Home recipients.  Dkt. No. 45.

## FACTUAL BACKGROUND

**A.    Congress Responded to Hurricanes Katrina and Rita by Funding the Largest Emergency Housing Program in American History, and Required States Spending the Funds to Follow Federal Non-Discrimination and Fair Housing Requirements**

In the aftermath of Hurricanes Katrina and Rita in 2005, Congress established a $19.7 billion Disaster Recovery Grant program.  To support that program, Congress allocated Community Development Block Grant ("CDBG") funds for necessary expenses related to disaster relief, long-term recovery, and rebuilding in the most affected areas in the Gulf of Mexico.[2]  Congress created and funded the Disaster Recovery Grant program through three

---

[2] *See* Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act, 2006, Pub. L. No. 109-148, 119 Stat. 2680, 2779-81 (Dec. 30, 2005) (the "2005 Act") (Ex. A); Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006, Pub. L. No. 109-234, 120 Stat. 418, 472-73 (June 15, 2006) (the "2006 Act") (Ex. B); Department of Defense Appropriations Act, 2008, Pub. L. No. 110-116,

3

appropriation statutes passed in 2005, 2006, and 2007.  The first two statutes appropriated a combined $16.7 billion to the five affected states—Louisiana, Mississippi, Texas, Florida, and Alabama—for activities authorized under the CDBG statute.  *See* 2005 Act, 119 Stat. at 2779-81 ($11.5 billion appropriation); 2006 Act, 120 Stat. at 472-73 ($5.2 billion appropriation).

From the overall $16.7 billion appropriation in the 2005 and 2006 Acts, HUD allocated $10.41 billion to Louisiana for disaster recovery expenses.[3]  Congress passed the third appropriations statute in late 2007, authorizing an additional $3 billion for supplemental CDBG grants to Louisiana "solely for the purpose of covering costs associated with otherwise compensated but eligible claims that were filed on or before July 31, 2007, under the Road Home program"—the program at issue in this litigation.  2007 Act, 121 Stat. at 1343-44.  Thus, $13.41 billion of the total amount appropriated by Congress for the CDBG Disaster Recovery Grant program has been allocated to Louisiana.

The Disaster Recovery Grant program is governed by the same statutory and regulatory framework that governs regular CDBG funds.[4]  *See* 2005 Act, 119 Stat. at 2779-80; 2006 Act, 120 Stat. at 472-73.  Congress granted HUD limited authority to waive certain CDBG program requirements if requested by a state, but Congress expressly retained the standard restrictions on

---

121 Stat. 1295, 1343-44 (Nov. 13, 2007) (the "2007 Act") (Ex. C).  For the Court's convenience, the relevant CDBG Disaster Recovery Grant statutes and regulations are attached as exhibits A through F.

[3] *See* 71 Fed. Reg. 7666, 7666 (Feb. 13, 2006) (Ex. D) (allocating $6.21 billion of the $11.5 billion from the 2005 Act to Louisiana); 71 Fed. Reg. 63,337, 63,338 (Oct. 30, 2006) (Ex. E) (allocating $4.2 billion of the $5.2 billion from the 2006 Act to Louisiana).

[4] The regular CDBG program provides annual block grants to local and state governments for housing and housing-related development activities.  42 U.S.C. § 5301.  The primary objective of the CDBG program is to develop "viable urban communities[] by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income."  *Id.* § 5301(c).  The statutory requirements for the regular CDBG program are established in Title I of the HCDA.  *Id.* §§ 5301-5318.

the use of CDBG funds related to fair housing, nondiscrimination, labor standards, and the environment, and HUD may not waive them. *See* 2005 Act, 119 Stat. at 2780; 2006 Act, 120 Stat. at 472-73.

The appropriation statutes include a reporting and monitoring framework that supplements the regular CDBG program requirements. The 2005 and 2006 Acts provide that "prior to the obligation of funds each State shall submit a plan to the Secretary [of HUD] detailing the proposed use of all funds, including criteria for eligibility and how the proposed use of all funds . . . will address long-term recovery and restoration of infrastructure." 2005 Act, 119 Stat. at 2780; 2006 Act, 120 Stat. at 473; *see also* 42 U.S.C. § 5304(a)(1). HUD's implementing regulations require that grantees submit an "action plan" to fulfill this obligation. *See* 71 Fed. Reg. at 7669; 71 Fed. Reg. at 63,338-39; 72 Fed. Reg. 70,472, 70,472-73 (Dec. 11, 2007) (Ex. F). In addition to detailing the intended uses of all grant funds, the action plan must include a number of certifications,[5] including assurances that the grantee will comply with the Fair Housing Act and will affirmatively further fair housing. 71 Fed. Reg. at 7671; 71 Fed. Reg. at 63,339; 72 Fed. Reg. at 70,472. HUD is required to review and approve these certifications before it obligates any grant funds. 42 U.S.C. § 5304(b).

**B.     Louisiana Has Spent Approximately $11 Billion of the Recovery Funds on the Road Home Program to Assist Homeowners With Repairing and Rebuilding Their Homes, But Applies a HUD-Approved Formula That Adversely Impacts African American Homeowners**

To administer the recovery funds from Hurricanes Katrina and Rita, including CDBG Disaster Recovery Grant funds, Louisiana created the LRA. LRA Strategic Plan FY 2008/2009

---

[5] "Certification" is defined in HUD regulations to mean: "A written assertion, based on supporting evidence, that must be kept available for inspection by HUD, by the Inspector General of HUD, and by the public." 24 C.F.R. § 91.5.

at 1 (Ex. G).  The LRA "was created by Executive Order in 2005 and in statute through Act 5 of

the 2006 1st Extraordinary Session of the Louisiana Legislature. The organizational sunset date

of the agency is July 1st, 2010, unless further extended by the Legislature."  *Id.*  At the inception

of this action, Paul Rainwater was the LRA's Executive Director.  *See* Compl. ¶ 19.  As of

January 1, 2010, Robin Keegan replaced Rainwater as the Executive Director of the LRA.  *See*

Louisiana Recovery Authority, Rainwater Joins Governor's Staff, Keegan Named LRA

Executive Director (Dec. 29, 2009) (Ex. H); Biography of Robin Keegan (Ex. I).[6]

From a total of over $13 billion in Disaster Recovery Grant funds, the LRA designated

nearly $12 billion for housing programs known collectively as the Road Home program.  *See*

LRA Recovery Budget and Program Updates, Robin Keegan, at 1 (May 10, 2010) ("May 2010

LRA Budget Update") (Ex. J).  The largest Road Home component is the Homeowner

Assistance Program,[7] which provides rebuilding assistance to homeowners whose homes were

destroyed or suffered major damage as a result of Hurricanes Katrina and Rita.  *See id.* at 1-2

(stating that $10.348 billion of the total LRA budget of $13.781 billion has been obligated to the

Homeowner Assistance Program, compared to $1.303 billion for rental assistance); The Road

Home, Overview of the Homeowner Program (Ex. K).

Homeowners who agree to use Road Home funds to rebuild or repair their homes are

eligible for rebuilding grants of up to $150,000.  *The Road Home* Homeowner Program Policies,

Version 3.4 (Mar. 15, 2007) at 12 (Ex. L).  The formula for computing the grants, which was

adopted by LRA and approved by HUD, provides that the grant amount is the *lower* of two

---

[6] For the purposes of this Motion, the Plaintiffs will refer interchangeably to Rainwater and the LRA's Executive Director.

[7] Unless otherwise specified, this memorandum will refer to the Road Home Homeowner Assistance Program as the "Road Home" program for brevity.

values: (1) the home's pre-storm value (minus any other compensation the applicant received for loss to the structure, such as insurance proceeds), or (2) the cost of repairing damage to the home (minus any other compensation the applicant received for loss to the structure).  *Id.*  Hereinafter, the Plaintiffs refer interchangeably to the cost of repairing damage, the cost of damage, and the estimated cost of damage.  In May 2007, individuals with incomes at or below 80 percent of the area median income became eligible for an Additional Compensation Grant of up to $50,000.  LRA Action Plan Amendment 14 (First Allocation) – Road Home Homeowner Compensation Plan (May 14, 2007) at 7 (Ex. M).

Consistent with the statutory and regulatory framework described above, the LRA proposed and developed the Road Home grant formula and the details of the Road Home program in consultation with HUD and subject to HUD's ongoing approval and oversight.  *See* Testimony of Paul Rainwater, Executive Director of the LRA, Before the U.S. Subcommittee on Housing and Community Opportunity (Aug. 20, 2009) at 87 (Ex. N) (stating that HUD had approved "two overarching Action Plans" and "Louisiana ha[d] presented" 45 amendments to HUD "to clarify programmatic rules and outline additional uses of funds"); State of Louisiana Office of Community Development Disaster Recovery Unit (Ex. O) (listing action plans and amendments approved and rejected by HUD).

As the Plaintiffs alleged in their Complaint and document below, the requirement that the Road Home grant not exceed the pre-storm value of the home has had a disparate impact on African Americans.  Pl's Complaint ¶¶ 52-60 (Dkt. 1).  Because homes in predominantly African American communities had lower pre-storm values than comparable homes in predominantly White communities, and the Road Home program provides a grant based on the lesser of the pre-storm value or the cost of repairing damage, African Americans have been more likely than

Whites to receive a Road Home grant based on the pre-storm value of their home rather than on the higher cost of repairing damage. *Id.* ¶¶ 52-55. As a result, African American homeowners are more likely than White homeowners to have a gap between their rebuilding resources and the cost to rebuild and, on average, their gaps are larger. *Id.* ¶¶ 55-57.

**C.     The Road Home Program Grant Formula Has Had a Disparate Impact on African American Home Owners**

Notwithstanding that the Plaintiffs have yet to conduct discovery in this action, evidence from publicly-available sources reveals that the Road Home program's grant formula has had an adverse impact on African American homeowners in New Orleans. First, homes in African American communities have lower values than homes in predominantly White communities. Second, by linking the amount of the grant award to the pre-storm home value, the Road Home formula ensures that African Americans are more likely than Whites to receive grants based on a low pre-storm home value and face larger gaps between the cost of repairing their homes and their Road Home grants.

   i.     *Homes in Predominantly African American Communities Have Lower Values Than Homes in Predominantly White Communities*

Both statistical and testimonial evidence demonstrate that African Americans in New Orleans are much more likely than Whites to own homes with lower values, even when the homes are comparable. First, U.S. Census data shows that before the storm, 80% of African American homeowners in New Orleans owned homes worth less than $100,000, compared to 33% of White homeowners; 89% of African American homeowners owned homes worth less than $125,000, compared to 44% of White homeowners; and 93% of African American homeowners owned homes worth less than $150,000, compared to 55% of White homeowners.

8

Percentage of African American and White Homeowners Who Own Homes Less Than $100,000, $125,000 and $150,000 in Orleans Parish (Ex. P).



Second, U.S. Census data broken down by Census tract demonstrates a strong *negative* correlation between the pre-storm percentage of African American homeowners in a neighborhood and median home value.  *See* African American Homeowners and Home Values by Census Tract, Orleans Parish (Ex. Q). The disparities in pre-storm home values between predominantly African American and predominantly White communities can be discerned even more clearly from a map of New Orleans reporting for each Census tract the median home value and the percentage of African American owner-occupied homes.  African American Percentage of Owner Occupied Homes and Median Home Values in Orleans Parish (Ex. R) (applying the same 2000 Census data).  The map paints a stark picture: almost none of the Census tracts where African Americans own 60% or more of the homes has a median home value of $150,000 or

more, whereas the vast majority of Census Tracts where Whites own 80% or more of the homes have median home values between $150,000 and $300,000, or $300,000 to $500,000. *Id.* Similarly, while almost none of the Census tracts where Whites own 80% or more of the homes has a median home value less than $100,000, almost all Census Tracts where African Americans own 60% or more of the homes have a median home value of less than $100,000. *Id.*



*Accord* Kalima Rose, Annie Clark, & Dominique Duval-Diop, *A Long Way Home: The State of Housing Recovery in Louisiana 2008* ("PolicyLink Study"), at 46, 49 (Ex. S) (reporting "average pre-storm home value by block" in "select heavily damaged neighborhoods" in New Orleans, to demonstrate how the "predominantly African-American neighborhoods" of "Gentilly, Lower 9th ward, and New Orleans East had lower pre-storm value").

10

Third, this statistical data is consistent with the first-hand observations of local real estate professionals and public officials who recognized that homes values in predominantly African American neighborhoods were typically much lower than home values in predominantly White neighborhoods.  *See* Affidavit of Carol George Johnson, Owner and President of Johnson Mortgage Company ¶¶ 2, 5 (June 1, 2010) (Ex. T) (noting that her "chief responsibility is determining feasibility of mortgage loans based on . . . the market values of assets," that she evaluates appraisals, and that her company "has originated more than 7,500 home mortgage loans for first time-homeowners").  Based on nearly two decades of experience as a lender and her public service as the Executive Director of the Finance Authority of New Orleans, Ms. Johnson "observed that pre-Katrina homes in predominantly African American neighborhoods were valued less than comparably sized homes in predominantly White neighborhoods."  *Id.* ¶ 6.

      ii.      *As African Americans Own Homes With Lower Values, They Are More Likely Than Whites to Receive Rebuilding Grants Based on Low Pre-Storm Values and Have Larger Gaps in Their Rebuilding Resources*

As a consequence of this phenomenon that homes in predominantly African American neighborhoods were worth less than homes in predominantly White neighborhoods, the Road Home grant formula adopted by LRA and approved by HUD resulted in African Americans being more likely than Whites to receive grant awards based on lower pre-storm values and, as a result, being more likely to confront costs of rebuilding their homes that exceed the size of their Road Home grants (and other resources, such as insurance proceeds).  *See The Road Home Homeowner Program Policies* 3.4 at 12 (Ex. L).

First, the results of a study conducted in 2008 by PolicyLink, a national independent research organization, confirm that gaps between the amounts of Road Home program grants and

the costs to rebuild homes are more frequent and larger for African American than for White

home owners in Louisiana.  The study reported that:

> Nearly three-fourths of Road Home applicants had gaps between their rebuilding
> resources and the cost to rebuild.  The gap was larger for African American
> applicants [$39,082 on average] than their white counterparts [$30,863]. . . .  The
> grant formula had a more negative effect on those whose homes were valued less
> than their damage estimates.  Those whose damages were greater than their pre-
> storm home value—46.7% of all applicants rebuilding in place—experienced a
> gap of nearly $50,000.  All the rest had a much lower gap—an average of about
> $14,000 (53.3% of all applicants rebuilding in place).

PolicyLink Study at 42-43 (Ex. S).

These disparities are most pronounced in New Orleans, where there are especially large

differences in the value of homes located in predominantly African American and White

neighborhoods.  *See id.* at 42, 47, 49 (reporting large disparities in property values, grant awards,

and gaps between the cost to rebuild homes and awards received for that purpose, finding "New

Orleans' Road Home applicants are more likely to have a gap than all applicants statewide," and

the average rebuilding gap was $55,000 in New Orleans compared to about $36,000 statewide).

For instance, in the Lower 9th Ward, a predominantly African American neighborhood in

New Orleans, the average pre-storm home value was $100,739, the average Road Home grant

was $93,401, and the average gap between the cost to rebuild homes and the funds awarded for

that purpose was $75,355  In the predominantly White New Orleans neighborhood of Lakeview,

the average pre-storm home value was $336,064, the average Road Home grant was $109,777,

and the average gap between the cost to rebuild homes and the amount of funds awarded to do so

was $44,405.  *Id.*  And while 66.1% of the Lower 9th Ward applicants faced gaps of more than

$40,000, only 35.2% of Lakeview applicants faced a gap of the same magnitude.  *Id.* at 48.  That

Lower 9th Ward homeowners were more likely to face larger gaps in rebuilding resources than

Lakeview homeowners is even more striking, given that the cost of repairing home damages was, on average, $78,000 less in the Lower 9th Ward than in Lakeview.

|  | **Lower 9th Ward** | **Lakeview** |
|---|---|---|
| Howeowner Demographics | Majority African American | Majority White |
| Average Pre-Storm Value | $100,739 | $336,064 |
| Average Damage Estimate | $203,597 | $281,537 |
| Average Road Home Grant Award | $93,401 | $109,777 |
| Gap Between Avg. Damage Estimate and Avg. Total Resources | $75,355 | $44,405 |
| Percentage of Homeowners Facing Gaps of $40,000 or more | 66.1% | 35.2% |

Anecdotal accounts are consistent with these patterns.  For example, Ms. Carol George Johnson, an owner of a mortgage company, who has handled property sales and valuations in New Orleans for nearly 20 years, attests that "because of the formula employed . . . homeowners in predominantly African American areas receive[d] lower grant awards than homeowners in predominantly White areas."  Johnson Aff. ¶¶ 5, 7.

Accounts from the named plaintiffs illustrate, in greater detail, the adverse effect of the Road Home program grant formula on African American homeowners.

Almarie Ford is an African American resident of Orleans Parish who, since 1988, has owned a home at 7071 Ridgefield Dr., New Orleans.  Her home was "completely destroyed" by Hurricane Katrina, making it uninhabitable and forcing her to rent an apartment in Baton Rouge for two years while she continued to pay the mortgage on her home.  Affidavit of Almarie Ford ¶¶ 1-3, 5 (May 24, 2010) (Ex. U).  Although Ms. Ford received over $146,000 in insurance proceeds, she faced over $297,000 in rebuilding costs.  *Id.* ¶¶ 4-5.  Because the pre-storm value

13

of her home was only $150,000 and that value was less than the cost of repairing the damage,

Ms. Ford received an award of *only* $3,468 ($150,000 minus her insurance proceeds), leaving a

gap in rebuilding costs of nearly $150,000.  *Id.* ¶ 5.  LRA also required Ms. Ford to assign to it

the proceeds from a small settlement with State Farm Insurance, "leaving [her] with a grant of

only $1,399.46."  *Id.* ¶ 5.  As Ms. Ford explains:

> I have been living in my property since September 2008, but repairs are not
> completed, because I did not receive enough money from the Road Home
> Program or insurance to complete repairs.  The exterior of my house still requires
> painting, and storm shutters, and the interior requires finishing work. I had to
> spend $35,000 of my own funds and take out a SBA loan for $54,000 to repair the
> home, but the repairs are still not finished.  I currently still owe $22,173.01 on the
> SBA loan.  My mortgage company Wells Fargo Home Mortgage will not release
> the remaining balance of insurance funds until repairs are completed, but I cannot
> finish repairs because I have no money available.

*Id.* ¶ 6.

Edward Randolph is an African American resident of Orleans Parish who, since 2000,

has owned a "duplex" at 8851-8853 Gervais St., New Orleans, 70127, half of which he rented

out prior to Hurricane Katrina.  Affidavit of Edward Randolph ¶¶ 1-2 (May 24, 2010) (Ex. V).

Mr. Randolph's home suffered more than $308,193 in rebuilding costs.  *Id.* ¶ 6.  But because his

home's pre-storm value was $135,000, he received a Road Home grant of only $16,649.92 --

$135,000 minus his insurance proceeds of about $107,000 and minus the $10,500 FEMA grant

he had received to fix structural damage.  *Id.* ¶¶ 4-5.  Mr. Randolph describes the consequences

of the gap between the Road Home grant award and the cost of repairing his home:

> With the grant award I received from the Road Home, insurance, and FEMA, I
> am still short $173,193 needed to rebuild my house. . . . I was able to move back
> into my house in December 2009, after renting an apartment in Luling, Louisiana,
> 25 miles upriver of New Orleans.  During this time, I had to pay rent and my
> mortgage, and almost lost my house twice to foreclosure because I was unable to
> afford both of these responsibilities.  I am still unable to rent the other side of my
> house, and all repairs are not yet completed.

14

*Id.* ¶¶ 6-7.  If the LRA had awarded grants based on the cost of repairs, rather than on pre-storm home value, Ms. Ford and Mr. Randolph each would have received a grant of $150,000, instead of grants of $1,399 and $16,649, respectively.  Ford Aff. ¶ 5; Randolph Aff. ¶ 5.

**D.    The LRA Executive Director Admits That the Road Home Grant Formula Has Adversely Affected African American Homeowners**

In August, 2009, the House Subcommittee on Housing and Community Opportunity[8] held a hearing on the administration of the Road Home program and the extent to which it has operated adversely to African American home owners.  At that hearing, in his capacity as Executive Director of the LRA, Rainwater admitted that the Road Home program had produced an adverse effect on African American homeowners.  Field Hearing Before the Subcommittee on Housing and Community Opportunity of the Committee on Financial Services, *Implementation of the Road Home Program Four Years After Hurricane Katrina* (Aug. 20, 2009), Ser. No. 111-70, at 23 (Ex N) ("Hearing Transcript"), at 23-24, *available at* http://www.house.gov/apps/list/hearing/financialsvcs_dem/hrhus_082009.shtml.

In his testimony, Rainwater confirmed that the Road Home grant formula has had an adverse effect on African American homeowners.  First, Rainwater agreed that "home values in predominantly African American neighborhoods tend to be lower than values in similar houses in predominantly white neighborhoods." *Id.* at 23; *see also id.* at 18 (Rainwater stating that the additional compensation grant was created because assessments in "parts of New Orleans were

---

[8] The House Subcommittee on Housing and Community Opportunity has jurisdiction over HUD and its implementation of the Road Home program.  *See* House Committee on Financial Services, Committee/Subcommittee Jurisdiction: Housing and Community Opportunity (Ex. W) ("The Housing and Community Opportunity subcommittee . . . oversees the Department of Housing and Urban Development . . . . The subcommittee also handles matters related to public, affordable, and rural housing, as well as community development . . . .").

lower than other parts, like Lakeview").  Next, when asked whether it is "true that African-American homeowners are more likely to receive what is called the pre-storm value for their homes by virtue of the [] methodologies that you use to compute values—is it true that they are more likely to receive the pre-storm value as opposed to the actual cost to repair value," Rainwater agreed, "Yes sir, I am sure it is. . . . I do not deny that."  *Id.* at 23-24.

Rainwater also admitted that most low-income homeowners lack the resources to rebuild their damaged homes, agreeing that low-income homeowners "9 times out of 10, they cannot save the money or have the money by which to get these homes [repaired]."  *Id.* at 17.  Overall, Rainwater disclosed, the Road Home grant formula had left a gap between the cost of rebuilding homes in New Orleans and the grant funds available for that purpose.  As he explained, LRA's "analysis showed a gap in homeowner rebuilding resources available in the city of New Orleans, of between $1.6 billion and $2.3 billion. . . .  Many low-to-moderate income homeowners may not have the resources to build their homes with the funds available."  *See id.* at 90.

**E.     More than $500 Million in Road Home Monies Are Needed to Fund the Road Home Grants Recalculated Through Use of a Non-Discriminatory Formula**

Although the Plaintiffs lack access to LRA's current program data, publicly available information reveals  that the cost of recalculating Road Home grants in Orleans Parish, based on a  formula with no adverse impact, is estimated to exceed $500 million.

The computation of this estimate is straightforward.  The starting point is 41,419, the number of Road Home grant recipients in Orleans Parish who have received rebuilding grants under Option 1.  *See* State of Louisiana, Office of Community Development, *The Homeowner Assistance Program* Week 201 Situation & Pipeline Report (May 11, 2010) at 17 (Ex. X).  Next, this number is multiplied by 46.7% to reflect the percentage of recipients who received a grant

based on pre-storm home value, resulting in 19,343 residents of Orleans Parish who are estimated to have received grants based on the pre-storm value of their homes.  (These individuals would receive higher rebuilding grants under a grant formula based on the cost of repair).  PolicyLink Study at 43 (Ex. N).  This number is again multiplied, this time by 48.9%, the percentage of recipients who have incomes *above* 80% of the area median income, *id.* at 37, as they were ineligible for the Additional Compensation Grant, which was initially limited to $50,000 but today is limited only by the full cost of repair.[9]  Thus, 9,459 recipients in Orleans Parish would be expected to benefit from a recalculated grant formula.  Finally, to estimate the cost of funding the difference between the old grants and the recalculated grants for 9,459 recipients in Orleans Parish, their number is multiplied by the average gap of $54, 586 between the grants awarded and the cost of repairing homes in New Orleans.  *Id.* at 47.  The ensuing estimate of the additional monies needed to fund recalculated Road Home grants for Orleans Parish residents is $516 million.

**F.      LRA Has Announced Plans That, in the Near Future, Would Deprive the Plaintiffs of Their Ability to Obtain Equitable Relief in This Action**

Since 2009, the LRA has taken action to obligate large portions of the remaining federal emergency CDBG funds that HUD has provided for the Road Home Homeowner Assistance program.  And now, with less than a month before the LRA is scheduled to dissolve

---

[9] Last year, the LRA amended its formula to remove the $50,000 cap on the Additional Compensation Grant.  LRA Proposed Action Plan Amendment 39, Removal of Affordable Compensation Grant Cap (Oct. 12, 2009) at 1 (Ex. Y).  As a result, Road Home grant recipients with incomes at or below 80% of the area median income should be entitled to a grant based on the full cost of repair.  Accordingly, it does not appear that these low-income individuals would receive a higher grant award if the Court orders the LRA to implement a non-discriminatory formula based on the cost of repair.

17

organizationally,[10] the LRA has announced plans to direct how the $148 million in remaining

Road Home funds it possesses should be expended by whatever organization assumes its duties.

*See generally* Proposed Action Plan Amendment No. 43 (Third Appropriation) – *Homeowner*

*Unmet Recovery Needs Program To be Submitted for LRA Approval*: May 19, 2010 (Apr. 28,

2010) (Ex. aa) ("Action Plan Amendment 43").  Equally critical, only $500 million in

unobligated funds remain with HUD from the third appropriation that Congress earmarked for

the Road Home program.  And it isn't even clear that, were the Court to grant the relief

requested, this $500 million could be used entirely to fund the recalculated Road Home grants, as

HUD may be required to direct a portion of this fund to defray expenses incurred by the LRA or

Louisiana under Options 2 and 3 of the Road Home program, as well as expenses for compliance

and assurance.   *See* Affidavit of Peter Romer-Friedman ¶ 5 (June 2, 2010) (Ex. bb).

It should be clear, therefore, that in the very near future, there will be insufficient monies

remaining to fund the equitable remedy the Plaintiffs seek.  As the remaining funds that HUD

and LRA together have in their custody are approximately $648 million, assuming none of those

monies has already been committed for other purposes, there are scarcely sufficient monies

remaining in the Road Home Program to permit funding of the grants to Orleans Parish residents

recomputed through use of a non-discriminatory formula.  Any further commitment of the

remaining Road Home monies would forever deny the Plaintiffs an opportunity to obtain a full

equitable remedy in this action.

    i.    *LRA's Recent Actions Reduced its Remaining Road Home Funds to $148 Million*

While the LRA has taken a number of steps to obligate its remaining Road Home funds,

by far the LRA's most significant action was removing the $50,000 cap on the Additional

_____

[10] By statute, the LRA Board will sunset on June 30, 2010.  See Louisiana Recovery Authority,
Resolution to Approve Strategic Allocation of Remaining Unspent Funds (May 17, 2010) at 2 (Ex. Z).

Compensation Grants ("ACG") given to homeowners with incomes at or below 80% of the area median income.  *See* LRA Proposed Action Plan Amendment 39, *Removal of Affordable Compensation Grant Cap* (Oct. 12, 2009) (Ex. Y); Letter from Yolanda Chavez, Deputy Assistant Secretary for Grant Programs, to Paul Rainwater (Oct. 14, 2009) ("HUD Letter") (Ex. cc) (acknowledging LRA's action plan amendment to "remove[e] the $50,000 cap for [ACGs] to provide these low- to moderate-income homeowners with additional resources needed to recover from Hurricanes Katrina and Rita").  Both Rainwater and HUD described removing the ACG cap as an effort to assist low-income homeowners who received low Road Home grants based on pre-storm homes values and, thus, faced large gaps in rebuilding costs that prevented them from realizing the program's benefits.[11]

Although removing the ACG cap provided important assistance to thousands of very low-income homeowners, including some members of the proposed Plaintiff class, it did not address the gaps that many moderate-income African American homeowners continue to face. Removing the cap did nothing to supplement the grants of homeowners whose incomes exceed 80 percent of the area median income.  *See, e.g.*, LRA Plan Amendment 39, at 1-2; Ford Aff. ¶ 5 (Ex. U) (stating that she was not eligible for a ACG and received a grant of $1,399); Randolph Aff. ¶¶ 5-6 (Ex. V) (stating that because he received a grant of $16,649 he is still "short

---

[11] *See id.*; Testimony of Paul Rainwater, Hearing Transcript at 11-12 (Ex. N); Katy Reckdahl and David Hammer, *Feds sign off on Road Home change*, Times Picayune (Oct. 16, 2009), at 1 (Ex. dd) ("Oct. 16, 2009 *Times Picayune* Article") (stating that HUD's approval letter would permit LRA to "give up to $34,000 in extra grant money to as many as 19,000 low- to moderate-income homeowners, Rainwater said.  The aim is to help people who had homes of modest value.  Because the original grants were based on a home's pre-storm value, in many cases they did not cover the cost of rebuilding.  That was especially true in poorer neighborhoods, which have lower property values.").  Accordingly, both HUD and LRA acknowledged that their formula adversely impacted residents with more modest homes, who are disproportionately African-American.  Absent any recognition that HUD had approved the formula that created the disparities in the first place, HUD Secretary Shaun Donovan hailed the removal of the ACG cap as "a good example of HUD's willingness to alter 'barriers that hamper recovery.'"  Oct. 16, 2009 *Times Picayune* Article, at 1 (Ex. dd) (quoting Secretary Donovan).

$173,193 needed to rebuild").[12]  Moreover, it reduced the LRA's remaining Road Home program

funds by $317 million to a total of $148 million.  May 2010 LRA Budget Update at 2 (Ex. J).

> ii.    *The LRA Intends to Obligate the $148 Million of Remaining Funds Very Soon*

With only $148 million remaining in unobligated Road Home Homeowner Assistance

funds, *id.*, the LRA intends to obligate most, if not all, of the remaining funds it possesses by

passing a $100 million-plus Action Plan Amendment (No. 43) to transform the remainder of the

Road Home program from a grant program into a "construction lending program."  Action Plan

Amendment 43 at 2 (Ex. aa).[13]   Amendment 43 would provide loans to homeowners who

already received Road Home grants, but "have not yet been able to reoccupy their pre-storm

dwelling due to unmet recovery needs."  *Id*.

Last week, the LRA informed the Plaintiffs that it intends to approve the lending program

as Action Plan Amendment 43 at its *final* board meeting in June before LRA dissolves, and then

several other state bodies would pass the Amendment before its submission to HUD for

approval.  Romer-Friedman Aff. ¶¶ 4-5 (Ex. bb).  Once LRA's Board approves Amendment 43

(or any other amendment), it could be presented to HUD within about 8 days, as the only waiting

period for action that state law imposes is a seven day period between approval by LRA and

approval by a legislative body.  *See* La. Rev. Stat. § 49:220.5(G)(4) (2010).  Therefore, if LRA

approves Amendment 43 on June 24, it could seek HUD's approval by early- to mid-July.  And

---

[12] Indeed, only 42% of Road Home applicants have incomes at or below 80 percent of the area median income to qualify for an ACG.  PolicyLink Study at 37 (Ex. S).  Nor did removing the ACG cap correct the discriminatory formula that created the sizable gaps in the first instance.

[13] To justify no longer providing rebuilding grants that need not be repaid and instead offering loans that must be repaid to private financial institutions, the LRA states that (1) despite Road Home program assistance, "20,000 households statewide . . . will not be able to rebuild and reoccupy their homes," and (2) there will be thousands of homeowners who require additional financial assistance, especially in the current recession where construction lending has been significantly reduced."  *Id*. at 1.

while HUD has 45 days to review and approve any Action Plan Amendment, HUD can approve the amendment immediately.  24 C.F.R. § 91.500.  Accordingly, based on the schedule currently in place, LRA's lending program will be ready for HUD approval in July or, at the latest, in August and can be implemented immediately thereafter.  LRA, however, has the discretion to accelerate this process by moving its Board meeting to an earlier date, as long it provides public notice 24 hours in advance,[14] in which case HUD could approve this amendment as early as mid-June, 2010.  Once LRA proposes and HUD approves an amendment obligating LRA's remaining Road Home funds, these monies will become unavailable to fund an equitable remedy in this action.

> iii.  *LRA May Also Request that HUD Disburse the $500 Million That Remains from the Road Home Appropriation, Jeopardizing the Availability of These Monies to Fund Recalculated Road Home Program Grants*

In addition to obligating the money it currently possesses, the LRA may also request that HUD obligate, award, and disperse the remaining $500 million that HUD has in unobligated federal Road Home funds from the third Congerssional appropriation.  *See* 2007 Act, 121 Stat. at 1343; Romer-Friedman Aff. ¶ 5 (Ex. bb).  Since the LRA can make such a request in the same timeframe as it approves and submits Amendment 43 to HUD, there is a direct and immediate threat to the remaining $500 million that would otherwise be available to fund recalculated grants, should the Plaintiffs prevail in this action.

## STANDARD OF REVIEW

"'The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'"  *Chaplaincy of Full Gospel Churches v.*

---

[14] *See* La. Rev. Stat. § 49:220.4(C) (stating that the LRA and its board "shall be subject to. . . the laws relative to public records and open meetings . . . applicable to state agencies");  La. Rev. Stat. § 42:7(A)(1)(b) ("All public bodies . . . shall give written public notice of any regular, special, or rescheduled meeting no later than twenty-four hours before the meeting.").

*England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("*CFGC*") (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  "To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Id.* (citations omitted).

"These factors should be balanced against one another and '[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 88 (D.D.C. 2006) (Kennedy, J.) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).  Thus, "[t]he Court evaluates the four factors on a 'sliding scale.'" *FOP Library of Cong. Labor Comm. v. Library of Cong.*, 639 F. Supp. 2d 20, 24 (D.D.C. 2009) (Kennedy, J.) (quoting *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)).  "For example, if plaintiffs make[] a strong showing of irreparable harm and there is no substantial harm to defendants, the Court applies a correspondingly lower standard for likelihood of success." *Id.* (citing *WMATC v. Holiday Tours*, 559 F.2d 841, 843 (D.C. Cir. 1977)).

The Plaintiffs need not show that irreparable harm is certain; they must only demonstrate "some likelihood of irreparable harm in the absence of an injunction." *Leitner v. United States*, 679 F. Supp. 2d 37, 42 (D.D.C. 2010) ("Both the United States Supreme Court and the Court of Appeals for the D.C. Circuit have also emphasized that a plaintiff must show at least some likelihood of irreparable harm in the absence of an injunction." (citing *Winter v. Nat. Res. Def. Council, Inc*., 129 S. Ct. 365, 375 (2008) (holding that a plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction," and not a mere "possibility");

*CityFed*, 58 F.3d at 747 (holding that a plaintiff must demonstrate "at least some injury" for a preliminary injunction to issue") (citation and internal quotation marks omitted))).

## SUMMARY OF ARGUMENT

As the Plaintiffs demonstrate below, they are entitled to a temporary restraining order and, if necessary, a preliminary injunction barring the LRA from obligating and/or spending the remaining Road Home Homeowner Assistance funds that could be used to provide the Plaintiffs with an equitable remedy.

In recent months the LRA has already obligated and spent hundreds of millions of dollars of the remaining Road Home Homeowner Assistance funds.  And within days or weeks, the LRA will obligate most or all of the remaining $148 million it possesses and also ask HUD to obligate and disburse the remaining $500 million in Road Home funds in HUD's custody.  If even a significant portion of these funds are obligated for a purpose other than relief in this action, it will forever deny the Plaintiffs an opportunity to obtain the full equitable relief they seek – the recalculation of Road Home grant awards in Orleans Parish on a non-discriminatory basis.

Under these circumstances and particularly when government funds are at stake, courts routinely freeze disputed assets in order to preserve the status quo pending resolution of the litigation.  In fact, the only unique or novel aspect of the Plaintiffs' motion is that one Defendant, the LRA's Executive Director Paul Rainwater, has actually conceded the merits of Plaintiffs' disparate impact claim.

The Plaintiffs can easily satisfy each part of the four-part balancing test to obtain a preliminary injunction.  First, it is undisputable that the Plaintiffs will lack an adequate remedy to the discrimination they suffered if the LRA is permitted to further obligate and spend the

remaining Road Home funds.  Next, there will be no harm to the Defendants by temporarily

freezing the remaining Road Home funds, and other interested parties will *actually benefit* from

the preliminary relief the Plaintiffs seek, as existing Road Home applicants would receive *grants*

instead of *loans* under the LRA's proposed lending program.

      Finally, the public interest strongly supports the issuance of a preliminary relief, because

an injunction will preserve the opportunity of the Plaintiffs and this Court to vindicate the civil

rights of homeowners who are victims of discrimination in the nation's largest federal

emergency housing program, a program to which Congress specifically attached fair housing and

non-discrimination protections.

## ARGUMENT

**The Plaintiffs Are Entitled to a Temporary Restraining Order and Preliminary
Injunction Barring the Executive Director of LRA or a Successor From Obligating
and/or Spending Any Funds Available for Relief in This Action, or Seeking From
HUD the Further Obligation and/or Disbursement of Any Such Funds**

**A.     The Plaintiffs Have a Substantial Likelihood of Success on the Merits**

      As the Plaintiffs have marshaled substantial evidence about how and why the Road Home

Program grant formula has had a disparate impact on African American homeowners, the

Plaintiffs have a very high likelihood of succeeding in their disparate impact claim.

      To determine the Plaintiffs' likelihood of success, this Court should apply the burden-

shifting framework that a number of Circuits have adopted to adjudicate FHA disparate impact

claims, drawing on Title VII jurisprudence.  *See Huntington Branch, NAACP v. Town of

Huntington*, 844 F.2d 926, 935-36 (2d Cir. 1988) (adopting the burden shifting framework); *see

also Nat'l Fair Housing Alliance v. The Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 60

(D.D.C. 2002) ("Courts have applied the basic burden-shifting scheme used to review disparate

impact claims brought under Title VII . . . to disparate impact claims brought pursuant to the

FHA.") (citations omitted).

The Second Circuit and "several [other] circuits have adopted this burden-shifting

framework," *2922 Sherman Ave. Tenants Assoc. v. District of Columbia*, 444 F.3d 673, 680

(D.C. Cir. 2006) (discussing competing approaches for adjudicating FHA disparate impact

claims, but declining to adopt a standard, as the plaintiffs could not satisfy either standard)

(citing *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 901-02 (8th Cir.

2005); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 51 (1st Cir. 2000)); *see also Gamble v.

City of Escondido,* 104 F.3d 300, 306 (9th Cir. 1997), which operates in the following manner:

> In order to make out a prima facie case under the FHA on a theory of disparate
> impact, a plaintiff must demonstrate that an outwardly neutral practice actually
> or predictably has a discriminatory effect; that is, has a significantly adverse or
> disproportionate impact on minorities, or perpetuates segregation. The plaintiff
> need not make any showing of discriminatory intent, however.  The burden then
> shifts to a defendant to demonstrate that "its actions furthered . . . a legitimate,
> bona fide governmental interest and that no alternative would serve that interest
> with less discriminatory effect.

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 366  (2d Cir. 2003)

(citations and internal quotations omitted).[15]

---

[15] In *Metropolitan Housing Development Corporation v. Village of Arlington Heights*, 558 F.2d
1283 (7th Cir. 1977), the Seventh Circuit adopted an alternative four-part test that would consider, *inter
alia*, "whether any evidence indicates discriminatory intent."  Courts have vigorously rejected that test,
however, as it "would place 'too onerous a burden' on plaintiffs to treat these four factors 'as steps
necessary to make out a prima facie case'" *2922 Sherman Ave.*, 444 F.3d at 680 (quoting *Town of
Huntington*, 844 F.2d at 935-36), and it would contravene the FHA's stated purpose of ending
discrimination.  *See Pfaff v. HUD*, 88 F.3d 739, 745-46 (9th Cir. 1996) ("we find no support for the
proposition that a finding of intent is required to establish a prima facie case of disparate impact under the
FHA") (citing *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217 (2d Cir. 1987) ("The consensus
is that a plaintiff need prove only discriminatory effect, and need not show that the decision complained
of was made with discriminatory intent."); *Town of Huntington*, 844 F.2d at 934-35 ("The Act's stated
purpose to end discrimination requires a discriminatory effect standard; an intent requirement would strip
the statute of all impact on de facto segregation."); *United States v. City of Black Jack*, 508 F.2d 1179,
1185 (8th Cir. 1974) ("Effect, and not motivation, is the touchstone, in part because clever men may
easily conceal their motivations, but more importantly, because . . . 'we now firmly recognize that the

The Plaintiffs have a strong likelihood of prevailing under this burden-shifting framework.  At the outset, the Plaintiffs can demonstrate a *prima facie* case under the FHA, as the statistical, documentary, and testimonial evidence in the record shows that the LRA's "outwardly neutral practice" of using the pre-storm value to determine rebuilding grants, "actually or predictably has a discriminatory effect," on African American homeowners in New Orleans; "that is, [it] has a significantly adverse or disproportionate impact."  *Huntington Comm.*, 316 F.3d at 366.

First, homes in predominantly African American neighborhoods have lower values than homes in predominantly White neighborhoods in New Orleans, even when the homes are comparable.  African Americans are also more likely than Whites to own homes with lower values than Whites.  Indeed, the LRA's Executive Director Paul Rainwater already conceded this point by admitting to a Congressional panel that it is "true that home values in predominantly African-American neighborhoods tend to be lower than values in *similar houses* in predominantly white neighborhoods."  Hearing Transcript at 23 (Ex. N) (emphasis added).

The following record evidence supports his observation:

- U.S. Census Data shows nearly 80% of African American homeowners in New Orleans owned homes worth less than $100,000, compared to 33% of White homeowners, and 93% of African American homeowners own homes worth less than $150,000, compared to 55% of White homeowners.  *See* Percentage of African American and White Homeowners Who Own Homes Less Than $100,000, $125,000 and $150,000 in Orleans Parish (Ex. P).

- U.S. Census data and an illustrative map show the median home value and percentage of African American owner occupied homes in each Census tract, and demonstrate that almost none of the Census tracts where African Americans own 60% or more of the homes have a median home value of $150,000 or more, whereas the vast majority of Census Tracts where Whites own 80% or more of the homes have a median home

---

arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.'") (citations omitted)).

value between $150,000 and $300,000, or $300,000 and $500,000.  African American Homeowners and Home Values by Census Tract, Orleans Parish (Ex. Q); African American Percentage of Owner Occupied Homes and Median Home Values in Orleans Parish (Ex. R); *accord* PolicyLink Study at 46, 49 (Ex. S) (reporting "average pre-storm home value by block" in "select heavily damaged neighborhoods" in New Orleans, to demonstrate how the "predominantly African American neighborhoods" of "Gentilly, Lower 9th ward, and New Orleans East had lower pre-storm value").

- The affidavit of a veteran New Orleans real estate professional and public official with authority over housing issues, who states that "Based on my experience, I have observed that pre-Katrina homes in predominantly African American neighborhoods were valued less than comparably size homes in predominantly White neighborhoods."  Johnson Aff. ¶ 6 (Ex. T).

Second, LRA adopted and HUD approved a grant formula that determines awards based on the lesser of the pre-storm home value or the cost of repairing damage.  Road Home Policies 3.4, at 12 (Ex. L).

Third, as African American homeowners in New Orleans are more likely than White homeowners to own homes with lower pre-storm values, and because Road Home program grant awards are based on the *lesser* of pre-storm value of the home or the cost of repairing damage, African American homeowners in New Orleans are more likely than White homeowners to receive grants based on the pre-storm value of their homes rather than the higher cost of repair, and experience more frequent and larger gaps in rebuilding resources than White homeowners.

The following evidence strongly supports these factual allegations:

- The PolicyLink study analyzed the LRA's *state-wide* program data and found that the rebuilding gap "was larger for African American applicants [$39,082 on average] than their white counterparts [$30,863]" and that "[t]he grant formula had a more negative effect on those whose homes were valued less than their damage estimates." PolicyLink Study at 42-43 (Ex. S).

- Because of the large racial disparities in home values in New Orleans, the disparities observed by PolicyLink are *very likely to be even greater within New Orleans* than statewide, as evidenced by the disparities reported for selected neighborhoods in New Orleans.  *See id.* at 48 (finding that in the Lower 9th Ward, a predominantly African American neighborhood, the average pre-storm home value was $100,739, the

average Road Home grant was $93,401, and the average gap in rebuilding resources was $75,355, whereas in the predominantly White neighborhood of Lakeview, the average pre-storm home value was $336,064, the average Road Home grant was $109,777, and the average gap in rebuilding resources was $44,405); *see also id.* (finding that 66.1% of the Lower 9th Ward applicants faced gaps of more than $40,000, while only 35.2% of Lakeview applicants faced such a substantial gap); *id.* at 42, 47 (stating that homeowners in New Orleans on average experienced a much larger rebuilding gap, $54,586, than homeowners statewide, $35,865).

- The affidavits of African American homeowners who received very low grant awards based on the pre-storm value of their homes and, therefore, have faced large gaps in rebuilding resources and have been unable to rebuild their homes.  *See* Ford Aff. ¶¶ 5-6 (Ex. U) (stating that the damage to her home was $297,000 for which she received over $146,000 in insurance proceeds; but she received a Road Home grant of only $1,468 based on her pre-storm home value of $150,000, and as result has not finished repairing her home, despite spending $35,000 of her own money and taking out a $54,000 SBA loan); Randolph Aff. ¶¶ 5-7 (Ex. V) (stating that the damage to his home was over $308,000 for which he received about $107,000 in insurance proceeds, he received a Road Home grant of only $16,649, and as a result he is still "short $173,193 needed to rebuild [his] house" and "all repairs are not yet completed").

- An affidavit of Carol George Johnson, the owner of a mortgage company in New Orleans that provides mortgages to thousands of New Orleans homeowners, who states that she has "observed that because of the formula employed [by LRA], Road Home Program grant awards have been issued in a manner such that homeowners in predominantly African American areas receive lower grant awards than homeowners in predominantly White areas."  Johnson Aff. ¶ 7 (Ex. T).

The LRA's Executive Director conceded this point by telling Congress that he is "sure it is true" and he "does not deny that" it is "true that African-American homeowners are more likely to receive what is called the pre-storm value for their homes by virtue of the [] methodologies that [the LRA] use[s] to compute values . . . they are more likely to receive the pre-storm value as opposed to the actual cost to repair value."  Rainwater Testimony, Hearing Transcript at 23-24 (Ex. N).

Taken together, these key facts are more than sufficient to show that the LRA's "outwardly neutral" grant formula has "actually or predictably" had a "significantly adverse or

disproportionate impact" on African American homeowners in New Orleans.  *Huntington Comm.*, 316 F.3d at 366.  Accordingly, the Court should find that the Plaintiffs will be able to "make out a prima facie case under the FHA on a theory of disparate impact."  *Id*.

Once the Plaintiffs present a *prima facie* case, the burden shifts to the LRA to demonstrate that (1) it had  a "bona fide governmental interest" in using the pre-storm value to determine the amount of Road Home grants, and (2) "no alternative would serve the [government's] interest with less discriminatory effect."  *Id.* (quoting *Town of Huntington*, 844 F.2d at 936).  The LRA, however, cannot satisfy either standard.

First, as the primary function of the Road Home Homeowner Assistance program is to assist homeowners in rebuilding their homes, *see* LRA Action Plan Amendment 14 (May 14, 2007) at 1 (Ex. M), LRA cannot assert that it has a bona fide interest in using the pre-storm value to determine Road Home grants when that formula will leave, and has left, owners of homes in areas with depressed property values without the means to complete repairs.  As Rainwater has made clear and as the record evidence shows, a homeowner who receives an Option 1 Road Home grant based on a pre-storm value will typically *not* have adequate funds to rebuild his or her home, whereas a homeowner who receives a grant based on the cost of repairing the damage typically will be able to rebuild his or her home.  *See* Hearing Transcript at 11, 17-20, 90; *see supra* at 11-14.

Second, the LRA cannot show the absence of a less discriminatory alternative. *Huntington Comm.*, 316 F.3d at 366.  Indeed, an alternative that would have had no adverse impact was readily available.  LRA's Executive Director conceded an across-the-board grant formula based on the cost of repairing damage would have been an acceptable alternative and would have reduced or eliminated the disparities faced by owners of homes in areas with low

29

pre-storm values, most of whom in New Orleans were African American.  *See* Hearing Transcript at 18-19, 23-24.  Nor is there any greater likelihood that HUD could satisfy this standard.  Therefore, neither the LRA nor HUD can claim that a less discriminatory alternative was unavailable.

As there is little chance the Defendants can carry their burden of rebutting the Plaintiffs' *prima facie* case, the Plaintiffs have a strong likelihood of prevailing in their disparate impact claim.  Accordingly, the Plaintiffs have satisfied the first part of the four-part balancing test for temporary and preliminary relief.

**B.    Absent an Order Freezing the Assets Available to Satisfy the Equitable Relief the Plaintiffs Seek in This Action Until the Merits of This Action Can be Adjudicated, the Plaintiffs Will Be Irreparably Harmed**

For an injury to constitute irreparable harm, it "must be 'certain and great,' 'actual and not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *FOP Library of Cong. Labor Comm.*, 639 F. Supp. 2d at 24 (quoting *CFGC*, 454 F.3d at 297).  In addition, it "must be 'beyond remediation,'" which means that "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."  *Id.* (quoting *CFGC*, 454 F.3d at 297-98 (citation omitted)); *see also* 11A Wright, Miller and Kane, Federal Practice and Procedure § 2948.1 (1995) ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief.")).[16]

---

[16] In the context of the FHA, a number of courts have adopted a rebuttable presumption of irreparable harm when the court finds that the Plaintiffs have demonstrated a likelihood of success on the merits.  *See Gresham v. Windrush Partners, Ltd*., 730 F.2d 1417, 1423 (11th Cir. 1984) (holding that "because of the subtle, pervasive, and essentially irremediable nature of racial discrimination, proof of the existence of discriminatory housing practices is sufficient to permit a court to presume irreparable

The LRA has already obligated and spent hundreds of millions of dollars of the remaining Road Home Homeowner Assistance funds, and in the near future it will take action to obligate and spend the $148 million of remaining funds it possesses.  *See supra* at 17-21. Similarly, the LRA or its successor could obtain from HUD within the near future an obligation and disbursement of all or part of the $500 million from Congress' third emergency appropriation that remains unobligated.  *See id.* at 21.  As these funds taken together, which amount to $648 million, barely exceed the estimated cost of $516 million needed to fund recalculated grants for nearly 9,500 homeowners in Orleans Parish, any additional commitment of the remaining Road Home funds will likely preclude the full award of equitable relief the Plaintiffs seek in this action.

Once the LRA and HUD obligate a portion or all of the remaining Road Home funds for other purposes, the funds "cannot be recouped" and, therefore, the Plaintiffs will suffer irreparable harm, as "[i]t will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits."  *Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) (holding that the threat of an agency obligating its remaining appropriated funds to other recipients before the conclusion of the action supports a finding of irreparable harm) (quoted in *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994)); *see also Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986).

As there is virtually no likelihood that the Plaintiffs' claim will be adjudicated on the merits before the remaining funds are obligated and/or dispersed, the risk is great and imminent that some or all of these funds will forever be lost to the Plaintiffs, causing them irreparable

---

injury"); *see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001). While the Court need not reach this issue to determine that the Plaintiffs will suffer irreparable harm, these cases show the importance that federal courts assign to remedying ongoing fair housing violations.

harm.  *Compare Population Inst.*, 797 F.2d at 1081 (finding irreparable harm and granting

injunction pending appeal because "this court will be unable to grant effective relief" if the

agency distributes to other groups the funds plaintiff sought to enjoin the agency from

withholding), *with Freeman v. Cavazos*, 756 F. Supp. 1, 3 (D.D.C. 1990) (finding no irreparable

harm when a school challenged an agency's decision to reduce funding the following year, but "a

decision on the merits, could be in place well before the end of th[is] school year," "[t]here is

little danger" that the "funds in question will be irrevocably lost," and the agency had "stipulated

that it will not disburse these funds elsewhere pending resolution of this case.").[17]

    Under these circumstances, it is plain that, "to avoid having its case mooted," a plaintiff

challenging an agency's use or allocation of funds "must . . . seek a preliminary injunction

preventing the agency from disbursing those funds."  *City of Houston*, 24 F. 3d at 1427 (citing

*Population Inst.*, 797 F.2d at 1081 ("if the government in the instant case is permitted *to*

*distribute* the $10 million to other organizations, the appeal will become moot.")).  Accordingly,

the Plaintiffs seek, and the Court should award, temporary and, if necessary, preliminary relief to

enjoin additional commitment and disbursement of the Road Home funds within the custody of

LRA and HUD.

    Nor can it be disputed that the Plaintiffs have an equitable interest in the disposition of

the Road Home funds in LRA's custody, and that the LRA's plans to dispose of these funds will

cause the Plaintiffs immediate and irreparable harm in the absence of temporary and preliminary

---

[17] *Accord Indian Path Med. Ctr. v. Leavitt*, No. 04-01000 (HHK), 2006 WL 1663453, at *6 n.7
(D. D.C. June 9, 2006) (Kennedy, J.) (dismissing an action for lack of standing, but observing that
without a preliminary injunction plaintiffs' complaint challenging the allocation of Medicare funds would
become moot "before a determination on the merits could be completed," and stating that "D.C. Circuit
case law makes clear that a plaintiff may only avoid having her complaint mooted by . . . 'seek[ing] a
preliminary injunction preventing the agency from disbursing the funds.'") (quoting *City of Houston*, 24
F.3d at 1427).

relief.  *See Ellipso, Inc., v. Mann*, 480 F.3d 1153, 1160 (D.C. Cir. 2007) (holding that a District Court may issue a preliminary injunction "when a party has demonstrated an equitable claim to the assets") (citing *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc*., 527 U.S. 308, 332-33 (1999) (holding that a court may not enter an injunction freezing assets in action for damages where there is no equitable interest in frozen assets); *Deckert v. Independence Shares Corp*., 311 U.S. 282, 289-90 (1940) (permitting an injunction freezing assets because it assisted the ultimate equitable relief of rescission)); *accord United States ex rel. Rahman v. Oncology Assocs., P.C*., 198 F.3d 489, 496 (4th Cir. 1999) (holding that when a plaintiff "asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested.").

In *Ellipso*, the D.C. Circuit affirmed a "preliminary injunction to preserve [the defendants'] assets for a potential judgment against [them]," because the plaintiff sought an "equitable remedy of an injunction" and not *solely* a remedy at law, and because there was evidence that the defendants were disposing of the disputed assets and would not have other significant assets from which they could satisfy a judgment.  480 F.3d at 1155, 1159-60.

Here, the identical conditions are present.  The Plaintiffs have a strong equitable interest in the remaining Road Home funds, as their entire ability to obtain relief is tied directly to those funds, and the only type of relief they seek is the "equitable remedy of an injunction" requiring the LRA prospectively to implement the Road Home program in a non-discriminatory manner.  *Id.* at 1159-60.  Moreover, the record shows that LRA has already obligated and spent hundreds

of millions of dollars in remaining Road Home funds, and in the near future the LRA and HUD

will obligate and disburse the remaining funds they possess.  *See supra* at 17-21.

Given that the Defendants currently possess about the same amount of funds as are

needed to provide full equitable relief, it is clear that without an injunction the Defendants will

lack sufficient funds to satisfy a judgment for the Plaintiffs, creating an imminent and concrete

risk of irreparable harm.  *Compare Ellipso*, 480 F.3d at 1155, 1159-60, *with Pan Am Flight 73*

*Liaison Group v. Dave*, No. 10-0077 JDB, 2010 U.S. Dist. LEXIS 46623, at *48-*49 (D.D.C.

May 12, 2010) (finding no irreparable harm and rejecting a motion to freeze disputed assets until

arbitration begins, as the plaintiff "only speculates that [the defendants] will dissipate the

disputed funds – it has provided no evidence that the [defendants] intend to do so," and "it has

not demonstrated that the amount of funds [the defendants] could disperse would leave an

insufficient amount to protect [the plaintiff's] financial interests").

Moreover, [t]he justification for a preliminary injunction [freezing the defendant's assets]

in this case is heightened by the fact that the public interest is at stake," as thousands of African

American homeowners are in jeopardy of losing the ability to enforce their federal civil rights in

an action challenging discrimination in the nation's largest emergency housing recovery program

– a program for which Congress mindfully mandated non-discrimination protections and

requirements affirmatively to further fair housing.  *Rahman*, 198 F.3d at 499 (holding that in

determining whether freezing the defendant's assets is "a reasonable measure to preserve the

*status quo* in aid of the ultimate equitable relief claimed . . . we may take into account that a

court of equity has enhanced authority when the public interest is involved"); *accord* 13 James

Wm. Moore, et al., Moore's Federal Practice § 65.20, at 65-33 (2010) ("[A] district court may

issue a preliminary injunction to freeze the defendant's assets in a suit that seeks some equitable relief and involves the defendant's assets, especially when the public interest is at stake.").

Indeed, "when interim equitable relief is authorized *and the public interest is involved*, . . . 'courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *Rahman*, 198 F.3d at 499 (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 383 (1965) (quoting *Virginian Ry. Co. v. System Fed'n No. 40*, 300 U.S. 515, 552 (1937))); *see also CFTC v. Next Fin. Servs. Unlimited, Inc.*, No. 04-80562, 2005 U.S. Dist. LEXIS 38965, at *31-*42, *46 (S.D. Fla. June 7, 2005) (following *Rahman*, 198 F.3d at 497, on the importance of the public interest, and denying a motion to vacate a TRO freezing a defendant's disputed assets in an action brought by the federal government).

Finally, beyond the near certain loss of their opportunity to obtain equitable relief in this action, the Plaintiffs would likely face additional irreparable harm.  Absent relief to enjoin commitment and disbursement of the remaining Road Home funds, many Plaintiffs will be unable to complete repairs to their homes in sufficient time to satisfy "covenants" required by LRA in every grant, that the homeowner "use the property within 3 years from the date of closing as a primary residence."  Road Home Homeowner Policies Version 7.0 at 48 (Ex. ee). LRA rules require that homeowners who fail to satisfy this covenant repay the entire grant, notwithstanding that the grant funds have been expended on repairs made to date.  *See id.* ("Applicants who fail to meet the terms of the covenants *are required* to pay back the entire grant amount.") (emphasis added).

Failure to occupy homes, because repairs couldn't be completed without grants calibrated to the cost of repair, would likely cause most homeowners to become insolvent and risk the loss

of their property altogether.  *See* Johnson Aff. ¶ 5, 8 (Ex. T) (stating that "many of my clients [95% of whom are minority] . . . are at significant risk of losing their property because they are unable to adequately rebuild and return to their homes, and therefore they cannot comply with the Road Home Program covenant requiring them to use as their primary residence within three years from the date of their closing with the Road Home Program.").[18]   The loss of property would, by its very nature, constitute irreparable harm to the Plaintiffs.

It is well settled that land is unique and its loss would cause irreparable harm.  *Pelfresne v. Village of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute."); *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982) (uniqueness of land "settled beyond the need for citation.").  Thus, the LRA's clawback provisions threaten many Plaintiffs' primary asset – their homes – and poses a very real threat of irreparable harm.

For all these reasons, the Plaintiffs have shown that, absent the temporary and, if necessary, preliminary relief sought herein, they would almost assuredly, and certainly "likely," suffer irreparable harm.

---

[18] *See also* Affidavit of Seth Weingart, Homeownership Counseling Supervisor at the Greater New Orleans Fair Housing Action Center ¶ 5 (May 29, 2010) (Ex. ff) (stating that, as a housing counselor in New Orleans since 2006, he has observed that "many homeowners who received Road Home Program grant awards are at risk of losing their homes, because they are unable to satisfy the grant covenants to reoccupy their homes.  They are at risk of the State of Louisiana taking their homes for failing to abide by the grant covenants, and at risk of foreclosure by their mortgage lenders for being unable to pay mortgages on homes they are unable to live in. These grantees would not have the financial capacity to repay a loan if such a program was available, due to the fact that they are already overburdened with a mortgage and other debts, lack of income, and poor credit. Many of the homeowners unable to rebuild are elderly and on fixed incomes, and will not be able to afford a loan regardless of the terms.").

**C.      A Preliminary Injunction Will Not Substantially Harm the Defendants or Other Interested Parties**

The third factor also weighs strongly in favor of granting preliminary injunctive relief. Neither the Defendants nor any other interested third parties will suffer harm, let alone "*substantial* harm," if this Court enjoins LRA from obligating or spending the remaining Road Home funds until it decides this case on its merits. *See Jasperson*, 460 F. Supp. 2d at 88 ("The court must consider . . . whether the issuance of injunctive relief would 'substantially harm' other parties").

Unlike the immediate, certain and grave harm the Plaintiffs face, the LRA plainly will *not* suffer substantial harm. The delay in obligating and disbursing the remaining Road Home funds is insufficient to demonstrate substantial harm either to LRA or to HUD. Indeed, delay alone does not constitute harm to defendants or third parties sufficient to deny a request for injunctive relief. *See Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 80-81 (D.D.C. 2008) (finding that the balance of harms favored the plaintiff where it faced loss of the right to purchase unique and irreplaceable real property, while defendant transit authority merely faced delay in its ability to sell the property).[19]  In contrast to the temporary delay that the Defendants might experience if an injunction is granted, should the Court deny Plaintiffs' motion for a preliminary injunction, the Plaintiffs will likely lose their opportunity forever to have the LRA recalculate their grants on a non-discriminatory basis. *See City of Houston*, 24 F.3d at

---

[19] *See also PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007) (district court did not abuse its discretion in granting preliminary injunctive relief preventing the sale of defendant's assets, because defendant faced only a delay in its ability to transfer the assets to a third-party purchaser, while plaintiff would forever lose its rights to purchase the assets in their current state); *Harris County, Tex. v. Gist*, 976 F. Supp. 601, 616-17 (S.D. Tex. 1996) (preliminary injunctive relief blocking federal distribution of funds was warranted where plaintiff county would otherwise suffer irreparable harm of losing its right to negotiate with defendant city over proper distribution of the funds, while defendant city would only face delay in receiving the grant money).

1426-27 (to avoid having its case mooted, a plaintiff must seek injunctive relief before agency

funds at issue are fully obligated or awarded); *see supra* at 31-32.

Moreover, no other interested parties[20] will face substantial harm.  First, the vast majority

of individuals eligible for the LRA's lending program – whether or not they are potential class

members – will actually *benefit* from preliminary relief, as  most individuals eligible for the

LRA's loan program would receive higher recalculated grants based on the cost of their repairs,

rather than pre-storm value, should the plaintiffs prevail in this action.

There is no dispute that LRA's lending program is limited to "Road Home recipients who

are not able to get back into their homes with their current resources," LRA Proposed Action

Plan Amendment No. 43 at 3 (Ex. aa), and that homeowners who face sizeable gaps in rebuilding

costs making it difficult for them to "get back into their homes" were far more likely to receive

grants based on the lower pre-storm value than the cost of repairing damage.  *See* PolicyLink

Study at 43.  Therefore, most of the homeowners eligible to receive a loan under the LRA's new

lending program received grants based on the lower pre-storm value.  And these homeowners

who received grants based on pre-storm values would receive a higher recalculated grant if this

Court orders the LRA to implement a non-discriminatory formula.

The benefits of receiving a larger recalculated grant that need not be repaid undoubtedly

exceed the value of receiving a loan, pursuant to LRA's proposed Amendment 43, that must be

---

[20] As a large portion of the Road Home grant recipients who have been unable to rebuild due to
insufficient grants are actually members of the proposed plaintiff class, they cannot be considered "other
interested parties."  Indeed, named Plaintiffs have affirmed that repairs to their homes remain incomplete
because they still have not received sufficient funding from the Road Home Program, making them
potentially eligible for the new lending program.  *See, e.g.*, Ford Aff. ¶ 6 (Ex. U) ("I have been living on
my property since September 2008, but repairs are not completed, because I did not receive enough
money from the Road Home Program or insurance to complete repairs."); Randolph Aff. ¶ 6 (Ex. V)
("With the grant award I received from the Road Home, insurance and FEMA, I am still short $173,193
needed to rebuild my house.").

repaid in the near future.  For example, a homeowner in the situation of Mr. Randolph, who received a grant of $16,649, would clearly prefer a recalculated grant of $150,000 instead of a loan of any amount.  And for homeowners who have limited or fixed incomes, it is unlikely they would be able to repay a loan, making a grant the only feasible option.  Moreover, for a homeowner who already has been forced to borrow funds because the Road Home grant award was insufficient to defray all rebuilding costs, offering him yet another loan – rather than a grant – will only increase his overall debt.  *See, e.g.*, Ford Aff. ¶ 6 (Ex. U).

Second, in evaluating the impact of an injunction on existing Road Home recipients, the Court must recognize that the LRA's lending proposal will actually *increase and further perpetuate* discrimination against African American homeowners.  Simply put, the LRA's lending proposal will deepen the disparities between the benefits received by White and African American homeowners—Whites more often received *grants* based on the full cost of repairing their homes, while African Americans more often received grants based on the low pre-storm value of their homes plus a loan that must be repaid.

The balance of harms, therefore, decidedly tips in favor of granting preliminary relief, as the Plaintiffs risk the loss of any means to redress the harm giving rise to this action, whereas the Defendants, at most, face delay in implementing their programs.  As most of the homeowners eligible to receive a loan under the program LRA presently contemplates would likely be eligible for higher recalculated grants and thus ultimately benefit from a delay, the balance tips even further towards granting preliminary relief.

**D.      The Public Interest Unequivocally Favors Injunctive Relief**

The public interest plainly favors enjoining the LRA from obligating or spending the remaining Road Home funds, and barring LRA from seeking the obligation and/or disbursement of the remaining funds HUD has, as denial of such relief will deprive the Plaintiffs of an ability to vindicate their civil and fair housing rights, and will guarantee that they will be denied an equal opportunity to benefit from the nation's largest emergency housing program.

First, "[t]here can be no doubt that the public interest lies in terminating" such discrimination. *Cook v. Billington*, No. 82-0400, 1988 WL 35364, at *2 (D.D.C. Mar. 31, 1988). Indeed, the Supreme Court has recognized that the eradication of housing discrimination serves "an overriding societal priority." *United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004) (quoting *Meyer v. Holley*, 537 U.S. 280, 290 (2003)). Moreover, eliminating housing discrimination and affirmatively promoting fair housing were the very purposes of enacting the Fair Housing Act. *See* 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."); *see also Price v. Pelka*, 690 F.2d 98, 101 (6th Cir. 1982) ("The eradication of housing discrimination is a policy that Congress considered to be of the highest priority.") (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972)). And, "[i]n deciding what issues are imbued with the 'public interest,' courts have given considerable weight to the policies of Congress[.]" James Wm. Moore, et al., Moore's Federal Practice at § 65.22[3], at 65-58 (2010).

The importance of remedying housing discrimination is well established. Courts, including those within this Circuit, have routinely emphasized that remedying discrimination is an important public interest in cases involving violations of the Fair Housing Act. *See, e.g.*, *Brown v. Artery Org., Inc.*, 691 F. Supp. 1459, 1461 (D.D.C. 1987) (concluding that "the public

interest would be better served by remedying any possible racial injustice" and denying

defendants' motion to stay); *Brown v. Artery Org., Inc.*, 654 F. Supp. 1106, 1119 (D.D.C. 1987)

(concluding that "the public interest will most readily be served if prevention of the spread of

racial discrimination in housing is given priority weight."); *Price*, 690 F.2d at 101 ("Private

enforcement of the Fair Housing Act and 42 U.S.C. §§ 1981 and 1982 not only vindicates the

civil rights of the individual victim of discrimination, but promotes the public interest by

eradicating housing discrimination."); *United States v. Edward Rose & Sons*, 246 F. Supp .2d

744, 755 (E.D. Mich. 2003) ("[W]here there has been a showing of housing discrimination,

preliminary injunctive relief serves the public interest by carrying out the stated policy of the

United States in 42 U.S.C. § 3601"); *United States v. Puerto Rico*, 764 F. Supp. 220, 225 (D.P.R.

1991) (granting injunction and emphasizing "the public interest that all citizens have in seeing

vigorous enforcement of civil rights legislation like the Fair Housing Act.").[21]

    Second, "[t]he public has an interest in assuring that public funds are appropriated and

distributed pursuant to Congressional directives." *Population Inst.*, 797 F.2d at 1082. As

Congress specifically directed that the Road Home funds be spent pursuant to federal fair

housing and anti-discrimination standards, 2005 Act, 119 Stat. at 2780; 2006 Act, 120 Stat. at

472-73, "the public interest will be frustrated" if the LRA is permitted to "distribute the funds" in

direct contravention of the civil rights standards "dictated by Congress." *Population Inst.*, 797

F.2d at 1082; *see also* Letter from Rep. Maxine Waters to HUD Secretary Shaun Donovan (Apr.

---

[21] Likewise, outside the fair housing context, courts have found that the public interest favors
granting injunctive relief in the face of a discriminatory formula promulgated by a state agency. *See
South Camden Citizens in Action v. N.J. Dep't of Env. Prot.*, 145 F. Supp. 2d 446, 502 (D.N.J. 2001)
(concluding the public interest favored plaintiff, in part because "requiring the [state agency] to comply
with the EPA's Title VI implementing regulations is inherently in the public interest, insofar as it ensures
the protection of civil rights").

14, 2010) at 1-2 (Ex. gg) (stating that the Road Home program "appears to contravene the fair housing protections enshrined in federal law—protections that were explicitly mandated by Congress when it funded the Road Home program.").

Finally, if the Court preserves the status quo and the Plaintiffs are able to obtain the temporary and preliminary relief they seek, nearly 9,500 homeowners in Orleans Parish will receive additional resources that will help them finish repairing their homes.  *See id.* at 2 (stating that the Road Home Program's "discrimination . . . poses a major obstacle to rebuilding the great city of New Orleans and enabling its people to return home," and that many African American families "impacted by this discriminatory policy . . . still face insurmountable barriers to rebuilding.").  Undoubtedly, completing these rebuilding efforts, especially in predominantly African American neighborhoods, will improve the lives of residents, homeowners, and communities in New Orleans in so many tangible and intangible ways.[22]  As this Court has expressly recognized that rehabilitating communities is in the public interest, *Brown*, 654 F. Supp. at 1119 (noting that the argument that rehabilitating apartment complexes is in the public interest has "obvious merit"), surely the same logic applies to rebuilding thousands of homes there were devastated by Hurricane Katrina.

In short, there is overwhelming legal authority and evidence that a preliminary injunction will further the public interest by remedying costly discrimination, ensuring that the nation's largest federal housing program is administered according to the express fair housing mandates of Congress, and assisting thousands of homeowners to complete their repairs.

---

[22]     Relatedly, granting injunctive relief will provide an economic benefit to the New Orleans and Louisiana governments, as such relief will make it possible for thousands of displaced residents to receive additional assistance and properly repair their homes, which will translate into higher property values. Higher property values, of course, will translate to higher property tax collections for the city and state governments.  Moreover, all homeowners in the City of New Orleans will benefit from the rising property values.

## CONCLUSION

For the foregoing reasons, pending this Court's consideration of Plaintiffs' claims on the merits, the Court should temporarily restrain and, if necessary, preliminarily enjoin the LRA from taking any action to obligate any funds that remain available in the Road Home Homeowner Assistance program, and also enjoin the LRA from taking any action to request that HUD further obligate, award or disburse Road Home funds in its custody.

Dated: <u>June 2, 2010</u>.                                Respectfully submitted,


 /s/ John Payton                                        /s/ Joseph M. Sellers
John Payton, Director-Counsel              Joseph M. Sellers (D.C. Bar No. 318410)
(D.C. Bar No. 282699)                          Jenny R. Yang (D.C. Bar No. 484874)
Damon T. Hewitt                                   Llezlie Green Coleman (D.C. Bar No. 484051)
Renika C. Moore                                   Peter Romer-Friedman (D.C. Bar No. 993376)
NAACP LEGAL DEFENSE &              COHEN MILSTEIN SELLERS & TOLL PLLC
EDUCATIONAL FUND, INC.             1100 New York Avenue, NW, Suite 500
99 Hudson Street, 16th Floor                Washington, D.C. 20005
New York, NY 10013                          (p) 202-408-4600 / (fax) 202-408-4699
(p) 212-965-2200 / (fax) 212-226-7592    jsellers@cohenmilstein.com
jpayton@naacpldf.org

/s/ Danielle Conley
WILMERHALE
1875 Pennsylvania Avenue, NW
Washington DC  20006
+1 202 663 6006 (t)
+1 202 663 6363 (f)
Craig Goldblatt (D.C. Bar No. 449229)
Danielle Conley (D.C. Bar No. 503345)
danielle.conley@wilmerhale.com


*Attorneys for Plaintiffs*

43

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2010, the foregoing document was filed electronically

with the Court's ECF system, through which a copy was served on:

Allen J. Krouse, III
Renee G. Culotta
Suzanne M. Risey
FRILOT L.L.C.
1100 Poydras Street
Suite 3600
New Orleans, LA 70163
Telephone: 504-599-8004
Facsimile: 504-599-8104
Email: akrouse@frilot.com
Email: rculotta@frilot.com
Email: srisey@frilot.com

*Attorneys for Defendant*
*Executive Director of the*
*Louisiana Recovery Authority*

James D. Todd
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, N.W.
Washington, DC 20001
Telephone: 202-514-3378
Facsimile: 202- 616-8470
Email: james.todd@usdoj.gov

*Attorney for Defendant*
*United States Dept. of*
*Housing and Urban*
*Development*