# Exhibit N

**Field Hearing Before the Subcommittee on Housing and Community Opportunity of the Committee on Financial Services,** *Implementation of the Road Home Program Four Years After Hurricane Katrina* **(Aug. 20, 2009)**

# IMPLEMENTATION OF THE ROAD HOME PROGRAM FOUR YEARS AFTER HURRICANE KATRINA

## FIELD HEARING

BEFORE THE

### SUBCOMMITTEE ON HOUSING AND COMMUNITY OPPORTUNITY

OF THE

### COMMITTEE ON FINANCIAL SERVICES

### U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

FIRST SESSION

———————

AUGUST 20, 2009

———————

Printed for the use of the Committee on Financial Services

## Serial No. 111–70



U.S. GOVERNMENT PRINTING OFFICE

53–250 PDF                    WASHINGTON : 2010

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## HOUSE COMMITTEE ON FINANCIAL SERVICES

BARNEY FRANK, Massachusetts, *Chairman*

PAUL E. KANJORSKI, Pennsylvania
MAXINE WATERS, California
CAROLYN B. MALONEY, New York
LUIS V. GUTIERREZ, Illinois
NYDIA M. VELAZQUEZ, New York
MELVIN L. WATT, North Carolina
GARY L. ACKERMAN, New York
BRAD SHERMAN, California
GREGORY W. MEEKS, New York
DENNIS MOORE, Kansas
MICHAEL E. CAPUANO, Massachusetts
RUBÉN HINOJOSA, Texas
WM. LACY CLAY, Missouri
CAROLYN McCARTHY, New York
JOE BACA, California
STEPHEN F. LYNCH, Massachusetts
BRAD MILLER, North Carolina
DAVID SCOTT, Georgia
AL GREEN, Texas
EMANUEL CLEAVER, Missouri
MELISSA L. BEAN, Illinois
GWEN MOORE, Wisconsin
PAUL W. HODES, New Hampshire
KEITH ELLISON, Minnesota
RON KLEIN, Florida
CHARLES A. WILSON, Ohio
ED PERLMUTTER, Colorado
JOE DONNELLY, Indiana
BILL FOSTER, Illinois
ANDRÉ CARSON, Indiana
JACKIE SPEIER, California
TRAVIS CHILDERS, Mississippi
WALT MINNICK, Idaho
JOHN ADLER, New Jersey
MARY JO KILROY, Ohio
STEVE DRIEHAUS, Ohio
SUZANNE KOSMAS, Florida
ALAN GRAYSON, Florida
JIM HIMES, Connecticut
GARY PETERS, Michigan
DAN MAFFEI, New York

SPENCER BACHUS, Alabama
MICHAEL N. CASTLE, Delaware
PETER T. KING, New York
EDWARD R. ROYCE, California
FRANK D. LUCAS, Oklahoma
RON PAUL, Texas
DONALD A. MANZULLO, Illinois
WALTER B. JONES, JR., North Carolina
GARY G. MILLER, California
SHELLEY MOORE CAPITO, West Virginia
JEB HENSARLING, Texas
SCOTT GARRETT, New Jersey
J. GRESHAM BARRETT, South Carolina
JIM GERLACH, Pennsylvania
RANDY NEUGEBAUER, Texas
TOM PRICE, Georgia
PATRICK T. McHENRY, North Carolina
JOHN CAMPBELL, California
ADAM PUTNAM, Florida
MICHELE BACHMANN, Minnesota
KENNY MARCHANT, Texas
THADDEUS G. McCOTTER, Michigan
KEVIN McCARTHY, California
BILL POSEY, Florida
LYNN JENKINS, Kansas
CHRISTOPHER LEE, New York
ERIK PAULSEN, Minnesota
LEONARD LANCE, New Jersey

JEANNE M. ROSLANOWICK, *Staff Director and Chief Counsel*

SUBCOMMITTEE ON HOUSING AND COMMUNITY OPPORTUNITY

MAXINE WATERS, California, *Chairwoman*

| | |
|---|---|
| NYDIA M. VELÁZQUEZ, New York | SHELLEY MOORE CAPITO, West Virginia |
| STEPHEN F. LYNCH, Massachusetts | THADDEUS G. McCOTTER, Michigan |
| EMANUEL CLEAVER, Missouri | JUDY BIGGERT, Illinois |
| AL GREEN, Texas | GARY G. MILLER, California |
| WM. LACY CLAY, Missouri | RANDY NEUGEBAUER, Texas |
| KEITH ELLISON, Minnesota | WALTER B. JONES, JR., North Carolina |
| JOE DONNELLY, Indiana | ADAM PUTNAM, Florida |
| MICHAEL E. CAPUANO, Massachusetts | KENNY MARCHANT, Texas |
| PAUL E. KANJORSKI, Pennsylvania | LYNN JENKINS, Kansas |
| LUIS V. GUTIERREZ, Illinois | CHRISTOPHER LEE, New York |
| STEVE DRIEHAUS, Ohio | |
| MARY JO KILROY, Ohio | |
| JIM HIMES, Connecticut | |
| DAN MAFFEI, New York | |

# CONTENTS

_____

                                                                              Page

Hearing held on:
    August 20, 2009 ...............................................................................   1
Appendix:
    August 20, 2009 ...............................................................................  63


## WITNESSES

### THURSDAY, AUGUST 20, 2009

Baker, Shari, on behalf of Lillie Baker, resident, Pontchartrain Park, New
    Orleans, Louisiana ............................................................................  49
Colangelo, Matthew, Director, Economic Justice Group, NAACP Legal De-
    fense and Educational Fund ...........................................................  48
Croom-Fontenot, Mary, Executive Director, All Congregations Together ..........  46
Duval-Diop, Dominique, Senior Associate, PolicyLink .......................................  43
Finger, Davida, Clinical Professor, New Orleans College of Law, Loyola Uni-
    versity ................................................................................................  44
Franklin, Mildred, resident, Pontchartrain Park, New Orleans, Louisiana .......  51
Oney, Christopher J., Executive Vice President, Hammerman & Gainer, Inc. ..  39
Plyer, Allison, Deputy Director, Greater New Orleans Nonprofit Knowledge
    Works .................................................................................................  41
Rainwater, Paul, Executive Director, Louisiana Recovery Authority .................   9
Sathe, Ommeed, Director of Real Estate Strategy, New Orleans Redevelop-
    ment Authority (NORA) ..................................................................  12
Tombar, Frederick, Senior Advisor for Disaster Recovery, U.S. Department
    of Housing and Urban Development ................................................   8


## APPENDIX

Prepared statements:
    Baker, Lillie ......................................................................................  64
    Colangelo, Matthew .........................................................................  66
    Franklin, Mildred ............................................................................  70
    Oney, Christopher J. ........................................................................  73
    Plyer, Allison ...................................................................................  79
    Rainwater, Paul ................................................................................  85
    Sathe, Ommeed .................................................................................  92
    Tombar, Frederick ............................................................................  97

### ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

Waters, Hon. Maxine:
    Written statement of Melanie Ehrlich, Founder of Citizens' Road Home
        Action Team (CHAT) ..................................................................  101

# IMPLEMENTATION OF THE ROAD HOME PROGRAM FOUR YEARS AFTER HURRICANE KATRINA

————

**Thursday, August 20, 2009**

U.S. HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON HOUSING AND
COMMUNITY OPPORTUNITY,
COMMITTEE ON FINANCIAL SERVICES,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 1:25 p.m., in the Lawless Memorial Chapel, Dillard University, 2601 Gentilly, New Orleans, Louisiana, Hon. Maxine Waters [chairwoman of the subcommittee] presiding.

Members present: Representatives Waters, Cleaver, and Green.

Also present: Representative Cao.

Chairwoman WATERS. This field hearing of the Subcommittee on Housing and Community Opportunity will come to order.

Good afternoon, ladies and gentlemen. First, I would like to thank President Marvalene Hughes for allowing us to use Dillard's facilities one more time.

President Hughes, again, I am very thankful for the opportunity to be here with you and I would like to let you know how appreciative I am for your generosity. Whenever we have called on you, you have not hesitated. And to be here at this beautiful facility is certainly delightful and wonderful. And I would like to ask you to just say a few words to our audience here today.

Ms. HUGHES. Thank you so very much.

I want to start, first of all, by saying to the Honorable Chairwoman Maxine Waters, welcome back home.

Chairwoman WATERS. Thank you.

Ms. HUGHES. And I want you to know that it is so fascinating that this campus has totally adopted you. So any time you want to use this building, it is here for you. This building is different than it was the last time and it is fully restored and operable, so we are very proud of that.

I also would like to acknowledge the Honorable Al Green from Texas, who is, incidentally, a native New Orleanian. So welcome home to you.

To the Honorable Emanuel Cleaver, we are happy to have you here, and I am pleased to announce that your son, who graduated from here a couple of years ago, is very successful in Hollywood. He is the kind of alumni that we are proud to have.

(1)

2

And of course, our new Representative who has been so active with Dillard University is Representative Cao.

The cause for being here is a very important cause and I know that this audience is pleased that you have come back to do the tasks that are so important ahead of us.

This is the third time that this committee has convened here. You were here twice in 2007 when things were much more devastated and the recovery efforts and the renewal efforts were all very, very challenging. We at Dillard University have almost finished. We even have two new buildings under construction now and those buildings will be LEED certified buildings.

We are hopeful, of course, that the Corps of Engineers, FEMA, and the insurance industry will realize the severity of our need to recover and that by 2011, we will be absolutely completely finished.

I want you to make yourselves at home, let us know what you need. And I know that this audience joins me in welcoming you to bring us up-to-date on the latest issues and efforts that you are experiencing and can promise to us.

Dillard University is in a very special year. We are celebrating our 140th birthday and it was that important effort that caused us to know that we were absolutely going to restore the university. Our efforts continue. We depend on you to support us and we want to remain partners with you in everything that you are doing in Washington that relates to us in higher education.

Thanks for being here to each of you.

Chairwoman WATERS. Thank you so very much, President Hughes. Again, we are very pleased to be here and we see the progress and the work that has been done. And again, this building has been beautifully restored and we drove around the campus a little bit this morning as I was coming in, and you have done a wonderful job.

Even though we do not really applaud in these hearings, I always break the rules. Would you give President Hughes a big round of applause?

[applause]

Chairwoman WATERS. Thank you so very much.

I would also like to thank our Representatives from Congress who are here with us today. I have been explaining to some that many of the Members of Congress are traveling all over the world. We have CODELs that are in Afghanistan, we have CODELs in Africa, we have CODELs in Central America. But we have some Members who decided that they were going to spend time in their districts and important time on some domestic issues.

The next two gentlemen that I am going to introduce serve on the Financial Services Committee where I serve, but they also serve on the Subcommittee on Housing and Community Opportunity, which I chair, and which is holding this hearing today. They decided that they would break from their districts to be here because New Orleans deserves our presence. As President Hughes has said, we have been here several times trying to make sure that we understood what was happening with the Federal funds that have been sent to this district, trying to make sure that the people were being supported in every way possible. But they came back again today, because they thought it was so important to be here

3

on the fourth anniversary of Hurricane Katrina, to follow up. Not to have just come early on, not to have just come to say that we were in support, but to come to say we are following up to make sure that we are doing everything possible to be of assistance to the people of New Orleans.

With that, I would like you to welcome Congressman Cleaver all the way here from Missouri, Congressman Emanuel Cleaver; and Congressman Al Green from Texas, who is here with us today. Mr. Green and Mr. Cleaver have been consistent supporters of the Gulf Coast and its recovery. They both attended, again, the field hearings that we had here in 2007 and have been tireless advocates for this region. And I am delighted that they are here today.

We are joined also today by the Representative of this community, Representative Cao, who represents this district. Without objection, Mr. Cao will be considered a member of the subcommittee for the duration of this hearing, so that he too can participate in ways that will help us to extract the information that we need so that we will know what we must do.

I further believe that several members of the Louisiana State Legislature and the New Orleans City Council may be present in the audience today. We welcome them and we thank you for attending.

Today's hearing will focus on the implementation of the Road Home Program 4 years after Hurricane Katrina. Tomorrow, we will reconvene to hear testimony about the status of the redevelopment of the "Big Four" public housing developments. As I mentioned earlier, my subcommittee was initially here 2 years ago for its first field hearing. At that time, I was concerned about the lack of progress in rebuilding the City, including its affordable housing supply. I was especially concerned about the slow pace of the roll out of the Road Home Program.

While the program picked up its pace, I am now concerned about its processes and the amounts homeowners have received. Funded at $10.5 billion in Federal Community Development Block Grant funds, the Road Home Program is the largest direct run program to assist homeowners following a natural disaster in our Nation's history. The main purpose of the Road Home Program is to provide homeowners with funding up to $150,000 to repair or rebuild damaged homes. Homeowners can also receive Road Home funds to either relocate to a new property or to sell their damaged property to the State of Louisiana.

However, the majority of complaints that I hear about the program are brought by homeowners who do not want to sell or move. They simply want to fix up their home and live here. In many cases, these homeowners have lived in their homes and neighborhoods for decades. They have strong ties to their communities and do not want to live anyplace else. Unfortunately, because some of these homeowners have received less than they need to make repairs, their ability to rehabilitate their homes and stay in their neighborhoods is at risk.

In fact, just this morning, I met with a group of homeowners in the Pontchartrain Park area who are having problems with the program. These residents shared with me their experiences with the Road Home Program. Their stories are similar to many home-

4

owners in the City. The residents I met with this morning have been ripped off sometimes by unscrupulous contractors. They have followed difficult program rules, including title clearance. They have heard nothing back from Road Home. They have filed multiple appeals and 4 years after Katrina, they are still no closer to rebuilding their homes. This is especially frustrating given that the program is expected to have a surplus.

I am also concerned about disparities in grant awards that may exist between low-income and minority homeowners. The Road Home distribution formula provided homeowners the lesser of either the amount of damage less any insurance or pre-storm value less any insurance. As a result, homes with low pre-Katrina values received less funding. Unfortunately, many of these homeowners were low income or minorities. For example, according to one estimate, residents in the Lower Ninth Ward had an average shortfall of about $75,000 where residents in Lakeview had an average shortfall of $44,000.

Housing is critical to our national economic recovery and I believe that it is critical to the recovery of the Gulf Coast in general and the City of New Orleans in particular. The Road Home Program is an important part of that recovery.

However, if it does not work for homeowners, then we all need to be prepared to discuss how the program can be improved so that it fulfills its mission and truly puts homeowners on the road back to their homes.

I look forward to hearing the witnesses' views on this very important program and now I would like to recognize Mr. Cleaver first for his opening statement.

Mr. CLEAVER. Thank you, Madam Chairwoman.

Let me just speak on a personal level because I think it may in fact represent what I have heard thus far today at the listening session over at the Southern University of New Orleans. As the President mentioned, my son graduated from Dillard University a couple of years ago. Actually he was here when Katrina hit and managed to spend the night in a Wal-Mart parking lot before getting out of the City and making it to Houston to stay with his aunt. Dillard did a good job. My son was offered a full scholarship to go to LSU to get an MFA, but made a decision after Katrina, that he would rather go to California, which is what he did. He now resides in my colleague, Ms. Waters' district in Los Angeles.

But it was the decisionmaking that I want to talk about. After coming back from Missouri to New Orleans, going back to the apartment where he was living, visiting the campus, looking at the area with which he was most familiar, he made a decision that he did not think that it would be in his best interest to stay here, in spite of the fact that the movie industry was trying to crank up a high level movie manufacturing center here in New Orleans. But he said to me, that is not going to work because nobody is trying to rehab New Orleans and so it is going to lead the movie industry to begin to back away from New Orleans. I do not know whether that has happened or not, all I know is that he backed away.

So I can understand clearly people who left New Orleans, went to Houston, went to Atlanta, went to Chicago—I think Chicago took more residents than any other city outside of the south—and who

5

have made decisions, after looking at what was going on, not to come back.

Now I think all three levels of government can do better. The road home has been filled with road blocks and so a lot of people cannot come back home because it is difficult to climb over the mountains on the road. And in some places, I think either bureaucrats or government officials dug holes in the road and even when we attempted to pave over the holes, when we leave they dig some new holes. So I think there is a lot of work to be done, at all three levels—Federal, State, and the municipal level. And I think that it is important for you to express to us the kinds of opinions that I do not think anybody is going to be inhibited, that we can use to continue to fight.

The good news is that we serve with the Chair—who, if you know anything about her, is relentless and is not ever going to back away. And so here in the heat of August, we are in New Orleans because of her commitment and her willingness to go to bat for the people of New Orleans who deserve the best, because the road back is not representative of the Big Easy.

Thank you, Madam Chairwoman.

Chairwoman WATERS. Thank you so very much, Mr. Cleaver.

Mr. Green.

Mr. GREEN. Thank you, Madam Chairwoman.

I also would like to thank and compliment Dr. Hughes. She is a stately, courtly, and gracious lady who is also brilliant, and we appreciate you sharing your brilliance with us.

I would like to echo some of what Congressman Cleaver has called to our attention. And I would especially like to call to the attention of all present that Louisiana, and New Orleans in particular, is on the radar of the Congress of the United States of America because the Honorable Maxine Waters has caused it to focus on New Orleans. And if anyone deserves an expression of appreciation for hard work done on behalf of everyone, including the least, the last, and the lost, it is the Honorable Maxine Waters. And I think we ought to give her that expression of appreciation.

[applause]

Mr. GREEN. She has clearly been a friend. And the beautiful thing about having her as your friend is that she brings her friends with her. When she calls, there is no question as to what the answer will be. If it is New Orleans today, then Al will be in New Orleans today, and I come gladly. Not because I am a Charity baby, by the way. I was born in Charity Hospital and I am proud of it. But I come because I understand that our chairwoman is going to do everything within her power to make sure that the road home brings everybody home. And in a metaphorical sense, the road home is not bringing everybody home.

As Congressman Cleaver indicated, it has some potholes in it. But we fix potholes in the Congress of the United States of America, and we would be honored to fix some of these potholes and help you.

It also has some hazards. Hazard insurance, as I understand it, is a real problem—hard to come by and hard to maintain once you get it. But hazard insurance is a problem, that is a hazard in this road home.

6

It also has, as I understand it, some detours along the way. It seems that you had a management company that did fairly well. They are no longer managing, but they were properly compensated, as I understand it—or maybe I should said fairly compensated. I do not think anybody argues that they were not fairly compensated.

And finally, it has some tolls along the way. It seems to take a greater toll on some more than others. It seems to be costing some more to get home than others.

I am here because I believe in making sure that every person is treated properly and that everybody has an opportunity to have a similar experience that will lead each and every one back home. About 10,000 people from Louisiana and this area of Vietnamese ancestry came to Houston, Texas, and many of them still desire to come home. I represent a constituency that is as diverse as any in the country: 36 percent African-American; 31 percent Latino; 21 percent Anglo; and 12 percent Asian. My Asian constituents are concerned. I have received anecdotal evidence that language has become a problem in helping them to return home. I am here to represent all of my constituents and that includes everyone in this room, because we are Congresspersons for the United States of America, U.S. Congresspersons. That means that when I vote, I vote for everyone in this room, and I assure you, I want to make sure that everyone has an opportunity to come home who wants to come home and then have a place to call home when they get here.

Madam Chairwoman, I thank you, and I thank Representative Cao, I believe this is his district. I thank you and I thank Representative Cleaver as well. Thank you.

Chairwoman WATERS. Thank you, Mr. Green.

At this time, I am going to call on the Representative for this district. When we were here before, there was a different Representative. When we learned that we were coming here, we extended an invitation to your Representative because that is the protocol that should be followed. We should come to a Representative's district and allow them the opportunity to participate. He responded immediately and he is here today and I will call on him for his opening statement. Mr. Cao, thank you very much.

Mr. CAO. Thank you, very much, Madam Chairwoman, for hosting this very important field hearing. And I would like to thank my distinguished colleagues in the House, Al Green and Emanuel Cleaver, for also coming here. I and the other officials who represent the people of this district are grateful that the committee has renewed its interest in the recovery of New Orleans and seeing that its citizens receive fair treatment as the City's housing stock is rebuilt. My hope is that this interest and the work that stems from this hearing will go beyond a once-per-Congress event to a sustained dialogue on the issues and solutions.

In just 9 days, the City of New Orleans will mark the fourth anniversary of Hurricane Katrina. Once again, this community will take stock of what has and has not been done to restore the City. As their Representative in Congress, it is now my task to work towards bringing them home to a city prepared to house them.

When Katrina hit, entire sections of the City were destroyed. No one has ever seen a disaster of this magnitude on U.S. soil. No

7

local, State, or Federal Government entity was ready for what happened. At that time, there did not exist in our national psychology a framework for rebuilding every aspect of a city. How does one rebuild an entire city and get mentally, physically, and financially fatigued residents to come home? Do we focus on jobs first, housing, schools or stores? In August of 2005, no one had the answers to these questions. Today, we are still in the process of finding the answers.

One of the key outstanding issues left for us to resolve is solving the City's housing problem. Thousands of people were displaced after the storm and many still are. With roughly 40 percent of the City's housing stock abandoned or blighted, there are still areas which need to be repopulated. One of the solutions we have worked on to address rehousing residents was the Road Home Program.

While the Road Home Program has undergone some changes and made significant progress in the last year, it still was a challenged program that left many homeowners unable to return home. We now need to work to resolve these final cases and bring these families back to Louisiana permanently.

I know from working with the LRA and their staff that they are hard at work trying to correct some of the residual issues with the program and have made providing complete assistance to the affected families a priority. The State cannot accomplish this task without cooperation from the Federal and State Governments. As I and my counterparts in the Louisiana Congressional Delegation work with our colleagues in Washington to get more resources to the State, we need for the City to plan ways to effectively use those resources.

In addition to working on Road Home, the City has yet to spend more than $200 million in long-term community recovery funds that the State has approved, but has remained relatively unspent by the City. The recovery of this great City depends on money being spent and I urge the City government to do so in an expedient manner.

With that, again, I want to thank Chairwoman Waters for holding this very important hearing. I would like to thank my distinguished colleagues for being here. And lastly, I would like to thank President Hughes for providing us this facility to hold this very important hearing.

With that, I would like to ask the chairwoman for leave to go to another event and I will be back right after the end of that event.

Chairwoman WATERS. Thank you very much.

I am pleased to welcome our first distinguished panel. Our first witness will be Mr. Fred Tombar, III, Senior Advisor to the Secretary for Disaster Recovery, U.S. Department of Housing and Urban Development. Our second witness will be Mr. Paul Rainwater, executive director, Louisiana Recovery Authority. Our third witness will be Mr. Ommeed Sathe, director of real estate strategy, New Orleans Redevelopment Authority.

And without objection, your written statements will be made a part of the record. You will now be recognized for a 5-minute summary of your testimony.

Thank you very much. We will start with Mr. Tombar.

8

### STATEMENT OF FREDERICK TOMBAR, SENIOR ADVISOR FOR DISASTER RECOVERY, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Mr. TOMBAR. Thank you, Congresswoman Waters, and members of the subcommittee for hearing my testimony today. As you said, my name is Fred Tombar, and I am a Senior Advisor to Secretary Donovan at HUD. More importantly, like Congressman Green, I am a Charity baby and a native of New Orleans. It is my honor to join with you today to discuss the implementation of the Road Home Program 4 years after Hurricanes Katrina and Rita.

I first want to express HUD's commitment to the recovery and revitalization of New Orleans and the entire Gulf Coast—to ensuring that the resources that we have provided are used in a most effective way to help people move back into their homes and revitalize the entire region. That is a message that we sent within weeks of President Obama's inauguration, when HUD brought together partners from across the country to help provide Disaster Housing Assistance Program transitional rental assistance to more than 30,000 families. It is a message we have continued to send over the past 6 months and it is a message that Secretary Donovan and Deputy Secretary Ron Sims and many of our Assistant Secretaries will make clear when they are down here next week to mark the fourth anniversary of Hurricane Katrina.

The storms of 2005 were deadly and costly to communities across the Gulf Coast, and particularly destructive here in Louisiana, causing the loss of lives, damage to businesses and public facilities, and devastation to homes.

To address the devastation left in the wake of the 2005 disasters, three supplemental appropriations providing HUD Community Development Block Grant, or CDBG, funds for Gulf Coast disaster recovery purposes were enacted. In December of 2005, Louisiana received $6.2 billion in its first disaster supplemental appropriation. The following June, an additional $4.2 billion was appropriated for Louisiana; and in November of 2007, a $3.0 billion third appropriation was specifically allocated to close the anticipated funding gap for the State of Louisiana's Road Home homeowners assistance program.

The State has dedicated approximately $10 billion from its Hurricane Katrina CDBG disaster recovery appropriations for this Road Home homeowner assistance program.

To assist the State of Louisiana in administering a recovery program of this size, HUD has implemented strong programmatic oversight and ongoing technical assistance measures, which are critical elements to ensure compliance. HUD staff conducts on-site management reviews twice a year to ensure that programs and related cross-cutting Federal requirements are carried out efficiently and effectively in compliance with applicable laws, regulations, and policies. Monitoring visits include an overall management review of the State, as well as provide on-site technical assistance in areas that are deemed high risk. The intended goal of monitoring and technical assistance is to assist our grantees like the State of Louisiana in improving their performance, developing and increasing capacity, and augmenting their management and technical skills.

9

The magnitude of Louisiana's programs and the sensitive nature of expeditiously getting resources to the individual and to neighborhoods warrant careful monitoring and ongoing technical assistance. With the aid of the Department, Louisiana has been relatively successful in disbursing $8 billion with few findings. The Road Home Program has been heavily scrutinized as reflected in the State being audited over 52 times since the first supplemental. HUD is committed to assisting Louisiana and all of its disaster grantees to effectively and efficiently manage the resources needed to recover and rebuild communities stronger after a disaster.

Effectively administering a program as significant as the Road Home Program requires a great deal of coordination. As an immediate response to aid Louisiana and other disaster-affected States, HUD acknowledged the complexities of addressing a disaster of this magnitude and granted several waivers to allow programmatic dexterity.

The Road Home Program specifically benefitted from the compensation waiver, which allowed the State to provide compensation to homeowners whose homes were damaged during the covered disasters and met approved program stipulations. The waiver also allowed the State to offer disaster recovery or mitigation incentives to promote housing development or resettlement in particular geographic areas. The compensation waiver made it possible to more quickly put resources in the hands of disaster-affected homeowners.

HUD also granted a low- and moderate-income waiver that allowed the program to meet the recovery needs of the entire community affected by the 2005 disaster. But to be sure, this has been no easy process for homeowners and for families who lost their homes. As we speak, some families are still trying to work their way through the process of receiving compensation for their damaged homes.

In conclusion, CDBG has assisted States and communities with disaster recovery, especially, long-term recovery. Over the last 4 years, we have seen many challenges that face our Federal-State partnership in quickly administering grant assistance to individuals and neighborhoods. We are dedicated to working through these challenges while ensuring the continued focus on both performance and accountability. Long-term recovery and rebuilding after a disaster is a complex process that requires tough decisions at all levels as well as the ability to acquire additional capacity to carry them out.

Thank you for the opportunity to appear before your subcommittee. This completes my testimony and I look forward to answering your questions.

[The prepared statement of Mr. Tombar can be found on page 97 of the appendix.]

Chairwoman WATERS. Thank you very much.

Mr. Rainwater.

### STATEMENT OF PAUL RAINWATER, EXECUTIVE DIRECTOR, LOUISIANA RECOVERY AUTHORITY

Mr. RAINWATER. Thank you, Congresswoman Waters, Congressman Cleaver, and Congressman Green, for being here.

10

I work for Governor Jindal, and just as introduction, I have been involved in this disaster since the beginning. I was part of the evacuation team that helped evacuate the City. I have been involved with the Louisiana recovery under Governor Blanco. I worked for Senator Landrieu as her Legislative Director in 2007. She needed someone to help her through recovery issues. I gladly went to Washington and worked with her to get the last $3 billion. And Governor Jindal asked me to come down and run a consolidated recovery organization, one that would be focused on helping people get back in their homes. I served as the Governor's authorized representative to the Federal Emergency Management Agency in negotiations with helping Dillard University get rebuilt, as well as Secretary Napolitano just announced about Southern University's public assistance money it will receive. We have been involved in those negotiations as well. I want to thank you for the support that you have given us here in Louisiana. We appreciate it very much.

As I go through some of the numbers and talk about the Road Home Program, I do it as a measure, because there is a lot of work to be done. I do not have all the answers. I have believed from the first day I took this job that we could not do it without our Federal partners and without the City in partnership. And Fred Tombar, who works with Secretary Donovan, and Secretary Donovan have been good partners, and we appreciate very much the Obama Administration and what they have done through Secretary Donovan; it has been a good partnership. And Fred and I talk quite often about trying to resolve some of the complicated issues that exist out there.

The Road Home Program, although it has faced many trials and it struggled early on, has paid out $8 billion to 124,538 Louisiana homeowners, including about $836 million for homeowners to elevate their homes.

In New Orleans alone, the homeowners have received about $3.7 billion. And again, I throw those numbers out as a measure, not that—you know, it is what the program has done. As I said, we still have a lot of work to do.

In January of 2008, when Governor Jindal came in and he asked me to take the program over, we wanted to do a couple of things. We wanted to look at how people were being treated and we wanted to hold the contractor accountable. There was no doubt that the contractor was compensated very well and had a very loose contract, a very loosely written contract with no performance measures at all. But we held the contractor accountable and ended up fining the contractor a little over $1 million when I got there in 2008.

We have paid over $2.2 billion since 2008 and when we relaunched that elevation program I talked about earlier, one of the things we did is to remove the bureaucracy from the elevation program. We basically worked with HUD to come up with a simple formula that did not require any more paperwork and really got $828 million out in about 8 months to about 124,000 homeowners to help them elevate their homes.

Additionally, when it came time to renew the ICF contract, we did not renew that contract. We chose to go a different route. And what I did basically is break up the contract, unbundle it into four

11

separate pieces. Before, ICF ran a Small Rental Program, the Piggyback Low Income Housing Tax Credit Program, the Road Home Program, and also managed the accounting of those files. We have broken it up into four different pieces. Hammerman & Gainer, Inc. is now a Road Home contractor, the largest minority contract in the history of the State of Louisiana, an IT contractor, who manages independently from the Road Home contractor. ACS has the Small Rental Program and a group called the Compass Group manages our piggyback program. CGI, the IT contractor, works independently and works for me, to go in and pull up electronic files to show me what is happening on the ground so that we can validate what is going on. Before, we did not have that opportunity. So I think by breaking it up into different pieces, unbundling it, the State has been much more responsible in the execution of the program.

Many of the remaining applicants have either difficult title/power of attorney issues—we are in the process of putting an RFP out, a request for proposals, through Hammerman & Gainer, Inc., to provide additional legal services to those folks who are low- to moderate-income and cannot afford an attorney of their own.

A recent analysis of the Road Home Program showed that Road Home had been instrumental in restoring homes in areas impacted by Katrina in the City of New Orleans. That is, 75 percent of its population, without the aid of the Road Home Program, could not have come back.

That said, the same analysis pointed to 30 percent of the Road Home—that is, in Option 1, those who were going to rebuild or repair—did not have the money to do so.

So we had an analysis done and it showed there is about a $1.6-$2.3 billion gap. In looking at that, many of those people are low-to moderate-income homeowners and do not have the resources to rebuild.

Tuesday, I briefed the Governor; and yesterday, I talked to our Board of Directors in the Louisiana Recovery Authority. We did not have a meeting in July, so we had our meeting yesterday. And we made a decision to—there has been a lot of conversation about what surplus we might have. And I will tell you that in that third allocation, the $3 billion, Congresswoman, that you worked so hard to get for the State of Louisiana, along with Senator Landrieu, to make the Road Home Program whole, we made a decision that the surplus or any dollars we have left over we use to help Road Home applicants. We have made a decision to lift what is called the additional compensation grant cap of $50,000—we have decided to lift that, which will hopefully have a positive impact on about 20,000 low- to moderate-income Road Home applicants. Hopefully we can get them an additional $30,000 for a total of about $600 million. So we think by doing that, it is a smart decision, we will send an action plan to HUD in September. Part of that conversation happened up in D.C. in a meeting with Mayor Nagin and yourself and others and Senator Landrieu in a roundtable, having a study done at the beginning of August that showed us that gap. So we have come to that conclusion. We have always been committed to using the Road Home money that you sent us, that $3 billion that has

12

tight language around it, on trying to help people get back in their homes.

So while the proof is in the pudding, I have my staff working on an expedited plan to not force people to come back and do additional paperwork, provide additional documentation. We have worked very hard and I myself have signed waivers, personal waivers, for people who could not prove homeownership. I have signed waivers for people who could bring electrical bills to me, whatever they could bring to me to give me some proof that they had a homeownership, I was willing to do that and we will continue to do that. You have our commitment to do that.

Not always perfect, I know that, but we have been to multiple outreach sessions. We did about 20 mobile outreach sessions last year and closed about 30,000 grants, very difficult grants where people were having difficulty because there is no doubt the contractor fast forwarded the easier grants early on in the program, left some low-income folks who could not afford to hire attorneys and other things in the back of the program. We picked that up, and we have worked very hard to complete those grant applications.

We will continue to work closely with Congress and the Senate and Mr. Tombar and HUD to make sure that people are given to opportunity to return home.

Thank you, Congresswoman.

[The prepared statement of Mr. Rainwater can be found on page 85 of the appendix.]

Chairwoman WATERS. Thank you very much.

Am I pronouncing your name correctly? Please pronounce it for us.

Mr. SATHE. Ommeed Sathe.

Chairwoman WATERS. Mr. Sathe, thank you very much.

## STATEMENT OF OMMEED SATHE, DIRECTOR OF REAL ESTATE STRATEGY, NEW ORLEANS REDEVELOPMENT AUTHORITY (NORA)

Mr. SATHE. Thank you for having us here today.

I represent the New Orleans Redevelopment Authority, which has been tasked with a very specific part of the Road Home process. I think, Congresswoman, you mentioned the Option 2 and 3 properties which were the ones that people sold back to the State.

There are approximately 4,700 of those properties in Orleans Parish. NORA is the exclusive agent in charge of the disposition of those properties; 4,700 properties is undoubtedly an incredibly large sum of properties. I think we are competing to be the largest land bank in the entire country. However, it is a small piece of the puzzle and I think Mr. Rainwater and Mr. Tombar have talked a little bit about the Road Home 1, which very much matches what we are trying to do.

If you look at the map I think I put on the first board over there, you will see that the properties we have are very spread out. The ones highlighted in yellow on that map are all the ones that we have been transferred ownership of.

And so in devising our disposition strategy, you asked us to sort of come talk about what we are trying to do to redevelop these

13

properties. We have three or four primary avenues we use to dispose of those properties.

The first and an incredibly important program to our City Council was the Lot Next Door Program. That gives any homeowner with a homestead exemption the right of first refusal to purchase the property adjacent to them. They can use that property to expand their footprint. New Orleans is an old urban city, we have a lot of small lots, a lot of people who have been dying for off-street parking, a place to have the kids play. At the same time, it is also things they can rebuild for relatives, family members who are struggling to get back.

It is an incredibly important program. To date, we have identified approximately 2,000 families who are eligible to participate. We have sent 1,200 letters to those families inviting them to purchase the property and have signed 300 purchase agreements.

We began that in March, when the properties became available for transfer. So until then, they were closing through the Road Home process and going through the various HUD environmental reviews. So these properties only became available for transfer in March of this year, and we have already signed 300 purchase agreements on those lots next door. We expect to do somewhere between 500 and 800.

The second and incredibly important program for us are our Neighborhood Based Disposition Plans. New Orleans, as we all know, is a city of incredibly varied and diverse neighborhoods, all with different characteristics and desires. The City went through an extraordinary planning process and we have tried to ground that in the specific context of the properties we have. We have developed neighborhood development agreements for a variety of neighborhoods. We have already done 15, and we should cover the whole City by the end of the year.

One of our hallmarks, and that is the one that you see in front of you right there, is the Pontchartrain Park neighborhood. There are approximately 120 what we call LLT properties in that neighborhood as well as approximately 400 properties where people cannot rebuild on their own. They did not get enough money from the Road Home Program. A lot of our families were elderly and struggling to come back, and a lot of them were just mentally and physically exhausted.

And so working with the neighborhood, they approached us and deeply wanted a master developer who would come in, be able to build a high-quality home on the properties we controlled as well as assist the families next door trying to rebuild as well as all the people struggling with ongoing gaps.

We went out, we selected a national developer, SRP. They have done a tremendous job. We expect to break ground on the first houses in a few weeks. We are working closely with the State to have the properties demolished prior. It is a very important part of the program because we have to have them elevated. And for these old houses, it makes a lot more sense to elevate them, rebuild. They are going to have the latest energy efficiency features and we are working again with the State to find the resources to make these affordable.

14

One of the central challenges we have in the recovery is that the cost of construction exceeds what many, many, many families can afford. And if that was not bad enough already, the cost of home-ownership has skyrocketed since Katrina, it has gone up nearly 500 percent. What that means is that a family making less than 120 percent of AMI cannot afford new construction. And that is quite a heavy burden. Down here, it is about $70,000. Anyone making less than that is deeply struggling to afford housing. And so we are absolutely dependent on the support of the Federal Government and the State to find the resources to fill those gaps.

We are working with the State on a soft second program for some of that. We are also working to try and get some of the elevation resources to reduce that cost. We are also looking to try to get some of the energy efficiency resources to resource that. Solving that gap is absolutely crucial to the rebuilding of this City. A lot of people have talked about wanting to rebuild smarter and safer. Without the resources, people are being driven to rehab in situations where that is a terrible idea.

In terms of some of our other programs, we have also—you know, we have taken very different approaches in other neighborhoods. In Lakeview, which had a strong demand, they decided they did not want any developers. They said what we want is just to get single families to come back, we have plenty of demand. Give folks a shot who want to come here, live here, and raise their kids. We did a disposition program there that sold over 200 properties.

To put these numbers in context, and I think it is helpful, in the typical year in New Orleans, you only do about 1,000 to 1,200 single-family home sales a year in the entire private market. Between Pontchartrain Park, Lakeview, and our programs, we will have done over 1,000 this year alone.

We have worked in almost every neighborhood. We have done projects in the Lower Ninth Ward working with groups like NINA and Make it Right to build back some of the most energy-efficient houses in the country.

Where are the impediments going forward, however? And that is what I would like to talk to you Congresspersons about. We are struggling with a couple of things.

Demolition—we were recently denied a waiver from the EPA that would have allowed the City to continue with demolition in a rapid fashion. It is a peculiar choice, since they extended the waiver to St. Bernard Parish which is neighboring us. And we have had that waiver for the past 4 years. It is crucial in demolishing a lot of these Option 2 and 3 properties because after 4 years of being ungutted and sitting there in many cases, these homes need to come down so that they can be elevated and rebuilt in a sustainable fashion. That is one key thing we are struggling with.

The second is construction costs.

The third I think is a jack-o-lantern pattern of rehabilitation. If you look at these maps and you see our neighborhoods, you see beautiful houses next to houses struggling to rebuild. We have applied some assistance to try to help fill some of those gaps that Paul is going after and to do it in a way that brings people into a more sustainable solution and stops them from being ripped off by unethical contractors.

[The prepared statement of Mr. Sathe can be found on page 92 of the appendix.]

Chairwoman WATERS. Thank you very much. I notice that perhaps you did not all get an opportunity to finish your testimony. You can do some of that through the exchange you will have with us on questions. And I would like now to recognize myself for a few questions.

First, let me ask you, Mr. Tombar, I know that this Administration is only 6 months into leading this country, and I appreciate the information that you shared with us about the oversight. Did you discover in your work that perhaps some parts of the Road Home Program had been originated in ways that created problems during the implementation and while you were doing oversight to make sure that they were doing what they said they would do. Was the program designed correctly in the first place to accomplish the goals it intended to accomplish?

Mr. TOMBAR. That is a very good question; thank you for asking it.

Let me say that one of the things that I did testify to is that this is an incredibly complex undertaking, as we all know. There never before has been a disaster of this magnitude, causing as much damage as was caused.

The State of Louisiana, in the year before Hurricane Katrina, its overall CDBG allocation was in the millions, the tens of millions. And as I testified to, the overall allocations that they have dedicated to the Road Home Program is upwards of $10 billion. So there was a tremendous issue with capacity building, one.

The second thing that I know personally was that there were ever-changing rules. The State—this is prior to Mr. Rainwater's involvement, but the State of Louisiana Recovery Authority was, quite frankly, I believe making the train as they were riding on it in many cases. And the rules changed constantly, making it difficult to communicate to homeowners exactly what it was that they should expect in the way of the application process and the program itself. But that was done because of the complexity, because of the challenge of trying to address so many of the issues that are out there.

I will tell you, part of the challenge from a Federal perspective that we had was that the CDBG program is sort of like a square peg in a round hole. It is intended for long-term recovery, but it happens to be the most flexible tool, the most flexible program, that we have at the Department and, therefore, is used by the Congress often to help communities in their recovery.

That flexibility limits the Federal Government's ability to actually determine how that money is used. There are broad, really broad, goals that are set up for the program. And as long as a grantee like the State of Louisiana in its program design meets those broad goals or demonstrates how its program could meet those broad goals, we are obligated to approve it. That is the Federal law and how the program operates.

And so part of the challenge is, one, the complexity of the challenge in addressing the devastation of Hurricanes Katrina and Rita, quite frankly. And then two, the fact that this had not been

16

done before, and there was rulemaking and policymaking as the program itself was being implemented.

Chairwoman WATERS. What is HUD's authority or role with CDBG in this instance in advising or determining in any way how any excess funds should be used?

Mr. TOMBAR. The final $3 billion, that Paul testified to and I did as well, is strictly tied to the compensation grants for the Road Home Program. If in fact that money is not needed for that purpose, after the program is completed, the way that the legislation was written is that the money would be returned to the Treasury. I can say to you that Secretary Donovan and President Obama have absolutely no desire to see money returned to the Treasury when there are still ongoing needs here in the State of Louisiana. We have been in internal discussions about a legislative—working with Members of Congress on developing the legislative strategy, once it has been satisfied that there is a surplus, should there be a surplus, about redirecting those dollars to some other existing needs here in the State of Louisiana.

Chairwoman WATERS. Mr. Rainwater, the $3 billion or so surplus, let us not call it surplus, let us call it funds unexpended. As you have identified and I guess we talked about, you are talking about using that money to satisfy some of the unmet needs of Road Home of compensating in some way those people who fell through the cracks. Explain that one more time to us.

Mr. RAINWATER. Yes, Chairwoman Waters, if I could.

The $3 billion, we have spent $1.5 billion of that, and we have $1.5 billion left.

Chairwoman WATERS. How much do you have left?

Mr. RAINWATER. $1.5 billion.

Chairwoman WATERS. 1.5 billion?

Mr. RAINWATER. Yes, ma'am. And we think we are going to spend half-a-billion on finishing out the more traditional Road Home Program. I hate to use the word traditional; nothing is traditional about it.

Chairwoman WATERS. Right.

Mr. RAINWATER. But going forward, we made some budget adjustments. Originally, we were going to take $600 million and use it to pay out individual mitigation measures for applicants at about $7,500 an applicant. But then we made a decision to go ahead and move that over to our Hazard Mitigation Grant Program because it made more sense, and we were seeing, you know, it takes awhile to get the information, but we were starting to see that gap. And so we said, let us go ahead and use the Road Home money for what it was intended, that is, to help people repair their homes.

And so we think—we had an additional compensation grant program that had been set up back in—I was not part of the design, but as I understand historically back in 2007, to help low- to moderate-income applicants. And it was capped at $50,000. We have now made a decision to lift that cap, and we think just on the broad data that we have looked at, there are 20,000 low- to moderate-income Road Home applicants that we can give around an average of $30,000. And so that is what we plan to do. And we think that will make a huge difference in their ability to rebuild their homes. If the gap is for Option 1 in New Orleans, for example, ac-

17

tually across the recovery area, about $600 million, that should do some of it.

Now we have a $20 million pilot construction repair program that we are sending down to nonprofits across New Orleans and the area that we are just getting ready to execute. That should help repair some homes as well because you have folks with much smaller gaps.

Chairwoman WATERS. Let me try and understand.

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. On the low-income homeowners that you would like to try and help with these $30,000 subsidies in some way, are these people who may have applied for Road Home money who were homeowners, or these are not homeowners for the most part?

Mr. RAINWATER. These are homeowners.

Chairwoman WATERS. These are homeowners. They may have applied for Road Home assistance. They may or may not have gotten some assistance?

Mr. RAINWATER. Yes, in most cases, they would have most probably gotten something.

Now we have been going back into our files to look at people who—and one of things I am doing right now, we have about 8,000 applicants that I am still holding onto, you know, that we are still trying to work through the proof of homeownership, title issues and so forth. We are going to continue that on through next year.

Chairwoman WATERS. I know, you are going to continue on with the traditional Road Home Program.

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. And you are going to try to go back and identify the low-income homeowners who may have applied, may have gotten $10,000 or $15,000, but certainly it did not go very far in rehabbing that home. And so you are going to look at how you can give some additional assistance, because their incomes are low—

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. —and 9 times out of 10, they cannot save the money or have the money by which to get these homes done; is that right?

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. And then the money to the nonprofits is more like a smaller program to do repairs of some kind, to help people who may not have had significant damage, but have some damage or may still have some needs left over after they have spent their Road Home money, etc., something like that?

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. Okay. Now you say there are about 8,000 people who may be left in the Road Home Program, who need to be dealt with. These are people who filed considerably late, these are people who had complaints or they are on appeal. Something like that?

Mr. RAINWATER. Well, yes, ma'am, if I could just walk you through it really quick.

We have about—early on in the program when I got here in January 2008, there was this program called dispute resolution that

18

ICF was running, that basically there was no accountability. We got rid of that, pulled those out, put them into an automatic appeal. We created a two-tier appeal process, one at the contractor level and one at the State level.

Before 2008, the contractor had the final say-so on the appeal and that just did not make a lot of sense to myself and to many others, as we looked through the issues. And right now, we have 490 appeals at the contractor level and about 60 at the State level. So we have worked through those, I think.

But there are still obviously in that group of 8,000 people, there are people who are having trouble, you know, with title succession issues. I mean I can give you example after example of folks who—

Chairwoman WATERS. Let me ask you, Mr. Rainwater, did you find that one of the problems—and Mr. Tombar, you may have found this in your overview in some way—did you find that there were problems with assessments? I hear a lot about that. I hear that people who had a home that was worth $150,000, got an assessment from Road Home for $70,000. What is that all about?

Mr. RAINWATER. That is about the formula and the way it was laid out. Basically if you were considered 51 percent over—it was a complicated formula that had to do with pre-storm value versus estimated cost of damage.

Chairwoman WATERS. Well, most people say that whatever that formula was, it was not right. Is there a need to correct that?

[applause]

Chairwoman WATERS. And the reason I asked is if we are going to play with some of the $3 billion in some way—and this may be complicated. It is all complicated.

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. But if these places were underassessed, that really determined how much money they got in Road Home assistance, right?

Mr. RAINWATER. That was one—

Chairwoman WATERS. So if your max was $150,000 and you ended up receiving $75,000 because your home was assessed at a much lower rate, is there a need to fix that?

Mr. RAINWATER. That was one of the reasons I think they set up the additional compensation grant back in 2007, was to help the assessments, and parts of New Orleans were lower than other parts, like Lakeview. So that is one of things we are going back to do, not a re-evaluation, but just the automatic, you know, dollars to those folks who fit in the additional compensation category.

Chairwoman WATERS. So are you saying that you may look at this in a way that you say okay, a review of our records shows that 30,000 people may have been underassessed. We are going to give them a set amount of money. We cannot go back and do all the re-evaluation, but we are going to give everybody $20,000 or something like that. Is that what you are talking about?

Mr. RAINWATER. Congresswoman, if I could, one of the challenges that we have is if I go back and start trying to re-assess, we just recreate the problem.

Chairwoman WATERS. I get that.

Mr. RAINWATER. Yes, ma'am. And I have spoken with HUD about, you know, adjusting formulas, for example. I do not think

19

at this point, what I have been told is that it is probably—the program was the program. What I need to do now is try to go back and reconcile as quickly and easily as I can some of those issues to try to get money to people.

Chairwoman WATERS. Okay, well, you know, this is very important. If that is on your radar, and it should be I think, and you recognize that and you have some money, and you can dedicate some of the billion or so to that; does it make good sense to do a flat amount of subsidy without having to jump through a lot of hoops? Because one of the things the people complain about is what they have been required to do, how their money, $150,000, has been reduced because of an SBA loan, because of insurance money they should have gotten, may have gotten, because of the under-assessment, on and on and on.

If they have simple proof, and you talked about simplifying that in some ways, show me that you own the house—if they can do that in a very simplified way, are you prepared to come up with a program that will subsidize all of those people who fall in that category a set amount?

Mr. RAINWATER. Yes, ma'am. And we can work with HUD to do that. We support that 100 percent, that's why we talked about—

Chairwoman WATERS. But HUD does not care.

Mr. RAINWATER. Yes, ma'am—no, ma'am, they do care, they do care.

Chairwoman WATERS. In this case, we will hold them to it. Ordinarily, we would say okay.

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. But—well, he did not quite say it that way, but what he said is, Congresswoman, you have rules. The public policy says that when you use Block Grant money, this is the only amount of oversight that we have. And HUD cannot write the exact rules for how you spend that money. That is what you told me, right?

Mr. TOMBAR. Yes, ma'am.

Chairwoman WATERS. And so—just a moment. And so, having said that, and because the State made the determination about its Road Home Program and we agree, and we are sympathetic to the fact that this was difficult. I mean everybody recognizes it is the biggest disaster in the history of our country certainly and that it is complicated. And that even from the time you started, there were modifications and changes to accommodate the difficulty that you ran into to try and be fair.

So now, we have one of those issues we are dealing with right now. There are a lot of others, but we are only dealing with one right now and that is the assessment issue. HUD will not interfere with how you correct that, will you, HUD?

Mr. TOMBAR. Ma'am, if I could—

Chairwoman WATERS. No, just tell me.

[laughter]

Chairwoman WATERS. You can speak for Secretary Donovan, he told me you could.

Mr. TOMBAR. The language on the money that we are talking about—

Chairwoman WATERS. Yes.

20

Mr. TOMBAR. —as you know, was very tightly written.

Chairwoman WATERS. Yes.

Mr. TOMBAR. I am not a lawyer, so I will not play a lawyer here, but I do want to say that because of how tightly the language was written, it really constricts in ways that the CDBG program normally does not. It really constricts the usage of that money.

Chairwoman WATERS. Mr. Green, Mr. Cleaver, what does it take for an amendment quickly when we get back in whatever is passing through our committee to fix it? Are you prepared to do that?

Mr. CLEAVER. Yes.

Mr. GREEN. Yes.

Chairwoman WATERS. Let's fix it.

Let me tell you, Mr. Rainwater—

[applause]

Chairwoman WATERS. —Mr. Rainwater, we expect that—we cannot tell you how much, we do not want another set of rules that will put people through a thousand hoops to correct the underassessment of their property.

If we agree and you concur, and you said you did—do not change on me after we do this.

Mr. RAINWATER. Congresswoman, I will send money out faster than you can get back down here, I promise.

Chairwoman WATERS. You got it. That is exactly what we want. We want you, in the most simplified way, to get to me and Chairman Frank a letter of request for assistance to rectify the underassessment of properties considered under the Road Home bill so that you may, in the simplest way possible, compensate or make up for that difference or that gap that everybody agrees occurred.

Now let me just say this. It may not be what everybody would want.

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. Or would like to have. But it is going to be something that is substantial enough that people will know that they have some money that can help move them along in either completing the repair of that property, or will get them much further than they are now.

So I am not talking about what you did in Road Home where people could have gotten $150,000 and ended up with $1,000 or $2,000 or $12,000. We are not talking about that. We are talking about coming up with a number that would be somewhere—well, I do not want to start talking about that number, I think it would be unfair to you. But do not bring me any $2,000, okay?

Mr. RAINWATER. Oh, no, ma'am.

Chairwoman WATERS. It is not going to work. It has to be substantial enough to make a difference in the lives of people who have been struggling with properties that have been underassessed. Okay?

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. Okay, I could go on with other things, but I have two colleagues who have come a long way. Mr. Cleaver, yu are recognized for as much time as you would like to take.

Mr. CLEAVER. Thank you, Madam Chairwoman.

Mr. Tombar, do you and Mr. Rainwater communicate on a regular basis?

21

Mr. TOMBAR. Yes, sir.

Mr. CLEAVER. So, HUD and the State. The Mayor is going to be here tomorrow, I think, but can we add the municipality as well?

Mr. RAINWATER. Congressman, if I could, Mayor Nagin and I text each other. I mean we are in contact with each other all the time, absolutely.

Mr. TOMBAR. The Secretary brought me on—called me on the day that he was confirmed by the Congress, and asked me to come and join his staff specifically to work on disaster recovery. I have been in regular communication with folks not only in this State but also in Congressman Green's State of Texas and others that are recovering from disasters, to help out as much as possible.

Mr. CLEAVER. I am very pleased with Secretary Donovan, other than the fact that he looks like he is 16, but beyond that—

Mr. TOMBAR. I have asked him what water he drinks, too.

Mr. CLEAVER. Yes. I am asking the question because apparently there are questions being raised about the inspections when homes are being readied for citizens to move in. People are complaining that sometimes the house is inspected by five different jurisdictions, including FEMA, but that, you know, you will have a HUD inspection, you have a City inspection, you have a FEMA inspection, you have a State inspection, vendors, major league baseball referees—I mean everybody is coming in to inspect.

I am wondering why we cannot reduce the number of inspections so that people can be about the business of getting back into their homes. When I talked about people digging potholes in the road home, that is what I mean, when we are doing that kind of thing.

I am a former mayor, and we had a problem with delays in inspections, so during my term, we established a one-stop-shop. There is no point in having 15 different departments inspecting one home. So can we not put some kind of system in place for a one-stop-shop so that it does not delay people getting back into their homes?

Mr. TOMBAR. It is a very good question.

Part of what the Obama Administration actually is doing is certainly trying to learn lessons from the past. And we think the experience in Hurricane Katrina is extremely instructive. And you are right that there have been issues with multiple inspections, those that are used for various Federal programs. As you mentioned, FEMA, the Small Business Administration, and the CDBG grantees, the State of Louisiana doing a third. And in many cases private insurance companies coming out and doing inspections.

What we are looking to do at the Federal level is to consolidate those inspections under one agency. Quite frankly, what some of this will require is beyond just administrative coordination, some new authorities given to various Federal agencies to do some coordination, especially around the Stafford Act.

Congressman Waters mentioned some of the complexity that the program has seen and things that have irritated people about amounts being taken into account from their insurance company and from FEMA and from other places. That is a clear requirement coming from the Stafford Act, against duplication of benefits. That is something that I must say that even in the exchange that was just had that would have to be dealt with, because that Stafford

22

Act requirement is in no way—there is no way to get around it. It is a requirement that stands.

And so while we might want to easily facilitate the additional compensation to homeowners and applicants under the program, it could be that the requirement under the Stafford Act, which supersedes everything in the disaster context, could get in the way of easily facilitating that.

Chairwoman WATERS. Will the gentleman yield for a moment?

Mr. CLEAVER. Yes, Madam Chairwoman.

Chairwoman WATERS. As you know, the Stafford Act is but an Act of Congress.

Mr. TOMBAR. Yes, ma'am.

Chairwoman WATERS. We make the laws.

Mr. TOMBAR. Yes, ma'am.

Chairwoman WATERS. And what we are talking about doing is amending, modifying or doing whatever is necessary to expedite the assistance to these homeowners so we can get these problems behind us. And that is what we are willing to do. We will have to, and our staff will have to take a look at everything of how we do it, but we are committed to doing that. So do not worry about the Stafford Act. It may end up the Cleaver Act or the Waters Act or the Green Act. But we are going to have to get it done. Okay?

Mr. TOMBAR. I was not worried. I mentioned it only so that it would not be missed and that when in fact implementation came, if it were missed in the drafting of whatever legislation would provide the flexibility, did not want it to come back on us that we are being bureaucratic.

Chairwoman WATERS. I yield back.

Mr. CLEAVER. The Chair has already spoken.

So you could probably give us—the two of you, maybe the three of you—information about what we need to do. If there is new authorizing legislation required and where, can we get that quickly?

Mr. RAINWATER. Congressman, I can give it to you this afternoon. I have a list of duplication of benefits and we have tons of issues that we have been fighting with for quite some time. Fred and the Secretary have only been in the job for a bit, and we have had numerous conversations about how—the Mayor and Fred and I have met with the Secretary a number of times and talked about the complexities of this and trying to get information to you so you can act. Because we know if you know the issues, that you will act, and you will make it simpler for us to work with some of these issues. So absolutely.

Mr. CLEAVER. Okay, thank you. That has almost justified a trip down here, but I want to go one other place.

In addition to the inspection issue, we are told that there are some issues around zoning that some neighborhoods are balking at zoning changes because the prefab housing that is being placed in some areas are not consistent with the housing stock that remains, and so people are concerned about a reduction in property values.

Are any of you familiar with that issue?

Mr. SATHE. Quite honestly, Congressman, I do not think that is an issue of anyone at the table. It may be that is probably best raised with the Mayor in terms of the zoning code.

23

Mr. CLEAVER. Yes, I used to be mayor of a city larger than New Orleans, so I know how that goes.

Mr. TOMBAR. I have heard the issue more closely tied to the neighboring State of Mississippi than in Louisiana, where that concern has come up.

Mr. CLEAVER. We had a listening session this morning and in hanging around, somebody came up and raised that issue with me. Which was a valuable session, incidentally, and so I wanted to, you know, make sure that if that is an issue, that we need to do whatever we need to do.

I will mention that to Mayor Nagin.

Madam Chairwoman, I yield back the balance of my time.

Chairwoman WATERS. Mr. Green.

Mr. GREEN. Thank you, Madam Chairwoman.

I would like to, for the record, associate myself with the comments of the Chair. I appreciate greatly her pearls of wisdom and I would only add that the people of Louisiana and New Orleans have suffered too long, they have waited too long, and it is really time for us to do everything that we can to get them back into their homes. It really is.

[applause]

Mr. GREEN. And because I am going to be terse and laconic, I am going to ask that you be pithy and concise, so that we can go through this as expeditiously as possible.

In my former life, I was a judge and I have learned the value of the truth, the whole truth, and nothing but the truth. So let us move, if we can, to truth, because there is beauty in truth. You know the truth, it will set you free. So let us see if we can free a few souls today.

Let us start with some intelligence that I have received. Is it true that home values in predominantly African-American neighborhoods tend to be lower than values in similar houses in predominantly white neighborhoods? Mr. Rainwater, you were here at the genesis of this and I suspect that you are the best person to help us get to Revelations. Is it true?

Mr. RAINWATER. Sir, I have only been here since 2008, January of 2008. I worked—

Mr. GREEN. That is genesis for us.

Mr. RAINWATER. So I was not part of the design of the program, I will say that the additional—

Mr. GREEN. May I ask you to do this, if you would, Mr. Rainwater—I love you and I am not trying to be overbearing—

Mr. RAINWATER. No, sir.

Mr. GREEN. —but this is important.

Mr. RAINWATER. Yes, sir.

Mr. GREEN. Sometimes when people finish, I do not know whether they have said yes or no. So I am going to ask that you start with yes or no, and then we will get the explanation. So is it true that in African-American neighborhoods property values are valued less than similar properties in Anglo neighborhoods? Is this true?

Mr. RAINWATER. Yes, sir.

Mr. GREEN. If this is true, is it true that African-American homeowners are more likely to receive what is called the pre-storm value for their homes by virtue of the three different methodologies

24

that you use to compute values—is it true that they are more likely to receive the pre-storm value as opposed to the actual cost to repair value?

Mr. RAINWATER. Most probably, I would suspect so.

Mr. GREEN. If you would now, I have a record that I am building. Is this true?

Mr. RAINWATER. Yes, sir, I am sure it is.

Mr. GREEN. Okay.

Mr. RAINWATER. I do not deny that.

Mr. GREEN. It is true, it is true. I am building a record. But you and I know that it is true.

Given that it is true, then it is more likely that African Americans who have homes that are similarly constructed to homes in other areas are going to receive less for their repairs than the persons who live in these other neighborhoods. That causes me some concern. That kind of invidious methodology needs to be corrected.

You are in a unique position. It is my hope that you will give consideration to the truth, the undeniable truth that you and I absolutely agree on. Somehow that should be corrected.

Now I am not going to ask more information, because you have already been sued because of this. There is a lawsuit against HUD, lawsuit against—I believe against—

Mr. RAINWATER. Against me for a program I did not design, but that is okay, Congressman.

Mr. GREEN. Yes. Well, I do not want to get into your lawsuit and I hope you have a good lawyer. But what I really trust is that this will be resolved, not because of ethnicity, not because of race, but because it is just right to make sure that people who have homes that are similarly constructed receive similar amounts of money to repair their homes. Hurricanes do not discriminate and we should not discriminate once hurricanes have gone by.

[applause]

Mr. GREEN. Now I hate to ask you if it is true, but I have to. I am a lawyer and I do not know how to start sentences otherwise, so please forgive me.

Is it true that the management company received a handsome amount of money for the work that it was supposed to do?

Mr. RAINWATER. There is no doubt about that.

Mr. GREEN. What was that amount of money, please, sir?

Mr. RAINWATER. It was $897 million.

Mr. GREEN. $897 million?

Mr. RAINWATER. Yes, sir. In a contract I did not sign, in a contract I accepted or was handed over to me. We basically held back about $11 million of that based off of audits that we have done and program requirements that were not met. Congressman, it is distasteful, I know that. But we did everything we could in 2008 when we took the contract over, to set benchmarks and to—

Mr. GREEN. Well, let me ask you this. By the way, this is in no way a reflection upon you.

Mr. RAINWATER. I understand that, sir.

Mr. GREEN. But again, there is beauty in truth.

Mr. RAINWATER. Yes, sir.

25

Mr. GREEN. Did we, as has been done with you, did we consider litigation? Did we consider suing these people to get some of the taxpayers' money back?

Mr. RAINWATER. We are in the process of putting together a lawsuit now, Congressman. That is what we are doing right now, going back and looking at mistakes that the company made, not treating people fairly. And our lawyers, who are here today, have been in the process of reviewing that. That is why, as I mentioned earlier, I separated out the IT piece from the contract—

Mr. GREEN. You did.

Mr. RAINWATER. —so I could get the truth.

Mr. GREEN. You did, and I salute you for doing it.

Would you kindly, once the lawsuit has been filed, forward a copy to—if you will send it to me, I will make sure that it is available to committee members. And Madam Chairwoman, if there is a better way to do this, I will yield to your wisdom. But I would like to see a copy of the lawsuit. And my assumption is that your lawyer will be in a position to give us somewhat of a summary. I would be interested in seeing your summary—

Mr. RAINWATER. Yes, sir.

Mr. GREEN. —of the litigation.

Finally, let us deal with something that is important to many thousands of people who have come to my district. I am concerned—and maybe this should be to Mr. Tombar—I am concerned about anecdotal evidence that I have received indicating that persons who do not speak English are not having enough information accorded them in a language that they do understand. Is it true or not true that you have your information printed in Vietnamese for the purpose of helping the 10,000 Vietnamese persons who relocated to Houston, many of whom live in my district? How have we dealt with the language barrier that can exist when we try to communicate with persons who speak a language other than English?

Mr. TOMBAR. I am trying to clarify—is this information on the Road Home Program?

Mr. GREEN. Yes, sir, on the Road Home Program; yes, sir.

Mr. TOMBAR. I would have to defer to Mr. Rainwater.

Mr. GREEN. Mr. Rainwater, we are back, here we are.

Mr. RAINWATER. Yes, sir. I do not have that information, Congressman. I know we have—

Mr. GREEN. This lady is going to help you.

Mr. RAINWATER. We are required to translate; yes, sir. I have had staff who have gone to Houston and worked with folks over in Houston; so yes, sir, we have translators.

Mr. GREEN. Do you have a person who is continually working in this process, a person that I can contact that I can have an opportunity to receive some empirical evidence from?

Mr. RAINWATER. Yes, sir.

Mr. GREEN. I would like the name of this person.

Mr. RAINWATER. Yes, sir.

Mr. GREEN. And I would like for you, if you can, to accord me this name—can you do this within a week, please?

Mr. RAINWATER. I can do it this afternoon, sir.

26

Mr. GREEN. All right. I would like to have the name. And if you will do this, for fear that you may not get me, I hope that you will, if you will give it to a staff person, it will be given to me.

I have other areas that I would like to visit with if there is another round or perhaps I will address my questions to someone else, but I do want you to know that this is serious business for us and we are going to do everything that we can as fast as we can, to make a difference.

I thank you, Madam Chairwoman. I yield back.

Chairwoman WATERS. Thank you very much, Mr. Green.

I will authorize another round for 2 minutes each for us to kind of wrap up any questions we might have for the witnesses who are before us.

We did not spend much time on Mr. Sathe and we need to spend time on you.

We did not spend much time, but you have an important responsibility, you have acquired the people's property. You acquired property from people who decided to leave the City, who decided they were too old and they just could not go through dealing with another crooked contractor, or decided that they were just going to give up owning a home and maybe going to an apartment. So you have all of this property. What are you going to do with this property?

Mr. SATHE. Sure. We are going to do our best to get as much of it back into commerce as possible.

Chairwoman WATERS. What does that mean, back into commerce?

Mr. SATHE. I think we talked about the two key initiatives. One, the Lot Next Door, so homeowners who—

Chairwoman WATERS. That is good. Let me repeat that, so that I understand it. The homeowner adjacent to acquired property will have the right of first refusal for the purchase of that property, is that right?

Mr. SATHE. That is correct.

Chairwoman WATERS. And is that property to be purchased at what you would consider market rate or something different?

Mr. SATHE. We have gone out of our way—under the regulations we are working under, it is current appraised value and it is current conditions, but what we do recognize is that one of the things we adjusted is that in all those neighborhoods that are storm damaged and where properties have to be elevated, it is the raw land value and nothing more. So we have reduced the cost down to the raw land value because we recognize that it would be unfair to charge someone for a home that on the one hand, FEMA was saying should be demolished or elevated and basically—

Chairwoman WATERS. So this property that can be bought by the adjacent homeowner can be purchased for the pure land value and not for the building or the property that is on there that has to be demolished, or any of that?

Mr. SATHE. That is right. So long as it is outside the historic areas. So long as it is in the areas that require elevation.

Chairwoman WATERS. Okay.

Mr. SATHE. Which is most of it.

27

Chairwoman WATERS. When the assessment was done and you purchased that house and that land, was there a determination about that land value that you paid that is different than what you are charging the new homeowner buyer for it?

Mr. SATHE. We had nothing to do with the original acquisition, so I cannot speak to that.

Chairwoman WATERS. Oh, I see.

Mr. SATHE. We had current appraisals done as of now.

Chairwoman WATERS. How do those appraisals compare with the appraisal that was used when you bought it from the person or the individual or whomever?

Mr. SATHE. My sense is that in most cases, the property was bought with the structure on it, so it would have been bought at a considerably higher price than what we would be selling it at. I mean by orders of magnitude, I would imagine.

Chairwoman WATERS. Would you please supply to this committee a description of how you value the land—

Mr. SATHE. Absolutely.

Chairwoman WATERS. —that you are selling, that you now have in your portfolio.

Okay, now while we are discussing in a big way how to rectify some of the mistakes that were made originally—and we talked about one today and I think we have a consensus that the assessment was not perhaps what it should be and there were other kinds of things that have to be straightened out. And we have so many unhappy homeowners who feel as if they were not compensated properly. And I have a bias about this, I do believe, as I have watched what was happening with the so-called 150,000, that the mentality and the attitude was, do not give them the full amount, that somehow we have to work very hard to reduce this amount as much as we possibly can. I mean that is the feeling that I get.

[applause]

Chairwoman WATERS. I do not know if that can be proven or not, but we know that there were mistakes and some things happened and I always flinch when I hear about the description of damage and how much people received, and I am going to ask somebody to tell me, give me a list of all of the ways by which you subtract from the $150,000. What are the ways by which you say you had an SBA loan, you did this, you had insurance for this amount, you were supposed—I would like a list of that, perhaps Mr. Rainwater can give that to me.

But now I want to go someplace else. And the place that I want to go with you is this, if we are doing corrections in some way and if we are able to do what I would like to have us do, and that is amend law in whatever way we need to, in order to come up with some subsidies that are given to people who were underassessed, without having to go through a lot of other hoops. I am looking at what you can do with all this land that you have. Because in essence, while the people who sold you the land may have benefitted a little, many of them lost a lot. And particularly, the seniors who had bought those homes, improved on those homes, raised their children in those homes, and during the time that we had a bubble,

28

those homes were worth a lot more than what you probably paid them for them.

I am trying to figure out how you are going to give the people back some of their money that was lost in all of this complicated situation. I like the idea of first refusal for those who live nearby. Maybe first refusal should be looked at in a lot of other ways too. I do not know, but I want to start this conversation, I want to look at first refusal in terms of immediate family, I want to talk about how we can think about that. And I just want to put that on the table and I am going to think about it a lot more. I want to think about the difference in the cost of that land to buyers and I want to differentiate between individual buyers and commercial or big contractors.

Mr. SATHE. Sure.

Chairwoman WATERS. Have you done that already?

Mr. SATHE. Well, we have done something towards that extent which should make you very happy.

Chairwoman WATERS. Tell me what you did.

Mr. SATHE. One of the programs we offer for folks buying it for expansion is that if they agree to take immediate action to fence and beautify—

Chairwoman WATERS. They cannot hear you, let us speak up a little bit louder.

Mr. SATHE. Sorry. If they take immediate action to clean up the property, put a nice fence around it, plant it with some trees, we actually will reduce the value of the appraisal by up to $10,000.

Chairwoman WATERS. Hold it.

Mr. SATHE. And in many cases, that makes the property—

Chairwoman WATERS. Hold it, hold it.

Mr. SATHE. —entirely free.

Chairwoman WATERS. Hold it, that is good. Did everybody hear that? Just a moment.

This is a program that says if you clean up the property and maybe put a fence around it and maintain it, that you could have a $10,000 reduction on an already reduced amount of land.

Mr. SATHE. We would give you a dollar-for-dollar credit for the money you spend on that.

Chairwoman WATERS. Does everybody know that? Has that been publicized?

AUDIENCE. No, no.

Mr. SATHE. Just to put it out there, it is on our properties that we control, which is the Option 2s and 3s. But yes, it is publicized when people come in on every appointment. They have an appointment, and we have case managers who walk them through it.

Chairwoman WATERS. How do you publicize it?

Mr. SATHE. It is—basically we send a letter and there is a little information about the program. They are invited to call and come in for an appointment.

Chairwoman WATERS. No, no, no, no. You cannot be sending letters out for this because this should be for everybody who wants to buy.

Mr. SATHE. What we do, Congresswoman, we—

Chairwoman WATERS. Yes.

Mr. SATHE. —actually have the universe of buyers.

29

Chairwoman WATERS. Okay.

Mr. SATHE. So when we go to contact them—

Chairwoman WATERS. What is a universe of buyers?

Mr. SATHE. Basically, there are 4,700 properties.

Chairwoman WATERS. Yes.

Mr. SATHE. And of those, to be eligible for this program under the City Council ordinance, you need to have a homestead exemption. So 2,000 of the properties—we go to the tax records and say look, here is to the left, here is to the right.

Chairwoman WATERS. Okay, I get it. I don't want to keep—

Mr. SATHE. So we—

Chairwoman WATERS. But this is for people who already own homes?

Mr. SATHE. The person living in the home can acquire the property we own when it is next to them.

Chairwoman WATERS. We know about that.

Mr. SATHE. Right.

Chairwoman WATERS. Are you tying this ability to maintain or clean up the property to that same program that is adjacent—

Mr. SATHE. That is right.

Chairwoman WATERS. Okay, I like that, but I want to go past the possibility of buying the property by those who are adjacent. I like that but we have to publicize even more that those homeowners adjacent to that property can get another $10,000 deduction. That is what you are talking about.

Mr. SATHE. Yes, and—

Chairwoman WATERS. Now in addition to that, I want to talk about Mr. Jones who is not an adjacent homeowner, but is somebody who said, you know, we have a lot of property around here for sale and my government is selling this property, I would like to buy this property. What kind of break can Mr. Jones get?

Mr. SATHE. In terms of the main program that is being designed currently to assist people—you know, we can definitely go back to the drawing board for more of them, but the main one is actually on the back end. The State has been very generous to create a soft second program for first-time home buyers to provide them with up to $65,000 in assistance, to fill gaps between what they can get a mortgage for and what the property sells for. So the assistance is actually on the purchase at the home level as opposed to at the purchase of the land.

And so generally, what we are trying to do with the land is in part—one of the challenges that I think people saw with the Road Home and with all the owner rehab is a lot of times people were struggling to rehab. And I think we have in many cases been able to identify excellent entities that are building the kind of housing that we want to see people get into, so it is energy efficient, properly elevated.

Our Pontchartrain Park project, as you know, and you can see on the renderings in front of you, we are not putting them up on stilts, we are actually regrading the land. The project led by the Pontchartrain Park CDC, they are going out and reaching out to family members, they are investigating a reverse mortgage product to help people get into those houses. Because I think while there are a lot of people who would just love to do another fix it up or

30

rehab job, there are a lot of folks who want to come in, buy a house they know is well built, cost controlled, properly manufactured, the latest and greatest in energy efficiency. And so I think we do believe that soft second for purchasers—now we would potentially love to come to you and talk to you about some of these surplus funds being used for expanding that soft second, expanding the eligibility because right now it is only for first-time home buyers. There are a lot of resources that could really—

Chairwoman WATERS. Please come and talk, because we are on the same track. And I heard about what you are doing in Pontchartrain Park, of course. I am very pleased about organizing effort there and SRP and what they are doing there. And I think we are going to be able to see the redevelopment, rehabilitation of a whole community if we can help get additional funds through the Road Home Program, so that people can participate. And I do not know what else goes with that, but I think you have another piece that may be helpful.

Now one of the things we have to understand is this, that the City, the State, what have you, in acquiring these properties and helping people out who cannot rehab them or did not want to come back, what have you, you are not trying to make a profit, are you? So what you are interested in is facilitating the rehab, the building, the ownership—not necessarily losing money, but certainly not making money.

Mr. SATHE. Absolutely.

Chairwoman WATERS. So you are not trying to sell these properties to make money?

Mr. SATHE. We do not even get to keep the proceeds.

Chairwoman WATERS. What happens with the proceeds?

Mr. SATHE. It is program income to HUD.

Chairwoman WATERS. Program income to HUD? HUD gets some of New Orleans' money?

Mr. RAINWATER. Congresswoman, can I please—

Chairwoman WATERS. Yes.

Mr. RAINWATER. What happens is it becomes program income, it gets put in an account for the City of New Orleans and NORA. That is what happens. NORA comes back, says that is what we want to do with that money. Once they spend it the second time, we are done with it. Whatever happens, happens. Those are the HUD rules. I am just—

Chairwoman WATERS. Wait just a minute, let me make sure that I understand this so my staff can get this down.

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. If you sell property and you make some money, it goes into another pot of money controlled by HUD?

Mr. RAINWATER. The State.

Chairwoman WATERS. The State?

Mr. RAINWATER. The State; yes, ma'am.

Chairwoman WATERS. And what do you do with that money?

Mr. RAINWATER. I hold it until they come up with a project they want to spend it on that is HUD-eligible. Once we clear that, then I am done with it. If they build another house, for example, and then sell that house, so we can create a revolving fund, then they keep the money after that.

But I have to do that review one time, which is program income, and then we are done. So yes, ma'am, that money is set aside for the City of New Orleans, not for the State of Louisiana.

Chairwoman WATERS. For the City of New Orleans.

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. That money goes into a pot?

Mr. RAINWATER. Yes, ma'am.

Chairwoman WATERS. Is this the pot where Mr. Cao was talking about the City had $200 million or so? Is that the pot he was talking about?

Mr. RAINWATER. No, ma'am, that is separate. What Congressman Cao was talking about was $411 million of Long-Term Community Recovery Program money that the State allocated to the City of New Orleans. They obligated $200 million of that to certain projects, and they have another $200 million that they have not obligated as of yet.

Chairwoman WATERS. We will talk with the City officials about that.

But I now want to talk about this pot that you just described and I want to make sure that it is being utilized in ways that will do several things; not only help new home buyers or whatever you want to do, but I am still also keyed and focused on the people who have gone through Road Home, who do not feel that they have been properly compensated.

So I want to look at that money as another way to add to possibly the underassessment and maybe we can put this all into some kind of package, I do not know. But that is good information.

Is there anything else you would like to share with me that perhaps we can help you with?

Mr. SATHE. You know, I think the issue we did not get the chance to get to, which I know we are all fighting for on the same side, is the elevation issue. I think there have been some rules on the elevation program such that it was only available to the Option 1 families. It makes all the sense in the world to elevate our properties. I think people would think we were crazy not to elevate these properties.

Chairwoman WATERS. You are talking about elevating existing properties?

Mr. SATHE. No, no, the ones, the 4,700 that we are—

Chairwoman WATERS. The new ones.

Mr. SATHE. Yes. The FEMA funds that are supporting elevation, under some crazy regulation, I will let—you know, you guys know more about that than I do—are only available to Option 1 families, not available on these Option 2 and 3 properties. And that puts us at a real disadvantage in being able to afford to elevate. If we could pay for that cost, all of that gets passed on to the end buyer.

Chairwoman WATERS. Would you please do as we are asking Mr. Rainwater to do and perhaps Mr. Tombar, is do your one page, two page descriptions, get them to us, talk with us, so we can see what we can do.

And again, remember I am focused on trying to put behind us the inequality, the inefficiency of the implementation of the Road Home Program. And again, the fair opportunity and ability for people to own the land and to get it at prices that make good sense.

32

And in addition to those homeowners who have right of first refusal on that land that is adjacent to them, other New Orleans residents who would be interested in acquiring property in ways that would be very, very efficient for them.

Okay, thank you very much.

Mr. Cleaver.

Mr. CLEAVER. Thank you, Madam Chairwoman.

Let me first, before—I have one question, but before we go any further, I need to just compliment the people of this community. You know, we are sitting here talking about what could have made the road home a lot easier. And we talked about one group getting almost a billion dollars in consulting fees, a billion dollars. You know, you give me a billion dollars, I could set up an office at Church's Fried Chicken and you come back 2 years later and you can see some changes. But what I am so fascinated with is that if there is any group in the United States with the right to be angry, it would be those of you who live here, and yet nobody is screaming—

[applause]

Mr. CLEAVER. Nobody is screaming, nobody has Hitler signs with mustaches, nobody, you know, is bringing guns in and talking about death panels. I mean, you have a right to be angry and yet, I wish we could show this tonight on CNN or Fox on how American citizens, who have been wronged, still act civil. And I appreciate it.

[applause]

Mr. CLEAVER. Now, we approved just under—I cannot even remember how much would have come here, but the stimulus bill which provided—should have provided additional dollars to do a major project here, the NSP program in particular I think would be of some value. But most major cities got a doubling of the CDBG, whatever their annual allocation was, the State received additional CDBG dollars. I am wondering where the—I mean we supported the stabilization program because of the impact it would make. So I am wondering what impact has been made through the stimulus, the spending of stimulus dollars.

Mr. SATHE. Congressman Cleaver, one of the great disappointments we share with you as well is that so little of the stimulus funds were provided directly for New Orleans. One of the decisions that the Administration made was not to have earmarks in the stimulus program and, therefore, for whatever reason, they deemed the recovery needs not only I think in our district, but the needs in Houston and Cedar Rapids, all across the country, as not worthy of a separate allocation in the stimulus program.

The State has gotten its share, as other States have of the stimulus money, of course, but the primary program I think we are very interested in is the Neighborhood Stabilization Part 2. The City of New Orleans got $1 million in version 1 out of—

Mr. CLEAVER. You hush.

Mr. SATHE. —out of a $4 billion pot, actually $1.8 or $1.9 million, I believe, from just the NSP program, out of a $4 billion pot.

The second round is competitive, it is supposed to be based on need as opposed to the scoring criteria. And we have put in an application for $80 million to assist the City of New Orleans with neighborhood stabilization. And quite frankly, we would have liked

33

to have asked for a lot more, but the scoring criteria were very limited.

As absurd as it may seem, and there are reasons for this, but to be eligible as a district, you either had to score very highly on foreclosure or vacancy. Well, our properties were foreclosed by Katrina, so a lot of our districts that are deeply struggling did not score highly on the foreclosure and the vacancy data they used was all pre-Katrina.

Mr. CLEAVER. Why were there not protests? The people need to be more upset than I thought when I started speaking. I mean we passed this mammoth spending bill, which would have been perfect for New Orleans and then you tell me that New Orleans did not get the money.

Mr. SATHE. I mean it was not even a category in the bill.

Mr. CLEAVER. Neighborhood stabilization money, you got $1.5 million?

Mr. SATHE. 1.8 million, I think, we can give you the exact—

Mr. TOMBAR. To be clear—

Mr. CLEAVER. Yes, I want to get some clarity.

Mr. TOMBAR. —he was talking about NSP–1.

Mr. CLEAVER. Yes.

Mr. TOMBAR. And that was done under the previous Administration and was done on a formulaic basis. NSP–2 under the stimulus is a competition that is ongoing. And what he is testifying to is that there is an application, as there are many applications across the country, that are now into the Department being reviewed, determinations about awards under that NSP–2 dollars will be made in coming months, in the next couple of months.

Mr. CLEAVER. Okay. I am very familiar with it. What I am saying is NSP–1 was approved after Katrina and so that was a wrong there. And so special attention should be given to what we are going through now. And I do not know what other city—if we need to change regulations, I mean I think you are right if they are talking about foreclosures and where you have this technical deal, we need to fix that.

Mr. TOMBAR. Under NSP–2, in fact there was a fix. Secretary Donovan was asked to review that issue and made a determination that properties that were impacted by disasters and blight caused because of a disaster would be eligible, which makes NORA's application eligible to the Department under NSP–2. So that is a change that Secretary Donovan—it was brought to his attention, he made a determination and actually increased the flexibility under the program so communities like New Orleans—

Mr. CLEAVER. So the application is in, there is an application currently. Do you know what the amount is?

Mr. SATHE. $78.5 million.

Mr. CLEAVER. 78 million?

Mr. SATHE. $78.5 million.

Mr. CLEAVER. Okay, that is more in line with what I think the people around this country would expect. That is probably not enough, but that is certainly better than what happened—in NSP–1, political decisions were made. I would not be surprised to learn that there were cities in Louisiana that received more money than New Orleans, even though this city would be larger. We found that

34

to be true in Missouri and we eventually did a little study and found out that the amount of money that communities received depended in part on the way they voted. And I know people down here would not do that, but what I am trying to say is—

[laughter]

Mr. CLEAVER. —what I am trying to say is we have to be vigilant on NSP–2 because I think it is critically important. I am so pleased that we have a new Secretary who was willing to delve into this issue and make the changes.

But I think we need to be concerned about it and involved with it and should some additional problems surface, I think you need to notify the Chair immediately if it is something that cannot be fixed internally with her, some of the regulatory inclusions cannot be changed unless we act. I think you need to notify the Chair immediately.

Thank you. I yield back the balance of my time.

Chairwoman WATERS. Thank you very much. I will yield to myself for a minute here to say that Mr. Sathe, you talked about the need for demolition money, you know you can do demolition within NSP?

Mr. SATHE. Yes.

Chairwoman WATERS. So I am hopeful that you get it.

We have gone back and forth on NSP–1 and NSP–2 about formulas and about competition and all of that and we need to continue to work on that to make sure that we can have fairer allocations. The chairman and I are looking at the possibility of even more money in NSP, that we would get from the profits that we make off of the money we gave to the banks, as they pay it back. We have our sights on that money for a national housing trust fund and for money to further expand the opportunity for NSP and a few other things. So we will be working to make sure we try and fix the inequities in how that money is allocated.

Mr. Green.

Mr. GREEN. Thank you, Madam Chairwoman.

I want to talk for just a moment about the Community Reinvestment Act. And I want to talk about the Community Reinvestment Act because we spent $30 billion to bail out Bear Stearns, $180 billion to bail out AIG, and had a $700 billion amount of money allocated to buy toxic assets and ended up spending billions of that to bail out banks.

Here is my thought: If we can spend $30 billion on Bear Stearns, $180 billion on AIG and billions to bail out banks, it is time for banks to help us bail out people.

[applause]

Mr. GREEN. And the Community Reinvestment Act may be a vehicle, with some degree of encouragement, that banks may utilize to help in this endeavor.

Madam Chairwoman, it has come to my attention by way of persons that I have had an opportunity to visit with, across the country I might add, in Florida, in Washington, D.C., and in Louisiana and other States, that some banks, at a time when CRA is most important, some banks are cutting back on their CRA departments. Some banks are moving to eliminate CRA departments and have

35

one—a—CRA officer at a time when CRA could be of great benefit to people.

So my question is this, can you envision a means by which CRA and banks through CRA could be in a position to help with this endeavor, given that it is time for them to start lending money and given that you need money and given that the Federal Government is doing its share—can you envision a means by which we can use the CRA and the banks' ability to invest in communities to help rehabilitate some of these communities? Mr. Rainwater, if you would, please, sir.

Mr. RAINWATER. Yes, Congressman, I think there is an opportunity there to work through the CRA and the banks. We have approached bankers to try to leverage some of those funds with what Ommeed is doing in the Louisiana Redevelopment Authority and what we are doing with Community Development Block Grant money, trying to push those dollars—you know, what we are trying to do is really create a neighborhood stabilization program and we do that through—I believe there is a way to do that.

But part of our challenge has been getting to this point where we can have this conversation, you know, at the end, tail-end of the Road Home Program and begin to talk about how we work with the banks through the Community Reinvestment Act. I think there is a way to do that, sir, and I think we can leverage some of those dollars and create revolving funds that we have talked about. I think there is a way to do that absolutely.

Mr. GREEN. What I would like for you to do, if you would, is once you get your plan together, if you would, let us know what the plan entails. I would like to chronicle the history of this as it develops because I literally sleep with one eye closed and the other on the CRA. I do. Because my fear is that many banks are going to start, in their downsizing process, to downsize the very department that we really need in this time of crisis. So I sleep with one eye on the CRA. And I would ask if you would let us know what this plan is, because there may be a means by which we can do something to help with this endeavor.

Next point, and I will be very brief on this one. I was present when the chairwoman asked if there would be a one-for-one replacement of properties that are demolished, housing projects that would be demolished. And my belief is that we were given an assurance that there would be a one-for-one replacement. Did not have to be on a given site, could be scattered, could be across the length and breadth of the area, but my belief, Madam Chairwoman, is that we got an affirmative answer that there would be one-for-one replacement.

I went by the St. Bernard project on my way here and I can see where construction is taking place there. Obviously I do not have the number of projects from just looking, but will we end up at the end of the day with as many units as we had before Katrina hit New Orleans? And that would be Mr. Tombar, I believe. Will we have the same number of units or more than we had before the Hurricane hit?

Mr. TOMBAR. At the St. Bernard site in particular, the answer is no. The plan that was put in place on each of the developments—and we are talking about the big four public housing redevelop-

36

ments, which I know the chairwoman has a hearing tomorrow to focus specifically on that. At that site, the plan that was approved by the previous Administration is currently, as you said, being enacted and constructed based upon, does not have one-for-one replacement. There is, however, not far away from the St. Bernard development one other of the big four redevelopments, the Lafitte redevelopment, that does in fact—not on the footprint itself, but within the community, throughout the community, has a plan for one-for-one replacement.

Mr. GREEN. Now if we can do this for this second location that you are talking about, that was unnamed, why can we not, notwithstanding the space in St. Bernard, and I can see why you might not want to have as much of a concentration—makes sense. But why can we not replace those some place else in the area as well? For me, it is not as important that they be in a given location as much as it is important that we do locate the one-for-one replacement so that they are accessible to people who live in New Orleans.

Mr. TOMBAR. Part of the challenge is that we inherited some of this and are trying to do the best we can to make lemonade out of some of the lemons that we were given. And I will tell you that you have worked with my boss and know that Secretary Donovan is the biggest advocate of affordable housing that this country has. I have known him for nearly 20 years and known him as an advocate for affordable housing. He has done great things in his native New York as Commissioner there, and is bringing that type of same commitment to the communities that he is responsible for around the country.

We here in New Orleans are doing as much as we can using the resources that we have available to provide for as much in the way of affordable housing as possible. I will tell you though that in the hearing tomorrow, and Assistant Secretary Henriquez, as she comes to testify before this committee, will speak more intelligently about these issues. There is a challenge with replacing the number of units that are taken down in a traditional public housing development.

Quite frankly, here in New Orleans, in both of our native city, there are developments that were built in the 1940's and 1950's that simply are substandard by today's housing standards—the size of the units, the functionality of the units and what-not. And if we are to use, as is the challenge in many cities, and New Orleans is not unique in that way, use the same or similar footprint and give those families the same type of amenities, the same type of living standards that all of us who are not limited by income would enjoy, that in fact, it will require dedensitization. That is the sad reality, is that you cannot get as many units if you are trying to upgrade the type of quality standards that are in those units with the families that are there.

Mr. GREEN. Well, I assure you that degentrification is something that I will salute. I think a good many people now understand that the density of population that we had in some places was just not healthy for having people become all they can and do all that they can do and be productive. So I appreciate this, this is why I said scattered in other areas. But in this area so that the people who—

37

many of whom are in other places who want to come home, but their home was a part of the public housing and we want to make sure that they get an opportunity.

Now let me comment on this. I want to agree with you about the Secretary. I have great respect for him, I really do. I appreciate him very much and I am looking forward to working with him on this and many other projects. As you know, he and I will be meeting. I got the consent of the chairwoman to meet with him and I will be meeting with him and I look forward to it. He is a good man and I think he has a tough job, but we are going to work together.

Mr. TOMBAR. Great, thank you.

Mr. GREEN. Madam Chairwoman, I will yield back.

Chairwoman WATERS. Thank you very much. Yes?

Mr. TOMBAR. If I could, I would just comment on the banking question that came up. I am not an expert in banking, but there is one thing that I do know about the situation here that has impacted the recovery of New Orleans. Many folks did have their homes insured and the insurance, as is the case when you have a mortgage in place, the insurance proceeds are written both in the name of the homeowner and of the banking institution. And in many cases—this is anecdotal—I am aware that banks encouraged families in some cases and in some cases families on their own for whatever reason, chose to take the entire insurance proceeds and actually pay it towards mortgage balances. What that created was a situation where the family no longer had that debt associated with the home, but had a home that in fact still needed to be repaired, that resource was now gone. That resource, as we talked about, by the Stafford Act, is required to be taken into account when making a determination about grants that the family is eligible for under the Road Home Program. And so what happened was, because of the choice that the family made, encouraged by a bank or otherwise, their grant, overall grant, now was reduced by what may have been pretty substantial insurance proceeds that they have received. That stands in the way in some cases.

What I know is that there are families who may be interested in now replacing the mortgage that they have paid off, to close the gap that the Road Home Program doesn't quite cover for them—replacing that. But because of what has happened in the last 18 to 20 months in the financial markets, the credit markets have tightened and it has made it incredibly difficult for people to even get those loans.

One of the things that my boss and we are doing at the Department is trying to encourage and make flexible the FHA lending program so that more families could in fact avail themselves of financing, supported and of course backed by the Federal Government through the Federal Housing Administration.

But it is indeed a challenge because of the tightening of the credit markets for some of these families who in fact did get insurance proceeds, used those insurance proceeds to satisfy a mortgage that they have, to actually get the financing that they need now to close the gap to finish the construction on their homes.

Chairwoman WATERS. All right, that is very good information and as we look at this whole thing, Mr. Rainwater, would you please take that into consideration also. And let me just say that

38

the one-for-one is a commitment of Barney Frank, myself, and
many of the members of our committee. And we know that there
may be problems on the footprint, but of course, we are not opposed
to having that one-for-one on scattered sites. And since we have all
this land in New Orleans, we will just ask the State to give us
some of that land so that we can make sure we have our one-for-
one replacement. And guess what, one of the biggest costs of devel-
opment is land acquisition. We just wrote down the cost of building
those one-for-one replacements because we are going to take some
of the State's land. Okay?

[applause]

Chairwoman WATERS. The City's land.

Thank you all so very much. You have been wonderfully coopera-
tive, and we have learned an awful lot. We look forward to working
with you. What we do not want to hear from you is, "I did not
know that I should contact you," or "I was waiting on somebody
else to tell me." I expect to hear from you. Okay?

Mr. RAINWATER. Congresswoman, I have Charla's phone number.

Chairwoman WATERS. Thank you very much. Thank you all very
much.

We are going to call on our second panel. I am very pleased to
welcome our distinguished second panel.

I know we took a long time, but oftentimes, the people who have
the responsibility get away with just making a statement and leav-
ing. And so we had to do a little bit of asking more questions so
that we could help to get to a point of resolution on some of these
problems.

Our first witness will be Mr. Christopher Oney, executive vice
president, Hammerman & Gainer, Inc. Our second witness will be
Ms. Allison Plyer, deputy director, Greater New Orleans Nonprofit
Knowledge Works. Our third witness will be Ms. Dominique Duval-
Diop, senior associate, PolicyLink. Our fourth witness will be Ms.
Davida Finger, clinical professor, Loyola University College of Law,
New Orleans. Our fifth witness will be Mr. Matthew Colangelo, di-
rector, Economic Justice Group, NAACP Legal Defense and Edu-
cational Fund. Our number six witness will be Ms. Mildred Frank-
lin, resident, Eighth Ward, New Orleans, Louisiana. We also have
Ms. Shari Baker, resident Pontchartrain Park, New Orleans, Lou-
isiana. And we have added to that, Ms Mary Croom-Fontenot, exec-
utive director, All Congregations Together.

Now I want to, first of all, thank you for your patience. I know
that you have been sitting here a long time. But again, let me reit-
erate that we have heard some of the complaints and we had the
value of getting some input over a period of time and additionally
today. And we wanted to make sure that we grilled those who were
before us who have responsibility for making decisions to create
change, that we get as much out of them as we could this morning.
And so again, thank you for your patience.

We are going to start with our very first witness on our second
panel, which will be Mr. Christopher—is it Oney?

Mr. ONEY. "Oney."

Chairwoman WATERS. Oney. Mr. Oney, thank you very much.
Please start.

### STATEMENT OF CHRISTOPHER J. ONEY, EXECUTIVE VICE PRESIDENT, HAMMERMAN & GAINER, INC.

Mr. ONEY. Good afternoon, Representative Waters and subcommittee members. My name is Christopher Oney, and I am the executive vice president of Hammerman & Gainer. My responsibilities include—

Chairwoman WATERS. I do not think they can hear you in the back.

Mr. GREEN. Pull the microphone closer if you would, sir.

Mr. ONEY. My responsibilities include corporate oversight for the Homeowner Assistance Program of Louisiana's Road Home Program.

I am pleased to have been extended this opportunity to participate—

Mr. GREEN. I am getting an indication that some people cannot hear. Would you pull it within almost a touching of your lips.

Mr. ONEY. Can you hear me now?

Mr. GREEN. Yes, sir, I can hear you now. Good commercial.

Mr. ONEY. I am pleased to have been extended this opportunity to participate in the hearing and describing HGI's role in the implementation of the Homeowner Assistance Program.

First, I would like to provide a brief history of Hammerman & Gainer. HGI was founded in 1929 and has grown to become the largest minority-owned third-party administrator in the country. Since inception, we have always worked with a strong commitment to customer service and an ability to work with a wide array of partners in providing tailored solutions to demanding issues.

Headquartered in Lutcher, Louisiana, and with 12 office locations across country, HGI provides distinct services across multiple disciplines including property/casualty, third-party administration, healthcare administration, risk management, regulatory compliance, and emergency management.

For the past 80 years, HGI has maintained its focus on working with customers to develop business solutions that are specific to our clients' requirements and add value through efficiencies, expertise, quality, service, and technology.

The initial Road Home Program began in June 2006 for a 3-year term and included several components: Homeowner Assistance; Small Rental; Hazard Mitigation; Piggyback; and IT Management. As the original program drew to a close, the State of Louisiana decided to issue separate contracts for each of the original Road Home component programs. HGI was awarded a 24-month contract to continue and then close out the Homeowner Assistance Program.

On March 30, 2009, HGI began the transition phase of the project. Originally slated for 90 days, the transition was completed in less than 30 days with HGI taking full operational control on April 20, 2009.

These operational responsibilities include: resolving grant eligibility for 7660 homeowners who have yet to have a determination; reaching a final status for applications; processing additional disbursements based on appeal and grant review; providing compliance and monitoring services; and providing closeout functions for the program.

40

Since taking operational responsibility, HGI has achieved the following: implemented process-improvement techniques, thereby reducing the time to move applicants through the program; processed over 1,500 applications to the closing company and disbursing funds to 968 applicants; identified over 1,000 applications requiring additional information from applicants to move the file forward to closing; eliminated a backlog of approximately 400 appeals awaiting additional disbursement; achieved an error percentage of less than 1 percent on a 100 percent State review of all files transmitted for closing; reduced an average call volume per day approximately 20 percent since transition; and identified a need for and provided a limited in-person appointment capability that to date has resulted in 400 applicants being served.

While HGI's operational control has gotten off to a solid start, there are still obstacles facing homeowners as they attempt to complete this part of their journey. Approximately 8,000 applicants are still awaiting eligibility determination and a potential award of funds. For these applicants, the largest single hurdle remains their inability to obtain and provide ownership and occupancy documentation for the damaged residence. For many of these applicants, they simply have difficulty in obtaining the legal services required to deal with a variety of inheritance issues.

Other applicants are experiencing difficulty in addressing a lack of sufficient funding to complete either the rehabilitation or reconstruction of their damaged residence and dealing with a dramatic increase in insurance premiums. A direct result of these financial constraints is that the affected applicants are unable to comply with covenant requirements associated with the receipt of a program award.

To assist applicants in obtaining legal services to resolve inheritance issues and other ownership-related issues, HGI has approval from the State to issue a request for a proposal to obtain a legal provider that will work directly with low- to moderate-income applicants to attempt to resolve these issues and move them forward through the process. The RFP will be released tomorrow, Friday, August 21, 2009.

HGI has designed a due diligence process that allows us to communicate with applicants and identify documents required to move them forward through the process. If documentation cannot be obtained, the reasons for not being able to move a file forward are documented and shared with the State. This information can better help the State understand issues facing applicants and provide input into its decision-making process.

The State has identified that groups of applicants share similar challenges as they attempt to move forward through the program. HGI has partnered with the State to provide limited outreach activities to assist applicants in meetings these challenges. As an example, HGI recently supported the State with educating and visiting with a group of applicants concerned about home evaluation and damage allowances.

As HGI moves forward with administering the Homeowners Assistance Program, we are keenly aware of the importance of staying focused on assisting the remaining applicant population by processing the applicants as quickly, efficiently, and accurately as

possible. HGI has and will continue to work closely with the State of Louisiana to develop solutions that meet the challenges of the program. We are committed to providing effective and professional assistance to all remaining applicants and properly closing out the Homeowner Assistance Program.

[The prepared statement of Mr. Oney can be found on page 73 of the appendix.]

Chairwoman WATERS. Thank you very much.

We are going to move now to Ms. Plyer, is it? Thank you.

## STATEMENT OF ALLISON PLYER, DEPUTY DIRECTOR, GREATER NEW ORLEANS NONPROFIT KNOWLEDGE WORKS

Ms. PLYER. Madam Chairwoman and members of the subcommittee, thank you for the invitation to appear before you this afternoon. I am the deputy director of the Greater New Orleans Community Data Center, a product of Nonprofit Knowledge Works. Operating since 1997, the Data Center analyzes and disseminates data to help nonprofit and civic leaders work smarter and more strategically.

The purpose of my testimony today is to provide an overview of the status of the Road Home Program, the recovery of greater New Orleans, and some of the challenges homeowners have encountered as they rebuild. This overview draws largely from the New Orleans Index that we publish in collaboration with the Brookings Institution, as well as a large array of other data sources and studies that we have been gathering since Katrina.

I want to preface by saying that the Data Center is a neutral data intermediary. Our expertise does not extend to how law is written or how programs are designed. but I can present you with a solid set of facts about the Road Home program and New Orleans' recovery.

According to HUD estimates, the 2005 storms damaged more than 515,000 homes in Louisiana, the majority were owner-occupied, and of these, one-third were underinsured. The New Orleans metro area sustained the largest losses with 320,000 damaged homes.

Immediately after Katrina, housing costs rose sharply as demand exceeded supply. By 2006, fair market rents had risen 39 percent and job vacancies soared, particularly in lower-wage occupations.

Road Home provides grants for the uninsured losses of homeowners to repair their homes or relocate. The program began in June 2006, but got off to a slow start.

Nonetheless, by the third anniversary of Katrina last year, the program had disbursed grants to the vast majority of the applicants expected to receive awards. And today, over 120,000 grants, averaging $64,000, have been disbursed.

Road Home recipients include 96,000 in the New Orleans metro area, 45,000 of these are in the City of New Orleans itself. And fully 90 percent are repairing their homes rather than selling to the State.

By mid-2008, after the Road Home Program had distributed thousands of grants in the metro area, covering more than one-quarter of all damaged homes, the market began to soften and in 2009, rents fell for the first time since the storm.

42

Four years after Katrina, the City has recovered 77 percent of the number of pre-Katrina households, a big jump from mid-2006 when the Road Home Program began, at which time, less than half the population had returned.

New Orleans families with children have struggled to return. When the Road Home Program began, the share of all households with children had dropped from 30 percent pre-Katrina to only 18 percent, but rebounded somewhat to 20 percent by 2007. In 2006, the African-American population of the City had decreased dramatically from 67 percent of the total pre-Katrina to 58 percent. Three years after Katrina, the African-American population of New Orleans has rebounded somewhat to 61 percent of the total.

I would like to highlight three obstacles encountered by Road Home recipients in their attempts to rebuild: gaps in funding; contractor fraud; and inaccurate cost estimates. A PolicyLink study of Road Home data concluded that an astounding 81 percent of recipients in New Orleans and 69 percent of those in other parishes who planned to rebuild did not have sufficient funds to cover repairs, even when taking into account insurance and Road Home grants. Because grant awards were based on pre-storm home values rather than total repair costs, the average gap between damage estimates and rebuilding funds was $36,000 statewide. Gaps were larger in lower-income and African-American neighborhoods. For example, in the Lower Ninth Ward, the average gap was $75,000, as you mentioned earlier.

News reports abound about contractor fraud and a study by LSU, PolicyLink, and LouisianaRebuilds concluded that 9,000 households were affected. In over 40 percent of the cases, the homeowner was unable to finish rebuilding. More than half of the incidents were reported, but in 41 percent of the cases, no action was taken by authorities. Only 1 percent of victimized homeowners successfully got their monies returned.

Nonprofit groups working with homeowners also report that many recipients complain of a high-cost environment as one barrier to rebuilding. And although no post-Katrina studies have quantified this problem, extensive nationwide research by HUD indicates that estimating the cost of rehabbing structures is extremely difficult. Unforeseen circumstances such as termite damage behind walls can drive costs above initial estimates, sometimes by a factor of 100 percent, even when estimates are provided by experienced professionals.

Inability to accurately budget for all rebuilding costs, gaps in funding, and contractor fraud are three obstacles frequently encountered by Road Home recipients. Nonetheless, the Road Home program has had a marked effect on the New Orleans area housing market and the ability of homeowners to return.

Once again, we thank you for the opportunity to appear today. I would be pleased to answer any of your questions.

[The prepared statement of Ms. Plyer can be found on page 79 of the appendix.]

Chairwoman WATERS. Thank you very much.

We will now move to Ms. Diop.

43

### STATEMENT OF DOMINIQUE DUVAL-DIOP, SENIOR ASSOCIATE, POLICYLINK

Ms. DUVAL-DIOP. Thank you and good afternoon, Madam Chairwoman, and members of the subcommittee. My name is Dominique Duval-Diop and I am a senior associate with PolicyLink. I want to begin by thanking you for your continued vigilance in overseeing and monitoring the housing recovery programs of the State of Louisiana that were developed in the wake of the 2005 storms.

PolicyLink is a national research and action institute working to advance social and economic equity, with offices in Oakland, New Orleans, New York, and Los Angeles. Since early 2007, PolicyLink has invested significant resources in monitoring the development, implementation, progress, and impact of Louisiana's housing recovery programs. Throughout our work, we have partnered with State agencies such as the Louisiana Recovery Authority, and we have also helped to convene hundreds of nonprofits and faith-based groups who are working to recover their communities, both to inform our analyses and also to help in crafting policy recommendations to remedy gaps.

Four years after Hurricanes Katrina and Rita, we have seen much progress but we have also witnessed the struggles of the poor, the disabled, and the elderly as they languish, unable to transcend their difficult situations. I highlight in particular the still-relevant findings of our 2008 report entitled, "A Long Way Home," and the insight that we have gained over the years in my following answers to your questions regarding the status of the Road Home Program and the disparities in the distribution of funds to individuals and neighborhoods.

You have heard from the State detailed figures about the current status of the Road Home Program. But what is important to reiterate is that while 82 percent of those eligible have received funds, and low-income families have received over half of these funds, significant challenges still remain for those who have received their grants and those who have yet to close. Our research found that the majority of homeowners choosing to rebuild did not have sufficient funds to fully recover. And we are repeating conversations that have been stated before. But I think it bears repeating.

Furthermore, programmatic policies have had an impact on the equitable distribution of funding to low-income and to certain predominantly African-American neighborhoods in the City of New Orleans. Particularly by not taking into account damage estimates and instead using pre-storm home values to calculate grants, the Road Home Program grant formula caused major gaps for homeowners in low-income neighborhoods that had low pre-storm values that suffered high damage.

A geographic pattern also emerged in terms of gap with the highest gaps being experienced in the most damaged parishes, including Orleans of course, St. Bernard and Cameron. Across the City of New Orleans, we have heard that again certain neighborhoods that are largely African American and some low-income have experienced high gaps, including New Orleans East and the Lower Ninth Ward.

And to further illustrate the geographic distribution of gaps, I refer you to the map that can be found on page 7 of my testimony.

44

It shows a clear connection between high gaps facing residents in this area and the number of properties that still remain blighted and abandoned. It is a powerful way to show the actual progress or lack of progress on the ground and the impact of program policies on neighborhood rebuilding.

What obstacles or challenges are most frequently encountered by homeowners using the program? Again, nonprofit groups that we have been working with and we have been discussing over the years and meeting with report that many recipients face insufficient rebuilding grants, contractor fraud, a high cost environment, inability to access additional credit, and title or succession challenges that delay or deny their additional funding for home repair.

In the case of contractor fraud, as Allison quoted from our report, again, 9,000 people are estimated to have been the victim of fraud in the past 3 years.

So in conclusion, people face huge gaps and there has also been a sustained lack of investment in the community infrastructure that has traditionally responded to disasters in the past. Recently, the State has allocated a modest amount of funding to nonprofits who have stepped up and responded after the storms, but $20 million being allocated a couple of months ago is too little too late and it is still insufficient vis-a-vis the need. Nonprofit groups have really worked to leverage resources, leverage volunteers, leverage donations, and we need to allocate additional funds to complete this community infrastructure.

Thank you for allowing me to testify.

Chairwoman WATERS. Thank you very much.

Ms. Finger?

### STATEMENT OF DAVIDA FINGER, CLINICAL PROFESSOR, NEW ORLEANS COLLEGE OF LAW, LOYOLA UNIVERSITY

Ms. FINGER. Congresswoman Waters and members of the subcommittee, thank you for inviting me to testify today. I am grateful for this conversation and hopeful that these hearings will help change policies to increase safe and affordable housing for all.

I want to also thank the incredible advocates from Fair Housing Legal Services and community groups whom I talked with to prepare this testimony. Their concerns and the issues their clients face are reflected here and I appreciate their input.

As an attorney with Loyola Law Clinic here in New Orleans doing post-disaster housing work, I have given direct assistance to many hundreds of Road Home homeowner applicants. My understanding of Road Home is drawn from the experience of my clients, regular people just trying to come home. While funds distributed are useful, on the whole, this program has contributed to the bundle of post-Katrina challenges, especially for low-income and vulnerable displaced people.

For example, the ownership rules to qualify for Road Home were very burdensome. Families living in their homes for generations continue to struggle to pay for and complete title clearing procedures just to qualify. Our system should and can do better.

You asked me to report on Road Home obstacles. I am going to describe specific program obstacles. I am going to get into some details because that is what is important to applicants.

45

First obstacle—the design of the grant formula itself. Given property values and the way in which the program's grant formula utilized the pre-storm value, the program was discriminatory for African-American homeowners. If the Bobby Jindal Administration cannot fix that on its own, we really need your help. Pre-storm value should be taken out of the calculation, leaving the correct cost of damage as the basis of grants.

Obstacles two and three—pre-storm value and estimated cost of damage. The program chooses the lower of these two calculations to find the grant. Both measures are problematic. Incorrect determinations about both go uncorrected on appeal. Low-income homeowners could not afford the independent appraisals to increase pre-storm value. Low-income homeowners could not afford the structural engineer's report to increase estimated cost of damage. On pre-storm value, even with an independent appraisal, the highest home value is not always used. For example, when a homeowner supplies a Louisiana certified appraisal and it comes back with a value of 20 percent or greater than the Road Home's incorrect value, the program will not utilize the higher value. We have heard that this is because of a HUD rule. There is still the opportunity to change this and, Mr. Tombar, we request your assistance on this specifically. The highest credible value of a home should always be utilized. Actual repair costs should be the measure for determining cost of damage.

Problem four—the additional compensation grants for low-income people. This grant of up to $50,000 was available to homeowners who income qualified and who had a gap in their assistance. So not all low-income homeowners will qualify. They had to have a gap in assistance under the problematic program rules I just described.

Low-income eligibility as determined by Road Home is a serious hurdle. The standard is governed by rules that have changed causing confusion and errors. Most notably, rather than considering a household's actual annual income, the program has used one elevated pay period and attributed that spike in periodic income as annualized income. This wrongly cuts off low-income homeowners. Annualized income should be utilized as the benchmark.

Obstacles five and six—access to information and appeals. It has been very challenging to get individual file information and program policy information. Without this information, meaningful appeals could not occur. Appeals procedures themselves are broken. Basic best practices are missing. ICF reviewed its own decisions as the first tier of appeal. The second tier is reviewed by an unknown State panel. At no point does the appeals process include a hearing where the applicant can contest errors. There are no meaningful appeal guidelines to help applicants, nor are there standards that explain how documentation is evaluated and weighted in decision-making. All applicants should be given their full files with an explanation of the grant calculation. Because of serious systemic flaws, the appeals process should be reopened and independent review panels should make decisions.

Recapture of funds—we heard some new information today about recapture of funds. The bottom line is that as a basic first step, all recapture rules must be well publicized. They currently are not. No fund recapture should ensue without due process hearings, hard-

46

ship exceptions, waivers and, most importantly, opportunities for full leniency.

I just want to add here that people's experience with FEMA's recoupment of post-hurricane grants was unbelievably difficult. It ruined lives. People who have lived through botched evacuations, the shelters, FEMA, and everything else cannot now endure the additional toll of Road Home's collection efforts, especially after those funds were used to rebuild homes.

Turning to unspent Road Home funds, let me emphasize that there are no surplus funds to divert. While other important needs remain, including medical and infrastructure, these funds must be spent on unmet housing needs. For example, these funds should be used to correct all the program mistakes I just described, support the nonprofit community that is assisting Road Home applicants, and expand the additional compensation grants.

I am glad to hear that this is in the works, but the devil is in the details, and we need to fix already existing problems. I have just a few more.

Chairwoman WATERS. I'm going to have to move on. Ms. Fontenot, I understand you have to leave right away. I am sorry, because we have so many, we are going to have to move and just kind of keep it to 5 minutes, but Ms. Fontenot is next. And we will exchange some information through the questioning process.

### STATEMENT OF MARY CROOM-FONTENOT, EXECUTIVE DIRECTOR, ALL CONGREGATIONS TOGETHER

Ms. CROOM-FONTENOT. Thank you so much for your consideration. Madam Chairwoman and to the panel and your committee, we extend our sincere thanks to you for all that you are doing. I was asked somewhat late today to prepare a statement, so please bear with me.

I would like to share with you all just a little information as to who we are. We are All Congregations Together, we are faith-based organizers who have worked in and across this City for over the last 19 years.

We believe firmly in the right for every citizen to return should they choose to do so. And not only to return, but to be made whole, to be restored in this process, in this rebuilding process. We are the organization, the only organization that organized to march on the State Capitol in reference to the ICF and the Road Home process under a banner of "big contracts, no benchmarks". So Mr. Rainwater and those who came before him know our organization and know our work well.

We also worked with Davida Finger and the Katrina Clinic around stopping a deadline which the Road Home worked to impose just last year, which would have excluded an estimated 14,000 citizens from their right of appeal. So we have been monitoring this process, this Road Home process, for quite awhile.

In addition, I am not only the director of ACT, but I am a survivor, and I am also an applicant who is undergoing the appeals process. And I can assure you, it is as insane as everyone has said here. I am extremely concerned, because being somewhat a healthy person, I am concerned about the very elderly and we are also concerned, as it was brought up, about those with language barriers.

47

But let me bring up one more concern or one more area for concern, around literacy. We know that we had quite a substantial amount of our population who had challenges around literacy. We have learned in our intake process and serving that this too created barriers, the literacy piece, to citizens being able to successfully complete the application process. And so we are concerned about that as well.

I have some comments in reference to the guests who were here previously, in reference to HUD. We are working presently on stopping the demolition of 77 units which are located at the Florida housing site. Why? Because we have gone in, we have inspected that site with professional eyes that know what they are looking at. We see it as HUD being really fiscally irresponsible. There is nothing wrong with that site when last we inspected it. So we have been working to stop the demolition of it in hopes that we would demonstrate at a time when our City and our State is so financially strapped, that we are as a city and a state being fiscally responsible. And I have petitioned Ms. Finger to assist me with that, the Katrina Clinic.

The other comment I would like to make is in reference to NORA, who was here earlier. And I really do wish that they would have stayed. And I encourage that at the next session that they do stay to hear our side of it. In reference to NORA, NORA are working and building on a process that was created by ACT in the 1980's which it was called the expropriation process which called for any citizen who was living next door to a blighted or abandoned property to have first rights to that property, simply because they had been impacted by that property being there, blight, rodents, their lives had been impacted. And so in an effort to restore them, we worked to create what was called the expropriation process. They are now calling it the Lot Next Door. Our experience has been and is, and we have walked in, for lack of a better word, as secret shoppers, to explore that process. It is not working for the citizens of New Orleans. We are finding that developers have a much easier time acquiring property than the citizens who have been impacted do.

Is my time up?

Chairwoman WATERS. One minute.

Ms. CROOM-FONTENOT. Okay. In reference to the Road Home, the appeals process, we urge you to investigate the red ribbon file, which is where they send your appeals process after months of them not having contacted us. They put your file into the red ribbon file. And that file says that all of a sudden, you are at peace, and have no opposition to your grant process.

That was my experience; my file was sent to the red ribbon file after having written them several times and not having heard from them.

In closing, I ask that you work with us to ensure that every citizen is made whole with the $150,000 grant.

Thank you so much.

Chairwoman WATERS. Thank you so very much. I thank you for accommodating us on short notice. It was based on the information you shared with us this morning.

Mr. Colangelo.

## STATEMENT OF MATTHEW COLANGELO, DIRECTOR, ECO-NOMIC JUSTICE GROUP, NAACP LEGAL DEFENSE AND EDU-CATIONAL FUND

Mr. COLANGELO. Thank you very much, Chairwoman Waters and members of the subcommittee. I appreciate the opportunity to testify today on behalf of the NAACP Legal Defense and Educational Fund. I am an attorney and the director of the Economic Justice Group at LDF.

There was something striking to me about the testimony from your first group of witnesses on your first panel. They mentioned a number of Federal laws that guide their judgment as they implement and decide what to do with the $13.41 billion, the Federal funds that Congress appropriated to Louisiana. They mentioned the 2005 and 2006 appropriations statutes, they mentioned the 2007 special supplemental law for additional Road Home funds, they mentioned the Stafford Act, they mentioned a number of other Acts. But not one of those witnesses mentioned the Civil Rights Act of 1968. And I found that omission striking. Unfortunately, I also found it unsurprising.

The Civil Rights Act obviously includes as one part of it, Title 8, which prohibits discrimination in housing. Title 8 prohibits not only discrimination that is intentional, but also actions that have the effect of excluding people from housing on the basis of their race.

The Fair Housing Act also requires HUD and the Louisiana Recovery Authority to take steps that affirmatively promote fair housing, which is much more than a mere obligation not to actively discriminate. It requires active steps to break down barriers and eliminate disparities that exist in housing policies.

As has been mentioned, the Road Home Program, that $11 billion or nearly $11 billion, is the single largest housing recovery program in American history. Sadly for African-American families, the reality of the Road Home Program has fallen far short of its promise due to a fundamental flaw in the program design. HUD and the LRA created and approved and are now implementing a recovery program that links housing assistance to the depressed values of black families' pre-storm, segregated housing.

Under the terms of the program, as has been mentioned during this hearing today, rebuilding grants are calculated based on the lower of two figures—the pre-storm market value of the home or the cost of storm damage to the home. Therefore, by definition, homeowners either receive enough assistance to rebuild or they do not receive enough assistance to rebuild. And unfortunately, this dichotomy between enough and not enough falls disproportionately and most heavily on African-American New Orleanians. This is because, as, Congressman Green, you so eloquently put on the record earlier today, it is undeniable that homes of similar quality, size, and construction happen to be valued less if they are located in a black neighborhood than if they are located in a white neighborhood. As a result, Road Home grants for African-American families are far more likely to be based on the depressed pre-storm value of their homes rather than on their cost of damage. And this leaves those families disproportionately burdened in their ability to return home and rebuild and restore their communities.

This discriminatory disparity is the subject of a class action lawsuit that my office, the Legal Defense Fund, has filed on behalf of five African-American homeowners and two nonprofit housing organizations. We represent a class, a proposed class, of nearly 20,000 African Americans who are struggling to return to their homes in New Orleans because their Road Home grant awards were based upon the pre-storm value of their homes. Our lawsuit alleges that this disparity violates the Fair Housing Act of 1968 and the Housing and Community Development Act of 1974.

The math is clear and the outcome is obvious. African-American families in New Orleans are being short-changed. But rather than address this unfairness and treat all New Orleans homeowners equally, both HUD and the LRA have opposed making any changes to the Road Home Program.

HUD has argued that it lacks the authority to impose fair housing conditions on CDBG recipients like the LRA after Federal funds have been disbursed. This position is contrary to the legal duty that Congress has imposed on HUD to affirmatively promote fair housing in its programs and to make sure that its grantees do not violate Civil Rights laws.

The LRA has argued astonishingly that the Road Home Program is actually not even covered by the Fair Housing Act. This argument we think is frivolous and in enacting the appropriation statutes that funded the disaster recovery grant program, Congress, to its credit, refused to allow the waiver of fair housing and non-discrimination requirements.

Although some of these issues are now before the United States District Court in Washington, D.C., this subcommittee has its own oversight role over Federal fair housing programs. Congress devoted substantial funds to restoring New Orleans and other storm-damaged communities and now Congress must call on HUD and the LRA to distribute those funds fairly and in compliance with civil rights mandates.

Regardless of what has happened in the past, the Obama Administration and the 111th Congress have a responsibility to ensure that our Nation's largest housing recovery program does not go down in history as a government-sponsored act of housing discrimination.

I thank the subcommittee for this opportunity to testify and I look forward to your questions.

[The prepared statement of Mr. Colangelo can be found on page 66 of the appendix.]

Chairwoman WATERS. Thank you very much.

Ms. Baker.

## STATEMENT OF SHARI BAKER, ON BEHALF OF LILLIE BAKER, RESIDENT, PONTCHARTRAIN PARK, NEW ORLEANS, LOUISIANA

Ms. BAKER. Good afternoon. Madam Chairwoman, and the distinguished members of the subcommittee, I am indeed thankful and grateful for the invitation and opportunity to be able to speak before you today on behalf of my mother, Lillie Baker. I am just going to read a letter that she prepared for you:

50

"My experience with the Road Home Program has been tedious at best. After Katrina, my husband, who was 82 at the time, and I, 77, were devastated. Everything we worked for was gone in a matter of minutes. We had lost everything. We had 10 feet of water in our home. We both were retired from the Plaquemine Parish School system after 40-plus years combined. He was a principal and I was a teacher at Phoenix High School. We had nine children, six boys, three girls, one is deceased. All memories were lost. We had nothing but the clothes on our back and the car we were riding in.

"One cannot understand the anger and despair that you feel when the media portrays you as a refugee in a country that you were born and raised in and paid taxes in for 65-plus years, and to be abandoned during the greatest natural disaster of all times.

"We filled out the application for the Road Home Program in August of 2006. This gave my husband and me something to hold onto. When you lose everything at one time and do not know where or how to start over, it is scary, especially for an 82- and 77-year-old on fixed incomes, and living with someone else in a city that is not your own.

"We received funds from FEMA in the amount of $23,370.41 and $9,269.63 from Allstate Insurance. Unfortunately, we did not have flood insurance. Our expenses seemed greater now and we did not have anything. The funds we acquired were basically used for living expenses, since there was nothing to go back to.

"We received communication from the Road Home via letter dated December 22, 2006, stating that we were eligible for benefits. We chose Option 1 because we wanted to go back to what we had spent over half our lives building.

"We received $54,364.10 to rebuild our home. We tried to repair our home, but we were taken advantage of by so many contractors. I had to pay for my electrical work 3 times and it is still not right. Some of the outlets are not functioning. I got the Attorney General's office involved, but that did not do any good. My plumbing is the same way. Some of the pipes leak. My shower doors fell off the tracks. My air conditioning was not done correctly. My duct work, from what I understand, was not changed. My lights come on when they want to sometimes.

"It is a shame that people are so driven by money that they would take advantage of people at such a low point in their lives.

"We appealed the amount of money that was given to us, but to no avail. You can call the office every 5 minutes and speak to 5 different people and everybody is going to tell you something different. We also applied for the elevation grant and were told I had to open succession, which was done, and I still have not heard anything. I am being told it is in the legal department.

"I thought that the Road Home was going to help us regain some semblance of normalcy back into our lives, but it only created more stress at a time when stress was not what we needed. I am glad that my husband did live to see us get back into our home, even though it is still not right.

"Sincerely, Lillie Baker."

Just to touch on, if I may, comments that Mr. Rainwater said as far as the assessment of the property and how the money is being

51

allocated. Because I have heard, and they said her estimated pre-storm value was $87,171, and the estimated damage to the home was $209,671.20. But she was only given $54,000. So if you do the math, there is no way, if it is $209,000 worth of damage, that $54,000 is going to correct the problem.

And to what Mr. Sathe with NORA said, he made a comment about the soft second program being a way for people who are not next door to acquire some of the property, but the soft second mortgages are only given to people when they are buying a home that is already built, constructed, and has passed Code. So I do not know how he can say the soft second mortgages would be used to acquire some of these properties that are available now.

[The prepared statement of Ms. Lillie Baker can be found on page 64 of the appendix.]

Chairwoman WATERS. Thank you very much.

Ms. Franklin.

## STATEMENT OF MILDRED FRANKLIN, RESIDENT, PONTCHARTRAIN PARK, NEW ORLEANS, LOUISIANA

Ms. FRANKLIN. Good afternoon, everyone.

Chairwoman WATERS. Good afternoon.

Ms. FRANKLIN. I am pleased to say as of today, my primary home is completed. I am living now in my primary home from Katrina and Rita that had 7 feet of water. I am in the home now as of yesterday.

My primary home that was destroyed due to Katrina and Rita, the contractor did me a fraudulent situation for 7 months. But a contractor in 7 weeks completed the home where we could live in it. So thank you, the Lord, and you all for allowing Road Home to really work with me.

But I had a problem with a donation that my father gave me due to my father's death. This is where the problem is now and I will just give you the meat of this because my home is up and I cannot complain because I waited 2 years to even get into this primary home. It is not all done, but I am able to live in it now.

Now the home that I am really concerned about is my donated home that my father gave me in 2007. I applied for the Road to Home for the small rental and after applying for the small rental, I could not really begin the work until the succession was done. I have done the succession and as of now, I am encountering problems rebuilding the family home that my father donated to me on Delachaise Street in the Garden District of New Orleans. He was 94 years old and he donated the property to my husband and I. I am waiting for the small rental program.

I applied for the small rental program in 2007. I was initially told by the bank that I could not borrow the money, so therefore, I have to rely on the Road to Home to give me the money. I was denied the loan because of our income, we are on a fixed income. If I had borrowed the money, I would have had to pay the money back, so I am glad I did not get the loan, in effect.

I qualified for the first clearing of the title, when I removed my deceased mother's name from the title and I had the succession done and it was fully cleared. But I was rejected because they claimed the succession was not clear, so I did it over. And they

52

have all my paperwork, all my material, and I am just waiting for my award to be granted.

The money did not arrive and they said they do not know exactly when I will get it. But I would call constantly and I completed the succession in December of 2008, I sent the documents to Road to Home but I never heard from them. In January of 2009, I received a Code Enforcement citation for Delachaise Street. The Code Enforcement levied a fine of $100 to $500 a day if I did not get the repairs done to the home. We were cited several times and it required me to fix the house just to have enough to show that I was trying to improve the home, with the money that I had on hand. My lawyer and I did something to write off the Code Enforcement officials that we were trying to rebuild the home on Delachaise which was donated to me.

I provided many things that I could use to defend myself in the hearing. We finally reached the hearing panel and they were sympathetic with my rebuilding delay but we will still have to reach the hearing that they could show me that I was sitting and waiting for them to do something. So there were 20 to 30 other people in the neighborhood waiting for the Code Enforcement, like we were just a group of cattle sitting around and waiting doing whatever for hours just trying to get them to do our paperwork and everything. I paid another contractor to do some small repairs that they were asking me to do, but he took my money and he did not complete the work. Finally, the Broadmoor Civic Association donated paint and labor. We were able to come in and complete and went back for the hearing in May of 2009.

On our way out the door, the Code Enforcement, I heard the panel warn us the next time you may be cited for having a vacant unit. However, we will not have the money to rebuild the interior of the house without a grant from the Road to Home. I last spoke to the Road to Home Program on August 6, 2009. A worker named Diane told me that the State has not released the money and it should be released between September and October of 2009. I sincerely hope that the money is released well before the Code Enforcement begins their sweep on unoccupied property.

I would like for these improvements to be done to Road to Home for applicants who are applying for help through the Road to Home.

In order for the Road to Home to be improved, they need more local administrators, so the people in New Orleans can work closely with their caseworkers who are handling the application.

I would like for them to write us more and update our applications. Unless we call or we are going to sit on hold for a specific period of time, we will not know what is going on with our application.

The Road to Home Small Rental Program needs to finish its work, do its best in the interest of the applicants, and let the renters of New Orleans return. Waiting on the funds is holding the people back from being able to rent their homes.

[The prepared statement of Ms. Franklin can be found on page 70 of the appendix.]

Chairwoman WATERS. Thank you so very much, Ms. Franklin. I am going to yield to myself a few minutes here to engage our pan-

53

elists a bit. Then I am going to turn it over to Mr. Cleaver and we are going to wrap it up after Mr. Green.

Let me just say very quickly, if I may, that your testimony historically has been wonderful and you have confirmed everything that we thought we had learned about what is wrong with the implementation of the Road Home Program, and more, that we will act upon. What we have to do is act very quickly, because we cannot allow the Road Home Program to close out, as they are poised to do, with all of these issues still before us.

Mr. Oney, I just wanted to—first of all, let me say I recognize that your company has taken over the implementation toward the end of the so-called Road Home Program and that a lot of the problems you are certainly not responsible for. I do not know what your contract is all about and exactly what it says, but I would expect that when you run into certain kinds of problems that are created for the citizens of the city that just does not make good sense in the way it is indicated they should be dealt with in the Road Home program, that you would raise this up as a problem.

I see, based on your testimony, that you have a lot of people who need legal assistance, legal assistance in documenting the ownership of the property, is that right?

Mr. ONEY. Yes, ma'am.

Chairwoman WATERS. And I see that you have taken some steps to help with that. But this is a very difficult process, is that right?

Mr. ONEY. Yes, ma'am.

Chairwoman WATERS. And you have not really been able to provide that much help in making sure that people who have been living in property oftentimes for many years get the documentation that they need in order to get the help from Road Home; is that right?

Mr. ONEY. Yes, ma'am.

Chairwoman WATERS. All right, let me just say this to you. It was suggested to me some time ago that instead of denying people because of the lack of documentation on property that has been passed down perhaps, that perhaps we should be suggesting that there be a fund set aside and perhaps it can be done with some of the overage that we have or some of the $3 billion or $2 billion or whatever it is that is still left. Set aside a fund to protect against lawsuits that would be in effect for a number of years, so that you can move forward with assistance to those who need documentation. That you perhaps could set up some kind of criteria— if you have been living in a home for a certain period of time and other things exist, I do not know what they all are, that they be covered and that everybody be covered by this fund in case somebody comes along 10 years from now or 5 years from now to say that is my house, that is really not that person's house. So that we can expedite. If the fund was set aside to cover the liability, then that should take care of helping the people rather than not allowing them to be helped because they do not have the clear title or documentation.

Would you respond to that?

Mr. ONEY. I think that that is a wonderful idea and we would be happy to administer it at the direction of—

54

Chairwoman WATERS. You have attorneys who are involved in your firm?

Mr. ONEY. Well, we are issuing an RFP for legal services and it will be released tomorrow, so New Orleans and Louisiana legal firms will be able to respond and we will end up contracting with one of those firms.

Chairwoman WATERS. So you do have some money for legal services?

Mr. ONEY. Yes.

Chairwoman WATERS. Would you factor into your RFP—if it has been released already, whether you can do an addendum or another one or however you do it—that the recovery program, the Road Home Program, set aside some money to guarantee against—to deal with lawsuits or whatever the liability may be, if in fact you move forward with assisting residents who fit a certain criteria. And that criteria should make good sense. If they have been living in this home for a certain period of time, if they have been paying the bills, they have been paying taxes or electric bills, what-have-you, set up a criteria, put the fund there to protect against the lawsuits, let the fund be responsible for the next 5 years, 6 years, 7 years, I do not know how long. And if people have not made a claim on that property in that length of time, it is over.

Can we do something like that?

Mr. ONEY. It is not currently part of our contract. We would be happy to do it at the direction of—

Chairwoman WATERS. Would you look at drawing something up and seeing if we cannot help get that into the implementation of the Road Home Program?

Mr. ONEY. Absolutely.

Chairwoman WATERS. I thank you very much.

Let me just say, I thought I made myself some notes here, I am so bad at scribbling, I have the recommendations both I think from PolicyLink where you have documented and confirmed what we are hearing about contractor fraud, not enough money to rebuild, credit issues and foreclosures. Credit issues and foreclosures, we need to take a look at that. Increased financial vulnerability and all of the other things that you have identified here. You also talked about title issues, is that right?

Ms. DUVAL-DIOP. Right, yes.

Chairwoman WATERS. You heard what I am trying to suggest here. Does that make good sense to you?

Ms. DUVAL-DIOP. Legal issues are not my forte. I would defer that to Davida Finger.

Chairwoman WATERS. Okay, that's okay. That's all right.

The contractor fraud issue has not been dealt with. That is part of the criminal justice system, we ought to bring some people to the bar of justice on this stuff. We need to talk with the justice system about what we are going to do about contractor fraud, just like Ms. Franklin was talking about. You know, people have been ripped off tremendously here and I do not hear anybody saying we indicted, we arrested, we put somebody out of business and we are going to take a strong look at what we can do.

55

Mr. Green is a tough lawyer, he is tough. You hear him on these yes or no scenarios. And so I am going to ask you to particularly pay attention to that.

The recommendations that you made, Ms. Finger, are very, very well written and very well put in a position where we can move forward on some of that. You took each one of your complaints about the Road Home Program and you clearly defined, similar to what was done with PolicyLink, what your recommendations are and what we should do and we will definitely take that back to Washington, the staff has all of that. We will act and move on that, some of which you identified which we did not have an opportunity to talk about today.

You stopped me dead in my tracks, Mr. Colangelo, about the civil rights laws. You are absolutely correct and if what you have, the lawsuit, what you need is—not what you need, you are doing what you need to do. I do not know if this reaches class action status but I do know this, that class action possibilities were undermined in the previous Administration and we have not done anything about it. It just dawned on me that our Judiciary Committee under Mr. Conyers should revisit this so that we can get rid of the obstacles to filing class actions. And aside from that, if you will be in contact with us and let us know legally whether we can file an amicus curiae in support. I will be willing to do it and I would be willing to go to a tri-caucus that includes the Black Caucus, the Asian Caucus, the Latino Caucus, to see if we can file an amicus curiae in support of the lawsuit. If that makes good sense, you let me know. Okay?

Mr. COLANGELO. Absolutely, and thank you, Madam Chairwoman.

Chairwoman WATERS. You are absolutely welcome.

Ms. Baker, thank you so very much for being here on behalf of your mother. One of the things we discovered as we did our listening session over in Pontchartrain Park area was that we have so many people who are trying to help their mothers and fathers, who are aged, who are being taken advantage of, who cannot traverse this terribly cumbersome system that has been placed before them. We recognize that as a problem and we definitely will do everything that we can to try and talk about the plight of seniors in this whole mess. Seniors have lost a lot and I am very disturbed by it and we will do everything that we can to pay attention.

I do not want to lose the bit on renters either that you brought to our attention. Someone said just before I came in that nothing has been done for renters. So we have to take a look at that and see what can be done with existing funds or funds that are unexpended or responsibilities added to your contract for the Road Home Program, or additional monies that may have to be appropriated, to deal with that. We have situations that have been defined for us where people got some Road Home money and because they were displaced, they had nothing, they had to have some place to live and so they are using that money in order to just rent a place, have some place to live. They do not have that money to put toward rehabilitation or rehab of their home, which was not enough to begin with. And we have to look at that and see what

56

we can do because they fall in that renter category now, or people who need some assistance.

So based on your testimony, I have heard you loud and clearly and I have the testimony that you have made. I am committed to acting on it, as my colleagues who are here, and you can count on us to do it.

And I thank you so very much. I must give time to Mr. Cleaver at this point.

Mr. CLEAVER. Thank you, Madam Chairwoman.

Let me apologize. I had to step out and then ended up in the hallway engaged in another listening session, unscheduled, with people who came up to me and raised a number of issues and some of it was with some bone-chilling emotion.

Professor Finger, I am curious about your testimony because it points out a part of the problems here, that the Road Home Program would not accept certified Louisiana appraisals if the appraisal was higher than 20 percent of the Road Home, even if the Road Home appraisal was wrong. Am I right about that?

Ms. FINGER. Generally yes, that is my understanding and that is part of the convoluted appeal process and ever-changing rules on how home valuation was made and substantive problems with how the pre-storm value itself was calculated. In other words, if there was a meaningful appeals process that could have cured an error in an erroneous pre-storm value, there could have been some remedy there, but there was not. The homeowner's last resort, if they learned of it, was to pay for their own independent Louisiana certified appraisal. And if that came back with that higher value—

Mr. CLEAVER. Twenty percent.

Ms. FINGER. Twenty percent or more is our best understanding. Then it simply was not counted.

Notably, low-income homeowners who could not afford to pay for their own Louisiana certified appraisal did not even have that option even if they were lucky enough to learn about it.

Mr. CLEAVER. Let us go to the appeals process because that is— are you a football fan?

Ms. FINGER. I can be today.

Mr. CLEAVER. I mean, you cheer for the Saints, I am sure.

Ms. FINGER. Sure.

Mr. CLEAVER. We can still have a relationship even though I cheer for the Chiefs and our team is worse.

But one of the—I am just curious whether or not as a fan of the Saints, you would support giving Clark Hunt who owns the Chiefs permission to appeal bad decisions or ask for a replay if the Chiefs are playing the Saints. But the only person who could file the appeal against the Chiefs would be the Chiefs' owner Lamar Hunt?

Ms. FINGER. I see where you are going and in an analogy to ICF, I would not think that would be a very equitable appeals process.

Mr. CLEAVER. For those of you who may not have caught on with the football analogy, it appears as if some of the companies would have—are the only ones who can participate in the appeals process.

Ms. FINGER. Right. In the world of best practices, the decision-maker should not be reviewing its own decision.

Mr. CLEAVER. The contractor—

57

Ms. FINGER. Right. Which is what happened and sadly, the decision-maker seems to have been paid for the bad decision and then paid again to review it.

And, you know, in any system of appeals where we are looking at best practices, where we are looking at equitable results, where we are looking at trying to create a system that has uniform and understandable standards, that just does not make sense.

Mr. CLEAVER. Well, is there a written, a developed appeals process? I mean does anybody in here know, has anyone seen—

Ms. FINGER. I have seen many rules about appeals and like the other rules in this program, they have changed. As Mr. Rainwater described earlier this morning, there was initially something called dispute resolution that was very confusing for applicants and advocates. We thought that applications were going into appeal, but they were not. They went into some kind of dispute system. I truly cannot explain that. My understanding of Road Home is based on my experience going through this with clients and on behalf of clients, and it has been very difficult to understand.

Mr. CLEAVER. Sir, are you holding up an appeal?

[document displayed by a member of the audience]

Mr. CLEAVER. I do not want to get in trouble with the chairwoman and nobody else should want to get in trouble with her either. But I am very much interested in this because I do not understand the appeals process.

Mr. HOLMES. That is my name, my address, my phone number. That is the appeal process.

Mr. CLEAVER. Just state your name for the record, but I—

Mr. HOLMES. My name is David J. Holmes, and I am a resident of Jefferson Parish.

Mr. CLEAVER. Thank you. The problem I have is I am very much interested in that but the rules—

Mr. HOLMES. I understand. I did not know anything about this meeting. Someone called me from Nashville, Tennessee, to tell me.

Mr. CLEAVER. I will visit with you as soon as this is over, because there are a lot of people who wanted to talk, but we are restricted to the panel.

And maybe looking at whatever he has will clarify. I just do not understand what the appeal process is.

Ms. FINGER. It has been a convoluted process and one that is very difficult to understand. Applicants believed at many points in the program that they were engaged in appeals only to find out later that they were not.

The substantive problems I described existed. Under the program's own rules, applicants should have had the opportunity to appeal before and after closing. People were under great financial pressure to close on a grant, any grant, even when they intended to appeal it. At that closing, they checked off, amongst the many forms they filled out, a box that said, "Intend to appeal." Many applicants thought that they perfected their appeal by checking that box, only to later learn that an appeal had never been filed. That amongst the many papers they signed was a form that says, "I will file yet another written appeal within 90 days of this closing." So many applicants either did not know about that or did not under-

58

stand that or were not able to do it within that time period, and were cut off from appeal that way.

That is why my best recommendation, because of the systemic flaws of the appeal system, both procedural and substantive, is that the appeal system be opened up for applicants, but that it not just be opened up to the program as it existed with flawed rules, with broken policies, that applicants be given a copy of their file with an explanation of the grant, that formulas be redesigned to enable equity in this program and that appeals be opened up with those corrections.

Our system can do better than this and where we know the program has failed and where we have the opportunity to fix it, we have to take that opportunity.

Mr. CLEAVER. All right, Ms. Franklin?

Ms. FRANKLIN. I have to leave. Do you have my phone number?

Mr. GREEN. Would you move closer to the microphone, please, ma'am, Ms. Franklin? I cannot hear you.

Ms. FRANKLIN. I said, you have a telephone number on my paper that you have.

Mr. GREEN. A little closer, please.

Ms. FRANKLIN. Do you have a telephone number on my testimony that I gave to the panel? My phone number, I would like to keep in contact with you all, please.

Mr. CLEAVER. Yes, we have your testimony.

Ms. FRANKLIN. Yes. Do you have my telephone number?

Mr. CLEAVER. Yes, ma'am, thank you.

Ms. FRANKLIN. Yes, I need to keep in touch with you all through Legal Aid.

Mr. CLEAVER. Thank you very much. We appreciate you coming.

Ms. FRANKLIN. Thank you so much.

Mr. CLEAVER. One final question and I will turn it over to my colleague.

What do we need to do to clear up this appeals process or, frankly, to establish it?

Ms. DUVAL-DIOP. Thank you for allowing me to respond.

Representative Waters committed to granting the State greater flexibility in terms of sending the—how to spend the remaining $3 billion, whatever amount remains. I really strongly urge that in granting that flexibility that Congress ensure that that the funds only get spent on the ongoing needs of Road Home applicants.

You saw in the LRA testimony a range of between $1.6- to $2.3 billion in terms of gaps that are the result of low grants because of pre-storm values, issues with appeals and errors, etc., that Ms. Finger mentioned.

Also, we have done, in our analysis that was done in 2008, we did an estimate of the amount of funds it would take to bring people up to their damage estimate or $150,000, whichever comes first, and our estimate was $1.7 billion.

And so the community and the nonprofits and the community-based groups, people like Davida, people like the Road Home applicants, they have the wisdom, they understand the problem, they talked about the issue, the need to address contractor fraud about 6 months into the life of the program. So 2½, 3 years later, we see the issue of contractor fraud arising and nothing has been done, no

59

infrastructure has been put in place to deal with it. Yet the community knew and had the wisdom and insight to understand that that would be a problem down the road.

So what we strongly encourage is that in allowing for the greater flexibility and allowing for the State to use those funds, that we not only hear from the State about how to address these problems, but that we urge the State to work with the community-based groups and the nonprofits to devise solutions. Only working with people like Davida, people like other advocates, is I think the best way of coming up with real solutions to address the needs.

Ms. FINGER. You mentioned earlier, you complimented our community about the lack of evident anger in the room, and what I want to say is that people are exhausted. Almost every week, I hear from someone who is absolutely at the end of their rope, who cannot go on, who is struggling waiting on Road Home, so many open cases still, trying to figure out how to make ends meet.

There is a lot of wisdom in this community and we also need serious oversight from policymakers who can help us improve these policies. We cannot let this program close knowing about the systemic flaws in the system, and allow it simply to trail off like that. We need your help in making sure that the funds get spent for most people who needed the money the most.

Mr. CLEAVER. That is exactly what we want to do. It would be helpful to me at least if you could send your recommendations on how we could put in place this oversight and actually provide homeowners with some rights. This is unbelievable. And then I think we can look to see if there is something that we can do legislatively. Because if there is, I can assure you that is the direction we are going to go.

Mr. Green.

Mr. GREEN. Thank you, Mr. Chairman.

I found the last line of dialogue quite intriguing. If I may paint a picture, it seems that the person appealing would announce, "I am going to appeal this," and the person who was being complained against would say, "But of course you may. And if you will go over next door, you can have your appeal heard." And then you walk out of the room and you go next door to have your appeal heard and, lo and behold, it is the same person that you just said you would like to complain against, he is sitting right there saying, "Okay, come right up, you will be heard, let us have a fair trial, fair hearing." And proceeds to give you another opinion that I would think many people would conclude is tainted by the original decision. It just does not make sense, it really does not.

We have a concept of due process in this country. That ought to afford a person the opportunity to be heard by some disinterested—interested in the sense only that it is a part of your duty—third body when disputes are promulgated. I find it shocking that such a process was in place. And this is what makes it even more invidious—lawyers worked on this—lawyers worked on this, people who were trained as students of jurisprudence worked on this. They knew what should have been done. And I find it remarkable that lawyers would allow such a process to be promulgated. It is shocking.

Thank you for bringing this to light, Mr. Cleaver.

60

Let me move to, if I may, what the chairwoman has assigned me to do and I would like to speak to Ms. Plyer, is that the way you pronounce your name, ma'am, Ms. Plyer?

Ms. Plyer, in your testimony, the pages are not numbered, but let us say that it is the third page from the very last page. You indicate that only 1 percent of victimized homeowners successfully got their monies refunded. May I say this conversely, conversely am I to conclude that 99 percent of those who were victimized did not get their monies returned?

Ms. PLYER. Well, PolicyLink did that study and I think that would be correct.

Mr. GREEN. 99 percent.

Ms. PLYER. Of those who responded to the survey.

Mr. GREEN. Say again?

Ms. PLYER. Of those who responded to the survey.

Mr. GREEN. Yes, of those that responded to the survey.

The Chair mentioned prosecutions. Have we had any prosecutions in this area, any at all? Has anybody been prosecuted?

Ms. DUVAL-DIOP. According to the results, I recall maybe one or two and the issue is that the process is flawed, the process of reporting fraud. Police stations say that it is not their jurisdiction or they provide barriers, they put up barriers to people reporting fraud. The district attorney sends them a letter and that is about it. There is a lack of staff, a lack of capacity.

Recently in the State legislature, the penalties were strengthened and that was viewed as a way to deter fraud, but if we do not address the issue of allocating additional resources to prosecute and really take these cases beyond the simple reporting phase, then we will continue to waste State resources, Federal resources.

Mr. GREEN. We will make some inquiries in terms of statistical information to give us some indication as to whether or not this has been vigorously delved into and whether prosecutions would have taken place.

What I marvel at is how a welfare mother who receives money that should not have been received is prosecuted and many times jailed for much less money. If we can prosecute welfare mothers, we can prosecute people who take advantage of welfare mothers, we really can.

Now I want to talk for just a moment to Ms. Plyer. Ms. Duval, is the last part of your name Diop?

Ms. DUVAL-DIOP. Yes, sir.

Mr. GREEN. Okay, you and Ms. Finger, let us talk about these pre-storm values, and Mr. Colangelo.

My suspicion is—well, without giving you my suspicions, do you all agree that the pre-storm values as recommended by—I have the testimony of Ms. Finger before me, on page 3, and she recommends that we should simply have pre-storm values taken out of the grant calculations. If you concur with her recommendation that moving forward we take this out. Ms. Plyer, would you give me your response—a simple yes or no would be sufficient—

Ms. PLYER. Personally, I would say yes, we should take that out.

Mr. GREEN. That was a yes, for the record. Ms. Duval-Diop?

Ms. DUVAL-DIOP. Can I give a little bit longer answer?

Mr. GREEN. A little closer, please.

61

Ms. DUVAL-DIOP. Can I give a little bit longer answer?

Mr. GREEN. After you say yes or no.

Ms. DUVAL-DIOP. Yes, but—

Mr. GREEN. Okay.

Ms. DUVAL-DIOP. —I understand that resources are limited and so I think we need to think creatively about how to address gaps that were caused by the formula and so we need to bring in additional resources to nonprofits that leverage other resources such as volunteers and donations, and that we need to target to the most vulnerable. There are people who really could cover with their own resources some of the gaps, and so—

Mr. GREEN. I am with you. You are talking about the remedy now, right?

Ms. DUVAL-DIOP. Right. If you take out the pre-storm value, we are talking about affecting everybody, including those who are upper income, who do not really need the additional resources.

Mr. GREEN. I understand. And I can see that it would impact everyone, but based upon the testimony that I have heard, the pre-storm values seem to disproportionately impact some. And the question is, if it has disproportionately impacted some and adversely impacted others, perhaps it is something that we need to take a look at extricating.

Ms. DUVAL-DIOP. Yes.

Mr. GREEN. Ms. Finger, your thoughts on the pre-storm value.

Ms. FINGER. Yes, I agree with myself. And the reason I proposed that is because where we know that the pre-storm value led to discriminatory impacts, yielding lower grants for African-Americans, indeed removing that would impact everyone in the program, but a discriminatory disaster housing program necessarily impacts everyone. We cannot continue to operate a discriminatory housing program here. Where we have the data to support that, we need to craft a remedy. And one idea is to take out pre-storm value so that grants will be based on the correct determinations of estimated cost of damage. That is one idea, knowing the discriminatory formula that we have. It is certainly not the only idea and we do need to be forward thinking and pragmatic and know that we will not have endless resources to continue to operate this program. At the same time, we cannot gloss over something so big as the problems we see with pre-storm value.

Mr. GREEN. Thank you.

Mr. Colangelo?

Mr. COLANGELO. Yes.

Mr. GREEN. I suspected you would say yes.

Let me just ask you one additional question, Mr. Colangelo.

In your efforts to call this to the attention of the appropriate parties, have you had an opportunity—and I do not want you to get into the litigation, let us talk about pre-litigation—have you had an opportunity to sit and has there been any opportunity for some sort of mediation by way of judicial mandate or judicial—no mediation?

Mr. COLANGELO. No, there is not.

Mr. GREEN. I know that in the Federal courts, it is not as commonplace as it is in State courts. Is there any rule that would prohibit a request for mediation in such a circumstance?

Mr. COLANGELO. No, there is not, Congressman.

62

Mr. GREEN. I am exceedingly concerned about this. It is very unfortunate that after all we have fought for to get the 1968—actually 1965 as well as 1968 civil rights laws, that we find ourselves in 2009 with this sort of circumstance and we have to find ourselves trying to find a remedy after the fact. It just does not make sense that if something is called to the attention of the appropriate persons that we would not have an appropriate remedy. If there is something that I am missing, I will gladly rethink my position, but I did get answers earlier from a prior panel that seems to confirm that this formula is inherently invidious discrimination. By virtue of just imposing it, by simply using it, it seems to discriminate and it goes back to the red-lining, goes back to the housing patterns. But someone has to say, not on my watch. Someone has to say, it stops here, this much, no more.

I hope that we will be able to rectify some of these concerns. And Mr. Chairman, I thank you for your indulgence. I know that I have gone longer than I should. I yield back.

Mr. CLEAVER. Thank you.

Let me thank all of you on behalf of Chairwoman Waters, for donating the most valuable thing you have, which is time, to helping us with information that will be used hopefully to help you. We appreciate the fact that you came out.

We want to thank again Dillard University for today and the Chair would have me note that some members of this subcommittee may have additional questions for the panelists and we might ask for the submission of some information in writing. And without objection, the hearing record will remain open for 30 days after today for members to submit written questions to those of you who are serving as witnesses and to place the responses you give us in the record.

We appreciate your participation; this panel is dismissed.

And before we adjourn, without objection, the written statement of the following organization will be made a part of this hearing: The Citizens Road Home Action Team. That will be included.

And this says, close the hearing. This hearing is adjourned. Bang the gavel.

[Whereupon, at 4:50 p.m., the hearing was adjourned.]

# **A P P E N D I X**

August 20, 2009

64

08-17-09

To whom it may concern:

I, Lillie Baker, am scheduled to appear before the Subcommittee on Housing and Community Opportunity on August 20, 3pm on the second panel.

My experience with the Road Home has been tedious at best.  After Katrina, my husband (82, at the time) and I (77) were devastated.  Everything that we worked for was gone in a matter of minutes.  We had lost everything.  We had 10 feet of water in our home.  We both were retired from the Plaquemine Parish School System after 40 plus years combined.  He was a principal and I was a teacher at Phoenix High School.  We had nine children, six boys and three girls, one is deceased.  All memories were lost.  We had nothing but the clothes on our back and the car we were riding in.

One cannot understand the anger and despair that you feel when the media portrays you as a "refugee" in a country that you were born and raised in and paid taxes for 65 plus years and to be abandoned during the greatest natural disaster of all times.

We filled out the application for "The Road Home Program", in August of 2006. This gave my husband and me something to hold on to.  When you lose everything at one time and don't know where or how to start over, it's scary, especially for an 82 and 77 year old on fixed incomes, and living with someone else, in a city that's not your own.

We received funds from FEMA in the amount of $23,370.41 and $9,269.63 from Allstate Insurance.  Unfortunately, we did not have Flood Insurance.  Our expenses seemed greater now and we didn't have anything.  The funds we acquired were basically used for living expenses, since there was nothing to go back to.

We received communication from The Road Home via letter dated, December 22, 2006, stating that we were eligible for benefits.  We chose Option 1 because we wanted to go back to what we had spent over half our lives building.

65

We received $54,364.10 to rebuild our home.  We tried to repair our home, but were taken advantage of by so many contractors.  I had to pay for my electrical work three times and it's still not right.  Some of the outlets are not functioning.  I got the Attorney General's office involved, but that didn't do any good.   My plumbing is the same way.  Some of the pipes leak.  My shower doors fell off the tracks.  My air conditioning was not done correctly.  My duct work, from what I understand, was not changed.  My lights come on when they want to sometimes.

It's a shame that people are so driven by money, that they would take advantage of people at such a low point in their lives.

We appealed the amount of money that was given to us, but to no avail.  You can call the office every five minutes and speak to five different people, and everybody is going to tell you something different.  We, also applied for the elevation grant, and were told I had to open succession, which was done and I still have not heard anything.  I am being told it's in the legal department.

I thought the Road Home Program was going to help us to regain some semblance of normalcy back into our lives, but it only created more stress at a time when more stress was not what we needed.

I am glad that my husband did live to see us get back into our home, even though it is still not right.

Sincerely,

Lillie Baker

66

National Office
99 Hudson Street, Suite1600
New York, NY 10013

T 212.965.2200
F 212.226.7592
www.naacpLDF.org



Washington, D.C. Office
1444 Eye Street, NW, 10th Floor
Washington, DC 20005

T 202.682.1300
F 202.682.1312

### Testimony of Matthew Colangelo
### Director of the Economic Justice Group,
### NAACP Legal Defense &Educational Fund, Inc.

Presented to the Subcommittee on Housing and Community Opportunity of the
House Committee on Financial Services

August 20, 2009

Chairwoman Waters, Ranking Member Capito, and members of the
subcommittee, thank you for inviting me to testify today on behalf of the NAACP
Legal Defense & Educational Fund (LDF).  My name is Matthew Colangelo, and I
am the Director of LDF's Economic Justice Group.  LDF is the nation's oldest
civil rights law firm and has served as legal counsel for African Americans and
other people of color in many of the country's major fair housing and other civil
rights lawsuits.

As we approach the fourth anniversary of Hurricanes Katrina and Rita,
displaced residents of the Gulf Coast continue to display tremendous courage,
resolve, and dignity as they attempt to return home and restore their communities.
Yet, with well over 100,000 individuals still displaced from Louisiana alone, the
path home has been slow.  Unfortunately, for many African American homeowners
in New Orleans, their efforts to return to their communities have been hampered by
racial disparities that were built into the very design and operation of the federally-
funded Road Home Program.

Congress appropriated billions of dollars in federal Community
Development Block Grant (CDBG) Disaster Recovery Grant funds with the goal of
assisting thousands of families in the Gulf Region to repair their damaged and
destroyed homes.[1]  Using these funds, the Louisiana Recovery Authority (LRA)

---

[1] *See* Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of
Mexico, and Pandemic Influenza Act, 2006, Pub. L. No. 109-148, 119 Stat. 2680, 2779-81 (Dec. 30, 2005);
Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery,
2006, Pub. L. No. 109-234, 120 Stat. 418, 472-73 (June 15, 2006); Department of Defense Appropriations Act,

67

and the Department of Housing and Urban Development (HUD) designed the Road Home Program, which aims to restore storm-devastated communities in Louisiana by providing grants to help families rebuild.[2]

With an $11 billion budget, the Road Home Program is the single largest housing recovery program in American history.[3]  Sadly, for African American families, the reality of the Road Home program has fallen far short of its promise, due to a fundamental flaw in the program design: HUD and the LRA created a recovery program that links housing assistance to the depressed values of black families' pre-storm segregated housing.

Under the terms of the Road Home Program, rebuilding grants are calculated based on the *lower* of two figures: the pre-storm market value of the home, or the cost of storm damage to the home.[4]  Therefore, by definition, homeowners either receive enough assistance to rebuild (if the cost of damage was less than the pre-storm value), or they receive insufficient funds to rebuild (if the pre-storm value was less than the actual cost of damage).  Under this formula, the owners of nearly identical homes with similar storm damage and repair estimates can receive wildly different grant awards, based on where they happen to live and how much the market says their homes were worth before the hurricanes.

This formula has had a discriminatory impact on African Americans, because homes in predominantly African American communities had lower values than those in predominantly white communities, even when the condition, style, and quality of the homes were comparable.  This is largely due to decades of racial discrimination in the Louisiana housing market that has caused and reinforced segregation in residential housing.  As a result, Road Home grants for African American homeowners are more likely to be based on the depressed pre-storm value of their homes, rather than on the cost of damage.  This leaves African

---

2008, Pub. L. No. 110-116, 121 Stat. 1295, 1343-44 (Nov. 13, 2007).  These three statutes appropriated a combined $19.7 billion to the five affected states—Louisiana, Mississippi, Texas, Florida, and Alabama—for housing and housing-related redevelopment.  Louisiana received $13.41 billion of this total for disaster recovery expenses.  *See* 71 Fed. Reg. 7666, 7666 (Feb. 13, 2006); 71 Fed. Reg. 63,337, 63,338 (Oct. 30, 2006); 121 Stat. at 1343-44.

[2] The stated purpose of the Road Home program is to rebuild communities in Louisiana affected by Hurricanes Katrina and Rita.  *See* Louisiana Recovery Authority, *Action Plan Amendment 14 (First Allocation) – Road Home Homeowner Compensation Plan* 2 (2007); Louisiana Recovery Authority, *The Road Home Housing Programs, Action Plan Amendment for Disaster Recovery Funds* 5 (2006).

[3] *See* The Road Home Program, "About Us," *at* http://www.road2la.org/about-us.

[4] *See* Louisiana Recovery Authority, *Substantial Changes & Clarifications to Action Plan Amendment No. 1 for FY 2006 CDBG Disaster Recovery Funds* 9-10, 17-20, *available at* http://www.doa.la.gov/cdbg/dr/plans/Amend1-RoadHomeClarification-Approved.pdf.

2

68

American families with just a fraction of the funds needed to rebuild their homes and, for many, extinguishes their hope of returning to their communities. Thus, the program is essentially designed to fail many African American New Orleanians.

Of course, many homeowners—of all backgrounds—have faced significant obstacles in their efforts to return to New Orleans, including shortfalls in rebuilding resources. But because of the Road Home grant formula, African American families have faced far larger shortfalls. To give just one example, data from 2008 shows that homeowners in the Lower Ninth Ward, a predominantly black neighborhood, faced shortfalls of over $75,000 between the available rebuilding resources and the cost of rebuilding each home. At the same time, homeowners in Lakeview—a predominantly white neighborhood—faced shortfalls of only $44,000 per home.[5]

This discriminatory disparity in the Road Home grant formula is the subject of a class action lawsuit filed in November 2008 by five African American homeowners and two fair housing organizations—the Greater New Orleans Fair Housing Action Center and the National Fair Housing Alliance.[6] LDF is serving as counsel along with our co-counsel at the law firm of Cohen Milstein Sellers & Toll. We represent a proposed class of nearly 20,000 African American homeowners who are struggling to return to their homes in New Orleans because their Road Home grant awards were based upon the pre-storm value of their homes.

Our lawsuit alleges that the Road Home Program violates both the Fair Housing Act of 1968 and the Housing and Community Development Act of 1974 (HCDA). The Fair Housing Act requires housing programs to produce equitable results, regardless of their intent.[7] And both the Fair Housing Act and the HCDA require HUD and the LRA to "affirmatively further fair housing."[8] This means much more than simply refraining from active discrimination in housing programs. HUD and the Louisiana Recovery Authority cannot use federal redevelopment funds to perpetuate existing inequalities, and they must affirmatively advance fair housing principles.

---

[5] *See* Kalima Rose, Annie Clark, & Dominique Duval-Diop, *A Long Way Home: The State of Housing Recovery in Louisiana 2008*, at 47, *available at* http://www.policylink.info/threeyearslater/.

[6] *See* Complaint, *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, No. 08-cv-01938 (D.D.C. filed Nov. 12, 2008), *available at* http://www.naacpldf.org/content/pdf/housing_discrimination/road_home_complaint.pdf.

[7] *See* 42 U.S.C. §§ 3604(a), 3605(a).

[8] *See* 42 U.S.C. §§ 3608(d), 3608(e)(5), 5304(b)(2).

3

69

The math is clear.  Because of the Road Home Program's design, African American families are being shortchanged to the tune of about $1 billion in grant awards.  But rather than addressing this unfairness and treating all New Orleans homeowners equally, both HUD and the LRA have opposed making any changes to the Road Home Program.

HUD has argued that it lacks the authority to impose fair housing conditions on CDBG recipients like the LRA once federal funds have been disbursed—a position that is contrary to the legal duty that Congress has imposed on HUD to affirmatively promote fair housing in its programs.  The LRA has argued, among other things, that it isn't even subject to the requirements of the Fair Housing Act.  But in enacting the appropriations statutes that funded the CDBG Disaster Recovery Grant program, Congress to its credit refused to allow the waiver of fair housing and non-discrimination requirements.[9]  All grantees thus must agree to comply with the non-discrimination requirements of the Fair Housing Act and the HCDA—and the Louisiana Recovery Authority agreed to do so in exchange for billions of dollars in funds.

Although some of these issues are now before the United States District Court in Washington, D.C., this Subcommittee has its own oversight role over federal housing programs.  Congress devoted substantial funds to restoring New Orleans and other storm-damaged communities; now Congress should call on HUD and the LRA to distribute those funds fairly and in compliance with civil rights mandates.

Regardless of what has happened in the past, the Obama Administration and the 111th Congress have a responsibility to ensure that our nation's largest housing recovery program does not go down in history as a government-sponsored act of housing discrimination.  I thank the Subcommittee for this opportunity to testify and I look forward to your questions and comments about this critically important program.

Thank you.

---

[9] See 119 Stat. at 2780; 120 Stat. at 472-73.

4

70

Ms. Mildred Williams Franklin
2112 Eads Street
New Orleans, LA  70117

Attn: Julie Harris/Charla Ouertatani
Re: U.S. House of Representatives Field Hearing on the Road Home Program
New Orleans City Hall
1300 Perdido St.
New Orleans, LA 70112

Re: United States House of Representatives' Financial Services Subcommittee on
Housing and Community Opportunity, August 20, 2009 Field Hearing in New Orleans,
Louisiana

Dear Members of the House Subcommittee on Housing and Community Opportunity:

Thank you for allowing me to testify.  My name is Mildred Franklin and I am a
seventy-eight year old retired school teacher.  I graduated in 1970 from Southern
University and I taught at in Orleans Parish at Central City Child Development Center for
seven years and Laurel Elementary for twelve years.  I was born in New Orleans and
raised five children here.   I am happy to report that this week my husband and I finally
moved from our FEMA trailer back into our home.  In order to get to this point,
beginning in September of 2005; I kept careful records to record my contacts with Road
Home, contractors, and city officials.  This has filled five ledgers.

During Hurricane Katrina my husband and I lost our home on Eads Street in the
Eighth Ward of New Orleans to seven feet of water.  It was re-flooded by Hurricane Rita
that same year.  We also lost our family home, a double shotgun on Delachaise St.
uptown to four feet of water.  I applied for a Road Home grant on my primary residence
on Eads Street.  I was lucky enough to have a clear chain of title the home on Eads Street,
so I got my Road Home money relatively quickly.  We received our first disbursement of
$92,000 in May of 2007.  However, we did not receive the whole of our Road Home
money on our primary residence until February of 2009, when we received an additional
$53,000.  We do not know why the money came in two parts or why it took two years to
disburse the full amount.  It took us almost $180,000 to rebuild our home on Eads Street.

In repairing our primary home on Eads Street we had serious problems with
contractors.  My first contractor was paid over $46,000 in two installments but he never
completed the work.  He completed the framing, windows, and roof with the first
installment.  After the second installment he started the plumbing and gas and installed
the hardy board siding, but he never closed the walls as agreed to in the contract.   After
waiting over six months for him to complete the work I retained another contractor who
completed the work.  When I fired my first contractor I discovered that he had not
obtained and filed the proper permits to do the work.  I paid for and filed those permits.
The second contractor found he had to finish jobs the first contractor said he completed

71

and correct mistakes the first contractor made.  Therefore I had to pay twice for much of the work done on my house.

We encountered multiple problems in rebuilding the Delachaise Street house as well.  The family agreed that my stepfather, who is 94 years old, would donate his interest to us so I could get the house rehabilitated through the Road Home Small Landlord Program.  I applied for the Road Home Small Landlord Program in 2007.  The applicants were initially told to go to a bank and get a loan and the Road Home Small Landlord Program would repay the funds.  I was denied for the loan based on my income.  This was a blessing in disguise because I would be paying this money back with interest and no help from the Road Home if I had received this loan.

In order to qualify for the program we first had to clear title and remove my deceased mother's name from the title.  The house had to move through two successions, my mother's and my brother's, to fully clear title.  We got the donation of my stepfather's interest, but it took months to get the death certificates needed for the successions.  In November of 2008 the program began to put pressure on me to finish the successions.  My counsel contacted them to check the status of my application.  They said they had all of my material and had approved me for an award.  They said the money would arrive "any day now", but they did not know exactly when.  They said if the succession was not completed when the money came in I would go to the back of the line.  We completed the succession in December of 2008 and sent the documentation to the Road Home, but never heard from them.

In January of 2009 we received a Code Enforcement citation on the Delachaise St. home.  Code Enforcement can levy fines of $100 to $500 per day and can eventually expropriate your home. We were cited for several things that required more money to fix than my income would bear, so my counsel and I immediately contacted the Road Home Small Landlord Program again.  My attorney asked for something from them in writing to show the Code Enforcement officials that we were trying to rebuild, but they would not provide anything that I could use to defend myself in the hearing.  When we finally reached the hearing panel they were sympathetic to my rebuilding delays, but we still had to return for multiple hearings to show the status of our progress on the Delachaise Street house.  Each time we came for a hearing we had to sit and wait for over an hour with 20-30 other homeowners for our turn in the Code Enforcement cattle-call.  I paid yet another contractor to do what small repairs I could afford, but he also took my money and did not complete the work.  Finally, with the help of the Broadmoor Civic Association's donated paint and labor, we were able to come into compliance and finished the last hearing in May of 2009.

On our way out of the door, the Code Enforcement hearing panel warned us that next they would start citing people for having vacant units.  However, we will not have the money to rebuild the interior of the house without a grant from the Road Home Small Landlord Program.  I last spoke to the Road Home Small Landlord Program on August 6, 2009.  A worker named Diane told me that the state still has not released the money and it should be released between September and October 2009.  I sincerely hope that the money is released well before Code Enforcement begins their sweeps on unoccupied properties.

72

**Improvements:**
- In order to improve the Road Home Program they need more local administrators, so the people of New Orleans can go and visit their caseworkers.
- They need to write us more with status updates. Unless we call and are willing to sit on hold for a significant period of time, we will not know what is going on with our applications.
- The Road Home Small Landlord Program needs to finish its work in the best interest of the applicants and the renters of New Orleans. Waiting on the funds is holding people back.

Sincerely,

/s/ Mildred Franklin

Mildred Franklin

73

STATEMENT OF CHRISTOPHER J. ONEY

EXECUTIVE VICE PRESIDENT

HAMMERMAN & GAINER CATASTROPHE SERVICES, INC. (HGI)

BEFORE

THE SUBCOMMITTEE ON HOUSING AND COMMUNITY OPPORTUNITY

OF THE HOUSE COMMITTEE ON FINANCIAL SERVICES

FIELD HEARING IN NEW ORLEANS, LOUISIANA

AUGUST 20, 2009

Good afternoon, Representative Waters and subcommittee members.

My name is Chris Oney and I am the Executive Vice President of Hammerman &
Gainer Catastrophe Services, Inc.  My responsibilities include corporate oversight for
the Homeowner Assistance Program of Louisiana's *Road Home* Program.

I am pleased to have been extended this opportunity to participate in your hearing
and describing HGI's role in the implementation of the Homeowner Assistance Program.

1

74

First I'd like to provide a brief history of Hammerman & Gainer.  HGI was founded in 1929 and has grown to become the largest minority owned Third-Party Administrator in the Country.  Since inception, we have always worked with a strong commitment to customer service and an ability to work with a wide array of partners in providing tailored solutions to demanding issues.

Headquartered in Lutcher, Louisiana, and with offices in 12 locations across the country, HGI provides distinct services across multiple disciplines including: Property / Casualty Third-Party Administration, Healthcare Administration, Risk Management, Regulatory Compliance, and Emergency Management.

For the past 80 years, HGI has maintained its focus on working with customers to develop business solutions that are specific to our client's requirements and add value through efficiencies, expertise, quality, service and technology.

The initial *Road Home* program began in June 2006 for a 3-year term and included several components including: Homeowner Assistance, Small Rental, Hazard Mitigation, Piggyback, and IT Management. As the original program drew to a close the State of Louisiana decided to issue separate contracts for each of the original Road Home component programs. HGI was awarded a 24-month contract to continue and then close out the Homeowner Assistance Program, or HAP.

On March 30, 2009, HGI began the Transition phase of the project. Originally slated for 90 days, the transition phase was completed in less than 30 with HGI taking full operational control on April 20, 2009.

2

75

These operational responsibilities include:

- Resolve grant eligibility for 7,660 homeowners who have yet to have a determination;

- Reach a final status for applications (eligibility and a disbursement of funds or ineligibility with supporting rationale);

- Process additional disbursements based on appeal and grant review;

- Provide compliance and monitoring services; and

- Provide closeout functions for the Program.

Since taking operational responsibility, HGI has achieved the following:

- Implemented process-improvement techniques, thereby reducing the time to move applicants through the program

- Processed over 1,500 applications to the closing company and disbursing funds to 968 applicants

- Identified over 1,000 applications requiring additional information from applicants to move the file forward to closing

- Eliminated a backlog of approximately 400 appeals awaiting additional disbursement

- Achieved an error percentage of less than 1% on a 100% state review of all files transmitted for closing

- Reduced average call volume per day approximately 20% since transition

3

76

- Identified a need for, and provided, a limited in-person appointment capability that, to date, has resulted in service to over 400 applicants.

While HGI's operational control has gotten off to a solid start, there are still obstacles facing homeowners as they attempt to complete this part of their journey. Approximately 8,000 applicants are still awaiting an eligibility determination and a potential award of funds. For these applicants, the largest single hurdle remains their inability to obtain and provide ownership and occupancy documentation for the damaged residence.  For many of these applicants, they simply have difficulty in obtaining the legal services required to deal with a variety of inheritance issues.

Other applicants are experiencing difficulty in addressing a lack of sufficient funding to complete either the rehabilitation or reconstruction of their damaged residence and dealing with a dramatic increase in insurance premiums.  A direct result of these financial constraints is that affected applicants are unable to comply with the covenant requirements associated with their receipt of a Program award.

To assist applicants obtain legal services to resolve inheritance and other ownership-related issues. HGI has approval from the State to issue a Request for Proposals (RFP) to obtain a legal provider that will work directly with low- to moderate-income applicants to attempt to resolve these issues and move them forward in the process. The RFP will be released Friday August 21, 2009.

4

77

HGI has designed a Due Diligence process that allows us to communicate with applicants and identify documents required to move them forward though the process. If documentation cannot be obtained, the reasons for not being able to move a file forward are documented and shared with the State. This information can better help the State understand issues facing applicants and provide input into its decision-making process.

The State has identified that groups of applicants share similar challenges as they attempt to move forward through the program.  HGI has partnered with the State to provide limited outreach activities to assist applicants in meeting these challenges.  As an example, HGI recently supported the State with educating and visiting with a group of applicants concerned about Home Evaluation and damage allowances.

As HGI moves forward with administering the Homeowner Assistance Program, we are keenly aware of the importance in staying focused on assisting the remaining applicant population by processing applicants as quickly, efficiently, and accurately as possible.  HGI has and will continue to work closely with the State of Louisiana to develop solutions that meet the challenges of the program.  We are committed to providing effective and professional assistance to all remaining applicants and properly closing out the Homeowner Assistance Program.

Representative Waters and members of the subcommittee - thank you for allowing me to participate in today's hearing on behalf of HGI.  I would be pleased to answer any questions that you may have.

5

78

**Christopher J. Oney, Executive Vice President**

Christopher has executive level experience overseeing catastrophe operations related
to Hurricanes Katrina and Rita.  He served as liaison between company clients and the
company's management team and staff.  He supervises the selection, training, and day-
to-day operations of the company's catastrophic department support staff.  He also has
other large-project experience with the most recent being his service as project
manager for the company's recent engagement with the Road Home Program providing
the oversight for over 120,000 property inspections and the disbursement of over $3
billion in grant awards. Christopher oversaw the deployment of over 200 field personnel
for Hurricanes Katrina and Rita. That deployment covered Louisiana, Mississippi,
Florida, and Texas.

79

**"Four Years after the Storm: the Road Home Program's Impact on Greater New Orleans"**
Congressional Testimony of
Allison Plyer, MBA, ScD
Deputy Director, Greater New Orleans Community Data Center
Nonprofit Knowledge Works
www.gnocdc.org
Presented before
House Subcommittee on Housing and Community Opportunity
August 20, 2008

Madam Chair and members of the Committee, thank you for the invitation to appear before you this afternoon. I am Deputy Director of the Greater New Orleans Community Data Center, a product of Nonprofit Knowledge Works. Operating since 1997, the Data Center analyzes and disseminates data to help nonprofit and civic leaders work smarter and more strategically.

The purpose of my testimony is to provide an overview of the status of the Road Home program, the recovery of greater New Orleans, and some of the challenges homeowners have encountered as they rebuild. This overview draws largely from the New Orleans Index that we publish in collaboration with the Brookings Institution as well as a large array of other data sources and studies that we have been gathering since Katrina.

I want to preface by saying that the Data Center is a neutral data intermediary. Our expertise does not extend to how law is written or how programs are designed, thus, I cannot provide recommendations about statutory or regulatory changes or other ways in which the challenges associated with the Road Home program might be overcome. But I can present you with a solid set of facts about the Road Home program, as well as New Orleans' recovery.

By all available measures Katrina and the related levee failures resulted in the largest residential disaster in U.S. history by a large magnitude. Estimates of total damages range from $96 billion to $135 billion. The next largest U.S. disaster, Hurricane Andrew, had estimated damages of $22 to $33 billion (in 2005 dollars).[i] The Great Chicago Fire, the Galveston Hurricane, and the San Francisco Earthquake, although legendary for the extent of their destruction, ravaged cites that were much smaller than the modern day New Orleans metropolitan area, and, thus, could not destroy the number of homes destroyed by hurricane Katrina and the flooding of New Orleans.[ii]

According to HUD estimates, the 2005 storms damaged more than 515,000 homes in Louisiana, the majority were owner occupied, and of these, one-third were underinsured. The New Orleans metro area sustained the largest losses with nearly 320,000 damaged homes.[iii]

Immediately after Katrina, housing costs rose sharply as demand exceeded supply. In late 2005, 72 percent of the region's jobs remained intact [iv] but only 63 percent of metro area homes were habitable.[v] By 2006 fair market rents had risen 39 percent and job vacancies soared--particularly in lower-wage occupations. In 2007, rents continued to rise, reaching 45 percent above pre-Katrina levels. Meanwhile, the Road Home was just getting on its feet. [vi]

80

Road Home provides grants for the uninsured losses of homeowners to repair their homes or relocate. The program began in June 2006, but got off to a slow start. HUD approved Louisiana's plan for the Road Home program in the May of 2006[vii] and by June 2006 (two months shy of the first anniversary of Katrina ), $10.4 billion in supplemental CDBG funds had been allocated to Louisiana.[viii] There is no objective measure for how fast such a massive housing recovery program should move. The only program that is nearly comparable to the Road Home program in Louisiana is the Homeowner Assistance Program in Mississippi.  Both programs were developed to compensate underinsured homeowners and were funded by emergency supplemental CDBG dollars following the 2005 hurricanes. However, Mississippi's program processed less than 40,000 applications including duplicates[ix] while Louisiana's program processed more than 220,000 applications including duplicates.[x] Mississippi continued to process applicants for their program as recently as 2009. [xi]

By January 15, 2007, the Road Home program had received nearly 99,000 applications, but had distributed only 177 grants.[xii]  The program established a July 31, 2007 deadline for submitting applications[xiii] and by the second anniversary of Katrina, one month after the deadline, the program had recorded approximately 185,000 unduplicated applications.  As the program received applications, it also disbursed grants, thus, by the second anniversary of Katrina over $3 billion had been disbursed to 50,000 homeowners.

The program established a December 2007 deadline for completing an initial appointment.[xiv]  By the third anniversary of Katrina $7 billion had been disbursed to over 117,000 applicants and approximately 30,000 applicants were determined to be ineligible -- most often because they did not complete an initial appointment by the December deadline.  Additionally some 15,000 applicants had been determined to be due 0 dollars due to duplication of benefits such as insurance, or had decided to decline the award offered to them.  Thus 23,000 applications remained in the pipeline. [xv]

Nonetheless, by the third anniversary of Katrina last year, the program had disbursed grants to the vast majority of the applicants expected to receive awards.  In the fourth year after Katrina, more applicants declined benefits, were determined to be due 0 benefits, or were determined to be ineligible, and 7,100 additional grants were disbursed. Only approximately 8,500 applicants remain in the pipeline – half of whom are still demonstrating eligibility.[xvi] Today over 124,000 grants averaging $64,000 have been disbursed.[xvii] Forty-eight percent of the recipients that reported race were African American, and 46 percent were white. [xviii]

81



Source: The Road Home Program (The New Orleans Index, July 31, 2009).

Road Home recipients include 96,000 in the New Orleans metro area—nearly 45,000 are in the city of New Orleans itself.  Fully ninety percent are repairing their homes rather than selling to the state. In Jefferson, St. Tammany, St. Charles and St John parishes, where housing damage was often minor in severity, 99 to 100 percent of Road Home recipients are repairing their homes. [xix]

By mid 2008, after the Road Home program had distributed thousands of grants in the metro area, covering more than one-quarter of all damaged homes, the market began to soften and rents leveled off. In 2009, rents fell for the first time since the storm.[xx]

Four years after Katrina, the city has recovered 77 percent of its pre-Katrina number of households, a big jump from mid-2006 when the Road Home program began at which time less than half the population had returned. As a whole, the metropolitan area has regained 90 percent of its pre-Katrina households.[xxi]

New Orleans families with children have struggled to return.  When the Road Home program began, the share of all households with children had dropped from 30 percent pre-Katrina to 18 percent, but rebounded to 20 percent by 2007.[xxii] Multiple studies indicate that African Americans were disproportionately impacted by Katrina.[xxiii] In 2006, the African American population of the city had decreased dramatically from 67 percent of the total pre-Katrina to 58 percent.[xxiv] Three years after Katrina when most Road Home grants had been disbursed, the African American population of New Orleans had rebounded to 61 percent of the total.[xxv]

I'd like to highlight three obstacles encountered by Road Home recipients in their attempts to rebuild: gaps in funding, contractor fraud, and inaccurate cost estimates. A Policy Link study of Road Home data concluded that an astounding 81 percent of recipients in New Orleans and 69 percent of those in other

82

parishes who planned to rebuild did not have sufficient funds to cover repairs even when taking into account insurance and Road Home grants. Because grant awards were based on pre-storm home values rather than total repair costs, the average gap between damage estimates and rebuilding funds was $36,000. More than 46 percent of all applicants who planned to rebuild had damages that were greater than their pre-storm home value. New Orleans applicants were more likely to have a gap in funding than applicants statewide. Across New Orleans the average gap was $55,000. Gaps were larger in lower income and African American neighborhoods.  For example, in New Orleans East the average gap was $69,000, in the Lower Ninth Ward the average gap was $75,000, while in Lakeview the average gap was $44,000.[xxvi]

News reports about contractor fraud abound and a study by LSU, PolicyLink and LouisianaRebuilds concluded that 9,000 households were affected.  In over 40 percent of the cases, the homeowner was unable to finish rebuilding. More than half of the incidents were reported, but in 41 percent of the cases no action was taken by the authorities.  Only 1 percent of victimized homeowners successfully got their monies returned.[xxvii]

Nonprofit groups working with homeowners also report that many recipients complain of a high-cost environment as one barrier to rebuilding.[xxviii]  Although no post-Katrina studies have quantified this problem, extensive nationwide research by HUD indicates that estimating the cost of rehabbing structures is extremely difficult.  Unforeseen circumstances, such as termite damage behind walls; erroneous judgment calls, such as  windows thought to need repairs actually needing to be replaced, difficult working conditions, such as miniscule crawl spaces, can drive costs above initial estimates sometimes by a factor of 100 percent—even when estimates are provided by experienced professionals.[xxix]

Inability to accurately budget for all rebuilding costs, gaps in funding, and contractor fraud are three obstacles frequently encountered by Road Home recipients.  Nonetheless, the Road Home program has had a marked effect on the New Orleans area housing market and the ability of homeowners to return. Once again, thank you for the opportunity to appear today. I would be pleased to answer any questions you may have about my testimony.

---

[i] "Natural catastrophes and man-made disasters 2005: high earthquake casualties, new dimension in windstorm losses," Swiss Re Sigma Insurance Research, No.2/2006, Swiss Reinsurance Company, Economic Research & Consulting. Zurich. www.swissre.com/sigma. "The Federal Response to Hurricane Katrina: Lessons Learned." Frances Fragos Townsend, Assistant to the President for Homeland Security and Counterterrorism. http://georgewbush-whitehouse.archives.gov/reports/katrina-lessons-learned/index.html

[ii] "The Federal Response to Hurricane Katrina: Lessons Learned." Frances Fragos Townsend, Assistant to the President for Homeland Security and Counterterrorism. http://georgewbush-whitehouse.archives.gov/reports/katrina-lessons-learned/index.html

83

[iii] "Current Housing Unit Damage Estimates, Hurricanes Katrina, Rita and Wilma, February 12, 2006." U.S. Department of Housing and Urban Development's Office of Policy Development and Research. http://gnocdc.s3.amazonaws.com/reports/Katrina_Rita_Wilma_Damage_2_12_06__revised.pdf

[iv] "The New Orleans Index. July 31, 2009" The Brookings Institution and Greater New Orleans Community Data Center. http://gnocdc.org/NewOrleansIndex/index.html

[v] "Current Housing Unit Damage Estimates, Hurricanes Katrina, Rita and Wilma, February 12, 2006." U.S. Department of Housing and Urban Development's Office of Policy Development and Research. http://gnocdc.s3.amazonaws.com/reports/Katrina_Rita_Wilma_Damage_2_12_06__revised.pdf

[vi] "The New Orleans Index. July 31, 2009" The Brookings Institution and Greater New Orleans Community Data Center. http://gnocdc.org/NewOrleansIndex/index.html

[vii] Jackson approves Louisiana's $4.6 billion 'Road Home Program.' Calls for quick Congressional approval of additional $4.2 billion for Louisiana." U.S. Department of Housing and Urban Development. http://www.hud.gov/news/release.cfm?content=pr06-058.cfm

[viii] "Federal allocations in response to Katrina, Rita and Wilma: An update." The Brookings Institution. http://brookings.edu/metro/pubs/20060712_Katrinafactsheet.pdf

[ix] Mississippi Development Authority web site. http://msdisasterrecovery.com/housing/ Accessed August 16, 2009.

[x] "The Homeowner Assistance Program: Week 162 Situation & Pipeline Report." Louisiana Office of Community Development. http://road2la.org/Docs/pipeline/Week_162_Combined_Report.pdf

[xi] "Homeowners Assistance Program Finishing a Year Ahead of Projections." Mississippi Development Authority. http://msdisasterrecovery.com/whats_new/2009_ahead_of_schedule.html

[xii] "The New Orleans Index. July 31, 2009" The Brookings Institution and Greater New Orleans Community Data Center. http://gnocdc.org/NewOrleansIndex/index.html

[xiii] "Eligibility." Road Home web site. http://www.road2la.org/homeowner/eligibility-info.htm Accessed August 16, 2009.

[xiv] "The Homeowner Assistance Program: Week 162 Situation & Pipeline Report." Louisiana Office of Community Development. http://road2la.org/Docs/pipeline/Week_162_Combined_Report.pdf

[xv] "The New Orleans Index. July 31, 2009" The Brookings Institution and Greater New Orleans Community Data Center. http://gnocdc.org/NewOrleansIndex/index.html

[xvi] "The Homeowner Assistance Program: Week 162 Situation & Pipeline Report." Louisiana Office of Community Development. http://road2la.org/Docs/pipeline/Week_162_Combined_Report.pdf

[xvii] "The New Orleans Index. July 31, 2009" The Brookings Institution and Greater New Orleans Community Data Center. http://gnocdc.org/NewOrleansIndex/index.html

[xviii] "The Homeowner Assistance Program: Week 162 Situation & Pipeline Report." Louisiana Office of Community Development. http://road2la.org/Docs/pipeline/Week_162_Combined_Report.pdf

84

[xix] Ibid.

[xx] "The New Orleans Index. July 31, 2009" The Brookings Institution and Greater New Orleans Community Data Center. http://gnocdc.org/NewOrleansIndex/index.html

[xxi] Ibid.

[xxii] "Resettling New Orleans: The First Full Picture from the Census." The Brookings Institution. http://www.brookings.edu/reports/2007/07katrinafreysinger.aspx. "Demographic Profiles of New Orleans & the Metro Area. Based on 2007 Population Estimates and American Community Survey Data." Greater New Orleans Community Data Center. http://gnocdc.org/2007Demographics/index.html.

[xxiii] "Hurricane Katrina: Social-Demographic Characteristics of Impacted Areas." Congressional Research Service. http://gnocdc.s3.amazonaws.com/reports/crsrept.pdf; "The Impact of Katrina: Race and Class in Storm-Damaged Neighborhoods." Brown University. http://www.s4.brown.edu/Katrina/report.pdf; "Resettling New Orleans: The First Full Picture from the Census." The Brookings Institution. http://www.brookings.edu/reports/2007/07katrinafreysinger.aspx

[xxiv] "Resettling New Orleans: The First Full Picture from the Census." The Brookings Institution. http://www.brookings.edu/reports/2007/07katrinafreysinger.aspx

[xxv] US Census Bureau Population Estimates 2008.

[xxvi] "A Long Way Home: The State of Housing Recovery in Louisiana 2008." PolicyLink. http://www.policylink.org/atf/cf/%7B97c6d565-bb43-406d-a6d5-eca3bbf35af0%7D/EQUITYATLAS.PDF

[xxvii] "LouisianaREBUILDS.info Contractor Fraud Survey." Louisiana State University, PolicyLink, LouisianaRebuilds.info. http://www.louisianarebuilds.info/files/Survey.pdf

[xxviii] "A Long Way Home: The State of Housing Recovery in Louisiana 2008." PolicyLink. http://www.policylink.org/atf/cf/%7B97c6d565-bb43-406d-a6d5-eca3bbf35af0%7D/EQUITYATLAS.PDF

[xxix] "Barriers to Rehabilitation of Affordable Housing: Volume 1 Findings and Analysis." U.S. Department of Housing and Urban Development. http://www.huduser.org/publications/destech/brah.html

85

# TESTIMONY OF

# PAUL RAINWATER,

## EXECUTIVE DIRECTOR OF THE
## LOUISIANA RECOVERY AUTHORITY

## BEFORE THE U.S. HOUSE SUBCOMMITTEE ON
## HOUSING AND COMMUNITY OPPORTUNITY

## August 20, 2009

Louisiana Recovery Authority
150 Third Street, Suite 200
Baton Rouge, LA 70801
Voice: (225) 342-1700
Fax: (225) 342-0002
lra.louisiana.gov

86

Thank you for this opportunity to address this committee about our progress and remaining challenges in administering the Road Home program in Louisiana, which is the largest housing program in American history.

This subject matter is particularly relevant as we approach the fourth anniversary of Hurricane Katrina, which is also the third anniversary of the official launch of the Road Home program in Louisiana. This time each year, we pause to assess hurricane recovery on the Gulf Coast, noting the progress made and the challenges that remain.

The situation we face in Louisiana is unique – I know of no other state that suffered such destruction in three years or that faces as many complex rebuilding issues. In context, the combined impact of hurricanes Katrina and Rita is the largest disaster in U.S. history. Measured only in terms of Stafford Act funds, it is larger than the next largest disaster -- the Attack on America on September 11, 2001 -- by four times and it is larger than the remaining top 10 disasters combined. Coupled with the affects of Hurricane Gustav and Hurricane Ike last year, the vast majority of our state has suffered the effects of one or more hurricanes since 2005. In total for these storms, the state has more than $14.4 billion in Community Development Block Grant funding.

No discussion of the unprecedented level of CDBG aid would be complete without considering the catastrophic damage our state suffered in the span of three weeks after Hurricane Katrina, the failure of the federal levees and Hurricane Rita. Coupled with the damage inflicted last fall by hurricanes Gustav and Ike, Louisiana faces a major recovery made even more complex by the national economic downturn. Our state will require continued special considerations from the federal government when it comes to federal regulations governing recovery-related funding streams.

**Catastrophic Damage to Louisiana**

*Impact of Hurricanes Katrina and Rita*

In 2005, the state of Louisiana bore the brunt of the biggest natural disaster in American history – Hurricane Katrina. Three weeks later Louisiana was hit by Hurricane Rita– now the third most expensive natural disaster in American history.

Hurricanes Katrina (landfall Aug. 29, 2005) and Rita (landfall Sept. 24, 2005) devastated south Louisiana, claiming 1,464 lives and displacing 900,000 residents. In the New Orleans metropolitan area, storm surge from Hurricane Katrina breached the city's levee protection system at several points. Eighty percent of the city was left underwater and thousands were stranded on rooftops and in shelters-of-last-resort. All 26,000 homes in St. Bernard Parish were damaged or destroyed. Hurricane Katrina also left behind major wind, rain and storm surge damage in Plaquemines, Jefferson, and St. Tammany parishes.

Three weeks later, storm surge from Hurricane Rita reflooded parts of New Orleans before the storm made landfall in far eastern Texas, devastating much of Cameron Parish and leaving behind intense flood and wind damage in Calcasieu and Vermilion parishes. Hurricane Rita destroyed every building in Cameron Parish with the exception of the Parish Court House. Many other Louisiana parishes also suffered major damage from the storms.

These damage statistics are well known, but it is important to review the scale and scope of two of the largest natural disasters in the nation's history, which left Louisiana with more than 200,000 housing units with major or severe damage, including 82,000 rental units. Orleans Parish alone had 50 percent of the damage statewide and lost more than 51 percent of the parish's rental units. This past fall the state experienced two devastating

87

storms, Gustav and Ike. While not at the same scale of the 2005 events, these storms caused significant housing damage and economic interruption along the Gulf Coast.  Additionally, these storms caused much greater damage statewide than in 2005. Another 9,400 homes received major damage and 800 families have been placed in FEMA-assisted housing.

***Impact of Hurricanes Gustav and Ike***

Hurricanes Gustav and Ike struck Louisiana on September 1, 2008 and September 12, 2008, respectively. The storms flooded approximately 12,000 homes and damaged approximately 200,000 more, caused as much as $750 million in agricultural damages, damaged more than $1 billion in infrastructure and caused $2.5 to $5 billion in business losses. Education facilities across the state suffered between $100 and $150 million in damages. The state evacuated more than one million citizens from south Louisiana, and more than 1.5 million homes and business were without power for up to three weeks. The Louisiana Economic Development Department estimates that hurricanes Gustav and Ike left behind $8 billion to $20 billion in insured and uninsured physical damage.

In Louisiana, 46 people died in Hurricane Gustav and five died in Hurricane Ike. The state spent $500 million on the initial response to Gustav and Ike. Following the storms, estimates indicate that FEMA Public Assistance claims in Louisiana will likely exceed $800 million in damages.

**Timeline of Federal Aid**

In the aftermath of Katrina and Rita, Louisiana received $13.4 billion in Community Development Block Grant funds for disaster recovery, which the state divided among three priorities – housing, infrastructure and economic development. This allocation represents the vast majority of "discretionary" funds the state received. Many other funding sources, including FEMA Public Assistance funds and Hazard Mitigation Grant Program dollars have narrow uses or are tied to specific projects. CDBG funds are one of the few funding streams where the state has some flexibility to set priorities for its recovery, and even then, all of its plans face a public vetting and then final federal approval to ensure they conform to sometimes strict regulations.

Congress allocated $11.5 billion in CDBG funds for Gulf Coast recovery at the very end of 2005, but capped Louisiana's share of funds at 54 percent, even though the state received the lion's share of housing and infrastructure damage during the 2005 hurricane season. When HUD allocated funds to the states in February 2006, Louisiana received only $6.2 billion.

In the summer of 2006,  Congress allocated Louisiana an additional $4.2 billion in CDBG funds, bringing the total of funds to $10.4 billion. To access this funding, Louisiana has presented two Action Plans outlining potential uses of funds. In keeping with the state's internal approval process and federal regulations, the Louisiana Recovery Authority's board approves all Action Plans and amendments to these plans, they have a public comment period and plans totaling more than $10 million receive a vote of the full Legislature. Following this, the Governor forwards the plans to HUD for approval. This process typically takes between 60 and 90 days from start to finish. In addition to the two overarching Action Plans, Louisiana has presented 33 amendments to the first plan and 12 amendments to the second plan to clarify programmatic rules and outline additional uses of funds.

Following months of administering the Road Home program, which is the largest single home rebuilding program in American history, Louisiana faced a deficit in 2007 because of higher than expected need and

88

lower than expected insurance payouts. In November 2007, Senator Landrieu ensured that the state get a third allocation of $3 billion in CDBG funds.

This final allocation included strict language that forbids Louisiana from using these funds for anything other than approved Road Home activities in the state's original action plan. This language was attached to ensure that Louisiana would not open the program to new applicants or further expand funding to current program participants.

In the aftermath of Gustav and Ike, last fall Congress set aside a $6.1 billion pool of CDBG funds for states affected by disasters in 2008. Louisiana received more than $1 billion of this funding. The state has set aside 25 percent of its total allocation for projects dealing with rental housing, agriculture and fisheries recovery and hurricane protection. The bulk of the funds were allocated to the parishes based on their level of damage. Parishes will select from a menu of options and decide how they will spend the funds. Louisiana adopted this decentralized funding model for Gustav and Ike parishes after our experience using the Katrina and Rita funds and because of the smaller scale of devastation in the state. HUD has approved our first action plan for using these funds and the second is being prepared for public comment.

### Overview of Louisiana's CDBG programs for Hurricane Katrina and Hurricane Rita Recovery

In total the state's property losses after Hurricane Katrina, the failure of the federal levees and Hurricane Rita are estimated to be in excess of $100 billion, when factoring public and private losses. Louisiana identified three priorities for its CDBG funds after the 2005 hurricane season – housing, infrastructure and economic development.

Housing was the top priority for CDBG funds because of the large unmet housing needs in the state, which saw the destruction of more than 200,000 homes. Following housing, the state dedicated funds to infrastructure needs, though the majority of public infrastructure rebuilding is funded with billions in FEMA Public Assistance funds. To address long-term rebuilding needs that cannot be met using FEMA funds, Louisiana created the Long Term Community Recovery program, which set aside $700 million in CDBG for projects in plans that parishes formulated and presented to the LRA's board for approval. Additional infrastructure investments included a program to rebuild fisheries infrastructure needed to support this critical industry in Louisiana, pools of funds for local governments and school systems and $200 million for ratepayer mitigation to help repair heavily damaged electrical systems and stave off huge increases in energy bills.

The final priority was economic development. Despite the fact that more than 16,000 businesses flooded and 30 percent of all businesses in New Orleans failed after the storms, the federal government in 2005 and 2006 refused to give the Gulf Coast discretionary economic development funds. So our state carved out a small pool of several hundred million in CDBG for a grant and loan program, technical assistance and workforce development. Business need dwarfed the funding we could afford to allocate to this purpose because our other needs were so great.

### The Road Home

The cornerstone of Louisiana's recovery program is the Road Home housing program, which is divided into two components – Homeowner aid and the Small Rental Property Program. Though the Road Home has faced many trials and initially struggled to award grants, we now have paid almost $8 billion to 124,538 Louisiana homeowners, including more than $836 million for homeowners to elevate their homes.

89

Since the beginning of 2008 when Governor Jindal took office, we have disbursed more than $2.2 billion to homeowners, re-launched the stalled elevation program, paid almost $18 million to Road Home applicants who sold their homes at a loss prior to the program's launch, revamped the appeals process so that it is more customer friendly and closed more than 31,500 of the most difficult applicant cases. The majority of the applicants we've closed since January 2008 had complicated cases and had been pushed to the back of the line while the contractor picked easier to close cases. In 2008, we had more than 20 successful mobile outreach sessions where we took Road Home and state of Louisiana staff into the community to meet with applicants one-on-one to discuss their issues.

Additionally, in 2008 we decided not to extend the state's controversial contract with ICF International, necessitating that we transition the program to new contractors. In general, the state and the public were not satisfied with ICF's performance, its treatment of applicants and the contract the previous administration signed with the company. We recently hired new contractors to take ICF's place, dividing the work of the company among three firms. In the spring, we signed a contract that included strict performance measures with Hammerman and Gainer, Inc., a Louisiana-based business that now runs the homeowner portion of the Road Home.

By breaking up the remaining work, we have ensured a more case management driven program for the remaining applicants. We anticipate that between 1,500 and 2,000 applicants could still close on their grants this year, though the new homeowner contractor is reviewing ICF's systems to determine if groups of applicants marked as unable to close actually could be closed.

Many of the remaining applicants have difficult title, power of attorney and other legal issues that stand between them and closing on their Road Home grants. The state has provided and will attempt to continue to provide legal services for lower income Road Home applicants. Additionally, we do not have current deadlines for applicants to close. That said, we anticipate that the majority of closings for compensation and elevation grants will be complete by the end of 2009.

There has been some talk of potential unspent funds in the third CDBG allocation of $3 billion. It is entirely too early to know what funds, if any, will remain at the end of the Road Home program. Clearly there is much interest in these funds, should they remain, and it is Louisiana's hope that the state would be able to access the funds to provide additional aid to homeowners and address unmet recovery needs.

Because of strict language governing the use of these funds, we must work with HUD and Congress to ensure they are used properly and may require some flexibility in the interpretation of federal regulations in order to achieve this.

While the Small Rental Property Program, the second aspect of the Road Home, has been slower going than we had hoped, we have made great strides in the past year. When we took this program over from the previous administration, it had created only five rental units. We have now created 1,876 rental units using these funds and made payments of more than $85.8 million to landlords. Additionally, we soon will begin offering advance payments to landlords, which was not something done under the original program implementation. This will speed up production of units significantly, as many landlords have been left unable to get financing for their reconstruction efforts due to the economic downturn.

Additionally, we have made great strides in our Low Income Housing Tax Credit "Piggyback" program, which pairs CDBG funds with GO Zone tax credits to help build large rental developments. Eleven of these complexes have been completed thus far, creating 1,525 total rental units, 738 of which offer affordable rents. Others are

90

under construction, including several HUD complexes that will replace the "Big Four" public housing projects in New Orleans. CDBG funding has been critical gap financing that has kept many of these developments afloat during this tough economic time.

In total, when looking at this Piggyback program and other tax credit initiatives by the Louisiana Housing Finance Agency, in Louisiana we have created more than 7,500 rental units statewide, including more than 2,300 in Orleans parish. We have thousands of units under construction across the state and we expect many all of these to come online by the end of the year. When coupled with our investments in the Road Home Small Rental program, this will provide much more affordable housing for residents and help stabilize the very uncertain rental market in New Orleans and the surrounding areas.

**New Housing Programs / Changes to the Road Home**

Recent analysis of the Road Home program showed that the Road Home has been instrumental is restoring homes in areas impacted by Katrina and that the city of New Orleans would not have recovered 75 percent of its population without the aid of the program. That said, the same analysis pointed to 30 percent of Road Home "Option 1" grant recipients who have yet to rebuild.

In addition, the analysis showed a gap in homeowner rebuilding resources available in the city of New Orleans of between $1.6 billion and $2.3 billion. This represented a shortfall between the amount of assistance available from the Road Home, flood and homeowner insurance and FEMA assistance, but it does not account for private funds being invested into rebuilding by individual homeowners. Many low-to-moderate income homeowners may not have the resources to rebuild their homes with the funds available. The rising cost of construction, increased insurance rates, the unstable credit markets and the national economic downturn make rebuilding difficult for many families.

Based on this analysis and our own experience running the Road Home program, it is absolutely crucial that the state have access to the remaining CDBG funds from the final allocation meant for the Road Home. This will take Congressional action, but it will allow us to extend further assistance to help fill this gap. This fall, we are legislatively required to present a full account of all unspent recovery CDBG to the Louisiana Legislature, and we anticipate the conversation about how to program these funds so that they meet the needs of the state will again intensify.

Additionally, for the first time in the program's history, homeowners who accepted Road Home grants are facing a deadline to rebuild. When homeowners accept their grants, they signed a covenant that said they would do so within three years. The first group of homeowners affected by the covenant will meet their deadlines this fall.

Based on data analysis on the Road Home and the very difficult climate we find ourselves in, the state of Louisiana will offer applicants an extension of this timeline if they can show good cause as to why they cannot complete their construction, including experiencing an unexpected financial hardship, coping with health issues, falling prey to an unscrupulous contractor or exhausting their Road Home funds because the cost of construction was too high.

While we hope Road Home grantees rebuild within three years of receiving their grant awards, we are convinced that some homeowners simply will not make this deadline. Grantees will be allowed to request up to two extensions of one year each, giving them a maximum total of five years from the time they received their Road Home grants.

91

In addition to this change, to address the ever-changing needs of the recovery and to help fight the housing crisis Louisiana faces, the state is working on four new housing programs, funded with unallocated dollars from our rental programs. These include:

- **Nonprofit Rebuilding Pilot Program,** which will award competitive grants to nonprofits and other organizations that have a proven track record in assisting homeowners to meet gaps in their rebuilding resources. The will put forth $20 million for this purpose;

- **Plaquemines Parish Pilot Program,** which will allow Plaquemines Parish to use $4 million of its $13 million in Small Rental Program funds for a Homeowner Rehabilitation Program. Plaquemines had a very small number of landlords participate in the Small Rental program and will use the money to address the parish's urgent housing need.

- **Emergency Rental Assistance,** which will move $5 million in unallocated funds from the Small Rental Property Program to the state's Rapid Re-Housing program, which is run by nonprofit agencies under a contract with the state Department of Social Services. The additional funds will bring the program's total available funding to $12.7 million. The LRA is working with FEMA, HUD, DSS and other state and nonprofit partners to assist those residents who are moving out of their FEMA trailers and off of the Disaster Housing Assistance Program (DHAP), which ends this fall. The Rapid Re-Housing program is a key element of the state's strategy for ensuring that those affected by hurricanes Katrina and Rita do not become homeless when temporary disaster assistance ends. Rapid Re-Housing funds are used to offer temporary rental assistance, pay utility connection fees and other costs necessary to assist families threatened by homelessness.

- **Chinese Drywall Program,** which the state is developing at the request of the Louisiana Legislature to assist Road Home applicants who are affected by Chinese drywall that must be replaced in their homes. The $5 million program has not yet been designed, and it will need formal approval from the LRA, the Legislature and HUD before funds can flow to homeowners.

92

**Written Testimony -  Ommeed Sathe**
**Regarding Disposition of Properties Acquired by the State of Louisiana through the**
**Road Home program.**

**I.  Background**

Under Options 2 and 3 of the Road Home program, homeowners could sell their property to the State of Louisiana rather than receive funds to rebuild.  Properties sold to the state were transferred to Louisiana Land Trust ("LLT"), which maintains them and assists in their demolition prior to transferring to appropriate parish for disposition.  In Orleans Parish nearly 4700 properties have been transferred to LLT, and will be referred to as "LLT Properties" below.   The New Orleans Redevelopment Authority ("NORA") is a quasi public agency with an independent board of directors.  NORA has been designated as the exclusive agent in charge of disposition of LLT properties in New Orleans.  NORA has four primary methods to dispose of LLT properties

1. **Lot Next Door ("LND") program**:  The LND program provides adjacent property owners with a homestead exemption a right of first refusal to acquire the property adjacent to them on left or right.  After acquisition the property can be used for either green space or redeveloped by the family.  There is currently a 5-year anti-flipping restriction and all transferees must maintain the property.
2. **Neighborhood Based Disposition and Development Plans**:  NORA works closely with neighborhood groups and stakeholders to develop neighborhood specific and sensitive redevelopment strategies.  These are codified in neighborhood based development agreements with chosen developers that span a broad array of strategies.  In crafting these development plans NORA is focused on promoting homeownership and will work with both for-profit and non-profit entities.  See below for a complete list of goals that shape our disposition strategies.
3. **Small Entrepreneurs, Individuals, Education and Faith Based Organizations**:  NORA makes a concerted effort to involve small entrepreneurs, individuals, faith based and education groups in all of its disposition programs.  It is also working to create programs specifically focused on the needs of these groups.
4. **Public Benefit**:  In select instances NORA can use properties for items expounded in neighborhood plans, such as community health centers, small grocers, creation of pocket parks and expansion of schools facilities.

**II. Status of Transfers and Number of Purchase Agreements Signed**

NORA's disposition plan for the LLT properties was approved in December 2007; however the LLT properties were only made available for transfer in March 2009. Property was delayed primarily due to HUD requirements mandating individual environmental reviews of each property.  Since March, NORA has aggressively moved to

93

dispose of these properties and has signed purchase agreements on over 600 properties, and has another 400 purchase agreements in process.

1. **LND Performance**: NORA has identified over 2000 properties that are eligible for potential purchase under the City of New Orleans' Lot Next Door program. To date NORA has mailed over 1200 official purchase offers to these families and signed nearly 300 purchase agreements.
   a. To enhance the Lot Next Door program NORA created the "Growing Home" program which provides up to $10,000 in assistance to families who agree to fence, plant and immediately improve the property they acquire.  Over 250 families have elected to participate to date.
   b. By year end we expect to have over 500 signed purchase agreements.

2. **Neighborhood Development Performance**:  NORA has created neighborhood specific dispositions plans for over 15 neighborhoods encompassing over 1000 properties and a wide array of approaches.   As a useful barometer, in a typical year there are only 1000-1200 single family home sales in New Orleans.  Among some of the key examples of neighborhood projects are
   a. In Pontchartrain Park, which was one of the first African American subdivisions in United States, and had a 97% homeownership rate prior to Katrina, the recovery efforts were struggling as many elderly families were financially, emotionally or physically unable to rebuild.   The community approached NORA and determined that a single highly skilled master developer was needed to redevelop the LLT properties and the numerous still vacant privately owned properties.  The neighborhood sought a master developer, in part, to ensure that homes were built to high aesthetic and energy efficient standards and in line with the history of neighborhood.  In total that project is expected to address over 500 properties (including over 100 road home properties), generate over $100 million in direct economic activity and restore the fabric of one of the most important neighborhoods in the city.
   b. In Lakeview, where the community was wealthier and there was strong pre-storm demand from young families, the community asked NORA to avoid large developers and instead dispose of properties to only individual buyers.  Under that plan we will sell nearly 200 properties to individuals all of whom have agreed to use them for homeownership.
   c. In Lower 9th Ward, where the devastations was most severe and demand was weak, NORA has worked with community groups like NENA and charitable organizations like Make it Right to rebuild high performing homes that can withstand natural disaster and use little to no electricity. NORA is in the midst of disposing of over 150 LLT properties in Lower 9th and will build over 50 LEED Platinum Homes – more than the rest of country combined.

3. **Small Entrepreneurs, Individuals, Education and Faith Based Organizations Performance:**

94

   a. Franklin Avenue Baptist Church and Samaritans Purse. Franklin Baptist is the largest church in New Orleans and Samaritan's purse is the international relief wing of Franklin Graham's church. NORA is working with them to redevelop 50 homes surrounding the Church and make them affordable to families making less than 80% AMI.
   b. Mid City Development Agreement. The Mid City neighborhood has been the site of significant entrepreneurial rehab and asked NORA to design a disposition program that encouraged rehab and participation by small entrepreneurs. Our recently completed RFP identified over 20 entrepreneurs interested in fixing nearly 50 properties.

4. **Public Benefit Performance:** Public benefit transaction are obviously a smaller portion of our work but we have sold 2 properties for a community center in 9th Ward, identified 3 properties for pocket parks in Lakeview, and are working with School system to finalize their needs.

## III. Key Impediments to NORA and Redevelopment of Properties

*1. The most immediate impediment are difficulties demolishing blighted properties*
- NORA is awaiting demolition on over 1400 properties. Demolition is being performed by LLT and must occur prior to closing. Many redevelopments sites are awaiting demolition
- The EPA recently denied a No Action Assurance Request that would have allowed demolitions to proceed more rapidly and cost-effectively. This waiver had been granted through July 31 and was extended for neighboring St. Bernard Parish.

*2. Dramatic increases in construction costs and insurance make it cost prohibitive to produce new housing for families making below 120% AMI*
- The cost of new construction has soared following the storm due to a shortage of labor, heightened elevation requirements, increased materials costs and a lack of construction financing. Adding energy efficient features also adds approximately 5% to the typical cost of a home although it can be quickly recouped.
- The recent explosion in homeowner's insurance cost (rates have soared by nearly 500%) has also drastically reduced the amount of mortgage that families can qualify for.
- Rehabilitation can be a cheaper option, however under FEMA guidelines many properties need to be elevated and therefore any savings on rehab will be consumed by the cost of elevation.

*3.   The Jack O'Lantern pattern of redevelopment is exacerbating the stabilization challenge significantly*
- In the years that followed Katrina, New Orleans has begun to recover led by dedicated families who have returned to their storm damaged homes and invested their life savings, road home and insurance proceeds into rebuilding their homes. Today the city is at over 70% of its pre-Katrina population and unemployment is holding steady at 5.3 percent.

95

- In majority of severely storm damaged areas occupancy rates are at approximately 50%, which creates a patchwork pattern on nearly every block of newly rehabilitated properties adjacent to vacant and blighted properties.
- 50% occupancy levels are highly destabilizing to a community. Owners of unoccupied properties are reluctant to invest their limited resources in rehabilitating them for fear of returning to a half empty neighborhood. At the same they cannot generally sell these properties to new families either for anything approaching their pre-storm value, if they can sell them at all. This creates a vicious chicken and egg cycle where no one wants to be the first mover and there is no force to get people off the fence. This cycle is only exacerbated by the challenges in getting financing and overcoming high construction costs. As these properties sit idle the neighborhood around them deteriorates and these homes often become blighted. This cycle of deterioration will than gradually force owners of rehabilitated properties to abandon them. Saddest still, are families who invested their life savings in returning to a neighborhood following Katrina and now find themselves essentially trapped.
- Historically, this cycle of disinvestment has played out over time and against a backdrop of job losses. In New Orleans, the storm has almost instantly transformed once vibrant neighborhoods into this tenuous state. Fortunately, because job growth is solid (see below) and because many of these areas have long histories as stable neighborhoods and highly desirable locations we believe we can reverse this cycle of decay with the appropriate array of stabilization measures.

### 4. Banks tightening of access to credit is drastically slowing the recovery

- The mortgage crisis is exacerbating blight by impeding families from getting rehabilitation loans from banks to restore storm damage properties. In many cases, families had their mortgages paid off by homeowner's insurance but can no longer qualify for a new mortgage to restore the damaged property. This problem is heightened since many families credit was damaged by the turmoil after Katrina.
- High levels of storm created blight as well as historic blight are also combining to decrease property values which puts an increasing number of families into potential negative equity scenarios thereby increasing the likelihood of future foreclosures

## IV. Redevelopment Opportunities

Despite this massive challenge, New Orleans has strengths that are not usually found in high vacancy markets. These strengths will make it possible to combat the significant blight within the city and overcome the jack-o-lantern effect.

### 1. Unemployment rates are low and job growth is forecast to continue

- The Unemployment rate for the Metropolitan area is 5.3% which is the 6th lowest in the country and has not followed the recent nationwide spike in unemployment.
- 11,700 jobs were added to the New Orleans Metropolitan area when comparing third quarters of 2007 and 2008.

96

- According to the Metropolitan Forecast, produced by the University of New Orleans, 14,500 jobs will be added to the Metropolitan area over the next two years.

*2. New Orleans is among fastest growing big cities in the US with significant future growth likely.*

- Orleans Parish is the fastest growing big city in the United States and added nearly 24,000 people between July 2007 and July 2008.
- City projections suggest that the city has added an additional 24,000 residents in the last year.
- New Orleans was voted one of top places to ride out the recession by both Business Week and Money Magazine
- A $2 billion biomedical district expansion that is expected to create over 10,000 jobs in the metropolitan area should continue to fuel growth

*3. The rate of job growth exceeds the level of population that has returned suggesting that there is significant potential demand for housing*

- While employment has reached 87.4% of pre-Katrina levels the city's population is estimated at between 69-75% of its pre-Katrina levels, depending on which method of calculation is used.
- Only 46% of jobs in city were held by commuters prior to Katrina and that figure has increased to 67%.  This suggest a large number of displaced families in immediate vicinity


## V.  Key Statutory or Regulatory changes needed

There are 3 simple and immediate fixes that would drastically help the pace of recovery:

1) *HUD to provide waiver allowing CDBG funds to be used for new construction.*
   a. This was granted under the recently adopted Neighborhood Stabilization Program (NSP) and it is even more vital in New Orleans
   b. This waiver would allow NORA to directly fund costs associated with production of new housing on LLT properties
2) *FEMA to grant waiver allowing already committed Hazard Mitigation Funds to be used to pay for elevation on LLT properties.*
   a. Under current FEMA guidelines only the original property owner may apply.  However, the state is an arm of government and their acquisition of these properties should not disqualify them from eligibility
   b. This change can be made administratively
3) *EPA to extend No Action Assurance letter regarding demolition for 6 months*

97

**TESTIMONY OF FREDERICK TOMBAR**

**SENIOR ADVISOR**

**OFFICE OF THE SECRETARY**

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**BEFORE THE SUBCOMMITTEE ON HOUSING AND COMMUNITY
OPPORTUNITY,**

**COMMITTEE ON FINANCIAL SERVICES**

**UNITED STATES HOUSE OF REPRESENTATIVES**

Thank you, Chairwoman Waters and members of the Subcommittee, for hearing my

testimony today.  My name is Fred Tombar, and I am a Senior Advisor to Secretary Shaun

Donovan at HUD.   It is an honor to join you today to discuss the implementation of the Road

Home Program four years after Hurricanes Katrina and Rita.  I'm glad to be joined today by our

colleagues from the State of Louisiana.

I first want to express HUD's commitment to the recovery and revitalization of New

Orleans and the Gulf Coast – to ensuring that the resources we've provided are used in the most

effective way to help people move back into their homes and revitalize the region.  That's a

message we sent within weeks of President Obama's inauguration, when HUD brought together

partners from across the country to help provide Disaster Housing Assistance Program

transitional rental assistance to more than 30,000 families.  It's a message that we've continued

to send over the past six months – and it's a message that Secretary Donovan, Deputy Secretary

Ron Sims, and many of our assistant secretaries will make clear when they are down here next

week for the fourth anniversary of Katrina.

The storms of 2005 were deadly and costly to communities throughout the Gulf Coast

and particularly destructive to Louisiana.  In Louisiana alone, the overall losses associated with

these unprecedented disasters included more than 1,100 people losing their lives; approximately

18,000 businesses severely damaged or completely destroyed; and a significant number of roads,

schools, public facilities, and medical services succumbing to the ill effects of Hurricanes

Katrina and Rita.  The path of destruction forced thousands of people to relocate after losing

their homes and left more than 123,000 homes and 82,000 rental properties severely damaged or

98

2

destroyed.  These housing repair costs were estimated at $32 billion, leaving a significant void between insured and uninsured damages.

To address the devastation left in the wake of the 2005 disasters, three supplemental appropriations providing HUD Community Development Block Grant (CDBG) funds for Gulf Coast disaster recovery purposes were enacted.  In December 2005, Louisiana received $6.2 billion in its first disaster supplemental appropriation.  The following June, an additional $4.2 billion was appropriated for Louisiana; and in November 2007, a $3.0 billion third appropriation was specifically allocated to close the anticipated funding gap for the State of Louisiana's "Road Home" homeowner assistance program.

The State of Louisiana has dedicated approximately $10 billion of its Hurricane Katrina and Rita CDBG disaster recovery appropriations to the Road Home homeowner assistance program. This accounts for approximately 75 percent of the State's $13.4 billion in CDBG disaster recovery allocations for the 2005 hurricanes. The State has expended approximately $8.5 billion (or 85 percent) of its budgeted funds for the Road Home program, resulting in a balance of approximately $1.5 billion.

The State received 229,417 applications for Road Home, of which 151,783 have been determined as eligible. Funding has been disbursed for 124,538 grantees for a total of $7.97 billion. The total disbursement calculation for all eligible applications is estimated by the State to be $8.19 billion. The average disbursement to date is approximately $61,600.

To assist the State of Louisiana in administering a recovery program of this size, HUD has implemented strong programmatic oversight and ongoing technical assistance measures, which are critical elements to ensure compliance.  HUD staff conducts on-site Management Reviews twice a year to ensure that programs and related Federal crosscutting requirements are carried out efficiently, effectively, and in compliance with applicable laws, regulations, and established policy.  Monitoring visits include an overall management review of the State, as well as provide on-site technical assistance in areas that are deemed high risk.  The intended goal of monitoring and technical assistance is to assist grantees in improving their performance, developing or increasing capacity, and augmenting their management and technical skills.

The magnitude of Louisiana's programs and the sensitive nature of expeditiously getting resources to the individual and neighborhood level warrant careful monitoring and ongoing

99

3

technical assistance.  With the aid of the Department, Louisiana has been relatively successful in disbursing approximately $8 billion with very few findings or concerns.  The Road Home Program has been heavily scrutinized as reflected in the State being audited 52 times since the first supplemental.   HUD is committed to assisting Louisiana and all of its disaster grantees to efficiently and effectively manage the resources needed to recover and rebuild communities stronger across the disaster affected region.

Effectively administering a program as significant as the Road Home program requires a great deal of coordination.  There have been a number of departmental measures that afforded the Road Home program much needed flexibility to adapt to the many situations presented throughout recovery.  As an immediate response to aid Louisiana and other disaster affected states, HUD acknowledged the complexities of addressing a disaster of this magnitude and granted several waivers to allow programmatic dexterity.  The Disaster Recovery Action Plan Process gave the State an additional planning tool to creatively develop their own program designs and wisely use their resources with maximum feasible deference.

The Road Home program specifically benefited from the compensation waiver, which allowed the state to provide compensation to homeowners whose homes were damaged during the covered disasters, and met approved program stipulations.  The waiver also allowed the state to offer disaster recovery or mitigation incentives to promote housing development or resettlement in particular geographic areas.  The compensation waiver made it possible to quickly put resources into the hands of disaster affected homeowners.   Another waiver that played a significant role in the successful implementation of the program was the adjustment in the overall benefit to low- and moderate-income (LMI) persons.  This waiver gave grantees greater flexibility to carry out recovery activities within the confines of the CDBG program national objectives, by expanding assistance to individuals who were outside of the LMI range. This waiver allowed the program to meet recovery needs of the entire community affected by the 2005 disasters.  But to be sure, this has been no easy process for homeowners and families who lost their homes – and as we speak, some families are still trying to work their way through the process of receiving compensation for their damaged homes.

As part of the Department's commitment to continuously improving the efficiency and effectiveness of our programs, we will soon be undertaking a study to assess the impact of the

100

4

various approaches used by states in meeting post-disaster housing needs with CDBG disaster recovery funds. The study will take a focused look at the impact of homeowner and rental housing programs by examining the degree to which neighborhoods have been rebuilt and reoccupied at the block level. The results of the study should demonstrate the impact and effectiveness that both compensation-based and rehabilitation-based programs have on returning residents to safer, stronger neighborhoods after a disaster.

In conclusion, CDBG has assisted States and communities with disaster recovery, especially long-term recovery.  Over the last four years, we have seen many of the challenges that face our federal-state partnership in quickly administering grant assistance to the individual and neighborhood level. We are dedicated to working through these challenges while ensuring a continued focus on both performance and accountability. Long-term recovery and rebuilding after a disaster is a complex process that requires tough decisions at all levels, as well as the ability to acquire additional capacity to carry them out.

Thank you for the opportunity to appear before this Subcommittee.  This completes my testimony and I look forward to answering your questions.

101

### Subcommittee on Housing and Community Opportunity

### Written Testimony for Field Hearings on Post-Katrina New Orleans on 8/20/09

From Melanie Ehrlich
Founder of Citizens' Road Home Action Team (CHAT); http://chatushome.com

**A. INTRODUCTION**
CHAT has more than 950 members and is a grass-roots, zero-budget group, with the goal of making the federally financed and state-run Louisiana Road Home Program fairer.

We are very concerned about LRA not spending the remaining ~$0.5 – 0.8 billion first and foremost to correct shortchanging mistakes of applicants

**B. OUR MOST IMPORTANT CONCERNS**



"I am a 96 year old handicapped widow.
*__Please help bring my Road Home process to closure (see p.24 - 25__*

**Thousands of low-income applicants and middle-class applicants have suffered financially and emotionally because of broken promises by the Road Home Program for Homeowners (RH) that led to lower grants than they were originally told they would get.**

**1. There is an extraordinarily high rate of mistakes in processing grant applicants. One piece of evidence for this is in the appeals data.**

> **More than 22,000 applicants disputed their grant amount**

> > Louisiana Legislative Auditor in a Jan. 9, 2009 audit
> > http://chatushome.com/chatusfiles/HUD_OIG_Complaint_ForPublicRelease_final__2_2_09.pdf

**16,217 first-level appeals have been processed. 5,592 won their appeal (average of $26,880 additional funds but applicants appealing wrong determinations of damage have a much lower rate of winning appeals).** http://road2la.org/Docs/pipeline/Week_162_Combined_Report.pdf p. 11/12

**3,454 applicants were able to file second-level appeals (many others missed deadlines or did not fill out a form AND write a letter so were unable to appeal). We were told by LRA that only 6% win these appeals.**

1

102

**2. While many RH applicants received fair grants that have helped them enormously, many other RH applicants were shortchanged on their grants due to contractor mistakes that remain uncorrected.**

**a. The lack of correction is due to some of the following factors:**

i. Many applicants were dissuaded from appealing by contractor staff.

ii. Applicants needing their house-elevation grant funding were not allowed to complete their in-process and often prolonged appeal to receive this grant money. Only if they gave up their appeal could they get their elevation grant (see page 6, line 8 of the official RH elevation grant form, http://road2la.org/Docs/Elevation%20Letter_SAMPLE.pdf ).

iii. Applicants who appealed in 2007 and many subsequently were not given a copy of their file so that they could know the specific contractor mistakes they were appealing.

iv. The contractor often rubber-stamped its own mistakes during the contractor-run first-level appeal.

> For example, the same House Evaluation Team member who greatly underestimated the damage for grant calculation often reviewed his/her own determination during the first-level appeal (see pp. 2 and 28-30, in our 39-page complaint to the HUD Office of the Inspector General, OIG, which is still under investigation http://chatushome.com/chatusfiles/HUD_OIG_Complaint_ForPublicRelease_final__2_2_09.pdf )

v. An apparently intentionally hidden rule during appeal gave applicants less chance for correction of mistakes than promised in the published rules.

> The published rules state that applicants appealing the pre-storm value of their home (PSV), which is the starting point for most grant calculations can get the highest PSV listed in their file. This was to compensate for the contractor using inferior methods for determination of the PSV, often having multiple determinations, and sometimes choosing lower PSVs for grant calculation. The hidden rule is that there was a 35% limit allowed for deviation of multiple determinations during appeal. This rule that limited appeal awards for some applicants was not posted anywhere but was obtained 8 months after I filed a public records request for an official copy of the document and several months after I filed a suit in court to obtain RH documents withheld by the Louisiana Recovery Authority (LRA). A copy of the document is available upon request.

vi. The second and last level of appeal is a state-run State Appeals Panel, which has no written standard for deciding appeals, not even a description of whether the decision is made by a vote and how applicant documentation is weighed against contractor documentation.

> This lack of written standards is verified in two letters from the attorney representing LRA Executive Director Paul Rainwater in response to my pending public records request suit for still-missing RH documents. Copies of the letters from Mr. Rainwater's attorney are available upon request.

103

vii. LRA is keeping secret the names and affiliations of those who serve on the State Appeals Panel even in the face of my pending public records request suit for such information.

viii. The State denies aggrieved victims any right of judicial review.

> The Louisiana Administrative Procedures Act allows aggrieved persons the right of review of final agency decisions, in certain circumstances, but the RH and State Attorney General are fighting applicants who seek such reviews in court.

> In several court cases, lawyers for the state have argued that the money was given to the State of Louisiana and not to the applicants and that the state is under no obligation to be fair or accountable for CDBG funds which provide the money for Road Home grants. According to the state attorney general's office, the state can do whatever it wants because the Road Home Program is a "giveaway program." The program may be unjust, inequitable and violate its own rules and no court has the power to correct it.

> The appeals system started with ICF reviewing its own mistakes which was a conflict of interest.

> With no known or published standards for reviewing decisions, the State ran a second-tier appeal. In the early stages the reversal rate was substantial and many people were helped. As time went along, applicants usually lost these and often they were given no reasons.

> After that, the State of Louisiana says applicants have no right of review in court.


**3. Applicant dissatisfaction is often suppressed.**

i. There were no mass mailings (not even email notices) to applicants of any of the very many grant-restricting rule changes.

> These rules resulted in inconsistent treatment of applicants often with applicants whose grants were processed earlier obtaining higher grants than similar applicants whose grants were processed later. Often, there was no good justification for these rule changes.

ii. The rule changes were buried many links down at the RH website with no notice on the first one or two pages of their being important rule changes.

iii. Using taxpayer money (more than $42,000) for a survey of RH "customer satisfaction" that was set up so as to be biased in several ways toward satisfied applicants.

> Over 8000 applicants were interviewed by phone but the data for only about 550 of these applicants were used in the final compilation of the results. One LRA staffer objected enough to two of the three sources of bias so that the survey touted previously in the media to be forthcoming was not released. Data were obtained only by public records request 8 months after documents were requested. LRA emails and copies of survey data are available upon request.

3

104

iv. Keeping secret rules for recapture of funds even in the face of my pending public records request suit.

> This recapture during appeals has been ongoing for 2 years and the recapture for violations of the covenant in the closing documents may begin shortly.

> Many applicants started rebuilding but could not continue because their promised grant amounts were reduced.

> Applicants often were told that after closing they could appeal decreases in their grants but the appeals were often unfair and extremely prolonged. Such applicants should not be asked to repay grant funds that they spent on rebuilding or repairing their home just because the closing documents allow repayment demands for unrepaired homes.

For a few representative photos of New Orleans houses in my immediate neighborhood whose repair or rebuilding is incomplete and in limbo for a long time (and not sold to the Road Home), please see our website ( http://chatushome.com/chatusfiles/StalledRepair_Devastated_PropertiesIn_GentillyOak_NewOrleans_5_16_09.pdf ).


**4. The ongoing HUD OIG investigation of our complaint is apparently not involving contacting any of the 35 applicants whose contact information I provided, at their request.**

The complaint was accepted in Feb. 2009 by the HUD OIG.


To read the complaint HL 09-0428:
http://chatushome.com/chatusfiles/HUD_OIG_Complaint_ForPublicRelease_final__2_2_09.pd

From an email that I sent to HUD OIG inspectors July 7, 2009.

> … you stated toward the end of the meeting that you would be interviewing Mr. Paul Rainwater, Executive Director of the Louisiana Recovery Authority (LRA) as part of the audit. I responded that I considered it appropriate but the audit should also involve input directly from a number of applicants because of uncorrected errors and omissions that many applicants have told us about in their files. You then said that you would see if that is necessary…. you did not offer any information about getting information directly from applicants but you did ask me with whom I corresponded at HUD previous to the complaint and said the this person … would be interviewed as part of the audit.

> As I indicated in both the written material that I supplied for that meeting and in phone calls and verbally at the meeting, the audit could not be considered complete without direct communication with applicants representative of the issues that we raised. Even email would suffice. A major issue highlighted in our complaint is the inconsistency in RH following its own regulations and enabling legislation, including often not accepting documents from applicants that could correct mistakes introduced into applicants' files by RH staff. Moreover, we provided evidence of fraud concerning processing of applications. If you do not interview a considerable number of applicants or otherwise give them a chance to share their documentation of mistakes in their file while you do interview RH and HUD officials charged with oversight of the program, the result would be a biased audit.

> In addition, … I would like to point out that during several phone calls from you, you asked for specific examples from applicants of the problems cited in our complaint. I went to a great deal of work to provide these examples for the audit including securing approval from about 35 applicants for this HUD audit of their files and their willingness to provide documentation to you. Without sufficient input from representative applicants to verify

4

105

items in their files, the audit will miss the perspective of the applicants about mistakes or missing items in RH files. For example a JIRA file recently brought to my attention by an applicant had three entries in different months about the phone being disconnected so that the applicant could not be reached when, in fact, the phone was not disconnected. Given that our complaint specifically mentions problems with data in files, the only way that these items can be fairly audited is to get input from applicants. One of the Louisiana Legislative Auditors' audits on Dispute Resolution did just that, and the results were important.

All the points that I have been raising with you about mistakes are mistakes which we have seen many times from independent sources. Many of these have not been corrected despite great efforts on the part of applicants to obtain correction.

I have written to the 35 applicants whose contact information and summarized RH issues were provided to the HUD OIG. None of them have received any communication from the OIG and the inspectors would not provide me with the assurance that they would contact any applicants for their side of the RH issues.

**This is a major problem of the RH. It is not applicant-centered although the applicant hurricane victims are the reason for the program's existence.**


**5. HUD is blamed by LRA for some of the restrictive rules that deprive applicants of fair grants but the evidence indicates otherwise.**

The critical phrase is that for CDBG programs (like the RH) HUD gives the states "maximum feasible deference." The citation is as follows:

http://fhasecure.gov/offices/cpd/communitydevelopment/library/stateguide/appg.pdf
24 CFR 570.480 (c) of the State CDBG regulations provides that the Secretary will give maximum feasible deference to the state's interpretation of the statutory requirements and the requirements of this regulation, provided that these interpretations are not plainly inconsistent with the HCDA and the Secretary's obligation to enforce compliance with the intent of Congress contained in the Act."

One specific application is this "blame HUD" stance is about the rule that if an applicant gives RH an appraisal that is more than 20% higher than the pre-storm value (PSV) used for grant calculation, RH will not accept it. This detailed requirement could not have come from HUD according to the "maximum feasible deference" regulation.

This 20% rule was changed on Nov. 9, 2007 after much advocacy by CHAT. The new rule (# 188G) was that instead of rejecting the appraisal out of hand, RH would do an evaluation of how good the appraisal was by another appraisal called a field review appraisal, also done by certified appraisers but arranged by ICF.

Here are the problems associated with this 20% rule.

1. LRA and OCD (both RH state agencies) told us in meetings first that OCD decided on 20% themselves (and Mike Spletto said the number could have been 5%, 10%, or 20% and he thought they were generous to choose 20%).

LRA later told us that HUD requires this 20% cutoff and told the Times-Picayune that HUD gave "guidance" about this 20% rule.
      http://www.nola.com/news/index.ssf/2008/07/rule_changes_frustrate_road_ho.html
      Rule changes frustrate Road Home applicants, by David Hammer, Friday July 25, 2008

OCD told state legislators that "HUD allows approximately 20% over the highest valid pre-storm value to be paid to homeowners" ... exceeding the 20% allowance ...would not be eligible for CDBG funds."

5

106

The legislative fiscal note to a Road Home reform bill
http://www.legis.state.la.us/billdata/streamdocument.asp?did=497732

Quite a different statement was made by Mike Spletto, former head of Housing at OCD during a Louisiana
Legislative Subcommittee at a Town Hall meeting on RH on Feb. 6, 2008
On p. 17 of the official minutes available from the Municipal Affairs Committee of the Louisiana Senate, the
following was written (emphasis added).

> Ms. Elkins said there have been about three policy changes on appraisals and asked Mr. Spletto to go
> over the most recent one.  Mr. Spletto responded, "As you heard earlier, a lot of the complaints were that
> when a homeowner provided an appraisal, a post-storm pre-value appraisal greater than twenty percent,
> the comment was that we just ignored it.  The state had us set up a policy that twenty percent was a
> number that we could accept a non arms length transaction.

2. LRA said that it has two letters from HUD indicating that 20% is the highest deviation that they would consider
acceptable. With considerable difficulty, I obtained one of these letters. It (the May 19, 2008 letter) is
unconvincing. It refers to the state's determination of PSV and the homeowner's appraisal, as if they were done by
similarly good methods. They are not. The state's involves a drive-by appraisal ("market analysis") at best and
often just a broker price opinion with a drive-by. The appraiser for the market analysis and the evaluator
(background unspecified) need not leave their car. Moreover, there is a mistake in the second sentence of the letter.
Lastly, this letter to Suzie Elkin, former executive director of OCD, is in response to a Mar. 31, 2008 letter from
her. I have been unable to obtain that letter despite a public records request to the LRA for it dating from July 1,
2008. A Freedom of Information Act request to HUD produced the May 19 letter from HUD but not this Mar. 31
Elkin's letter to HUD nor any second letter from HUD about this.

3. As to the second letter, Paul Rainwater, current head of LRA and OCD, told Louisiana Sen. Murray at a meeting
of the Legislative Audit Advisory Council that he had two letters from HUD about the 20% appraisal rule and
would be glad to share it with the legislators.
However, his lawyer finally admitted in writing in response to my pending  public records request case that there
is no second letter that Mr. Rainwater can find.  I received the first letter only after insisting that LRA's statement
that there were no letters was incorrect because I had seen one of them (the May 19 letter) briefly when I gave
testimony in Baton Rouge to a Senate subcommittee. Copies of the HUD, OCD, and LRA attorney letters are
available upon request.

4. It is arbitrary and inconsistent for RH to accept without question for grant calculation a homeowner-supplied
appraisal that is 19% higher than the PSV determined by inferior methods by RH but to reject one that is 21%
higher or 60% higher. The more erroneous the PSV by RH, the less chance that an applicant gets any correction.

5. Applicants who had handed in their appraisals that were more than 20% higher than RH's PSV were left waiting
for months without field review appraisals and then the field review appraisals were summarily stopped in Feb.
2008 with no notice of this until May, 2008. We were told first that HUD objected to them, which made no sense
because we had earlier been told that the long delay in passing the rule in the first place was that HUD had to
approve it. In fall of 2008, we were told during a meeting with RH officials that most applicants who had the field
review appraisals objected to them because they were giving LOWER than the original PSV. That was not
credible because the applicants were disputing the PSV as too low and had an appraisal by a certified appraiser to
back them up. Moreover, that would imply that RH's PSVs were too high even though applicants said they were
too low.

## Here is the abbreviated introduction to our complaint.

This complaint concerns the following substantive issues:
☐ Lack of adequate oversight by LRA and OCD in the performance by the contractor in
implementation of the Road Home Program which has resulted in the inefficient and wasteful
use of program funds and the failure to perform as required pursuant to the contract and in
derogation of requirements of the Louisiana Action Plan For The Use of Disaster Recovery
Funds and amendments thereto, CDBG guidelines for the program, LRA policy, and LRA
Program rules.

6

107

☐ Serious mismanagement or inattention, waste and abuse of program funds resulting from the failure to implement and/or adhere to program policy and rules, including the imposition of arbitrary, capricious and wasteful policies, including particularly:
o   failure to provide a common, consistent, fair and independent method of determining homeowners' damages, including pre-storm values,
o   thereby, many applicants received less grant money than they were entitled to, which has caused an especial hardship for moderate-to-low income applicants consequently unable to repair or rebuild their homes;
o   failure to provide program rules, information and documents to applicants in derogation of their rights;
o   failure to meet the contractual obligation to provide an "ombudsman" type program;
o   failure to provide a fair and independent appeals process in violation of due process;
o   acts in derogation of HUD requirements for citizen and local government representative participation.

There has been evidence of fraud concerning:
☐ the intentionally misleading appearance of the Contractor instituting a real dispute resolution program when, in fact, thousands of applicants were left in limbo and thereby unable to appeal;[1] For example, finally, one year after the Contractor had fallaciously maintained that it had made a benchmark for clearing thousands of long-stalled dispute resolutions, LRA and OCD levied a fine on the Contractor, for failing to meet the benchmark; however, the fine was less than 10% of what it should have been according to data from the Contractor and a subcontractor.[2]
o   Another example comes from the Louisiana Legislative Auditor in a Jan. 9, 2009 audit report, which stated the following.
☐ If applicants dispute their pre-storm value, Road Home employees check the PSV dispute flag in eGrants. If this flag is checked, ICF uses the highest prestorm value in the award calculation.
☐ However, because the policy says that applicants disputing their pre-storm must go through the resolution process, all applicants with a PSV dispute flag should have a corresponding issue in JIRA which is the system used to record and track disputes.
☐ However, we analyzed 50 applicant files of a total of 22,650 that had the PSV dispute flag as of March 2008 and found that 27 of the 50 (54%) did not have an issue related to PSV in either JIRA or JIRA archives.[3]
☐ the Contractor intentionally inflating numbers of actual applicants and fallaciously arguing that the Contractor had more work to do than originally stipulated in the contract to justify an increase in the contract;
☐ the Program manipulating the pre-storm evaluation process during grant calculation, dispute resolution and appeals, which lowered grant awards and wasted taxpayer money for purposely ineffective procedures;
☐ the Program intentionally inactivating large numbers of applications, many of which were inactivated for no substantive reason, then fallaciously assigning the blame to applicants, thereby making their accounting of pending "active" grant applications look more favorable.

---

[1] Legislative Audit Reports on Dispute Resolution in May, 2007 and Feb., 2008; the replacement for dispute resolution with another preliminary pre-appeal procedure (PAL, Personal Assistance Liasons) have left many applicants in limbo and many of those who were stranded in dispute resolution still cannot appeal.
http://app1.lla.state.la.us/PublicReports.nsf/E8F4E4997C03453686257324006S538B/$FILE/000013BD.pdf;
http://app1.lla.state.la.us/PublicReports.nsf/4E3AA11FCA10791E862573E700649613/$FILE/00003D79.pdf ;
http://www.nola.com/news/index.ssf/2008/03/road_home_set_to_revise_appeal.html;
http://blog.nola.com/updates/2008/05/road_home_purgatory.html
[2] http://www.nola.com/timespic/stories/index.ssf?/base/library-151/1216185779124240.xml&coll=1;
http://chatushome.com/chatusfiles/DisappearingDisputeResoln_from8_07__1_20_08.pdf
[3] http://app1.lla.state.la.us/PublicReports.nsf/6F905AB4148A123C8625753D0066BD41/$FILE/00008378.pdf, P.20

108

**C. Emails from applicants collected in just one day this week, immediately before the field hearing**

With the exception of the response from a whisleblower RH compliance officer, these emails were made anonymous. Contact information is available upon request of legislators or HUD officials. We have been in contact with RH officials hundreds of times (including weekly conference calls and a number of face-to-face meetings) about general and specific applicant problems without obtaining correction of systemic problems and only occasionally with correction of mistakes in specific grants that we cite.

**1. Rep. Waters & HUD Officials--Road Home Cong. Hearing in NOLA,**

Tuesday, August 18, 2009 10:35 AM
**From:**

" Julie " < >
Add sender to Contacts

**To:**

"Melanie Ehrlich" <mehrlich8@yahoo.com>

Dear Rep. Maxine Waters:

 I am writing regarding my dilemma/setbacks due to RH mismanagement of funds distributed.  Originally when I requested RH assistance, I was awarded a grant in the amount of $75,000.00.  When I went to closing, I was told that the amount that I would receive would be $50,000.00.  At that time, I was overwhelmed with all that I was going through and was happy to get anything.  But, as I began to rebuild, I ran short on money.  Trying to do the right thing, as far as living a quality life in the Metro New Orleans area, I raised my home eight feet, as I had six feet of water inside.  Raising my house cost more than I had received for elevation and it also cost me more to rebuild my home due to elevation.  I ran into problems I didn't foresee when I started the project (i.e., repair rotten pilings, additional electrical work, additional plumbing, etc.).  I didn't dispute my award amount because I didn't think I would get any help.  I have been through so much since this process started and I'm still not finished rebuilding.  The shortage in my grant money is approximately what it would cost me to finish my home.  With that said, I also have a SBA loan, and the SBA would come back and request me to pay them any additional funds that I might receive (I've also been through the wringer with them already).  I am a single parent, living in a city where it is costing more to own a home.  I didn't ask for these inconveniences.  Every day I wonder why did I return to rebuild?  I love my neighborhood, but the stress that I've been under since Katrina takes away from my quality of life.  I wish I had the simple life I had before Katrina.  In my opinion, coming back home was a huge mistake.

 I would like to take this time to thank you for your concern and support for the residence of New Orleans.  I have always admired you as a strong, powerful woman in the Political arena.  Maxine Colbert was my stepmother and her son, Walter is my stepbrother.  You were very good friends with Maxine in the early eighties (probably before then) and Walter worked for you a while in California at that same time.  I also had the wonderful opportunity to visit your home with Maxine when I was only nineteen years old.  I still remember the beautiful home and the roses outside your back door (and there were a lot of roses.)  Well, thanks again for your support and please continue to care.

*Julie*

**2. Rep. Waters & HUD Officials--Road Home Cong. Hearing in NOLA, Thurs.**
8

109

Tuesday, August 18, 2009 11:02 AM
From:
" @aol.com>
View contact details
To:
mehrlich8@yahoo.com

Dear Rep. Waters and HUD Officials,
I am a lifelong resident of New Orleans and have lived in Gentilly since 1999. I am also a Road Home applicant, and my experiences with Road Home have been more painful than the experience of losing my home and nearly all of my possessions.

I disagreed with the valuation Road Home used in determining my grant amount, so I hired a LA certified appraiser to conduct a post storm appraisal to determine the pre-storm value of my home. I submitted this appraisal to Road Home and they discarded it due to their "20% rule". I requested a copy of my file in order to appeal their decision, and I was told I could not see my file, so I had to write an appeal without access to the information they were using. I lost this appeal.

I again requested my file, and was able to secure a copy. I was stunned when I saw the methods they had used to determine my pre-storm value and the actual values they were using. I wrote a second appeal, and cited all of the flaws I discovered with their methodology. My home had been extensively renovated prior to the storm, yet none of my renovations were taken into account in determining the value by Road Home. They used comparable's that were not comparable at all (inferior locations, multi-family dwelling neighborhoods, homes more than 200 s.f. smaller, neighborhoods without curbs or sidewalks, homes with out central air and heat, etc). Their valuations were based on my home being in "typical" condition for my neighborhood, even though it was not. Road Home still refused to accept my appraisal, which was the only actual valuation done where someone spoke to me and took into consideration the actual features of my home. My second appeal was denied. At that time I was waiting to be considered for an elevation grant, and was told by Road Home staff that if my case was in appeal I could not receive the elevation grant. I signed something saying I would withdraw my appeal, which I felt pressured and coerced to do because I needed to receive my elevation grant as soon as possible.

I have met with Road Home officials on several occasions. I provided pictures and other evidence to try to show them that their "20% rule" is especially invalid if Road Home is using very low valuations to begin with. Of course if their valuations are extremely low, a valid appraisal would be greater than 20% of the valuation they are using. I questioned why the "20% rule" exists and was told it was mandated by HUD, yet I have a letter from HUD stating that they defer to the States to make their own policy. I asked to be provided with a written copy of this policy from HUD, and was denied that request. I also questioned why, if my appraisal had been between 1% and 19% of the value determined by Road Home I would have received up to an additional 19% to my grant amount, yet because my private appraisal (done by a Louisiana certified and licensed Appraiser) exceeded 20% of RH's value, I received nothing. I asked them why they would not pay me 20% above the grant amount, since I provided them with the work product of a Louisiana licensed professional, instead of them just throwing this work product out and acting as if it doesn't exist.

I hope I have described my situation in a clear manner. I have accumulated alot of records, paper and photos over the several years as I have struggled with Road Home. It is so complicated to try to distill

110

many, many conversations and injustices into a few paragraphs.  Please know I applaud you all for investigating the problems with Road Home.  I know it is a program which helped many thousands of New Orleanians and others return home, yet it is also a program which made some grave errors and treated applicants as suspects and thieves.  If I can provide any more information to you I would be happy to do so.

Thank you for caring enough to still remember us and all of the struggles we have been through and for some, continue to have.  You are in my thoughts and prayers....

New Orleans, LA

**3. Sarah**

Tuesday, August 18, 2009 8:29 PM
**From:**

This sender is DomainKeys verified
" >
Add sender to Contacts

mehrlich8@yahoo.com
**To:**
**Cc:**
chatira@yahoo.com
New Orleans La

Dear Rep. Waters and HUD Officials,

I am a Road Home applicant #  . I have appeal several time with RH they refuse to and my appeal. which I sent back on April 2006 certified mail. I sold my home which was my rental property during the time of Hurricane Katrina, on October 31,2006. I receive a package from RH with 3 option. I chose number 3 to return back home and rebuild out side of New Orleans, La RH sent me a RUSH letter stated I was ineligible because they did not find that I was the own of property at xxx New Orleans La.I sent all document proving I own my property on June 1990 until Hurricane Katrina.

I sent all document to RH. I received a letter from Govern Bobby Jindal office they had forward my letter to Office of Community Development and the Road Home Program.as of today no one has response to me.One Representative from RH stated that since I sold my home for $136,000 I received more than what they would pay me. I have never received any document stating I am not eligible. A RH representative stated that I had sign my RH to see owner I would never have done know such thing. My house was my source of income. RH never show me any document. Now I am EXTREME IN POVERTY .StateFarm paid me off the old scale in order for me to get my home in living condition. I was not able to rent the house after Hurricane Katrina because so many was afraid to move back to New Orleans East. I need to know Why the RH will not show me document or talk to me . I have lose everything I am living in POVERTY.

I was ripped off by StateFarm and Road Home. I had to used my retirement money also to get my home back in living condition. I will be at the meeting on Thursday August 20,2009 at 1:00 p.m. I need help with and attorney and submit evidence and have a chance to see my file on appeal. I have my record when I request and appeal but never received any answer. Early-Sold-Home.

I NEVER RECEIVE ANY RESPONSE FROM THE ROAD HOME, after I appeal with all document

10

111

whereas I sold my home at a LOSS. I relocated back home to live in high crime area, finally find something healthier. I retired, had to go back to work, I used my retirement money to get the house under way. I lived in the house for Seventeen years. I notice 2 years later the person who drawn up the paper state I bought the house in 2002. which my home was purchase in June 1990.

 I feel I was ripped off by everyone.

Thank you,
Sarah

**4. Road home saga**

Tuesday, August 18, 2009 9:58 AM
From:
This sender is DomainKeys verified
"Phyllis " < @yahoo.com>
Add sender to Contacts
To:
mehrlich8@yahoo.com
    Dear Rep Waters,
The road to home has not been a pleasant one for me.  I am currently homeless now because of the eneptness of the road home officials.  I have no money and no home to go back to.  The road home allowed my brother to file a fraudulent claim and paid him off.  He took my home and my money and left me and my family homeless.  I fought with everything I have.  I did everything they asked me to. Everything that was done in my file was wrong.  They had the wrong house,  the wrong picture of my house, the wrong address and so forth.  Then they told me to get a lawyer and try to recover some of my money.  Who ever is running this show is deplorable.  The people that really need the money are the ones who didn't get it.  I had everything to prove ownership of my house and still to no avail. This leads me to believe that because the majority of Katrina victims are African American, we are less than animals.  The whole world watched the treatment of the Katrina victims at the shame of Louisiana and its leaders.  I filed to dispute this and never heard anything since they told me to get a lawyer, this claim has already been paid off and they are not paying it twice.

Phyllis

**5. Rep. Waters & HUD Officials--Road Home Cong.Hearing in NOLA, Thurs.**

Tuesday, August 18, 2009 9:33 AM
From:
" @swbno.org>
Add sender to Contacts
To:
"Melanie Ehrlich" <mehrlich8@yahoo.com>
Dear Rep.Waters and HUD Officials,I am a ROAD HOME APPLICANT.My name is

112

XXX ,all paper work is under my husband YYY,road home#06H.We did not get enough money to finish repairs on our home.It has been over four years and we are still not finish.We have been repairing as much as we could by working.We are low income and we have fallen behind on our morgage.We have two sons and we reside in a travel trailer that is on the property.I fear for our health,but we have no choice.We are asking for your help.If you need to contact me,my #504-zzzzzzz.Thank you for reading my email.

### 6. Rep. Waters & HUD Officials--Road Home Cong.Hearing in NOLA, Thurs.

Tuesday, August 18, 2009 9:28 AM
**From:**

" < @navy.mil>
<u>Add sender to Contacts</u>

**To:**

"Melanie Ehrlich" <mehrlich8@yahoo.com>

**Message contains attachments**

Dear Representative Waters:

My name is XXXI was a life long resident of New Orleans and I lived in the Gentilly area until Hurricane Katrine forced me and my family to leave.  I immediately filed for the Road Home Program in early 2006 when I realized that there was such a program.  I sent all my forms and documentation to RH as instructed.  I finally heard from the RH rep approximately 6 months later.  I was told that I would be sent a gold envelope and it would explain the program rules, limits, etc.  I got that information and was finally assigned a case number.  I never heard back from RH until Mayor Nagin visited Memphis, where I now reside.  He told the group of New Orleanians that were present about the progress of the RH Program and that he would try to get a team of RH reps to Memphis ASAP.  After about 8 months, I did get information from another New Orleans resident that the reps would be here at a hotel for a week and gave me the telephone number to call for an appointment.  I did and I kept my appointment.  I gave additional information to the RH rep and it was recorded on a CD and was given to me for me to keep because they told me that they had everything recorded and this CD would identify me and my files.  I have copies of documents also that was given to me.  This was back in 2007.  I never heard any more from a RH rep.  I called several times and was put off for one reason or another.  I finally heard about an appeal process that was going on, but when I called RH, I was told that my file could not be located.  Ii eventually got hold of someone and explained to them my dilemma.  I told that rep that I had chosen the option to sell my home to the state because my job relocated and I was unable to return to New Orleans.  An appraiser was sent to my home.  Another six months passed by and I called RH and was told once again that they could not find my file and that there was nothing that could be done about it.  I called again about 6 weeks later and was told that the RH program was shut down and there would be a new contractor taking over and that I should call back in 2 weeks.  I called back in 2 weeks and was once again told that my file could not be found.  I

12

113

gave the new contractor rep the name of the appraiser and I was
again told that there was nothing on file for me.  I called the
Appraiser myself and he informed me that he no longer worked for the
RH program and that all the information he collected was turned in
electronically to the old contractor.  I called RH again and was
told to call back in 2 weeks because the new contractor would be
assigning case representatives then and I could find out who had my
case.  I called back and I got the same response, "we have nothing
on file for you."  I then heard about the new appeal process and
took advantage of it.  I was called by someone from the LSU law
clinic and was only advised to call a Mr. WWW and gave me the phone
numbers.  I called several times, but was never able to speak with
him.

Rep. Waters, I don't know what is going on.  I thought my choice to
sell my home to the city would have been the shortest process to
handle.  I am continuing to pay a $900.00 mortgage on my New Orleans
home that I can't live in.  I got insurance money, but it was not
enough to rebuild.  I am also paying a $550.00 mortgage on a condo
here in Memphis, TN.  I am a widow and paying 2 mortgages in
addition to my other expenses creates a financial hardship for me.
I have no help.  I try to financially assist my ailing mother as
much as I can since my father passed away a year ago after returning
to New Orleans and rebuilding.  They got ripped off by a contractor
because they were both elderly and uneducated and I was unable to be
there to talk to the contractor myself and advise them.  Sir, again,
all I want is to sell my New Orleans home so that I can get some
financial relief and be able to take care of my mother in her last
days.  Anything that you can do to assist me in this process would
be a true blessing for me.

Sincerely,

XXX

**7.** Tuesday, August 18, 2009 2:38 PM

From:

"Steve >
Add sender to Contacts

To:

"Melanie Ehrlich" <mehrlich8@yahoo.com>

Unfortunately I have to be completely UNSATISFIED with the Road Home Program design, staff, administrators,
board members and anyone AND anything related to the supposed  ongoing recovery effort.  Please
understand that my frustration stems completely from my multiple forms being denied the opportunity to
participate in the Road Home Program.

Your laws / statutes show no discretion.  It is also funny how the attached elevation programs are contingent
on having an ID for a program that is planning to end.  This still does not address the NEED TO ELEVATE.

13

114

Funny how my property was used to calculate the total figure requested to the government,  BUT I've been denied access to the those funds because of some statute……while seeing home owners that don't live here anymore getting offers for money.

I currently am helping 3 home owners that live on the same block and right next to each other with the following different outcomes:

HOME 1:  New home constructed after hurricane and was denied access to HMGP funds because home is too big…..(elevation risk completely eliminated)

HOME 2: Fixed home after hurricane and the program worked out perfect for these guys (they are lucky)

HOME 3: 96 year old elder demolished home after being displaced for many months after the storm, only to find out she could not participate in the Road Home, HMTP, Elevation programs because she did not apply on time (she couldn't apply in person or via telephone)..even though STILL needs help.  She is staring at an empty lot and I'm willing to build the house myself.  All she needs is a Road Home ID so she can access the elevation grants….just like everyone else in her neighborhood.

I've even heard of certain Road Home, LRA staff speaking of whether it is worth helping an elder (hinting that it is not worth it if she is likely going to pass away in the next few years)….that's called ageism.

Feel free to call or email if you want to really want to hear how efficient, []bureaucratic your program really is.

Steve

## 8. Rep. Waters and HUD Officials

Tuesday, August 18, 2009 4:05 PM
**From:**
" @netzero.com" < @netzero.com>
<u>Add sender to Contacts</u>
**To:**
mehrlich8@yahoo.com

Dear Rep. Waters and HUD Officials,

I just wanted to add my voice to those strained voices asking you take a deeper look into the inequities of the Road Home, the Elevation, and Mitigation Programs in Louisiana.

I myself was a Road Home Applicant, however, the grant received wasn't enough to assist in the renovation of my home.  I live in the upper 9th Ward in Gentilly, in New Orleans, LA.  My grant amount was $19,000.00, hardly enough to do any serious rebuilding after my home was flooded with over 5'-0" of water in the weeks following Hurricane Katrina.

But what was even more discouraging was the menial sum offered for elevation: roughly $13,000.00. I have a slab on grade home which would require either raising or separating the slab to elevate my house to the new base elevation.  Needless to say, I could not afford the elevation.  After I researched

14

115

the going rate then,  I chose not to accept the minicule elevation sum, if I could not properly afford for the job to be done. And did not want the temptation of misusing monies received.

I rebuilt, but still wanted to elevate my home and made further inquiries.  The price had actually gone down, and was more reasonable than in the early years following Hurricane Katrina, but still more than I could afford, especially, since I would now have to move out and store my furnishings and disconnect and reconnect my utilities to accomodate the elevation.  The inconvenience, however, is nothing compared to the peace of mind it would bring.

I inquired about the parish/state mitigation programs and was dismayed by the reimbursement plan. First off, I don't have that kind of lump money around. Secondly, after the stress of dealing with FEMA and Road Home in their "kill you with" red tape and dysfunctional processes, the idea that the decision would be up in the air as to "if" and "how much" money I would be reimbursed . . . even if I had it, was too daunting a frustration to contemplate. . . . .been there, done that.  I'd like to keep what sanity I have left.

I certainly would prefer to raise my home, and I'm still hopeful that I may find a way to do so before my esitmate expires in one year. But it seems futile, without going into debt.  And that is something I refuse to do.  I'm over 50, hoping to retire within the next five (5) years,. The last thing I want to do  is to go into debt.

I'm one of the lucky ones. I am back in my home. I'm working and life is actually pretty good, but I have neighbors, and have seen others who are not as fortunate.  They are still struggling to get back into their home and have received little or no help from Road Home, or the mitigation programs.  That seems very unfair. I hope you can help those home owners who have been worn down my constant struggle.

Gertrude XXX

New Orleans,LA

## 9. Rep Waters and HUD officials

Tuesday, August 18, 2009 6:34 PM
From:

This sender is DomainKeys verified
"Edward    @gmail.com>
Add sender to Contacts

To:

mehrlich8@yahoo.com
Dear Rep Waters and HUD officials,

I am writing to you to ask for the assistance of you and HUD to probe into the unfair ways that the Road Home Program treated the homeowner victims of Hurricane Katrina and Rita.  It is an embarrassment to the nation to have our President go on world television and promise help to the homeowners of the effected areas of the Gulf Coastal states. The help that I am referring to is financial help.  It seems to me that the true purpose of financial help was not the objective of the Road Home Program.  More and more of the citizens of Louisiana and particularly those of the New Orleans area

116

were short changed or received nothing at all and outright lied to. My wife and I have been told that our application was inactive, not eligible, and now back to the active list. As we approach the 4th anniversary of Hurricane Katrina I am told that my application has not been assigned because the program is short handed. The problem that we are having is that we had to sell our home at a loss and are close to claiming bankruptcy because of the loss. We are working now but we lost everything. Our financial situation is in a critical state, and it is very hard to start over in the later years of your life. All of the people involved in this Louisiana as usual game is a fair shake as promised. Many thanks in advance for your kind attention and concern to this matter.

Sincerely,

Edward

## 10. ZELIA ELISE BROWN

July 19, 2009

Honorable Maxine Waters
Congresswoman
2344 Rayburn House Office Building
Washington, DC 20515

Greetings Congresswoman Waters:

I would like to know if there are any laws, services, and/or resources that protect *whistleblowers*, as I am being blackballed from obtaining employment due to turning over pages of documentation to federal authorities concerning fraudulent activity with a private company, ICF International and the Road Home Program, that received government contracts/funding to conduct business during the Bush administration.

According to last month's issue of the Houston Business Journal, 47% of CEO's have resigned since the new administration. Increasingly, people like Bernard Madoff of Madoff Securities, Allen Stanford of Stanford Financial, and Angelo Mozilo of Countrywide are brazenly becoming the faces of widespread corporate American corruption that has reached epidemic proportions. As a result, because of their greed and illegal dealings, decent law abiding citizens are suffering.

I did exactly what I was supposed to do as a Compliance agent and person of integrity. Now, I cannot locate any federal agency to protect me from being blackballed, as I seek employment for handing over information to protect this country.

Strangely, someone changed my email password, and most recently, a package from FedEx was delivered to my residence with a DVD entitled "The Bucket List" and a letter inside asking me if I was prepared to die.

Any assistance that your office can provide, concerning the whistleblower laws/resources or protection for whistleblowers, is greatly appreciated. I may be reached at creationsbylisa@msn.com.

16

117

Warmest regards,

Zelia E. Brown

Enclosure

**ZELIA ELISE BROWN**

May 22, 2009

U.S. Attorney General Eric Holder
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

**RE: Senate Subcommittee Hearing on Road Home Program 05/20/09**

Dear Attorney General Holder:

In regards to the article written by Dr. Melanie Ehrlich, Founder of CHAT, ***"...serious problems with the Road Home Program,"*** I too am requesting that an investigation be conducted by HUD/OIG concerning ICF International and the Road Home Program.

Ironically, Dr. Ehrlich's finding was the title of my *subject* in numerous emails that went out in April of 2007 while I was Compliance agent for the New Orleans office of The Road Home Program's Small Rental Property Repair Program. During one visit to the corporate office in Baton Rouge, I along with others, witnessed thousands of applications and requested documents recklessly thrown over the floor. This explained why applicants were being asked to provide duplicative documents four, five and often six times before being assisted. The longer corporate office stalled the applications, the longer they could extend their jobs, salaries, and admin funds. By the end of September of 2007, not one landlord received any assistance from the program, although we opened our doors earlier that same year.

I personally provided thousands of pages of suspicious documents to federal authorities from June of 2007 through September of 2007. After turning over a 601 page plus document to the D.A., legislative auditor, and eventually the FBI alleging theft, payroll fraud, and other violations, I, former Compliance Specialist for the Road Home program's Small Rental Property Program, was savagely terminated six months later without cause. http://www.WAFB.com/Global/story.asp?s=7370774.

I did exactly what I was supposed to do...advise and engage in strategic development, conceptualization, program policy and project development concerning the Louisiana Road Home Program; supervise and oversee all aspects of compliance systems in the Greater New Orleans area, as it related to assisting in setting up $869 million Small Rental Property Repair Program for over 200,000 landlords. Upon my termination in September of 2007, not one landlord received any assistance from the program.

ICF has repeatedly used diversionary tactics to deflect blame.

17

118

Now, with new proactive administration in Washington, DC in place, hopefully someone will realize the seriousness of the aftermath that still face thousands of displaced citizens, as they were victims again in their quest for help.

As ICF is no new comer to lawsuits, there are numerous federal cases pending against them in court. An Investigator with the U.S. Department of Labor cited them for "mislabeling" 225 lower employees as supervisors so that those employees would not receive over-time pay, a violation of the Fair Standards Labor Act.  (http://www.2theadvocate.com/news/30877434.html?index=1&c=y)

ICF's 2008 own financial report indicates that their core business revenue was "...up 61.6 percent from the previous year of 2007 due to revenue it had received from obtaining the Road Home contract." http://www.reuters.com/article/pressRelease/idUS208284+11-Mar-2009+BW20090311

The citizens' spirit has been irrevocably damaged but our faith has not been defeated.

Your immediate attention to this request is appreciated.  For further discussion, I may be reached at creationsbylisa@msn.com.

Warmest regards,


Zelia Elise Brown

**11. Rep. Waters & HUD Officials--Road Home Cong. Hearing in NOLA, Thurs.**

Tuesday, August 18, 2009 1:09 PM
From:
" @yahoo.com>
Add sender to Contacts
To:
"Melanie Ehrlich" <mehrlich8@yahoo.com>
Melanie


Thank you for all the support and for all our sakes please dont stop.  This program has been a joke from the moment it began.  Constant rule changes and lies that was told to me and other members of my family has had devastating consequences.  My credit is completely destroyed wich makes it impossible to purchase another home.  Here is my story.  I was born and raised in Port Sulphur, La, like everyone once else my family lost everything.  I relocated to Baton Rouge, La.  I went for my first road home meeting and I was told that I would receive the additional compensation grant so I asked them are you positive because I could not stay in Baton Rouge unless that was the case.  Again I was told yes you do qualify and there should be no further problems.  During the entire year I waited for closing I was told exactly the same amount until I went to closing where I received a substantially less grant reward.  We were told that we can accept the first reward and still be able to appeal which we did.  In Jan of last year we appealed and were awarded the additional compensation grant again. Up to November we were told that there was nothing wrong it just takes a long time to close but everything is fine.  Then we received our second closing and we were only awarded a higher appraisal.  I explained to them that I received my appeal and it states that I qualified for the additional compensation grant and it was signed by everyone.  The reason I didnt qualify was because I worked to support my family.  The cutoff for the grant was at 41k a year and I made 42k.  I explained to them

18

119

that I had to take on two jobs to support my family.  We lost everything.  It didnt matter so I was denied.  Now I am being hasseled about getting a home in three years I explained to them that I just closed last month.  It goes by your first closing and not your second closing.  The program was designed to give people as little as possible and not to actually help.  It has taken me years to receive the little that I have.  Financially it has been a nightmare and the new administration could give a care less about all our struggle.  I have to work but im more than willing to accept any phone calls.

Thanks for listening

**Rep. Waters and HUD officials, please note that for many low-income applicants, the additional compensation grant (low-income supplement) eligibility was recalculated at much later dates after the initial calculations. This deprived many people previously promised these grants, who had been out of work or underemployed for the year following the storm. In addition, more red-tape grant-constricting rules were added in 2007 so that the grant amounts were lowered for many of these low-income supplements intended to compensate for low-land values for those trying to repair or rebuild devastated homes.**

**12.**

August 18, 2009

I was contacted by XXX in the Appeals office on May 20, 2009..  He asked about the depth of water in our house since I wrote 13 feet which was on our flood insurance report.  He said this was wrong, so my husband measured under the loft as he requested and the water level in the house was 9 1/2 feet.  I explained to him that I got the measurement from the flood insurance. He also said that we did not have enough damages
when calculations were made.  I asked him to look at the square footage since we have more square footage on the first floor than the second floor.  I asked him to check into the fact that other homes in my neighborhood had over 50 % damage only to be told that some claims may have been processed incorrectly.  He requested that I send him paperwork showing what we received from our insurance company which I had already submitted, but agreed to resubmit to hopefully keep our appeal moving along.  I send 13 pages to him.

On August 11, 2009 I received a phone call from YYY in the insurance area with Appeals. I contacted him on August 13th by phone.
 He had the information that I had sent to XXX.  He wanted to verify exactly how much money we received from our insurance company and how much of it was for the garage.  I had requested in my appeals that the amount of money that we received for the garage not be included since it was not part of the Road Home Claim.  We initially reported all amounts received because that was what the representative instructed us to do at our first meeting.

I also asked YYY about the damage over 50 % problem. Our home appraisal showed that the first floor has 1576.90 livable square footage and the upstairs had 642 square footage.  It seems obvious to us that there is more than 50 % of living space on the first floor and the frst floor was totally destroyed.  I

19

120

asked him if they were counting the front porch when doing the calculations since this is really not living space..  He said he would notify someone else since he only deals with the insurance end of claims.

Patty

### 13. Road Home

Tuesday, August 18, 2009 11:55 AM
From:

" @aol.com" <arthell46@aol.com>
Add sender to Contacts

To:

mehrlich8@yahoo.com
To Whom it may concern:

My home address is XXX., New Orleans, LA 70122.  I applied for
a road home grant and was denied.  I made an appeal to the denial and my
paper work was said to be lost.  After submitting additional paper work I was
still denied.  My name is YYY and I presently reside in the home
which has been partially restored.  I have paid 2 contractors who I had paid
substantial sums of money, but the repairs were never fully completed.  If
there's any assistance, I'd sincerely appreciate it. .
Thank you for your time and consideration.

### 14. LA-RH Covenants

Tuesday, August 18, 2009 11:59 AM
From:

" < @hotmail.com>
Add sender to Contacts

To:

mehrlich8@yahoo.com
I received LA RH money and commenced work on my house in 2008. In Janurary 2009 I completed
all of the work possible given the amount of money LA RH provided for my recovery. Now I have a
house that I own outright, (mortgage company required payoff), that is approximately 70% complete. I
would like to finance the house at the low existing interest rate in order to get money to complete my
recovery. The problem is, the covenence I signed with road home, which do not allow me to proceed
with financing. My question for the forum is, can LA RH covenants be challenged/modified or perhaps
relaxed, in order that homeowners that could not finish recovery on their LA RH allocation but own
their homes, can get financing to complete their recovery. I have not seen any commentary concerning
my situation and would very much like to find out if anything is being addressed concerning restrictive
covenence in any fashion...
Thank You

### 15. Rep. Waters & HUD Officials--Road Home Cong.Hearing in NOLA, Thurs.

20

121

Tuesday, August 18, 2009 10:49 AM
From:
"John " < @.com>
Add sender to Contacts
To:
"Melanie Ehrlich" <mehrlich8@yahoo.com>

It is imperative that the HUD OIG conduct a fair investigation of the Louisiana Road Home Program and I respectively request your assistance in making this happen. A brief history of my experience follows.

I live in Slidell,La. and had 4.5' of flooding in my home from Katrina, I was originally denied any compensation from the Road Home but after many calls and letters received approximately $5000.00. I went to closing with the understanding that I would appeal. Appealing is a two step process and both were denied, each citing insufficient documentation to change the CAD document which is essentially the Road Home's estimated cost of damage. In the appeals denial letters the= stated that aerial photos indicated insufficient damage to justify roof replacement and that only 4' of sheetrock should have been replaced. Someone removed five windows from the estimate, verbally stating there was no evidence of water damage or damage from a falling tree.

Although there were other issues addressed in my appeal, the primary discrepancy involved the number of windows and doors that were damaged and replaced. The Road Home has both flood and private insurance settlement documents which substantiate my claim and confirm the 4.5' of water, The Road Home has opted to rely on aerial photos and refuses to review the evidence in hand. They never once responded to any of my written questions. In my last appeal, I requested they conduct a weight of evidence study in accordance with their written policy. This involves a study of the surrounding area to see how many other homes sustained 51% or greater damage. I know for a fact there were many in the Oak Harbor/Eden Isles area where I live There was no mention in the appeals denial letter of having conducted this study or results of same if conducted. Both flood and private insurance companies had inspectors at my home within weeks of the disaster to substantiate and document the damage. The Road Home inspector came to my home when it was about 95% complete and didn't even come into the home.

Keep in my that I was the good citizen of Louisiana and did exactly what the state asked, immediately beginning  to rebuild my home after the storm and stay in Louisiana. Early Road Home advertising indicated that people doing as I did would be especially rewarded. In fact, we are being penalized.

This process is coming up on three years now. It has been filled with countless phone calls and letters never answered. When you did get someone on the phone, they were almost always totally incompetent and never helpful. Employees of the Road Home were not allowed to respond in writing to any requests and often denied having made statements in previous conversations. Total deniability.

These people are making arbitrary decisions and not applying the rules evenly. At first I attributed this to incompetence and laziness, but no more. When reviewing the appeals denial letters, anyone can easily interpret their intention as they do a very poor job of disguising it. I believe they are intentionally trying to limit compensations and in some cases applying some sort of unofficial means testing. In my case, the award could be much higher if the estimated cost of damage were to accurately reflect my losses and reached the 51% damage threshold and I think they are doing what has to be done to keep that from happening.

They believe they are untouchable and so far they have proven to be correct. Their word appears to be final with no recourse available from the applicant. I met a few competent people during this ordeal, and each told me that the vast majority of appeals involved people such as me that rebuilt quickly. Each went on to say that it would be difficult to impossible to win the appeals process. These statements were made two years ago and support my suspicions that there is some unwritten policy being applied to people who are in similar situations to the one I am in. One set of rules for those who didn't have flood and/or sufficient private insurance to rebuild quickly and one set for those that did. Reward those that that didn't do right at the expense of those that did.

I am sure you can detect that I am angry and frustrated. This ordeal has taken it's toll on me and others and no one seems to care or willing to do anything about it.

21

122

### 16. Dear Rep. Maxine Water and Hud officials

Tuesday, August 18, 2009 11:06 PM
From:

* @yahoo.com>
Add sender to Contacts

mehrlich8@yahoo.com, chatlra@yahoo.com

To:

New Orleans, La.  70126
August 18, 2009

Dear Rep Waters and HUD Officials,

I am a Road Home applicant that has been denied La. Road Home Grant Money.  La. Road Home Program has many discrepancies.  They changed the program daily to suit each case as they see fit.  I have been in the program since May 7, 2007.  I live in a two (2) stories house in New Orleans East.  We were told by the former Governor Kathleen Blanco and the Mayor Ray Nagin we would not be penalized for fixing our houses before the program begin.  The program was in the initial stage when I started fixing my house, it didn't start until August of 2006.

I had FEMA constantly asking for update and proof that I was repairing my house in order for them to continue to pay me for rental assistance.  I move back to my house December of 2006.  When the inspector came to my house it was 70% completed.  I was penalized because my house was repaired upon inspection by La. Road Home inspector.  I was classified as type 2 under 51% damages.  Many applicants' houses were given 51% without the inspectors going into them to see the damages. Whatever the inspectors from Road Home wrote that was a done deal.  It is almost impossible to change your CAD once the inspector wrote his findings.  Once you appeal your CAD report with La. Road Home the same inspector who denied your report received it again on appeal.

My insurance co. inspected my house in October of 2005 at its worst.  My insurance co. statement of loss has my damages at $161,000.00; Road Home has my damages at $107,000.00.  Using the insurance co. cost of damages I would be type 1 according to Road Home formula.  La. Road Home said they would use the insurance co. claim reports if they inspected your house.  Some applicants La.. Road Home used their insurance co. damage report for their CAD report, "mine wasn't".  Some applicants were given grant money without insurance money being deducted from their amount, "my insurance money was deducted".  I was denied my last appeal with the State Appeal in March 2009.  The State Appeal Office used the same people in ICF who denied my case to re-evaluate it on the "state level".  It is like asking the fox to watch the hen house.  The program at first was for "FLOOD VICTIMS ONLY".  Some time later the former governor changed it to dry and wet areas.

Walter Leger, Jr. was on the board with La. Road Home requested; anyone with a two (2) stories house with over four (4) feet of water and their kitchen is downstairs it  should be qualified as type 1.  I had over six (6) feet of water that sat in my house for over two (2) weeks.  I wasn't fortunate like the ones who lived in the dry areas who were able to be in their homes during the storm or to be home days after the storm, with many or all of their processions still intact.  We lost everything some things were priceless and no amount of money can replaced them.  The months not being home; the smell of a closed house for three (3) months and the destruction inside was unbearable.  I believe everyone whose house had flood water especially over four (4) feet of water should be grandfather into the program to receive Road Home grant money.  The former President Bush asked Congress for that money due to broken levels not wind damages.  I hope you will change La. Road Home program with Congress help.  There are many who have given up because La. Road Home keeps you in the system for years to make you disgusted.  Come see how many houses in New Orleans are still in the same shape it was when the flood water destroyed them.  I submitted pictures to Road Home of my home destroyed from flood water

22

123

**and the rooms gutted months later. Upon request I can submit all necessary paperwork concerning Road Home.**

**Yours truly**
**Marilyn XXX**

**17. Barbara XXX**

New Orleans, La. 70126

August 18, 2009

Road Home Grant Application #   06HHXXX
OCD File Number                          09-XXX

Dear Rep. Waters and HUD Officials,

RE: Ownership and transfer of rights were not an issue.

Mrs. Barbara XXX is a Road Home applicant that has been denied the Road Home Grant and wasn't given the opportunity to submit evidence to the State of Louisiana –Division of Administration –Office of Community Development.
Upon receiving the letter of denial I wrote a letter to the Office of Community Development strongly disagreeing with their decision and haven't received an answer from them.

Ms. YYY's original application was accepted by the Road Home.  A decision was made based on the perceived damage to her property.  Ownership and the transfer of rights were not an issue.  The appeal has brought up new factors that were not in play at the time of the original application.  Although the Road Home made up the rules as it went along, it is not fair to penalize her.  She should be grandfathered in because her application was accepted and in order at the time she applied.  (July 07)

They appealed the decision that was made regarding case #06HHXXX.They has been in the program for over 2 years.  Never were there any questions of their eligibility for the Road Home Homeowners program.  They applied to the program July 24, 2007 and the Road Home eligibility supervisor approved their application at that time of application to the program.

The request was made by Marie XXX (Satellite Center on Bullard Ave.-advisor) to have the supervisor approve or disapprove their application.  They accepted into the Homeowners Program at that time.  Also The Appeal Office, Resolution Division, all approved them as part of the program.  Mrs. XXX eligibility came into question after I wrote a letter to the State Review Panel.  I used the Summary of Wind Damage record that was provided by State Farm Insurance Co. to evaluate the damage to the property as $165,046.08.  That is more than Road Home $150,000.00grant money. Letter dated January 13, 2009 and all documents are available upon request. Mrs. XXX and Mrs. YYY were approved and deemed eligible for Road Home according to your standers supervisor and should not be denied The Road Home Grant or the amount of the (gap) difference of State Farm Insurance Co. Evaluation of the damage to the property.

Appeal Decision:

23

124

The appeal statement XXX was added to the application approximately 10/2007 is untrue,  Mrs. XXX and Mrs. YYY entered the program together and were approved 07/2007.

Without standard rules that governed the whole program, each Satellite Center that we went to had its own rules.  We went to 3 different Satellite Centers before we got all of the information that was needed to complete the application.  Most of the time we could not get anyone to tell us how to fill out the forms.

They applied to the program on Bullard Ave. in New Orleans East.  We later went to the Satellite Center in Chalmette, St. Bernard Parish and we were told how to fill out the CAD.  We also went to the Poydras St. Satellite Center and found out that the Assignments of Rights form had to be filled out before they could advance to the next step of the process.  The Assignments of Rights was accepted because it was turned in to the office before the deadline: also the Act of Sale was needed and they provided that information also.

Ms. ZZZ (Poydras St. advisor) had her supervisor explain why the Assignment of Rights form had to be fill out before they could advance to the next step in the process.
The advisor going through the file at the Bullard Satellite Center saw that the Assignment of Rights form was filled out: she explained that she didn't give the form to be filled out until the grant award was given.  She said that she was giving the applicant the chance to change their mind if they wantedto keep the money, if they chose to.

Mrs. XXX and Mrs. YYY did every thing the Road Home Program asked of them.
They are not at fault and should not be affected by any new rules/ regulations placed after their application was filed. Until now, they were considered approved and eligible for the Road Home Program.

I wrote a letter giving them the above facts along with the documents and asked them to please reconsider their decision.   I haven't heard form them.  The letter was sent by certified mail return receipt. July 2009.

Please help them. Thank you for your time and help in this matter.

Sincerely,
Kara UUU (agent)

**18. Rep. Waters & HUD Officials--Road Home Cong. Hearing in NOLA, Thurs.**

Tuesday, August 18, 2009 10:31 PM
From:

"Larry @ net>
Add sender to Contacts

To:

"Melanie Ehrlich" <mehrlich8@yahoo.com>

Dear Rep. Waters and HUD Officials,

24

125

Our 96 year old mother, Doris XXX, is a Road Home applicant who still has not received her grant. While she received an initial award letter 2+ years ago the amount of the damages was appealed (and was just now denied).

Based on flooding estimated depth maps created by the NOAA Office of Response and Restoration, the water depth at her home was approximately:

       8-10 feet on 8-31-05
       7-9 feet on 9-3-05
       3-5 feet on 9-14-05
       0-2 feet on 9-20-05

Yet the Road Home estimated cost of damages was only $98,392.50, while at the same time the SBA damage estimate was $169,900, which did not include several Road Home eligible allowances, such as driveway, appliances, handicap considerations, etc.

The difference appears to be that the SBA damage estimate was performed by a certified appraiser who spent approximately seven hours over two days performing the estimate, while the Road Home estimate was performed by a very young man with apparently little or no experience in estimating and took less than two hours.

A review of the details of the Road Home damage estimate revealed (to us) that several items were omitted that would significantly affect the damage estimates. My mother thus appealed (over 2 years ago). After numerous attempts to find out the status of her case, and numerous frustrating telephone calls (ICF did not follow their own or the state's procedures on maintaining contact) and requests for help from elected and appointed officials she received just a few days ago written notice that her appeal has been denied.

While there remain several challengeable apparent errors that have been called to the attention of the Road Home, we cite two as an example of what is being denied. In their unsigned appeal denial letter it is stated *"HANDICAP ACCESSIBILITY: The homeowner did not provide documentation that these items were in place before the storm."* Yet the Road Home document "Protocols for Estimating Replacement Housing Costs, v15" page 30 Paragraph 12.7.2 "Accessibility Improvements" states "Compensation for accessibility improvements for wheelchair bound homeowners is available upon request by disabled family member".

In another paragraph of the appeal denial letter it is simply stated "CLOTHES WASHER: Ineligible item", yet on pages 29-30 of the Road Home document "Protocols for Estimating Replacement Housing Costs, v15" 12.7.1 "Eligible Replacement Items" it is stated "Clothes Washer (hook-up only) $715.39".

Save for legal action or publicity, our mother has now basically been offered a "take it or leave it" decision as no other recourses have been offered. And because of her age we are concerned about the stresses these will cause. We still want a chance for an independent and new appeal of mistakes by the Road Home in calculating her grant. We still want fair and publicized rules for how they consider the evidence and decide the appeal.

We just want our mother to receive the same as others apparently have received as just compensation for the damages caused by the failure of the federal levees. We therefore think that it is important for the HUD Inspector General to interview applicants with RH problems and not mostly just Road Home and HUD officials and contractor representatives. We are sure that our mother is not the only one with outstanding issues and thus feel that it is important for the HUD IG to actually

25

126

interview a <u>representative sampling of those road Home applicants with outstanding Road Home issues</u> relative to grant calculations.

Thank you for your consideration.

Larry & Tommy XXX

**19. RD Home Issues**

Wednesday, August 19, 2009 7:56 AM
From:
<u>This sender is DomainKeys verified</u>
"mary    yahoo.com>
<u>Add sender to Contacts</u>
To:
mehrlich8@yahoo.com
The monies we rec'd were not enough--there were Contractor issues, we are sr. citizens on a fixed income..with medical problems, etc.b'fore anything can be done to elevate, I need enough money to remove a big tree, that has roots growing underneath the house, then a Drywall problem, which the walls will have to be Redone/Torn out. My Appeal was sent.. in 2yrs ago.just now receiving something to address the problem, have spent monies to and fro Houston to New Orleans.we are Still unable to live in the house in New Orleans.
I WANT the MAX of the RD Home money that was promised initially, or close to it., otherwise I would have chosen another OPTION.

Thanks for your concern, PLS forward to Rep. Waters
Mary XXX

**20 Road Home**

Wednesday, August 19, 2009 9:31 AM
From:
To:
mehrlich8@yahoo.com
    Dear Chat,

I am still in limbo regarding my condo.

I am 65 year old. This has been a hardship for me.  I used my 401K to repair my condo. My repairs were in the Range Of  over $60,000.00. Which I provided receipts,canceled checks and photo documentations. I was scammed by Contractors and filed a complaint with the State Attorney General Office. The DA office in NOLA would not pursue the contractor not even with the request of The Attorny General Office. This occurred  under the appointed interim DA. before Mr. Cannizarro was elected. I was scammed for over $60,000.00. I went into my 401k twice in order to rehabilitate my condo which was Two Blocks from the 17th St Canal. We are all aware as to what became of our 401's lately. like many of us this is what we did. We felt secure we could recoup our repairs cost at a latter time from Road Home. We were duped. Have most of us known the Horrific handling of the Road
26

127

Home Program, and the systemic low balling of our insurance companies we would not have returned back home. We had  blind faith in our
government. How were we to know otherwise.

The main thing I would ask congress for is a national disaster insurance policy that could be purchased by the public.  We can no longer rile on the Establishment of Independent Insurance Companies to live up to their polices that they write and we as individual citizens pay premiums for.  If the Insurances companies will not live up to policy holder coverages than the US Government must step in with a National Insurance coverage program.

A major disaster is capable of wiping a community or city or state off the map. Especially if insurance companies refuse to honor their policies. This is happing. This is the real world.

*My chronological order of Road Home Events are as follows:*

1.    *Applied for Grant Sept 18, 2006*
2.    *Ist appointment with road Home Nov 30, 2007*
3.    *Informed Grant to be awarded $14,647.86 on Feb 13, 2008*
4.    *Closed with American Title on June 26,2008 FOR the amount of $14,647.86 with option to appeal the award amount.*
5.    *Transfer of Grant by road Home in the Amount of $14,647.86 to my bank on July 08, 2008*
6.    *Sent Letter of appeal with prof of cost of damage To Road Home on July 21, 2008*
7.    *Road Home requested for more documentation regarding appeal on August 12, 2008*
8.    *Sent my letter per their request with documentations back to Road Home on August 23,2008*
9.    *Denial letter received from Road home regarding my appeal stating I am not eligible for ACG funds ( I am on SS) on November 18, 2009*
10.   *and  also denying additional monies in spite of all the documentation I sent on August 23,2008*
11.   *Sent another letter of appeal along with all documentations again on December 12, 2008 ( please remember Road Home adamantly states it does not want receipts, contractor contacts,no pictures and will not pay for mold and mildew.)   I had 18 inches of water and my condo was Two blocks from the 17th St Canal and sat in water for weeks.*
12.   *I did not hear from the State till April 6, 2009 offering me an additional $1,703.92 for a door and a toilet and it also stated I was ineligible for the ACG funds*
13.   *I appealed again on May 1, 2009 and sent two letters . One to the Governor's Office and one to the Office of Community Development ( Attn:The Disaster Recovery Unit)*
14.   *I received a letter From Governor Jindal stating that they have forwarded my grievance letter back to the Louisiana Office of Community Development on July 20.2009*


**21** The Road Home

The Road Home vastly inflated the value of my condo by $71,000.00 .

The Road Home hyper inflated value of my condo was estimated to be $136,000. The going price of

27

128

condos in my building just prior to Katrina were selling Between $60 to $65,000.

By pricing my condo at this $136,000 figure it left me out of the 51% rule estimated damage.

I am in litigation now with All STATE INSURANCE regarding my Katrina damage,  I have signed on with the Hurricane Legal Center.  All State wants to close with me and pay me for wind/rain damage.

This would be for ceiling damage and upper kitchen cabinets and upper walls.  If I settle with them this money will have to be returned to Road Home.

Road Home refused to pay me for this damage and even denied I had this damage to my ceilings, walls and upper cabinets.  So this means I would have to absorb this items my self at a loss to me. Even though I can re cope the cost of these repairs from All STATE only to have to turn around and have this money returned to Road Home, when actually Road Home refused me grant money for these Items.

I would gladly settle for The All State funds and return the funds back to the Road Home Program if Road Home had covered me and paid me for this Katrina damage.

I never received my complete file. I requested this in all my correspondence.  I have no idea as to what criteria they used in denying my eligibility for ACG funds. I was refused a request to them to please send me out another adjuster.  The Small Business Program denied me a lone based on my limited income although I have a very High Credit Rating . I have their letter to that fact.

I am over $30,000.00 in the hole for proper rehabilitation of my Katrina Damaged Condo.

I am very sorry I have returned home.  This nightmare does not end in a justified way that was intended with  and by the good heart of the people and our Senators and Representatives of the United States.

Thank you once again,

Kathleen


22. I don't know where to turn. I cannot make the meeting.

PLEASE HELP!

Thanks,

Bernard XXX (Charles XXX's son)

Road Home Appeal Letter (June 12, 2008)
I am appealing Road home's reason for designating my property "ineligible based on structure type".
First, my property is not a "quad". It is a double as attested to by two Road Home inspectors.
I have had two Road Home inspections; January 2006 and eight weeks ago. In each case, the inspectors stated to me in person and assured me that they would list in their reports that my property

28

129

at XXX is a "double", by Road Home definition. Pictures from the inspector are included in the report. Two storage spaces upstairs were not habitable for the previous 30 years. At no fault of my own, in spite of their inspector's reports, Road Home errantly, continues to designate my property as a "quad". Countless phone calls, emails, office visits, interviews, etc. have not been successful in prompting anyone in the Road Home hierarchy to make the simple change of property designation to reflect it's true nature as a "double". I keep "hearing" from various representatives that, " … this should have been done, but hasn't yet ... why don't you call so-and-so".

**I'm sick and tired of the runaround!**

I am 83 years old and a lifelong resident of New Orleans.  In fact, I lived at XXX Street from my birth in 1925 until Katrina forced me to leave. My dad built the house at the same time he built my two sister's house next door. In an ironic twist of fate, my sister's house, next door, was approved and closed for $119,000.00 from Road Home. They are currently living in their home while they continue to repair.

Listen, during my childhood, adolescence, adulthood and now, golden years, I have always "played by the rules"; been a law-abiding citizen, paid my taxes, voted and never complained!

I swallowed my pride, when segregation prevented me equal status in my homeland. Conversely, I felt great pride when America abolished Jim Crow legislation. I cheered when, New Orleans, in particular, and America, in general, opened the voting booths, courts, jobs, etc. to all citizens.

**Through it all, I've been a faithful American citizen.**

In 1943, I didn't make excuses, or, look the other way when our country was at war. No, I served in the U. S. Navy. I stood up and fought for America. I didn't ignore my country's call. So, somebody tell me why am I being ignored now, by my government?

**I didn't cause the levees to fail**. Yet, when I try to get a simple call-back from the Road Home representatives, at all levels of the process, I am treated like the villain. I am given the feeling that I no longer matter … I no longer count … my plight is falling on deaf ears!

I hear, "ineligible". How can I be ineligible for help from my government for damage sustained to my property, at no fault of mine, that my father built and I've maintained and dutifully, paid taxes on for over half-a-century.

I willingly put my life on the line for America. How can my government, at best, ignore me and at worst, "reject" me at _my_ only time of need?

I'm not asking much, only that anyone at Road Home just takes the time to review the inspector's reports and simply update my file to reflect the true nature of my property as a "double".

Once that simple act is done, I can move forward as the "eligible" applicant that I am and begin the process of repair. I was told the Road Home's mission is to help Louisiana citizens return home. That's all I want; To Come Home!

I stood up for America, when she needed me. I'm imploring you to help me now that I need you to stand up for me, a son of America.

NOTE:

I reserve the right to supplement my appeal.

Patriotically,

**24.**

Wednesday, August 19, 2009 9:40 AM
From:

" < @cox.net>
Add sender to Contacts

mehrlich8@yahoo.com

To:

We would like the following information forwarded to Rep Waters and HUD.  As you can see it has been previously sent to senators, representatives and others, but with no success.  Thank you

130

We are writing about a very serious problem with the Road Home Program.

We applied in both round 1 and round 2 of the Small Rental Program and were denied each time. The denial letter stated that we were ineligible due to the fact that the rental unit was not "continuously vacant since 11/1/06" . Only homes that were still vacant or partially vacant would be considered. We used our own retirement funds and savings to complete repairs on this home since the mayor, governor and other officials were imploring everyone to repair properties as soon as they possibly could so that people could return home. We did that because all information stated that Road Home funds would be available for all of the homes that were damaged by the storm. This one certainly was . Never once did we hear that if you repair the home "too soon" it would make you ineligible.  It seems we are being punished for taking action too soon since homes that were damaged at exactly the same time as ours, under exactly the same circumstances, were eligible if they had not yet been repaired by this arbitrary date.  To add insult to injury we were denied in appeal and told in both rounds to "continue to look for future small rental programs" that would possibly cover us. We have never seen any additionl Small Rental Program.  The next slap in the face occurred when we read in the paper and heard on the news that the Road Home Program has millions of dollars leftover in funds that they are trying to determine what they should do with.

Last year we sent a letter to the governor and Sen. Landrieu regarding this problem. The governor responded by referring us back to The Road Home Program. We did not receive a response from Sen Landrieu. There must be someone who can help those of us who have been so unfairly treated. Thank you in advance for any assistance you can provide.


XXX
New Orleans, La. 70128


**D. For complete responses from more than 300 applicants to CHAT's online survey (over 1500 responses total), please see our website, http://chatushome.com under "New Items."**


**E. Our request**

**Appeals should be re-opened, with written standards for determining the outcome, and decided by independent individuals who have the necessary background to do this. Optimal would be Administrative Law Judges, who at one point were the third-tier review panel for this program.**

Thank you very much for your consideration of our request,

Melanie Ehrlich, Ph.D.

30

131

Founder, Citizens' Road Home Action Team (CHAT)

Member, LRA Housing Task Force

(Prof. Human Genetics and Biochemistry)