# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT<br><br>and<br><br>ROBIN KEEGAN, Executive Director of the Louisiana Recovery Authority,<br><br>Defendants. | Civil Action 08-01938 (HHK) |

## MEMORANDUM OPINION

Greater New Orleans Fair Housing Action Center, the National Fair Housing Alliance, and five individuals who own homes in New Orleans (collectively "plaintiffs")[1] bring this action against Robin Keegan, in her official capacity as Executive Director of the Louisiana Recovery Authority ("LRA"), and the U.S. Department of Housing and Urban Development ("HUD"), asserting that defendants have violated the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*[2] This case arises from the alleged racially discriminatory effect of a formula used to distribute

---

[1]  Plaintiffs intend to represent a class of individual homeowners but, in accordance with a deadline set in an order proposed by the parties and entered by the Court on February 9, 2009, they have not yet filed for class certification.

[2]  Plaintiffs' complaint also includes a claim under the Housing and Community Development Act, 42 U.S.C. § 5301 *et seq.*  In the briefing currently before the Court, plaintiffs focus only on their FHA claim, so this memorandum opinion similarly does not discuss this second claim.

grants as part of the Road Home Homeowner Assistance Program ("Road Home Program" or "Program"), a housing redevelopment initiative designed to help homeowners affected by Hurricanes Katrina and Rita. Plaintiffs seek an injunction requiring recalculation of Program awards to homeowners in New Orleans using a formula that does not have a disparate impact on African Americans.

On June 29, 2010, the Court issued an order that denied plaintiffs' motion for a temporary restraining order and a preliminary injunction [#50] which sought to enjoin Keegan from spending surplus funds that remain available to the Road Home Program, or seeking any additional Program funds from HUD, while this case is pending. This opinion explains the reasoning on which that order was based.

## I. BACKGROUND

In 2005, Hurricanes Katrina and Rita caused catastrophic damage to New Orleans, Louisiana, and other nearby places. In response, Congress created a block grant program to assist in recovery of the region, which it funded through three appropriations statutes. *See* Pub. L. No. 109-148, 119 Stat. 2680, 2779-81 (Dec. 30, 2005); Pub. L. No. 109-234, 120 Stat. 418, 472-73 (June 15, 2006); Pub. L. No. 110-116, 121 Stat. 1295, 1343-44 (Nov. 13, 2007). Pursuant to these statutes and HUD regulations, the State of Louisiana was to receive $13.4 billion. *See* 71 Fed. Reg. 7666, 7666 (Feb. 13, 2006) (allocating $6.2 billion from the first appropriation to Louisiana); 71 Fed. Reg. 63,337, 63,338 (Oct. 30, 2006) (allocating $4.2 billion from the second appropriation to Louisiana); 121 Stat. at 1343-44 (appropriating $3 billion for supplemental grants to Louisiana).

Louisiana designated approximately $11 billion of those funds for the Road Home Program. The LRA, in consultation with HUD, developed the Program; HUD approved it and disburses the money Congress has appropriated for it to the LRA; and the LRA administers it. Under a portion of the Program called Option 1, an individual whose house was damaged by the hurricanes may choose to receive a grant to repair or rebuild her home.[3] Each beneficiary of an Option 1 grant receives an award in the amount of either the value of her home before the storms or the cost of repairing her home, *whichever is less*, but not in excess of $150,000. Since plaintiffs initiated their suit, the LRA has created Additional Compensation Grants ("ACGs"), supplemental awards available to Option 1 beneficiaries whose incomes are at or below eighty percent of the median in their areas. Regardless of the pre-storm values of their homes, these individuals may receive ACGs such that their total awards from the Road Home Program reach the cost of repairs to their homes, still subject to the $150,000 cap.

Since the Road Home Program's inception, the LRA has distributed Option 1 awards to tens of thousands of homeowners. As of the time of the briefing regarding plaintiffs' current motion, only 179 individuals who applied for Option 1 grants had yet to receive their awards. The LRA has money set aside to fund grants for those individuals, to continue to distribute ACGs to eligible individuals, and for other projects within the Road Home Program. The LRA is currently seeking approval to use much of the Program money not yet designated to a specific use for "Action Plan Amendment 43," a construction lending program designed to assist Road Home

---

[3] The Program also permits homeowners to instead opt to receive smaller grants to obtain housing elsewhere in Louisiana or outside the state. The design and implementation of those aspects of the Program are not at issue here.

Program beneficiaries who have not been able to complete repairs to their homes. Keegan estimates that she has $554.5 million remaining in the Program budget.

Individual plaintiffs Gloria Burns, Rhonda Dents, Almarie Ford, Daphne Jones, and Edward Randolph are African Americans who own homes in New Orleans that were severely damaged by Hurricane Katrina, and subsequent flooding, in 2005.[4] Each applied for a Road Home Program grant under Option 1, and each received an award based on the pre-storm value of her or his home rather than the cost of repairing that home.[5] Since receiving their initial grants, Burns and Jones have been deemed eligible to receive ACGs such that their total awards will amount to $150,000.

In their complaint, plaintiffs allege that the LRA's reliance on home values in calculating awards "has a discriminatory disparate impact on African Americans living in historically segregated communities." Compl. ¶ 52. Specifically, they argue that because "African American homeowners in New Orleans are more likely than white homeowners in New Orleans to own

---

[4] The other plaintiffs, Greater New Orleans Fair Housing Action Center, a non-profit organization based in Louisiana, and the National Fair Housing Alliance, a non-profit organization based in Washington, D.C., are advocacy groups that, *inter alia*, oppose housing discrimination.

[5] According to the complaint, Burns received $106,500, which was $89,000 less than the cost of damage to her home and $43,500 less than the maximum she could have received; Dents received $88,534, which was $58,730 less than the cost of damage to her home; Ford received $3,468, which was $156,073 less than the cost of damage to her home and $146,532 less than the maximum she could have received; Jones received $61,000, which was $45,262 less than the cost of damage to her home; and Randolph received $16,650, which was $173,193 less than the cost of damage to his home and $133,350 less than the maximum he could have received. Compl. ¶¶ 61-65. Some of the awards are in amounts less than the pre-storm value of the home because the LRA deducts from each grant any amount of money the homeowner has received as compensation for storm damage from her insurance company or another source, such as the Federal Emergency Management Agency.

homes with lower values," African-American recipients of Road Home Program grants are more likely than white recipients to receive only the amount of the pre-storm value of their homes and, consequently, to have a larger gap than white recipients between the amount of the grant and the cost of rebuilding. Compl. ¶¶ 54-57. This effect, plaintiffs assert, constitutes a violation of the Fair Housing Act.[6] Ultimately, plaintiffs seek injunctive relief, "including but not limited to ordering Defendants to cease immediately their violation of Plaintiffs' rights, and to remedy the invidious effects of their violations by recalculating Road Home homeowner grants in a nondiscriminatory manner." Compl. at 17.

At this time, plaintiffs seek a preliminary injunction enjoining Keegan from spending any surplus funds—that is, Program funds not already designated for the remaining 179 Option 1 awards, ACGs, or any other specific use—until the merits of their case are resolved. They make this request because Keegan will only be able to distribute recalculated awards, should plaintiffs prevail on the merits, if sufficient Road Home Program funds remain available for that purpose.

Plaintiffs' motion for a preliminary injunction is accompanied by evidence they allege supports their allegation that the Option 1 formula has a discriminatory effect. Specifically, they point to statistics from the U.S. Census showing that in New Orleans, homes owned by African Americans have lower values, on average, than homes owned by whites. Pls.' Mot. for TRO, Ex. P. They attached to their motion a study by PolicyLink, "a national independent research

---

[6] Specifically, Count I of the complaint alleges that defendants have (1) "made unavailable or denied housing to African American homeowners because of their race in violation of" section 3604(a) of the FHA; (2) "discriminated against African Americans because of their race in the availability of, and in the terms and conditions of, real estate-related transactions in violation of" section 3605(a) of the FHA; and (3) "failed to administer housing-related programs and activities in a manner that affirmatively furthers fair housing, in violation of" sections 3608(d) and 3608(e)(5) of the FHA. Compl. ¶¶ 74-76.

organization," which concludes that on average, African-American applicants to the Road Home Program received funds in amounts further below the costs to rebuild their homes than white applicants. *Id.* at 11-12; *id.*, Ex. S. They also assert that Paul Rainwater, Keegan's predecessor at the LRA, told a subcommittee of the U.S. House of Representatives that home values in African-American neighborhoods tend to be lower than in white neighborhoods and that he was "sure" that African-American homeowners were more likely than whites to receive awards based on the value of their homes than the cost of repairs. *Id.* at 15-16; *id.*, Ex. N at 23-24. Finally, they attach to their motion the declaration of Carol Johnson, president of a Louisiana mortgage company, who asserts she has expertise in the mortgage industry and that she has "observed that because of the formula employed, Road Home Program grant calculations result in homeowners in predominantly African American areas received lower grant awards than homeowners in predominantly White areas." *Id.*, Ex. T ¶ 7.[7]

## II. ANALYSIS

This court may issue a preliminary injunction only when the movant demonstrates: (1) "a substantial likelihood of success on the merits"; (2) "that it would suffer irreparable injury if the injunction is not granted"; (3) "that an injunction would not substantially injure other interested parties"; and (4) "that the public interest would be furthered by the injunction." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of*

---

[7] Keegan has moved to strike this declaration because Johnson is "not an expert economist or statistician." Keegan Opp'n to Pls.' Mot. for TRO ("Keegan Opp'n") at 29 n.20. Plaintiffs oppose this motion, arguing that Johnson has relevant expertise regarding home values in New Orleans. The parties have made these arguments in less detail than is necessary for the Court to rule on the motion. Furthermore, the Court's ruling on plaintiffs' motion does not depend on whether it considers this evidence.

*Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). Because preliminary injunctions are "extraordinary and drastic" forms of judicial relief, district courts should not grant them "unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, pp. 129-130 (2d ed.1995)) (emphasis in *Mazurek*).

A. **Plaintiffs Have Not Shown a Likelihood of Success on the Merits.**

   1. **Plaintiffs have demonstrated that they could likely make out a prima facie case of discrimination in violation of the Fair Housing Act.**

For the reasons explained below, the Court concludes that it may not provide the ultimate relief plaintiffs seek and therefore should not grant the preliminary relief they currently request. But the Court notes first that plaintiffs' disparate impact claim under the Fair Housing Act appears to have merit. Although full analysis of the issues raised here is unnecessary, the Court feels compelled nevertheless to briefly explain its reasoning.

Although the D.C. Circuit did not determine in *2922 Sherman Avenue Tenants' Association v. District of Columbia*, 444 F.3d 673 (D.C. Cir. 2006), which of two possible standards courts in this Circuit are to apply in assessing disparate impact claims under the FHA, *see id.* at 680, the Court believes that the appropriate approach is the burden-shifting framework adopted by several other Circuits. Under this framework, "once the plaintiff demonstrates that the challenged practice has a disproportionate impact, the burden shifts to the defendant to 'prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest

7

and that no alternative would serve that interest with less discriminatory effect.'" *Id.* (quoting *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935-36 (2d Cir. 1988)).

Plaintiffs have demonstrated that they would likely be able to make out this prima facie case after discovery. The statistical and anecdotal evidence they submit to the Court leads to a strong inference that, on average, African-American homeowners received awards that fell farther short of the cost of repairing their homes than did white recipients. Keegan's attacks on that evidence are unpersuasive. Plaintiffs need not make a showing at this stage of the proceedings, before discovery and when briefing is necessarily rushed, sufficient to prove the merits of their case. Keegan neither demonstrates that plaintiffs' statistics or logic is flawed nor provides data about the administration of the Program that would show what effect the Option 1 formula has had. *Cf. Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 (D.C. Cir. 1988) ("Defendants may also attempt to undermine plaintiffs' prima facie case by attacking the validity of plaintiffs' statistical evidence, or by introducing statistical evidence of their own showing that the challenged practice did not have racially disproportionate results." (citation omitted)). She has also offered no legitimate reason for taking pre-storm home values into account in calculating Program awards. The Court does not take lightly that some African-American homeowners received lower awards than they would have if their homes were in predominantly white neighborhoods. And, although the Court appreciates that all of the parties are committed to the rebuilding of a city that has suffered greatly, it is regrettable that this effort to do so appears to have proceeded in a manner that disadvantaged African-American homeowners who wish to repair their homes.

**2. Plaintiffs cannot prevail on the merits because this Court does not have the authority to grant the ultimate relief they seek.**

Keegan argues that regardless of the merit of plaintiffs' discrimination claim, the Court lacks subject matter jurisdiction over this case because the Eleventh Amendment to the U.S. Constitution bars the Court from providing the relief plaintiffs seek. Her primary argument[8] is based on a legal premise the Court explained in some detail in a Clarification [#52] to an order it entered regarding a motion to dismiss Keegan filed before plaintiffs submitted their motion. For clarity, the Court again describes the legal background before addressing plaintiffs' response.

The Eleventh Amendment bars suits against states absent the relevant state's consent to be sued. *See Papasan v. Allain*, 478 U.S. 265, 276 (1986).[9] But in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court held that "[a] federal court is not barred by the Eleventh Amendment from enjoining state officers from acting unconstitutionally, either because their action is alleged to violate the Constitution directly or because it is contrary to a federal statute or regulation that is the supreme law of the land." *Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008) (quoting CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4232

---

[8] Keegan also argues that Eleventh Amendment immunity bars this action because the LRA, and therefore the State of Louisiana, "not Keegan, is the real party in interest in this suit." Keegan Opp'n at 13. But the *Ex parte Young* exception to sovereign immunity permits suits against state officers by relying on "the fiction that the suit [goes] against the officer and not the State," *Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 114 n.25 (1984)), and the Court disagrees with Keegan's contention that this fiction does not operate here.

[9] The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Supreme Court "long ago held that the Amendment bars suits against a State by citizens of that same State as well." *Papasan*, 478 U.S. at 276 (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)).

(3d ed. 2007)).  The Supreme Court has directed that "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Verizon Md. Inc. v. Public Serv. Comm'n*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)).  In this context, the distinction between retroactive and prospective relief is significant because the Eleventh Amendment bars "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (citations omitted); *see also Verizon Md. Inc.*, 535 U.S. at 645 (making clear that relief that "impose[s] upon the State 'a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials'" is not permissible (quoting *Edelman*, 415 U.S. at 668) (emphasis removed)).  In other words, this Court cannot order the payment of damages to correct a prior unlawful act by a state official.  *See Edelman*, 415 U.S. at 663 (holding that a federal court may not issue an order that requires a state to spend money that "should have been paid, but was not").

Based on these principles of law, the Court suggested in its Clarification, and now holds, that it may not grant plaintiffs' request for an order mandating that LRA make payments to Road Home Program beneficiaries who have already received funds in amounts calculated using an allegedly discriminatory formula.  An order requiring Keegan to correct Road Home Program payments that have already been made would not provide prospective relief; it would require payment of state funds rather than prohibit certain actions in the future.  Plaintiffs do not dispute the Court's reliance on these fundamental principles, but they contest the Court's understanding

10

of the facts underlying this case and, therefore, its application of those principles to the situation at hand. The Court cannot agree with their arguments.

> a. **The relief plaintiffs seek would require the expenditure of state, not federal, funds.**

First, plaintiffs argue that the Court may enter the injunction they seek because such an order would require the expenditure of *federal* funds, not *state* funds. To demonstrate that this distinction is legally significant, plaintiffs rely primarily on *Edelman v. Jordan*, 415 U.S. 651 (1974), quoting the many instances in that opinion in which the Supreme Court discussed the significance for an Eleventh Amendment analysis of requiring the payment of "state funds," and they repeat language from other cases relying on *Edelman* for the proposition that it is impermissible for a federal court to impose a liability to be paid from the "state treasury." Pls.' Resp. to Clarification at 8-9.[10] They assert that because the LRA spends money that comes directly from HUD at Congress's direction, the funds they wish the Court to order Keegan to use to correct award amounts do not belong to the state.

The Court does not find that the funds the LRA spends are federal. It simply cannot be said that an injunction preventing a state official from disbursing money according to a program administered by her state agency controls only the flow of federal funds. Furthermore, a careful reading of *Edelman* reveals that the Supreme Court has made no distinction between money that comes to a state account from the federal government as opposed to from some other source. In

---

[10] Plaintiffs note in their reply to Keegan's opposition to their motion that Keegan has failed to address this point and argue Keegan has therefore conceded it. The parties have each made a multitude of arguments in addressing the various complicated issues raised in this case, and neither has directly addressed each point made by the other. The Court will not assume that any arguments are conceded.

11

*Edelman*, the plaintiffs had successfully demonstrated that Illinois's administration of a welfare program, which was "funded by the State and the Federal Governments" and administered by state agencies, the directors of which were the named defendants, violated certain federal regulations. *Edelman*, 415 U.S. at 653-56. The opinion held that the district court had properly enjoined the state officers from continuing to administer the program in a manner that violated those regulations but had improperly ordered that individuals who received less than they were owed because of past violations be compensated. *Id.* at 664-65. The Supreme Court referred throughout to state funds and the state treasury, generating the quotes to which plaintiffs have pointed, but nowhere did it distinguish funds that the federal government gave to the state for the welfare program from those the state contributed from its own resources. In other words, the opinion did not address the issue plaintiffs have raised and does not support plaintiffs' arguments; the best inference to draw is that the Supreme Court considered federal money given to the state for administration of the relevant program to be state funds.[11] For purposes of this analysis, the money the LRA uses to make awards to Road Home Program beneficiaries are properly considered state funds.

---

[11] None of the other cases plaintiffs cite contribute to an analysis of this issue. *See Verizon Md. Inc.*, 535 U.S. at 646 (distinguishing between an injunction that would require payment from a state treasury and one that imposed a financial liability on private parties); *Quern v. Jordan*, 440 U.S. 332, 337 (1979) (repeating language from *Edelman* but addressing only the question of whether ordering that a particular notice be sent to individuals who might have claims against Illinois constitutes retroactive relief); *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 689-90 (1982) (reciting language from *Edelman* but addressing the propriety of a suit against Florida based on the discovery of a sunken ship); *Travelers Indem. Co. v. Sch. Bd. of Dade County, Fla.*, 666 F.2d 505, 509 (11th Cir. 1982) (reciting language from *Edelman* but addressing whether the Florida board of education has Eleventh Amendment immunity under certain circumstances not analogous to those here).

### b. An injunction requiring the correction of Option 1 awards would impermissibly provide retroactive relief.

Second, plaintiffs argue that the relief they seek is prospective because the Road Home Program is "continuing and open," Pls.' Resp. to Clarification at 11, and they therefore request "an end to [] *present violation[s]* of federal law," *id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 278 (1986)) (alterations and emphasis in brief). They argue that in contrast to *Edelman*, in which the defendant state officers had failed to pay benefits that correlated to discrete past time periods, the Road Home Program "has an ever-changing current balance sheet for an incomplete program." *Id.* Keegan asserts that correction of Road Home Program awards previously disbursed would constitute retroactive relief.

The fundamental premise here, explained above, is not in dispute:

> Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant. . . . On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.

*Papasan*, 478 U.S. at 278 (citations omitted). The Supreme Court has acknowledged that "the line between permitted and prohibited suits will often be indistinct," *id.*, but here, the outcome is unavoidable.

Plaintiffs' characterization of the Road Home Program as ongoing does not persuade the Court that an injunction requiring the recalculation of Option 1 awards would constitute prospective relief. It is true that the Road Home Program as a whole is not complete. But all but

179 Option 1 grants have been distributed.[12] It is also true that some Road Home Program recipients have received funds in addition to their initial awards under Option 1. But those supplemental grants were not based on any change to the formula for, nor did they constitute a recalculation of, Option 1 awards. The allegedly discriminatory award amounts have, as to almost all applicants, already been calculated and disbursed. Correcting them, even by entry of an injunction, would effectively constitute an award of damages. *Cf. Papasan*, 478 U.S. at 279 (advising that "[i]n discerning on which side of the line [between prospective and retroactive relief] a particular case falls," a court is to "look to the substance rather than to the form of the relief sought"). As was the case in *Edelman*, the program at issue here distributes discrete awards; it does not provide any ongoing service such that a "present violation" of law can be said to exist. *Id.* at 278; *cf. Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (holding that a court-ordered program to remedy inequalities resulting from school segregation "fits squarely within the prospective-compliance exception reaffirmed by *Edelman*" because it "enjoin[s] state officials to conform their conduct to requirements of federal law" in the future operation of schools).

Were the Court to order, as plaintiffs request, that Keegan recalculate awards that have already been distributed and make supplemental payments to homeowners whose awards would have been greater had they not been based on home values, it would impermissibly be requiring the state to disburse money that "should have been paid, but was not." *Edelman*, 415 U.S. at

---

[12] The Court asked plaintiffs during oral argument on this motion whether they would wish to go forward with their request for a preliminary injunction if the Court were to hold that the ultimate relief they seek is only available to those 179 individuals. Plaintiffs did not express a desire to limit their case to such a narrow group of Road Home Program beneficiaries.

664. It would impermissibly be doing more than "enjoining state officers from acting unconstitutionally." *Vann*, 534 F.3d at 749. Although, as explained, the Court suspects that the Option 1 formula did violate the Fair Housing Act, this Court has no authority to remedy it in the way plaintiffs ask. Accordingly, the Court cannot find that plaintiffs are likely to succeed on the merits of their case.

> **2. Plaintiffs have not shown that they will face irreparable injury absent the entry of an injunction.**

Plaintiffs argue that without an injunction, the LRA will be able to spend any or all Road Home Program funds and an insufficient amount of money would remain available to provide the ultimate relief they seek. This reasoning relies on, among other assumptions, the premise that the LRA must hold approximately $516 million in order to comply with a future order from this Court mandating the correction of the disparate impact of the Option 1 formula. Keegan responds that the LRA has sufficient funds to comply with an order from this Court enjoining her from using the existing Option 1 formula in calculating the awards owed to the 179 remaining Option 1 applicants.

As explained above, the Court may not order the relief plaintiffs seek. There is no risk, therefore, that any spending by the LRA will cause the irreparable harm plaintiffs foresee.[13]

> **3. The injury to third parties that would result from the preliminary injunction plaintiffs seek weighs strongly against granting plaintiffs' motion.**

Plaintiffs argue that other parties would not be harmed by the entry of the preliminary injunction they seek. They note that non-class members whose Road Home Program benefits

---

[13] As noted, plaintiffs' counsel have declined to indicate that they wish to represent the 179 applicants who have not yet received awards.

might be delayed by such an injunction would benefit overall if the LRA is ultimately made to calculate future awards considering only the cost of repairs.

The Court will not find that third parties would not be harmed by the entry of an injunction of the sort plaintiffs seek. Even though the preliminary injunction plaintiffs seek would permit Keegan to disburse some Road Home Program funds, it would restrict her spending significantly. Each dollar the Court enjoined her from spending would be a dollar withheld from a Louisiana resident who wants to repair or rebuild her home and who has been unable to do so in the five years since the storm damaged it. The Court notes that plaintiffs could have initiated this case and sought preliminary relief long ago, before the Road Home Program was almost complete and the funds almost depleted. And the Court will not ignore the fact that the delay a preliminary injunction would cause is significant; discovery and a resolution on the merits of this case could, and likely would, take years.

4. **The public interest in an injunction does not weigh in favor of either party.**

Plaintiffs argue that it is in the public interest to remedy housing discrimination. Keegan argues that the public interest would not be served by delaying the distribution of funds under the Road Home Program and that Louisiana citizens "continue to need and rely upon funding from the Road Home" Program. Keegan Opp'n to Pls.' Mot. for TRO at 35.

Because both parties' positions have merit, the Court finds that this factor does not weigh in favor of either party. Plaintiffs are correct that there is a strong public interest in preventing discrimination on the basis of race, and the Court takes seriously Congress's intent to do so by enacting the Fair Housing Act. But Keegan is correct that there is a strong public interest in going forward with a program designed to repair a devastated area. As noted above, a

16

preliminary injunction would cause significant delay in the distribution of Program funds to people who have suffered long enough.

**5. Conclusion**

The Court must balance these four factors against each other. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). In sum, the Court has found that plaintiffs' Fair Housing Act claim likely has merit but that plaintiffs do not have a strong likelihood of success in this action because the Court cannot grant the relief they seek. Furthermore, delaying the administration of the Road Home Program would be harmful to Louisiana homeowners who still need assistance. Although the Court is not unsympathetic to the ways in which the law operates in this instance to preclude the possibility of correcting what may well be a discriminatory formula, it is bound to apply the law as it stands and it must consider the effect its ruling here could have on individuals who are not represented. For these reasons, the Court will not grant the preliminary injunction plaintiff seek.

### III. CONCLUSION

For the foregoing reasons, on June 29, 2010, the Court entered an order denying plaintiffs' motion for a preliminary injunction [#50].

Henry H. Kennedy, Jr.
United States District Judge