# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREATER NEW ORLEANS FAIR
HOUSING ACTION CENTER, et al.

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT

and

ROBIN KEEGAN, Executive Director of
the Louisiana Recovery Authority,

    Defendants.

Civil Action 08-01938  (HHK)

## MEMORANDUM OPINION AND ORDER

Greater New Orleans Fair Housing Action Center, the National Fair Housing Alliance,

and five individuals who own homes in New Orleans (collectively "plaintiffs")[1] bring this action

against Robin Keegan, in her official capacity as Executive Director of the Louisiana Recovery

Authority ("LRA"),[2] and the U.S. Department of Housing and Urban Development ("HUD"),

asserting that defendants have violated the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*,

and the Housing and Community Development Act ("HCDA"), 42 U.S.C. § 5301 *et seq.*  This

---

[1]  Plaintiffs seek to certify of a class of individual homeowners but, in accordance
with a deadline set in an order proposed by the parties and entered by the Court on February 9,
2009, they have not yet filed for class certification.

[2]  At the times plaintiffs filed their complaint and the state official filed the motion
to dismiss resolved herein, Paul Rainwater was the Executive Director of the LRA.  Pursuant to
Rule 25(d) of the Federal Rules of Civil Procedure, his replacement, Robin Keegan, became the
named defendant when she took on Rainwater's title.  Since that time, the LRA has ceased to
exist, and Keegan has become the Executive Director of the Louisiana Office of Community
Development ("OCD"), the LRA's successor agency.  No party has moved to correct the caption
to reflect this change.  The Court will continue to refer to the LRA as the relevant state agency.

case arises from the alleged racially discriminatory effect of a formula used to distribute grants as part of the Road Home Homeowner Assistance Program ("Road Home Program" or "Program"), a housing redevelopment initiative designed to help homeowners affected by Hurricanes Katrina and Rita. Plaintiffs seek an injunction requiring recalculation of Program awards to homeowners in New Orleans using a formula that does not have a disparate impact on African Americans. Before the Court is Keegan's motion to dismiss and for a transfer of venue [#28]. Upon consideration of the motion, the opposition thereto, and the record of this case, the Court concludes that the motion to dismiss should be granted in part and denied in part and the motion to transfer should be denied.

## I. BACKGROUND

### A.     Factual Background

In 2005, Hurricanes Katrina and Rita caused catastrophic damage to much of the Gulf Coast, including New Orleans, Louisiana. In response, Congress created a block grant program to assist in recovery of the region, which it funded through three appropriations statutes. *See* Pub. L. No. 109-148, 119 Stat. 2680, 2779-81 (Dec. 30, 2005); Pub. L. No. 109-234, 120 Stat. 418, 472-73 (June 15, 2006); Pub. L. No. 110-116, 121 Stat. 1295, 1343-44 (Nov. 13, 2007). Pursuant to these statutes and HUD regulations, the State of Louisiana was to receive $13.4 billion. *See* 121 Stat. at 1343-44 (authorizing spending $3 billion on supplemental grants to Louisiana); 71 Fed. Reg. 7666, 7666 (Feb. 13, 2006) (allocating $6.2 billion from the first appropriation to Louisiana); 71 Fed. Reg. 63,337, 63,338 (Oct. 30, 2006) (allocating $4.2 billion from the second appropriation to Louisiana).

Louisiana designated approximately $11 billion of those funds for the Road Home Program. The LRA, in consultation with HUD, developed the Road Home program; HUD approved it and disburses the money Congress has appropriated for it to the LRA; and the LRA administers it. Under a portion of the Program called Option 1, an individual whose house was damaged by the hurricanes may choose to receive a grant to repair or rebuild her home.[3] Each beneficiary of an Option 1 grant receives an award in the amount of either the value of her home before the storms or the cost of repairing her home, whichever is less, but not in excess of $150,000. Since plaintiffs initiated their suit, the LRA has created Additional Compensation Grants ("ACGs"), supplemental awards available to Option 1 beneficiaries whose incomes are at or below eighty percent of the median in their areas. Regardless of the pre-storm values of their homes, these individuals may receive ACGs such that their total awards from the Road Home Program reach the cost of repairs to their homes, still subject to the $150,000 cap.

Since the Road Home Program's inception, the LRA has distributed Option 1 awards to tens of thousands of homeowners. At this time, a relatively small number of Option 1 applicants have yet to receive their awards.

Individual plaintiffs Gloria Burns, Rhonda Dents, Almarie Ford, Daphne Jones, and Edward Randolph are African Americans who own homes in New Orleans that were severely damaged by Hurricane Katrina, and subsequent flooding, in 2005.[4] Each applied for a Road

---

[3] The Program also permits homeowners to instead opt to receive smaller grants to obtain housing elsewhere in Louisiana or outside the state. The design and implementation of those aspects of the Program are not at issue here.

[4] The other plaintiffs, Greater New Orleans Fair Housing Action Center and the National Fair Housing Alliance, non-profit organizations based in Louisiana and Washington, D.C., respectively, are advocacy groups that, *inter alia*, oppose housing discrimination.

Home Program grant under Option 1, and each received an award based on the pre-storm value of her or his home rather than the cost of repairing that home. Since receiving their initial grants, Burns and Jones have been deemed eligible to receive ACGs such that their total awards will amount to $150,000.

## B.    Procedural History

Plaintiffs initiated this action in November 2008. In their complaint, they allege that the reliance on home values in calculating Option 1 awards "has a discriminatory disparate impact on African Americans living in historically segregated communities." Compl. ¶ 52. Specifically, they argue that because "African American homeowners in New Orleans are more likely than white homeowners in New Orleans to own homes with lower values," African-American recipients of Option 1 grants are more likely than white recipients to receive only the amount of the pre-storm value of their homes. Compl. ¶¶ 54-57. Consequently, plaintiffs allege, African-American homeowners are likely to have a larger gap than white recipients between the amount of their awards and the cost of rebuilding. *Id.*

Plaintiffs assert that the discriminatory effects of the Option 1 formula violate the FHA and the HCDA. Specifically, Count I of their complaint alleges that defendants have (1) "made unavailable or denied housing to African American homeowners because of their race in violation of" section 3604(a) of the FHA; (2) "discriminated against African Americans because of their race in the availability of, and in the terms of conditions of, real estate-related transactions in violation of" section 3605(a) of the FHA; (3) "failed to administer housing-related programs and activities in a manner that affirmatively furthers fair housing, in violation of" sections 3608(d) and 3608(e)(5) of the FHA. Compl. ¶¶ 74-76. Count II alleges that defendants

"failed to administer the Community Development Block Grant Program in a manner that affirmatively furthers fair housing, in violation of Title I of [the HCDA], 42 U.S.C. § 5304(b)(2)." *Id.* ¶ 77. Plaintiffs seek injunctive relief, "including but not limited to ordering Defendants to cease immediately their violation of Plaintiffs' rights, and to remedy the invidious effects of their violations by recalculating Road Home homeowner grants in a nondiscriminatory manner." Compl. at 17.

Keegan and HUD both filed motions to dismiss this case.[5] On May 24, 2010, the Court issued an order scheduling a hearing on those motions [#45], indicating that the parties should address legal and factual issues regarding the application of *Ex parte Young*, 209 U.S. 123 (1908), to this case; in particular, the Court was concerned—as explained in some detail in a Clarification filed on June 4, 2010 [#52]—that the plaintiffs sought, in large part, retroactive relief that would impermissibly call on this Court to order payment from the state treasury. In response, plaintiffs filed a motion for a temporary restraining order ("TRO") and preliminary injunction. They sought to have Keegan enjoined from spending any surplus funds—that is, Program funds not already designated for any specific use—until the merits of their case were resolved. The Court denied the motion largely for the reasons explained in the Clarification, *see Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, — F. Supp. 2d —, 2010 WL 2718164 (July 6, 2010), which are also relevant to the resolution of Keegan's motion to dismiss. Plaintiffs then filed a second motion for a TRO and preliminary injunction, which sought only to enjoin Keegan from disbursing initial Road Home Program awards to

_____

[5] This opinion addresses only Keegan's motion to dismiss. The Court will issue a separate opinion resolving the distinct legal issues raised in HUD's motion.

5

Option 1 applicants using a formula that takes into account the pre-storm value of an individual's home. The Court granted that motion. *See Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, — F. Supp. 2d —, 2010 WL 3221968 (August 16, 2010). Both of the Court's opinions are currently on appeal to the D.C. Circuit.

Although the Court addressed in its opinions some of the issues crucial to ruling on Keegan's motion to dismiss, it has not resolved all of the issues Keegan raises nor has it ruled on Keegan's motion to transfer. It now turns to these motions.

## II. ANALYSIS

### A. Motion to Dismiss

Keegan seeks dismissal of plaintiffs' claims as against her on the ground that the Eleventh Amendment bars them. In the alternative, she argues that the complaint fails to state a claim on which relief can be granted as to Count I, the FHA claims and may not be brought by a private plaintiff as to Count II, the HCDA claim. The Court concludes that some of these arguments have merit but others do not.

#### 1. Sovereign immunity bars part of plaintiffs' suit against Keegan.

Keegan argues that plaintiffs' claims against her are barred by sovereign immunity.[6] She asserts that the exception to the Eleventh Amendment created by *Ex parte Young*, 209 U.S. 123 (1908), does not apply because (1) the LRA, not Keegan as its Executive Director, is responsible for the challenged provisions of the Road Home Program, and furthermore the LRA must obtain the approval of several other entities in order to take action; (2) plaintiffs seek retrospective

---

[6] This portion of Keegan's motion is based on Rule 12(b)(1) of the Federal Rules of Civil Procedure, which provides for dismissal based on lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

relief; and (3) this case implicates "special sovereign interests" and therefore is barred according to the reasoning of *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997).[7]

Plaintiffs respond that the Eleventh Amendment does not bar their claims. They argue that the *Ex parte Young* exception to sovereign immunity applies because (1) that the suit is effectively against the state does not bar it; (2) the relief plaintiffs seek is prospective and would require the expenditure of only federal, not state, funds; and (3) the principles articulated in *Coeur d'Alene* are inapplicable here.

The Court addresses each argument in turn but first describes the well established underlying legal principles. The Eleventh Amendment[8] bars suits against states absent a state's consent to be sued. *See Papasan v. Allain*, 478 U.S. 265, 276 (1986).[9] But *Ex parte Young* held that "[a] federal court is not barred by the Eleventh Amendment from enjoining state officers from acting unconstitutionally, either because their action is alleged to violate the Constitution directly or because it is contrary to a federal statute or regulation that is the supreme law of the land." *Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008) (quoting CHARLES ALAN

---

[7]     Keegan also asserts that plaintiffs' "fail[ure] to address the issue of sovereign immunity in their Complaint," in particular by not "invok[ing] *Ex parte Young*," is "fatal." Keegan Mot. to Dismiss at 7. She cites no authority for the proposition that a plaintiff must plead the application of the doctrine established in that case in order to rely upon it.

[8]     The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.

[9]     HUD, which filed a response to Keegan's motion, argues that Louisiana has consented to suits alleging violations of federal law by accepting federal funds under HCDA. Because the Court concludes that the *Ex parte Young* exception to sovereign immunity applies, this opinion need not address this alternative argument.

WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4232 (3d ed. 2007)). This doctrine relies on "the fiction that the suit [goes] against the officer and not the State, thereby avoiding sovereign immunity's bar." *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 114 n.25 (1984)).[10]

### i. Keegan is not an improper defendant.

First, the Court rejects Keegan's argument that because it is the LRA, not herself, who is responsible for the actions at issue and because the LRA must obtain approval for its actions, *Ex parte Young* does not apply. Cases analyzing and applying the doctrine established in *Ex parte Young* do not inquire into the state officer's personal actions or responsibility for the alleged violation of federal law by an agency, and, by extension, a state. *See, e.g.*, *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (holding that "the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit" against the individual commissioners of a state commission without discussing the responsibilities or authority of a commissioner). Nor has Keegan cited to any authority supporting the contention that the requirement that a state official consult with other entities before taking action negates the ability of a private party to sue that official for violations of federal law.[11]

---

[10]     In addition to the arguments described above and addressed below, Keegan contends that because Louisiana, rather than herself or the LRA, is the "real party in interest," she may invoke sovereign immunity as a bar to this suit. Keegan Mot. to Dismiss at 4. It should be clear from the Court's brief explanation of *Ex parte Young* that this contention does not have merit. Furthermore, the Supreme Court has so noted. *See Coeur D'Alene*, 521 U.S. at 269 (observing that "[w]hen suit is commenced against state officials, even if they are named and served as individuals, the State itself will have a continuing interest in the litigation whenever state policies or procedures are at stake" but continuing to follow *Ex parte Young*).

[11]     Furthermore, Keegan's underlying premise regarding her responsibilities appears to be incorrect. As HUD notes in the response it filed to Keegan's motion, the Louisiana statute

### ii.     The exception to *Ex parte Young* established in *Coeur D'Alene* does not apply.

The Court next addresses Keegan's third argument.  *Coeur D'Alene*, the case on which

Keegan relies, barred the Coeur D'Alene Tribe and some of its members from suing the State of

Idaho where they sought a declaration that the Tribe owned certain land submerged by water and

that Idaho's regulation of that land was invalid.  *Coeur D'Alene*, 521 U.S. at 265, 282.  The

Supreme Court held that these remedies would so significantly infringe on the state's "sovereign

authority and its standing in the Union" as to not properly be before a federal court.  *Id.*  The

opinion focused on the total inability to "exercis[e] . . . governmental powers" the relief the Tribe

sought would effect and discussed at length the significance of a state's control of submerged

lands and navigable waters.  *Id.* at 282, 283-88.  No such significant state interest is implicated

here.  The relief plaintiffs seek would not prevent Louisiana from acting as a sovereign over any

land, nor would it even take full control of the Road Home Program.  Because "[a]n allegation of

an ongoing violation of federal law where the requested relief is prospective is ordinarily

sufficient to invoke the *Young* fiction," *id.* at 281, and the Court finds nothing extraordinary

about the case before it, Keegan's argument fails.

### iii.    Plaintiffs' claims may go forward only insofar as they seek prospective relief.

Keegan's second argument raises more difficult questions.  Suits brought under the *Ex*

*parte Young* doctrine are only proper if they seek prospective, as opposed to retrospective, relief.

*Vann*, 534 F.3d at 750 ("In determining whether the doctrine of *Ex parte Young* avoids an

---

governing the LRA provides that the agency's Executive Director's "powers, duties, and
functions" include "[t]o discharge all operational, administrative, and executive functions of the
authority."  La. Rev. Stat. Ann. § 49:220.5(D)(2).

Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." (quoting *Verizon Md. Inc.*, 535 U.S. at 645) (internal quotation marks omitted)). A request for relief that would require payment from the state treasury, rather than that a state officer "conform [her] future conduct to the requirement of" a federal law, is barred by the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 664 (1974) (holding that an order "which requires the payment of a very substantial amount of money which . . . should have been paid, but was not" by the state to citizens eligible for a federal aid program was improper because such a retrospective award violated sovereign immunity).

It is the application of this principle of law to the facts of this case that has occupied the parties and the Court in significant part in the two motions for TROs and preliminary injunctions, the oppositions to those motions, and the Court's opinions ruling on them. Accordingly, the Court will not repeat here its understanding of how the doctrine controls under these circumstances. Based on the reasoning in the Court's Clarification and its opinions denying the first motion for a TRO and preliminary injunction and granting the second, the Court concludes that dismissal in part is warranted on this ground. The Court does not have subject-matter jurisdiction over any portion of this case seeking retroactive relief; in other words, to the extent plaintiffs seek correction of awards already distributed in accordance with an allegedly discriminatory formula, their case must be dismissed. As to any individuals who have not yet received initial awards of Option 1 grants, the case may go forward and plaintiffs may seek a permanent injunction that, like the preliminary injunction now in place, prohibits Keegan from calculating Option 1 grants based on the pre-storm value of a home.

Because each of the five individual plaintiffs has already received an Option 1 award, none have a claim over which the Court has jurisdiction. Accordingly, Burns, Dents, Ford, Jones, and Randolph may not remain parties to this case.

**2.    Count I of plaintiffs' complaint may go forward, but only as to section 3604(a).**

**i.    Keegan's argument that plaintiffs fail to state a claim under 42 U.S.C. § 3604(a) does not have merit.**

Keegan next argues that plaintiffs' FHA claim as to her should be dismissed for failure to state a claim.[12] She asserts that because Option 1 is "solely a compensation program," section 3604(a) of the FHA does not apply. Keegan Mot. to Dismiss at 20. Citing a variety of cases dismissing FHA claims, Keegan reasons that section 3604(a) of the FHA, which provides that "it shall be unlawful . . . to . . . make unavailable or deny[] a dwelling to any person because of race," 42 U.S.C. § 3604(a), applies only to situations in which a prospective homeowner or renter is unable to acquire housing.

Plaintiffs respond that Keegan is obligated by the terms of the block grant program pursuant to which the Road Home program was created to comply with the FHA. They also

---

[12]    Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint, or any portion of it, for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal citation omitted). A court considering a motion to dismiss pursuant to Rule 12(b)(6) must assume that all factual allegations in the complaint are true, even if they are doubtful. *Twombly*, 550 U.S. at 555.

assert that she agreed to comply with the FHA as a condition of receiving funds to disperse through the Road Home program. Finally, plaintiffs argue that because they allege that they have been unable to repair their homes, and in some cases have been unable to live in their homes at all, their complaint sufficiently makes out a claim under section 3604(a). They contend, relying on different cases than Keegan cites, that the provision's language prohibiting "mak[ing] unavailable or deny[ing]" housing on the basis of race should be construed broadly to encompass "any conduct that hinders access to housing on the basis of race." Pls.' Opp'n at 28.

The Court will not dismiss plaintiff's FHA claim on this ground. Section 3604(a) of the FHA provides:

> It shall be unlawful . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or *otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a) (emphasis added). The scope of the "otherwise make unavailable or deny" language is not entirely clear. Keegan asserts, and plaintiffs do not dispute, that the question raised here—whether a grant program for disaster recovery with an alleged racially discriminatory impact falls within the text's meaning—has not been addressed by any other federal court. But courts have discussed the "broad purpose of the FHA," *Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 77 (D.D.C. 2008), which is to "promote integrated housing patterns and to discourage discrimination in access to housing," *Nat'l Fair Housing Alliance v. Prudential Ins. Co.*, 208 F. Supp. 2d 46, 57 (D.D.C. 2002) (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211-12 (1972)). And the D.C. Circuit has made clear that "make unavailable" means not just preventing access to new

12

housing by prospective buyers and renters but also the loss of housing to those who already occupy it. *2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 685 (D.C. Cir. 2006) ("Telling the tenants either that their 'occupancy . . . is . . . prohibited' or that they must 'seek alternative housing' certainly qualifies as making the buildings 'unavailable' under the FHA."); *see also Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000) (holding that section 3604(a) applies to "predatory practices" in lending because those practices "can make housing unavailable by putting borrowers at risk of losing the property which secures their loans").

The cases on which Keegan relies do not persuade the Court that section 3604(a) is inapplicable here. In each opinion, the relevant Circuit Court concluded that an action farther removed from the statutory language than the one alleged here did not fall under the FHA. *See Cox v. City of Dallas, Tex.*, 430 F.3d 734, 740 (5th Cir. 2005) (concluding that a challenge to a city's placement of a dump near a residential area, which reduced the value of existing homes, "is not a claim of 'unavailability' or 'den[ial]' of housing under a proper reading of the FHA" (alteration in original)); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 192 (4th Cir. 1999) (holding that the construction of a bypass road, which would "clos[e] off expansion" of an African-American neighborhood, does not have a sufficient "causal link" to the denial of housing to state a claim under section 3604(a)); *Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1984) (holding that allegations that "the County's discriminatory refusal to properly manage the properties it owns damaged [plaintiffs'] interests in neighboring properties" do not implicate section 3604(a)). Each of these cases acknowledges the broad reach of the text of section 3604(a) to actions other than sales and

rentals that are tied to housing.  *Cox*, 430 F.3d at 741-42 & n.18 (including a string cite of

citations to cases applying section 3604(a), distinguishing the facts before it, and noting that the

court's holding "is not to say that a current owner or renter evicted or constructively evicted from

[her] house does not have a claim"); *Jersey Heights*, 174 F.3d at 192 (listing examples of

"housing-related" policies, such as "racial steering by real estate agents," that fall under section

3604(a)'s prohibition of discrimination); *Southend Neighborhood*, 743 F.2d at 1209-10 & n.3

(same, and including examples such as "mortgage 'redlining,' insurance redlining, . . . [and]

exclusionary zoning decisions").  The claim here rests not on a reduction in property values or a

limit on the growth of a residential area but on the inability of homeowners to inhabit their

houses because of a Road Home Program formula.[13]  Consequently, the Court shall not dismiss

plaintiffs' FHA claim pursuant to section 3604(a) against Keegan.

> **ii.     Plaintiffs' claims under sections 3605(a) and 3608(d), (e)(5) of the FHA may not go forward as to Keegan.**

As noted above, Count I of plaintiffs' complaint also states causes of action under 42

U.S.C. §§ 3605(a) and 3608(d), (e)(5).  These claims may not go forward against Keegan.

---

[13]      The complaint does not directly allege that homeowners who have applied for but not yet received Option 1 grants are unable to live in their homes.  But because this case is before the Court on a motion to dismiss, the Court must "accept[] as true all of the factual allegations contained in the complaint and draw[] all inferences in favor of" plaintiffs.  *City of Harper Woods Emps. Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009) (citing *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1156 (D.C. Cir. 2005)).  The Court finds that it is a reasonable inference from the devastating effects of Hurricanes Katrina and Rita, Compl. ¶ 31 ("As a result of Hurricanes Katrina and Rita, more than half a million New Orleans residents were displaced and more than 53,000 homes in New Orleans were damaged or destroyed."), and the eligibility requirements for the Road Home Program, Compl. ¶ 43 ("Eligible homeowners are those who . . . had FEMA catagorize their home as destroyed or having suffered major damage."), that many prospective Option 1 beneficiaries cannot live in their homes.

Section 3605(a) prohibits "any person or other entity whose business includes engaging in residential real estate-related transactions [from] discriminat[ing] against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race" or other enumerated categories. 42 U.S.C. § 3605(a). Keegan makes two arguments as to this provision. First, she contends that Road Home Program recipients "were allowed to use the funds . . . in any way they chose, and were not required to use the funds to rebuild or repair their homes," Keegan Mot. to Dismiss at 31, so Program awards cannot be said to be "for purchasing, constructing, improving, repairing, or maintaining a dwelling," 42 U.S.C. § 3605(b)(1)(a) (defining "residential real estate transaction"). Second, she asserts that she was not engaged in the type of financial practices contemplated by section 3605, such as providing information about or administering policies regarding loans for the purchase of homes. Plaintiffs do not respond to either of these points; their opposition to the arguments in Keegan's motion to dismiss does not mention section 3605(a) at all. Accordingly, the Court considers the arguments to be conceded. *See Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) ("It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997); *Stephenson v. Cox*, 223 F. Supp. 2d 119, 121 (D.D.C. 2002))).

Despite moving for dismissal of plaintiff's entire complaint as to her, Keegan makes no argument directly addressing section 3608, which provides in relevant part that "[a]ll executive departments and agencies shall administer their programs and activities relating to housing and urban development . . . in a manner affirmatively to further the purposes of this subchapter," 42

15

U.S.C. § 3608(d), and the Secretary of HUD shall "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter," *id.* § 3608(e)(5). The Court will nevertheless dismiss plaintiffs' claims against Keegan pursuant to this provision because Keegan, a state officer, is neither an executive department or agency nor the Secretary of HUD; therefore, these provisions do not mandate or prohibit any action by her.

    **3.**     **Count II of plaintiffs' complaint must be dismissed as against Keegan because plaintiffs cannot sue her under 42 U.S.C. § 5304(b)(2).**

Count II of plaintiffs' complaint alleges that Keegan and HUD have violated 42 U.S.C. § 5304(b)(2), a provision of the HCDA, which requires:

> Any grant under section 5306 of this title shall be made only if the grantee certifies to the satisfaction of the Secretary [of HUD] that . . . the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing.

42 U.S.C. § 5304(b)(2). Specifically, plaintiffs allege that defendants have "failed to administer the [Road Home Program] in a manner that affirmatively furthers fair housing." Compl. ¶ 77. No party disputes that the grants to Louisiana for purposes of administering the Road Home Program are subject to this provision.

Keegan has moved for dismissal of this claim as against her, however, on the ground that there is no private right of action under this provision.[14] First, she asserts that the remedies for any violation of section 5304(b)(2) are those described in the 42 U.S.C. § 5311, which provides

---

[14]     Keegan also argues that there is no basis for this cause of action because she complied with the requirements of section 5304(b)(2) by making the necessary certifications described therein. But plaintiffs do not argue that she failed to make these certifications; they argue that she failed to adhere to the promise to affirmatively further fair housing.

that the Secretary of HUD may, if a grant recipient has failed to comply with the HCDA, terminate grant payments or refer the matter to the U.S. Attorney General to initiate a civil action. Second, she contends that this Court should follow others that have held that Congress did not intend to allow private suits under the HCDA.

Plaintiffs disagree. They argue first that Congress plainly intended to allow for private rights of action under the HCDA, relying on legislative history and *Montgomery Improvement Ass'n v. HUD*, 645 F.2d 291 (5th Cir. 1981), a Fifth Circuit case permitting such a suit. Second, they argue that even if their first argument is incorrect, they may go forward with their claim under 42 U.S.C. § 1983.

The Court cannot agree with either of plaintiffs' contentions. Although "whether a statutory violation may be enforced through § 1983 'is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute,'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (quoting *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 n.9 (1990)), both "require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries," *id.* at 285. Courts have found that some provisions of the HCDA do indicate such an intent. *See Price v. City of Stockton*, 390 F.3d 1105, 1111 (9th Cir. 2004) (concluding that 42 U.S.C. § 5304(k) "evinces a clear intent to create a federal right" because it "requires that benefits be provided to particular persons displaced by federally funded redevelopment activities"); *Chan v. City of New York*, 1 F.3d 96, 104 (2d Cir. 1993) (concluding that plaintiffs could bring a section 1983 action for a violation of 42 U.S.C. § 5310, "the provision for payment of a certain minimum wage" to workers employed with funds from grants under the HCDA, because that provision "confers its principal benefit on

the wage earners," who are "clearly specified" as "laborers and mechanics").[15]  But the provision

under which plaintiffs seek to sue is distinct from those that are "phrased with an unmistakable

focus on the benefitted class."  *Gonzaga Univ.*, 536 U.S. at 284 (quoting *Cannon v. Univ. of

Chicago*, 441 U.S. 677, 692 (1979)).  It does not identify any class of people who will benefit

from the grantee's certification that it will further fair housing.  And the broad statement in the

HCDA's declaration of purpose that Congress sought, among other goals, to promote "[d]ecent

housing, suitable living environment, and economic opportunities for persons of low and

moderate income," 42 U.S.C. § 5301(c), is not specific enough to confer rights.  This conclusion

is especially correct here, where homeowners with viable claims are not low- and moderate-

income individuals; those beneficiaries of the Road Home Program are eligible for ACGs

supplementing their Option 1 grants and so are not subject to the alleged discriminatory effect of

---

[15]    Precedent is split as to 42 U.S.C. § 5309, which provides: "No person in the United States shall on the ground of race, color, national origin, religion, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under [the HCDA]." 42 U.S.C. § 5309(a).  *Compare Montgomery Improvement Ass'n*, 645 F.2d at 296 (relying on "the fact that the district court in this case found plaintiffs to be members of the class Congress intended to be especially benefitted" in "concluding that the anti-discrimination provisions of the [HCDA] permit the bringing of a private cause of action"), *with Latinos Unidos de Chelsea v. Sec'y of Hous.*, 799 F.2d 774, 794 (1st Cir. 1986) (concluding, as to a claim under 42 U.S.C. § 5309 by individuals who were allegedly discriminated against, that Title I of HCDA was not "enacted for their 'especial benefit' in the sense required for finding a private right of action"); *see also Freeman v. Fahey*, 374 F.3d 663, 665 (8th Cir. 2004) (holding that 42 U.S.C. § 5309 does not confer a private right of action because Congress did not intend to create a private remedy where other methods of enforcement exist, but not addressing whether a section 1983 action could have survived based on the intent to benefit a particular class of individuals). Because plaintiffs have not stated a claim under 42 U.S.C. § 5309, the Court need not address the question of whether they could have done so.

the Option 1 formula.[16]  Consequently, the Court will grant Keegan's request to dismiss Count II as to her.

**B.     Motion to Transfer**

Keegan moves for transfer of this case to the Middle District of Louisiana, in which Baton Rouge, the capital of Louisiana, is located, pursuant to 28 U.S.C. § 1404(a).[17]  That statute provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).[18]  To assess whether transfer pursuant to section 1404(a) is appropriate, the court will "balance a number of case-specific factors which include the private interests of the parties as well as public interests such as efficiency and fairness."  *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30 (1988)).[19]

---

[16]     Plaintiffs made explicit in a filing submitted in the course of briefing their first motion for a TRO that they now seek relief only as to "middle class African American homeowners who received grants based on pre-storm value [of their homes, rather than the cost of repair] and did not receive an Additional Compensation Grant of any amount."  Pls.' Reply to Keegan Opp'n to Pls.' First Mot. for TRO at 3.  As explained above, lower-income homeowners could receive ACGs such that their total Option 1 awards were either the amount of the cost of repair or $150,000, whichever was less, so they are no longer subject to the allegedly discriminatory practice of taking home value into account in calculating grants.

[17]     Keegan asks in the alternative that the Court transfer the case to the Eastern District of Louisiana, in which New Orleans is located.

[18]     Plaintiffs concede that this case could have been brought in the Middle District of Louisiana.

[19]     The private interest factors include: (1) plaintiff's choice of forum, (2) defendant's choice of forum, (3) whether the claim arose elsewhere, (4) convenience of the parties, (5) convenience of the witnesses, and (6) ease of access to sources of proof.  *Wilderness Soc'y*, 104 F. Supp. 2d at 12 (quoting *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16

Keegan argues that both the private and public interests weigh in favor of transferring this case. She asserts that plaintiffs' choice of forum should be afforded little deference because none of the individual plaintiffs reside in the District of Columbia. She further asserts that the claims arose in Baton Rouge, because that is where the LRA sits and where it developed and now administers the Road Home Program. Moreover, Keegan contends that the Middle District of Louisiana has a strong interest in the case, which revolves around the damage from storms that occurred in Louisiana and a program designed to assist people who live there. On the other hand, according to Keegan, the District of Columbia has no direct ties to or interest in this case.

Plaintiffs respond that their choice of forum should be given significant weight. They also note that HUD's assistance in developing and approval of the Road Home Program occurred in, and plaintiff National Fair Housing Alliance is based in, the District of Columbia. As to the public interest factors, they note that the Middle District of Louisiana has no special expertise in the legal questions this case raises. Furthermore, they contend that the District of Columbia, as the seat of the federal government, has an interest in the enforcement of federal statutes as well as adherence to those statutes by federal agencies, such as HUD.

Although several factors do weigh in favor of Keegan's request, the Court will not exercise its discretion to transfer this case. At this point, this Court is familiar with the facts and legal issues raised, and two of its opinions in this action are on appeal to the D.C. Circuit. Therefore, the interests of justice—in particular, in judicial efficiency—weigh strongly on the

---

(D.D.C. 1996)). The public interest factors include: (1) the transferee district's familiarity with the governing laws, (2) the relative congestion of both the transferor and transferee courts' calendars, and (3) the local interest in deciding local controversies at home. *Id.* (quoting *Trout Unlimited*, 944 F. Supp. at 16).

side of keeping the Court in this district.  *Cf. Navajo Nation v. Peabody Holding Co., Inc.*, 209 F. Supp. 2d 269, 280 (D.D.C. 2002) (denying a motion to transfer in part because where "th[e] case has been pending in this Court for almost three years, during which time the Court has considered and resolved a variety of potentially dispositive motions and discovery disputes," the "interests of judicial efficiency" would not have been served by transfer).  Accordingly, the Court will not grant this motion.

## III. CONCLUSION

For the foregoing reasons, it is this 7th day of September 2010 hereby

**ORDERED** that Keegan's motion to dismiss [#28] is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Keegan's motion to transfer [#28] is **DENIED**.

Henry H. Kennedy, Jr.
United States District Judge